D.A.'S COPY

*To be argued by*
**PAUL LIU**
(10 Minutes)

# NEW YORK SUPREME COURT

### APPELLATE DIVISION — SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

HAI GUANG ZHENG,

Defendant-Appellant.

**TO BE HEARD ON THE
ORIGINAL RECORD**

Queens County

Ind. No. 3282/95

A.D. No. 96-07827

## BRIEF FOR DEFENDANT-APPELLANT

**M. SUE WYCOFF**
**Attorney for Defendant-**
**Appellant**
**90 Church Street, 13th Floor**
**New York, New York 10007**
**212-577-3300**

**PAUL LIU**
*Of Counsel*

TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 5531 . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . 3

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . 4

    Introduction . . . . . . . . . . . . . . . . . . . 4

    The People Case . . . . . . . . . . . . . . . . . 5

    The Defense Case . . . . . . . . . . . . . . . . . 12

        Appellant's Motion and Requests to Charge . . 15

    The Charge, Deliberations and Verdict . . . . . . 16

    The Pre-sentence Report . . . . . . . . . . . . . 17

    The Sentencing . . . . . . . . . . . . . . . . . . 18

ARGUMENT

        POINT I
        THE TRIAL COURT'S REFUSAL TO SUBMIT
        APPELLANT'S DURESS DEFENSE TO THE JURY
        DEPRIVED HIM OF DUE PROCESS, WHERE THERE
        WAS UNCONTROVERTED EVIDENCE THAT A SMUG-
        GLER OF ILLEGAL ALIENS, WHO LIKELY HAD
        CRIMINAL TIES IN CHINA, HAD THREATENED TO
        KILL APPELLANT'S FAMILY IN CHINA IF HE
        REFUSED TO PARTICIPATE IN THE CRIME AND
        APPELLANT COULD NOT HAVE ENSURED HIS
        FAMILY'S SAFETY BY WITHDRAWING FROM THE
        CRIME OR BY CONTACTING POLICE. U.S.
        CONST., AMENDS. VI, XIV; N.Y. CONST.,
        ART. I, §6 . . . . . . . . . . . . . . . . . . 19

        POINT II
        THE 84 2/3 YEARS TO LIFE SENTENCE MUST BE
        MODIFIED BECAUSE IT SERVES NO LEGITIMATE
        PURPOSE . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 30

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,          :

               Respondent,                   :

          -against-                           :

HAI GUANG ZHENG,                              :

             Defendant-Appellant.          :

------------------------------------------X

## STATEMENT PURSUANT TO RULE 5531

1.   The indictment number in the court below was 3282/95.

2.   The full names of the original parties were people of the State of New York against Hai Guang Zheng and Qin Guang Zheng.  This appeal concerns only Hai Guang Zheng.

3.   This action was commenced in Supreme Court, Queens County.

4.   This action was commenced by the filing of an indictment.

5.   This appeal is from a judgment convicting appellant, after a jury trial, of the crimes of kidnaping in the first degree (P.L. §135.25[1],[2][c]) (four counts); rape in the first degree (P.L. §130.35[1]) (two counts); kidnaping in the second degree (P.L. §135.20); sexual abuse in the first degree (P.L. §130.65[1]) (two counts); and criminal possession of a weapon in the second degree (P.L. §265.03).

1

6. This is an appeal from a judgment of conviction rendered on August 15, 1996 (Katz, J.).

7. Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

PRELIMINARY STATEMENT

This is an appeal from a judgment of the Supreme Court, Queens County, rendered August 15, 1996, convicting appellant, after a jury trial, of the crimes of kidnaping in the first degree (P.L. §135.25[1],[2],[c])(four counts); rape in the first degree (P.L. §130.35[1])(two counts); kidnaping in the second degree (P.L. §130.20); sexual abuse in the first degree (P.L. §130.65[1])(two counts); and criminal possession of a weapon in the second degree (P.L. §265.03). Appellant was sentenced to four 25 years to life terms on each of the four first-degree kidnaping counts two each to run consecutively and concurrently for a total of 50 years to life; 8⅓ to 25 years on each of the two first-degree rape and second-degree kidnaping counts; 2⅓ to 7 years on each of two first-degree sexual abuse counts; and, 5 to 15 years on the second-degree weapon possession count, all to run consecutively with each other for a total of 84⅔ years to life (Katz, J., at trial and sentence).

Timely notice of appeal was filed and, on April 25, 1997, this Court granted appellant permission to appeal as a poor person on the original record and typewritten briefs and assigned Daniel L. Greenberg, succeeded by M. Sue Wycoff, as counsel on appeal.

No application has been made for a stay pending appeal. Appellant is currently incarcerated pursuant to the judgment being appealed. Appellant had Qin Guang Zheng as a co-

3

defendant on the indictment. Qin Guang Zheng pled guilty
prior to trial to the counts of first-degree kidnaping and two
counts of first-degree rape and was sentenced to concurrent
terms totaling 15 years to life. Upon information and belief,
his appeal is pending.

### QUESTIONS PRESENTED

1.    Whether the trial court's refusal to
submit appellant's duress defense to the
jury deprived him of due process, where
there was uncontroverted evidence that a
smuggler of illegal aliens, who likely
had criminal ties in China, had threat-
ened to kill appellant's family in China
if he refused to participate in the crime
and appellant could not have ensured his
family's safety by withdrawing from the
crime or by contacting police.    U.S.
Const., Amends. VI, XIV; N.Y. Const.,
Art. I, §6.

2.    Whether the 84 2/3 years to life
sentence must be modified because it
serves no legitimate purpose.

### STATEMENT OF FACTS

#### Introduction

Appellant was accused of first- and second-degree
kidnaping, first-degree rape and sexual abuse and weapon
possession arising from an incident in which he and two others
allegedly abducted two women and one man. The women were held
for ransom and allegedly raped. Appellant, testifying in his
own defense, acknowledged that he had been brought to this
country illegally and still owed the smuggler, a man named Ak
Guan, a large sum of money. The kidnaping was planned by Ak

4

Guan who compelled appellant to participate under threats of death to his family in China. Appellant denied that he raped or sexually abused the two women. The court denied defense counsel's request to instruct the jury on the defense of duress to the kidnaping and weapon charges. Appellant was convicted of kidnaping, rape, sexual abuse and weapon possession, and sentenced to maximum consecutive terms totaling 84 2/3 years to life.

### The People Case

During the evening of March 31, 1995, <u>Jin Hao Liu</u> went to JFK Airport in a limousine service car to meet her brother, <u>Guo Bang Liu</u>, and his wife, <u>Liu Yan Wu</u>, who were scheduled to arrive on a flight from Los Angeles between 9:00 and 10:00 p.m. (JHL: 394; GBL: 348; LYW: 450).[1] Jin Hao, her brother and his wife were leaving the terminal in the limousine service when their car was suddenly cut off and stopped by another car (JHL: 395; GBL: 349; LYW: 451).

According to Guo Bang and his wife, Liu Yan, two men came out of the other car and approached their car; Guo Bang testified that one of the men held a gun covered by a newspaper, while Liu Yan recalled that both men had guns (GBL: 349; LYW: 451). Jin Hao saw only one man get out of the other car.

---

[1]     Parenthetical numbers refer to the minutes of the trial; those preceded by "PSR" to the presentence report of the Department of Probation; and, those by "S" to the sentencing proceeding.

5

He had a gun and ordered the three to get into the car he had exited (JHL: 395).

The three got into the back seat and the car drove off. There were two men in the front seat; Jin Hao Liu identified the driver as appellant (JHL: 427). The front seat passenger demanded Guo Bang's and Liu Wan's passports and, after examining them, said something to the effect that the wrong people had been taken (GBL: 351, 385, 386; JHL: 428). Liu Yan Wu gave no testimony about the specifics of any conversation but claimed that both the driver and the passenger questioned her and her husband (LYW: 485).

The car stopped at an unspecified area near the Brooklyn Bridge; the passenger gave Guo Bang Liu a piece of paper with telephone numbers written on it and gave him one or two quarters (GBL: 386; JHL: 398). The car then drove off with Guo Bang's wife and sister still in the back seat (GBO: 386). Guo Bang took a car service to his family's apartment on Grand Street in Chinatown and then went to the 5th Precinct with one of his sisters (GBL: 353, 354).

Jin Hao and Liu Yan were driven to location that they did not recognize and brought into a basement apartment (JHL: 398; LYW: 454). The two were given food and the men looked at Liu Yan's passport (JHL: 432; LYW: 455). A third man then arrived in the apartment, after which the man who had examined the passports in the car left (JHL: 400; LWW: 455).

6

Both women spent the night in the apartment with the two men, the taller of whom Jin Hao identified as appellant (JHL: 401).[2]   Neither woman slept.   They saw that the taller man slept with a pistol near his pillow (JHL: 404; LWW: 457).

Liu Wan testified that when morning came the taller man took her into another room after touching her breasts with his hands.   She testified that he then removed her clothing and put his penis into her vagina while pointing a gun at her head (LWL: 460, 461).   Jin Hao testified that as this was occurring, the shorter man was doing the same to her in the first room (JHL: 405; 406).   The taller man then brought Liu Yan back to the first room where she was raped by the shorter man while the taller man raped Jin Hao in the next room (JHL: 407; LWW: 464).

At some point during the morning, Jin Hao gave the two men her home telephone number (JHL: 434).   The taller man left the apartment several times while the other man remained in the apartment (JHL: 434, 435; LYW: 492).   Both women saw the taller man make and receive telephone calls (JHL: 438; LYW: 460).   During the course of the day, Jin Hao spoke on the telephone to her sister (JHL: 409).   Liu Yan, at some point, heard one of the men say that they wanted $30,000 (LYW: 497).

Jin Zho Liu, the sister of Jin Hao and Guo Bang, was in her home during the evening of March 31, 1995, when her

---

[2]   Liu Yan Wu could not make an in-court identification (459).

7.

brother, Guo Bang, came into the apartment. She went to the police with her brother (JZL: 304). During the early morning of April 1, 1995, Detective Michael Greene, and Keith Ng, came to the Liu's apartment where they put recording and tracing devices on the Liu's telephone (MG: 701, 704; KN: 826). At about 12:35 p.m., Jin Zho received a telephone call from a man asking for $20,000 for each woman (JZL: 523). Ng listened to this and later conversations (KN: 867).[3] Jin Zho received "quite a few" telephone calls from the same man during which the demand went down to $7500 for each woman (ZHL: 526). Some time after 10:00 p.m., she received a call instructing her to take the money in a bag of groceries to 217 Henry Street in Manhattan (527, 535).

Detective Greene ascertained that the calls were coming from a cellular telephone and, at about 9:00 p.m., told Detective Steven Banks to survey 133-34 59th Avenue in the Flushing section of Queens County (MG: 706; SB: 726).

Shortly after midnight, Banks observed two Asian men and two Asian women walk out of a house and get into a car. Banks and his partner followed in their unmarked car for five or six blocks, until they pulled beside the car at a stop light (SB: 728).

Banks looked into the other car and saw that the two women resembled those depicted in photographs given to him by Detective Greene (729). The detectives got out of their car

---

[3]    Ng spoke Cantonese, Mandarin and Taison (826).

and arrested the two men. Banks identified appellant as the driver (SB: 730, 763).

Banks contacted Police Plaza and obtained the services of a Chinese speaking detective to translate for the two women (SB: 735). He recovered a cellular telephone from the front floor of the car and searched the two men but recovered no evidence (SB: 731, 767).

The detectives then went back to the house they had seen the men come out of and, after speaking to the landlord who lived on the first floor, went into the basement (SB: 737). There, the detectives recovered three cellular telephones and a .380 caliber pistol loaded with six bullets (SB: 735, 744).[4]

The two women were taken to Beekman Hospital in Manhattan where they were treated by Dr. Howard Kurtz (HK: 537).[5] Neither of the women had scratches or bruises. Kurtz took oral, vaginal, and rectal swabs from each woman, and put them along with the women's underwear into a vitulo kit (HK: 341). The items in the kit were examined on April 11, 1995, by Thomas Hickey, a police serologist (710). Liu Yan's underwear and the vaginal swab tested positive for the presence of semen (557, 558). There was no semen on any of the swabs taken from Jin Hao. Her underwear, however, tested positive for semen

---

[4]  Detective Kevin Streine, a ballistics expert, tested the gun and ammunition and determined that they were operable (795, 796).

[5]  Kurtz spoke to the women through a Chinese language interpreter (543).

9

(559, 560). Hickey testified that semen could be present in the vaginal canal for 72 hours and that it can remain on clothing for months or even years so as to cause a positive result during testing (563). Liu Yan had sexual intercourse with her husband during the evening of March 29, 1995, two days before the incident (LYW: 501). Jin Hao last had sexual intercourse about two months before the incident (JHL: 444).

After arresting appellant and the other man, Detective Banks and other officers brought them to One Police Plaza, where appellant was identified in a lineup by Guo Bang Liu (GBL: 356; SB: 752).[6] At about 6:15 a.m., Detective Keith Ng informed appellant of his <u>Miranda</u> rights in Chinese (KN: 830). Thereafter, appellant made a statement in Chinese, which Ng wrote down in English (KN: 832).

The statement written by Ng recounted that appellant had received a telephone call from "Yee Kong" at about 8:30 p.m. on March 31, 1995 (<u>see</u> People's 12). Yee Kong told appellant to accompany him to the airport to pick up two people coming from China and to demand $30,000 (<u>Id.</u>) He told appellant to cut off a car on a airport service road. Appellant did so, after which Ye Kong exited the car while armed with a gun. He then took two women and one man into appellant's car. Appellant got lost on the highway and was told by Yee Kong to

---

[6]    The second man, Qin Guang Zheng, pled guilty on June 25, 1996, to the counts of first-degree kidnapping and two counts of first-degree rape and was sentenced to concurrent terms totaling 15 years to life (<u>see</u> Supreme Court file).

stop near the "China Building" in Brooklyn.   There, Yee Kong ordered the man to get out.   He then told appellant to take the two women to appellant's apartment.   After arriving at the apartment, appellant discovered that they had picked up the wrong people.   He told Yee Kong this and Ye Kong told appellant to keep the two women and to ask for $30,000 from their family (Id.).   Yee Kong then gave appellant a gun and told him to watch the two women. He then left and Qin Guang came into the apartment (Id.).

The next day, appellant telephoned the family of one of the women and asked for $20,000 (Id.)   After subsequent telephone calls, the family agreed to a price of $15,000 (Id.).   Appellant kept in contact with Yee Kong.   Qin Guang told appellant that the money should be delivered to one of his friends who lived at 217 Henry Street (Id.) Appellant telephoned the family and told them to put the money into a bag of groceries and bring it to 217 Henry Street (Id.).   Qin Guang received a telephone call from his friend at Henry Street.   Appellant and Qin Guang told the two women they could leave and were driving them home in their car when arrested (Id.).

Ng never asked appellant to write his own statement in Chinese (867).   Nor did Ng first write the statement down in Chinese and have appellant read it (868).   After recording the statement in English, Ng read it back to appellant in Chinese and appellant and Ng signed the statement (832).   Ng asked

11

appellant about Yee Kong but appellant offered no information about him (872, 873). Appellant denied that he had raped the two women (869).

At the conclusion of the People's case, defense counsel moved to dismiss all counts, including the count of first-degree sexual abuse of Jin Hao Liu. With respect to this count, counsel argued that there was insufficient evidence that appellant touched Jin Hao's breast with his hand (894, 895). Jin Hao had specifically testified that the taller of the two men, who she identified as appellant, did not touch her with his hand (408). The court denied the motion in its entirety (897).

## The Defense Case

Appellant, <u>Hai Guang Zheng</u>, 27 years old, came to the United States in 1992 from Fuzhou, China (898, 899). Appellant spoke only Mandarin Chinese (899). Appellant paid $30,000 to a "snakehead" named Ak Guan to come to this country illegally.[7] He still owed Ak Guan $12,000 (899). Appellant feared Ak Guan and knew of others who also feared him (905).

On March 31, 1995, Ak Guan telephoned appellant, telling him to meet him at the airport to pick up a friend (900). Appellant drove to the airport where he met Ak Guan who got into appellant's car while saying something about his friends

---

[7]    A "snakehead" is an organizer of the passage of illegal immigrants from China to this country. <u>See United States</u> v. <u>Jiang</u>, 139 F.3d 1303, 1305 (9th Cir. 1998); <u>United States</u> v. <u>Moe</u>, 65 F.3d 245, 247 (2d Cir. 1995).

12

having gotten into another car (900). Ak Guan told appellant to follow that car (901). Appellant pulled his car next to the other car when it stopped. Ak Guan then got out while holding a pistol (901, 902). He returned to appellant's car with one man and two women and told appellant to drive away (902, 903).

Appellant could hear Ak Guan speaking to the three people while he was driving but could not recall what he said (904). At some point, Ak Guan told appellant to stop the car. He then ordered the abducted man to get out. Appellant gave the man two quarters (903, 904).

Ak Guan then directed appellant to an apartment he did not recognize. Ak Guan brought appellant and the two women into the apartment and told appellant to ask for money from the women's family (904, 905). When appellant asked Ak Guan why he should do so, Ak Guan responded that if appellant asked questions he would kill appellant's family in China and send appellant back there; he also remarked to appellant that he still owed him money (905, 931).

Ak Guan then left the apartment and another person named Qin Guan[8] came into the apartment. Qin Guan told appellant that Ak Guan had sent him to watch him and that if appellant did not do what Ak Guan wanted, Ak Guan would kill him (904, 938).

---

[8] This spelling apparently refers to the same man whose name is spelled "Qin Guang" in court file papers.

13

That night, appellant telephoned a friend who told him to call the police. Appellant responded that he was afraid to do so because Ak Guan would kill him (932). In the morning, Ak Guan telephoned appellant and expressed anger at appellant because he had not called the family (933).

Appellant telephoned the Liu family and, as directed by Ak Guan, asked for $20,000 for each woman (906). After subsequent telephone calls with Ak Guan, the amount was lowered to $15,000 (907). Appellant acknowledged that he told the Liu's not to call the police because he feared that Ak Guan would think that he had reported the incident to the police (959, 960). Appellant did not call his family in China and did not call the police (971). Appellant acknowledged that he tried to sound threatening during telephone calls to the Liu's because Qin Guan told him to do so (960, 965).

Appellant intended to free the two women when he was arrested. He never raped or sexually abused the two women (909, 914).

After the lineup, a police officer struck appellant with a steel bucket (916). Appellant thought that Detective Ng was an interpreter (974). A police officer struck appellant while he was speaking to Ng (910). Appellant told Ng that Ak Guan had tricked him into going to the airport and had compelled him to demand the ransom (975). Ng never read appellant the statement that he recorded; appellant signed it but could not read the statement written in English (913).

14

<u>Appellant's Motions and Requests to Charge</u>

At the conclusion of the case, defense counsel renewed his motion to dismiss all counts, including the sexual abuse count involving Jin Hao Liu (998). The court denied the motion but granted counsel's request to charge on the voluntariness of appellant's alleged statement (995).

Counsel then requested a charge of duress for the kidnaping and weapon possession counts, citing evidence that Ak Guan had threatened to kill appellant's family in China if he did not participate in the incident (993). The prosecutor responded that there was no evidence that the threats were capable of immediate realization (995).[9]

---

[9] The prosecutor had elicited the following during his cross-examination of appellant:

> Q: When you told him on direct examination that Ak Guan said, if you didn't do what I say, I may kill your family in China, was that accurate?
>
> A: Yes, if I didn't do as he told me, he will kill -- he will kill my family in China and send me back to China...
>
> Q: Did you interpret what he said to mean if you didn't do what he said, at a later time he would kill your family?
>
> A: Yes, he said that.
>
> Q: He also said that if you didn't do what he wanted, at a later time he would send you back to China; is that correct?

(continued...)

15

The court refused to charge duress, stating that appel-
lant was "free to go any time he wanted to," that he could have
telephoned the police, and that appellant participated in the
incident with Ak Guan because he "owed him $12,000" (996, 997,
998).

Counsel reminded the court that there was also evidence
that Ak Guan threatened to kill appellant's family in China
and there was no way for the police to protect the family
(997, 999). The court responded that appellant did not "call
the police and get the police to arrest (Ak Guan) who was very
available to be arrested. [Appellant] was part of this
kidnaping" (999). The court gave defense counsel "an excep-
tion" (998).

The Charge, Deliberations and Verdict

The court gave a charge on the voluntariness of appel-
lant's statement to Detective Ng (1067-1071) and instructed
the jury on acting in concert (1078). It submitted six counts
of kidnaping in the first degree (two counts each on the

---

[9](...continued)

> A: Yes.
>
> Q: So these were not immediate threats,
> but threats in the future if you did not
> do what he wanted, correct?
>
> (Defense Counsel): Objection, your Honor.
>
> THE COURT: Sustained. That's for the
> jury to determine (925-926).

16

theories that appellant intended to compel a ransom [P.L. §135.25(1)]; intended to sexually abuse [P.L. §135.25(2)(a)]; and, intended to terrorize [P.L. §135.25(2)(c)]); two counts of rape in the first degree; one count of kidnaping in the second degree; two counts of sexual abuse in the first degree; and, one count of criminal possession of a weapon in the second degree (1080-1121).

During deliberations, the jury requested appellant's purported statement and photographs of the lineup, the testimony of Jin Hao Liu and Liu Yan Wu regarding the rape charges, and the serological evidence (1141, 1144, 1148).[10]

The jury acquitted appellant of the two first-degree kidnaping counts on the theory that he intended to sexually abuse the complainants but convicted him of the other counts (1150, 1151, 1152).

The Pre-sentence Report

Appellant, 27 years old at the time of the incident, was born in Fuchow,[11] China, the youngest of two children from the marriage of Deeming Zheng and Yua Liang Chen (PSR. 7).

---

[10]   The jury further requested the DD-5 of Detective Greene; the court instructed the jury that it was not in evidence (1141). Detective Greene's handwritten notes of his interview with the two female complainants, which he incorporated into the DD-5, and the second page of the DD-5 were lost. The court gave the jury an adverse inference charge regarding the lost notes and page (1077).

[11]   Upon information and belief, "Fuchow" is another way to romanize the province often referred to as "Fuzhou."

17

Appellant's sibling died early in childhood (PSR. 7). Appellant had very little formal education; he left elementary school to earn money for his family by working on the family farm (PSR. 8).

In 1992, at the age of 24, appellant came to this country illegally. He paid Ak Guan[12] $18,000 and still owed him $12,000 to come to this country (PSR. 6). Appellant wished to earn money to send home to his parents (PSR. 7).

Since coming to this country, appellant had lived with eight to nine people at an address in Chinatown whose English name he did not know (PSR. 1, 7). Appellant worked in a restaurant, a sewing factory, and an automobile shop (PSR. 8). Appellant had one prior contact with the law. In 1993 he was arrested and charged with criminal trespass in Atlantic City, New Jersey. The disposition is unknown (PSR. 2, 7).

The Sentencing

The prosecutor, citing the circumstances of the incident, urged the court to impose maximum consecutive sentences totaling 84 2/3 years to life (S. 9-12).

Defense counsel noted that appellant had no prior convictions. He asked the court to take into consideration appellant's circumstances as an illegal alien who was still indebted to those who brought him to this country, while acknowledging that the court believed that appellant had no

[12]   The pre-sentence report's spelling of this individual is "Acwan" (PSR. 6).

18

duress defense (S. 15). Counsel asked that the sentences be concurrent (S. 16).

The court sentenced appellant to four 25 years to life terms on each of the four first-degree kidnaping counts two each to run consecutively and concurrently for a total of 50 years to life, 8 1/3 to 25 years on each of the two rape and one second-degree kidnaping counts, two and one-third to seven years on each of the two sexual abuse counts; and, five to fifteen years on the weapon possession counts, all to run consecutively with each other for a total of 84 2/3 years to life (S. 17, 18).

<u>POINT I</u>

> THE TRIAL COURT'S REFUSAL TO SUBMIT AP-
> PELLANT'S DURESS DEFENSE TO THE JURY
> DEPRIVED HIM OF DUE PROCESS, WHERE THERE
> WAS UNCONTROVERTED EVIDENCE THAT A SMUG-
> GLER OF ILLEGAL ALIENS, WHO LIKELY HAD
> CRIMINAL TIES IN CHINA, HAD THREATENED TO
> KILL APPELLANT'S FAMILY IN CHINA IF HE
> REFUSED TO PARTICIPATE IN THE CRIME AND
> APPELLANT COULD NOT HAVE ENSURED HIS
> FAMILY'S SAFETY BY WITHDRAWING FROM THE
> CRIME OR BY CONTACTING POLICE. U.S.
> CONST., AMENDS. VI, XIV; N.Y. CONST.,
> ART. I, §6.

Appellant, an illegal alien who spoke no English, was beholden to Ak Guan, the man to whom he had paid $18,000 and still owed $12,000 to enter this country. Not surprisingly, appellant feared Ak Guan. Thus, when Ak Guan threatened to kill appellant's parents in China unless he participated in the kidnaping, appellant knew that this threat was serious. There was no evidence that appellant could have ensured his

19

parents' safety by withdrawing from the kidnaping.  Even if appellant had contacted the police in an attempt to arrest Ak Guan, this could not have alleviated the threat to his parents who were in another country some 10,000 miles away.  Moreover, contrary to the People's contention below, Ak Guan's deadly threats were far from remote.  On the contrary, their realiza-tion was only a telephone call, fax or e-mail away.  Under such circumstances, the court's refusal to submit the re-quested duress defense to the jury violated appellant's right to due process.  U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, §6.

A trial court must instruct the jury on any claimed affirmative defense which is "supported by a reasonable view of the evidence." People v. Butts, 72 N.Y.2d 746, 750 (1988). Such a determination requires that the court view the evidence in the light must favorable to the defendant. Id.; People v. Jenkins, 214 A.D.2d 584, 585 (2d Dept. 1995).  While the defendant bears the burden of proving an affirmative defense by a preponderance of the evidence, P.L. §25.00(2), the requisite proof can be provided in whole or in part by prosecution witnesses since "a jury may accept portions of the defense or prosecution evidence or either of them." People v. Butts, supra, at 750.

The duress defense that appellant asked the court to charge is an affirmative defense codified in P.L. §40.00.  The defense excuses conduct that a predator coerced the defendant

20

into committing "by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist." The threat of force need not be explicit but must be capable of immediate realization, see People v. Jenkins, 214 A.D.2d 585; People v. Lane, 112 A.D.2d 247 (2d Dept. 1985); People v. Amato, 99 A.D.2d 495, 496 (2d Dept. 1984); People v. Tenace, 97 A.D.2d 592, 593 (3d Dept. 1985), and the belief in the impossibility of avoiding the threat must be reasonable for a person in the defendant's situation. William C. Donnino, Practice Commentary to McKinney's Cons. Laws of N.Y., Art. 40, Book 39, at p. 128; cf. United States v. Hearst, 563 F.2d 1331, 1335 n. 1 (9th Cir. 1977), cert. denied 435 U.S. 1000 (1978) (the defendant must have had "a well grounded fear of imminent death or serious injury" if she resisted).

In addition, the defense is unavailable where a defendant "intentionally or recklessly places himself in a situation in which it is probable that he will be subject to duress." P.L. §40.00(2). This subsection, which closely follows language in Model Penal Code §20.09(2), was intended to make the defense unavailable to defendants who culpably associate themselves with a criminal enterprise. Note, The Proposed Penal Law of New York, 64 Col. L. Rev. 1469, 1506-07 (1967). But a history of obedience to a criminal predator's commands does not necessarily evidence a voluntary association. Rather, the

21

relevant circumstances of the defendant must be examined. Thus, a prison inmate in People v. Tenace, supra, who considered himself the "servant or slave" of the inmate who ordered him to assault another was entitled to have duress charged. The defendant's status as a prisoner and the first inmate's violent conduct toward him raised a question of fact about the voluntariness of the relationship. Similarly, a defendant residing in an environment dominated by a criminal beyond the law's reach may be as helpless to avoid adherence to him as the prison inmate in Tenace was. See People v. Jenkins, 214 A.D.2d 585 (evidence that older criminal predator exploited defendant, his youthful cohort, to insulate himself from criminal liability and had critically wounded defendant three years before incident); see also Director of Public Prosecutions v. Lynch, [1975] 2 W.L.R. 641 (House of Lords holds that duress could be interposed by a Belfast resident who claimed that he had no choice but to aid an IRA assassination team).

Here, when viewed in the light most favorable to appellant, as it must be (People v. Butts, 72 N.Y.2d 750; People v. Jenkins, 214 A.D.2d 585) the evidence indisputably established the requirements of the duress defense. Ak Guan's deadly threats to appellant's parents and appellant's circumstances as an illegal alien showed that he neither could have reasonably resisted Ak Guan nor ensured the safety of his parents by withdrawing from the kidnaping.

There was uncontroverted testimony that Ak Guan told appellant that he would kill appellant's parents in China if appellant did not participate in the kidnaping. The trial assistant never even tried to contend that these threats were not made. Rather, he tried to elicit that appellant did not believe that these threats were capable of immediate realization (925-926). The court quite properly sustained defense counsel's objection, commenting that whether the threats were capable of immediate realization was "for the jury to determine" (926).

Contrary to the trial assistant's implication, Ak Guan's threats to kill appellant's parents were only a telephone call, facsimile or e-mail transmission away. Ak Guan was a "snakehead" (899), or an organizer of the illegal passage of immigrants from China to this country. See United States v. Jiang, 139 F.3d 1303, 1305 (9th Cir. 1998); United States v. Moe, 65 F.3d 245, 247 (2d Cir. 1995). Such organizers are part of criminal networks encompassing areas of operation in both China and in this and other countries. See Changle Journal; With Eye on Dollar, Chinese are Blind to Danger, New York Times 10/21/95, p. two, cl. one. Appellant undoubtedly knew that Ak Guan almost certainly had contacts in Fuzhou Province[13] China who could immediately carry out his threats

---

[13] The smuggling of illegal immigrants to this country and its attendant criminal organizations is particularly common in Fuzhou Province from which appellant himself was smuggled into this country by Ak Guan. See Changle Journal; With Eye on
(continued...)

23

to appellant's family. Indeed, associates of snakehead organizations apparently operate with impunity and inspire tremendous fear among residents in Fuzhou Province. See Brutal End to an Immigrant's Voyage of Hope, New York Times, 10/3/95, p. one, col. two. Ak Guan's status as a snakehead strongly suggested that he had associates in Fuzhou Province; his threat to have appellant's parents killed was thus neither idle nor remote. The court quite properly commented that it was a jury question whether these threats were capable of immediate realization (926).

Given this comment, the court apparently did not deny appellant's request for a duress charge on the basis that the threats were incapable of immediate realization. Rather, in denying appellant's request, the court commented that appellant owed money to Ak Guan, was "free to go" when he wanted, and that he could have had Ak Guan arrested (996, 997, 998; 999).

In denying the request to charge on this basis, the court usurped the jury's function. When viewed in the light most favorable to appellant, there was a reasonable basis to create a jury question as to whether appellant could have rendered the threat incapable of immediate realization.

First, Qin Guan was with appellant almost continuously after Ak Guan left the apartment. Qin Guan not only relayed

_____

[13](...continued)
Dollar, Chinese Are Blind to Danger, New York Times, 10/21/93, p. two, col. one.

24

Ak Guan's threat to kill appellant if he did not participate
in the kidnaping but also told appellant that Ak Guan had sent
him to watch over appellant (904, 938). There was thus a
basis for the jury to conclude that any attempt by appellant
to disobey Ak Guan or to seek to have him arrested would be
relayed to Ak Guan who would then cause his threat against
appellant's parents to be carried out. When viewed in the
light must favorable to appellant, there was nothing he could
have done to render Ak Guan's threat incapable of immediate
realization except by obeying Ak Guan. Even if he had tried
to enlist the help of the police, there was little they could
have done to protect appellant's parents who were in another
country 10,000 miles away and in an area where associates of
Ak Guan and other snakeheads operated openly.

Nor can it be said as a matter of law that appellant
intentionally or recklessly put himself into a situation where
he and his parents would be subjected to Ak Guan's threats.
Appellant was an illegal immigrant beholden to Ak Guan who
brought him to this country and to whom he owed $12,000.
There was no evidence that appellant had family or other
support in this country. He spoke no English. Thus, appel-
lant was isolated and had no more control over where he could
live or who he could associate with than the inmate had in
People v. Tenace, 97 A.D.2d 592.

Moreover, appellant testified that he did not realize
that he was participating in a kidnaping until he arrived in

25

the basement apartment. While his statement recorded by Detective Ng did not mention the claims of coercion and trickery, appellant testified that he was physically abused by the police before he spoke to Ng and that the statement, written in English, was never read to him in Chinese, and that it did not reflect what he had actually told Ng.

Of course, the jury was not required to credit appellant's testimony and could have rejected the duress defense. That decision, however, should have been the jury's not the court's. Accordingly, the court committed reversible error when it refused defense counsel's request to charge the affirmative defense of duress for the kidnaping and weapon possession counts. See People v. Butts, 72 N.Y.2d at 750; People v. Jenkins, 214 A.D.2d 583. Appellant's convictions on these counts must therefore be reversed and a new trial ordered.

In addition, appellant's rape and sexual abuse convictions must be reversed and remanded for a new trial as well. These counts were factually related to the kidnaping counts. Had the jury been instructed on the duress defense, its verdict on the rape and sexual abuse counts may well have been different. If the jury had been properly instructed and concluded that appellant's participation in the kidnaping was excused because he acted under duress, it may well have also credited his claim that he neither raped nor sexually abused the two female complainants. The sexual abuse counts were not

26

supported by any physical evidence and the serological evidence did not exclude the possibility that the semen specimens were from prior acts of consensual intercourse testified to by both women. Because the jury was never allowed to consider the duress defense, its guilty vote on the kidnaping and weapon counts might well have influenced its vote on the rape and sexual abuse counts. Accordingly, all of appellant's convictions must be reversed and a new trial ordered. People v. Kelly, 76 N.Y.2d 1013, 1015 (1991); People v. Cohen, 50 N.Y.2d 908, 911 (1980).[14]

## POINT II

THE 84 2/3 YEARS TO LIFE SENTENCE MUST BE
MODIFIED BECAUSE IT SERVES NO LEGITIMATE
PURPOSE.

Appellant, a first-time felony offender, could have received sentences ranging from 15 years to life to 25 years to life to run concurrently with each other. See P.L.

---

[14] The sexual abuse in the first degree count involving the complainant Jin Hao Liu must be dismissed. The court charged the jury, in accordance with the indictment, that it must find that appellant touched Liu's breasts with his hand (1120). Liu specifically testified that the tall man, whom she identified as appellant, did not touch her with his hands (408). Defense counsel moved to dismiss this count on the ground that there was insufficient evidence that appellant had touched Liu's breast with his hand (894, 895). Since the People failed to object to the court's instructions, or otherwise move to amend the count, they were bound to prove that appellant committed the acts as charged. See People v. Malagon, 50 N.Y.2d 954, 956 (1980); People v. Bell, 48 N.Y.2d 913 (1979); People v. Saporita, 132 A.D.2d 713 (2d Dept. 1987) app. den. 70 N.Y.2d 957 (1987). Because there was no evidence that appellant touched Liu's breast with his hand, this count must be dismissed.

§§70.00(3)(a)(1); 70.25(1). Instead, the court sentenced appellant to maximum consecutive terms totaling 84 2/3 years to life. Such a sentence, tantamount to life without parole, ignores appellant's rehabilitative needs and is unnecessary to serve any valid penalogical function. Accordingly, appellant's sentences should be modified to no more than 15 years to life to run concurrently with each other.

In determining an appropriate punishment, a court should consider the nature of the crime, the particular circumstances of the offender, and the purposes of the penal sanction -- rehabilitation, retribution, deterrence and isolation. People v. Farrar, 52 N.Y.2d 302, 305 (1981); People v. Martinez, 124 505 (1st Dept. 1986). Moreover, in weighing these factors, the court must also be guided by the overriding principle that it is the minimum amount of imprisonment, consistent with the public's protection, the offense's gravity, and the defendant's rehabilitative needs, which should be imposed. People v. Notey, 72 A.D.2d 279, 282-83 (2d Dept. 1980).

Here, the 84 2/3 years to life term meted out by the court was unnecessary to protect the public and utterly ignored appellant's rehabilitative needs. While lengthy sentences are authorized for the crimes of which appellant was convicted, incarceration for life with no hope for parole should not be allowed to stand. The chance of violent recidivism can only decrease with advancing age until it is practically non-existent for mature inmates. Moreover, a

28

sentence amounting to life without parole, obviously, takes away any discretion of the Parole Board to determine when the goals of incarceration have been fulfilled. If, for example, appellant is fit to leave prison at the end of 15 years, the Parole Board should be allowed to make such a determination. The Board would still have the option of detaining appellant indefinitely if his release is deemed inappropriate. Appellant's sentences of 84 2/3 years to life thus serve neither society's nor appellant's interests.

Appellant, 27 years old at the time of the incident, had only one minimal brush with the law in his three years in this country. There is no indication that he was involved in criminal activities in his native China. Rather, appellant, like countless others from Fuzhou Province,[15] came to this country in the naive hope of earning enough money to pay off the crushing debt owed to the criminal predators who brought him here and to send money home to his family. What appellant found instead was a threadbare, isolated existence in over-crowded apartments, low-paying jobs and domination by Ak Guan, the snakehead to whom he was beholden. While appellant's circumstances do not excuse the acts of which he was con-victed, they may go far in explaining how a person from an unremarkable background could have become involved in serious crime.

---

[15]   See Changle Journal; with Eye on Dollar Chinese are Blind to Danger, New York Times, 10/21/95, p. two, cl. one.

29

In sum, what is warranted in this case are lesser sentences which adequately convey their punitive and deterrent message, yet provides for the possibility that appellant will be rehabilitated. This objective would be met by the mandated minimum term of 15 years to life, which surely cannot be considered a light sentence as reflected in the People's acceptance of such a sentence for Qin Guang Zheng, the other man in the apartment. In order to reduce appellant's sentences, this Court need not find that the lower court abused its discretion, but may exercise its own broad plenary power to modify sentences which are unduly excessive. <u>People</u> v. <u>Delgado</u>, 80 N.Y.2d 780, 782 (1992). Accordingly, appellant's sentences should be modified so that they total no more than 15 years to life.

CONCLUSION

FOR THE REASONS STATED IN POINT I, APPEL-
LANT'S CONVICTIONS MUST BE REVERSED AND A
NEW TRIAL ORDERED; ALTERNATIVELY, FOR THE
REASONS STATED IN POINT II, APPELLANT'S
SENTENCES MUST BE REDUCED.

Respectfully submitted,


M. SUE WYCOFF
Attorney for Defendant-
Appellant


PAUL LIU
 Of Counsel
July, 1999

30

NOT FOR PUBLIC
INSPECTION
CIVIL RIGHTS LAW §50-b

*To be argued by*
JOAN YANG
(TIME REQUESTED: 10 MINUTES)

**FILE COPY**

# New York Supreme Court

## Appellate Division--Second Department

AD No. 96-07827

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*against*

HAI GUANG ZHENG,

*Defendant-Appellant.*

## BRIEF FOR RESPONDENT

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York 11415
(718) 286-6644

JOHN M. CASTELLANO
SHARON Y. BRODT
JOAN YANG
Assistant District Attorneys
*Of Counsel*

SEPTEMBER 17, 1999

Queens County
Indictment Number 3282/95

## TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . .  1

FACTUAL AND LEGAL BACKGROUND  . . . . . . . . . . . . .  2

POINT ONE

      THE  TRIAL  COURT  CORRECTLY  REFUSED  TO
      CHARGE THE DEFENSE OF DURESS  . . . . . . . . .  7

POINT TWO

      THE  SENTENCING COURT PROPERLY EXERCISED
      ITS  DISCRETION  IN  IMPOSING  THE  MAXIMUM
      TERM FOR DEFENDANT'S CRIMES . . . . . . . . . . 18

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . 21

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
-------------------------------------------- x

THE PEOPLE OF THE STATE OF NEW YORK,                :

                 Respondent,              :

           -against-                    :

HAI GUANG ZHENG,                                    :

           Defendant-Appellant.   :

-------------------------------------------- x

### BRIEF FOR RESPONDENT

### PRELIMINARY STATEMENT

Defendant Hai Guang Zheng appeals from a judgment of the Supreme Court, Queens County (Katz, J.).   By that judgment, defendant was convicted, after a jury trial, of four counts of Kidnapping in the First Degree (Penal Law § 135.25[1], [2][c]); two counts of Rape in the First Degree (Penal Law § 135.36 [1]); one count of Kidnapping in the Second Degree (Penal Law § 135.20); two counts of Sexual Abuse in the First Degree (Penal Law § 130.65[1]); and one count of Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03).   Defendant was sentenced to four indeterminate terms of twenty-five to life for the first degree kidnapping counts, of which two terms were to be served consecutively to the other two.   Defendant was also sentenced to indeterminate prison terms of from eight and one-third to twenty-five years on each of the rape convictions, and eight and one-third to twenty-five years on the second-degree kidnapping conviction. Defendant was also sentenced to indeterminate prison terms of

from two and one-third to seven years incarceration for each of the sexual abuse counts, and from five to fifteen years on the weapons conviction. These sentences were each to run consecutively to each other, and to the sentences on the first degree kidnapping counts. Defendant is currently incarcerated pursuant to this judgment of conviction.

## FACTUAL AND LEGAL BACKGROUND[1]

In the evening of March 31, 1995, Jin Hao Liu went to the airport to meet her brother, Guo Bang Liu, and his wife, Liu Yan Wu. After meeting at the airport, the three got into a car-service automobile to leave the airport. Shortly after entering the car-service automobile, the victims' car was cut off by the car being driven by defendant. A second man, known as Ak Guan,[2] was in defendant's car in the passenger seat.

After defendant stopped the victims' car, Ak Guan and defendant got out, went to the victims' car and, at gunpoint, ordered the victims to leave their car and get into the back seat of defendant's car. Ak Guan ordered the victims to produce their passports. After examining the passports, Ak Guan stated that the wrong people had been taken.

---

[1] The facts of the crime are briefly summarized in this section. References to the record appear in the points of argument where relevant to the legal issues before this Court.

[2] This man is also known as Yee Kong in defendant's written statement to the police, and Acwan in the pre-sentence report from the Department of Probation.

2

As a result, defendant stopped the car near the Brooklyn Bridge, and gave the man, Guo Bang Liu, one or two quarters and a piece of paper with telephone numbers written on it. Guo Bang Liu was then ordered to get out of the car, leaving his wife and sister with defendant and Ak Guan. Guo Bang Liu found a car to take him to his family's home in Chinatown. After he returned home, Guo Bang Liu went with one of his sisters to the 5th Precinct to report the kidnapping.

In the meantime, defendant and Ak Guan took Jin Hao Liu and Liu Yan Wu to a basement apartment in an unknown location. After some time, a third man, Qin Guang Zheng, arrived at the apartment. Shortly after co-defendant Zheng's arrival, Ak Guan left. The two women were forced to spend the night in the apartment with defendant and co-defendant Zheng. Defendant was in possession of a pistol, which he kept by his pillow when he slept. Neither woman was able to sleep.

The next morning, defendant took Liu Yan Wu into a separate room and began touching her breasts with his hands. He removed her clothing and put his penis into her vagina while holding a gun to her head. Defendant then brought Liu Yan Wu back into the first room and took Jin Hao Liu into the other room and raped her. Co-defendant Zheng also raped both women.

Jin Hao Liu was asked for her phone number, which she wrote down for her captors. After receiving the telephone number, defendant left the apartment several times. Defendant

3

also made and received several telephone calls in the presence of the women. At one point, Jin Hao Liu was permitted to speak with her family over the phone. She asked her family to give the kidnappers the money.

On April 1, 1995, Jin Hao and Guo Bang Liu's sister, Emily Liu, received a call demanding $20,000 for the return of each woman. Emily Liu received several more calls from the same man, which were monitored by the police, during which the demands ultimately went down to $7,500.00 for the return of each woman. Emily Liu was told to bring the money in a bag of groceries to a location in Chinatown.

The police determined that the ransom calls were being made from a cellular phone in the vicinity of 133-34 59th Avenue, in the Flushing area of Queens. At approximately 12:05 a.m., on April 2, 1995, defendant and co-defendant Zheng were stopped in that area by the police with the two female victims in their car. A cellular phone was recovered from the front seat of the car.

Later, a search was made of the basement apartment where the two female victims had been held. There, detectives recovered three more cellular telephones, and a loaded gun.

The victims were taken to a hospital where rape kits were prepared. Tests revealed the presence of semen in Liu Yan Wu's vagina and on her panties. Semen was also found on Jin Hao Liu's underwear.

Guo Bang Liu identified defendant in a line-up. In addition, defendant made a statement to the police corroborating the victim's accounts of what had happened at the airport, and admitted that he was the person who had called making the ransom demands. Defendant denied raping the two female victims.

Defendant and co-defendant Qin Guan Zheng were subsequently charged with eight counts of Kidnapping in the First Degree, four counts of Rape in the First Degree, one count of Kidnapping in the Second Degree, eight counts of Sexual Abuse in the First Degree, and one count of Criminal Possession of a Weapon in the Second Degree (Queens County Indictment Number 3282/95).[3]

Defendant proceeded to trial before Justice Katz and a jury. The jury convicted defendant of four counts of Kidnapping in the First Degree, two counts of Rape in the First Degree, one count of Kidnapping in the Second Degree, two counts of Sexual Abuse in the First Degree, and one count of Criminal Possession of a Weapon in the Second Degree. On August 15, 1996, defendant was sentenced as noted above.

---

[3]On June 25, 1996, co-defendant Qin Guang Zheng pled guilty to two counts of first degree rape (Penal Law § 130.35 [1]), and two counts of first degree kidnapping (Penal Law § 130.25[1]). Co-defendant Zheng was sentenced to concurrent indeterminate prison terms of from eight and one-third to twenty-five years for each of the rape counts and from fifteen years to life on each of the kidnapping counts. These prison terms were each to run concurrently with one another.

Defendant now appeals his conviction on the grounds that the trial court erred by refusing to charge the jury on the defense of duress.  But defendant failed to show that he was entitled to the charge because he failed to show that he engaged in the kidnappings because he was coerced into doing so, that the threats used to coerce him were capable of immediate realization, and that he had not placed himself into the situation that allegedly created the duress.  Defendant also argues that his sentence was excessive.  But, defendant's violent and depraved acts merited the maximum sentence.

## POINT ONE

### THE TRIAL COURT CORRECTLY REFUSED TO CHARGE THE DEFENSE OF DURESS (Responding to Defendant's Brief, Point One).

The trial court correctly denied defendant's request for a charge on duress.  The trial evidence, viewed in the light most favorable to defendant, revealed that defendant had the freedom to come and leave the premises as he chose, and the ability to make telephone calls as he pleased.  The evidence also showed that any threats to which defendant might have been exposed -- which were the basis of his claims of duress -- were incapable of being immediately executed.  Additionally, defendant had intentionally placed himself in the situation that he argued subjected him to the duress.  Thus, defendant failed to show that he was entitled to the charge.

After the close of the People's case, defendant testified on his own behalf.  Defendant testified that he had come to the United States illegally with the help of the "snakehead" Ak Guan (Defendant: 899, 900).[4]  Defendant told the jury the cost of being smuggled into the country was $30,000.  He noted that he had paid $18,000, but still owed $12,000 to Ak Guan, who was also in the United States (Defendant: 899-900).  On March 31, 1995, Ak Guan called defendant and asked defendant to pick up Ak Guan's friend at

---

[4]Page references preceded by a witness's name or by "Proceedings" are to the minutes of defendant's trial.

7

the airport (Defendant: 900). After defendant met Ak Guan at the airport, Ak Guan told defendant that his "friends" had gotten into someone else's car. Ak Guan asked defendant to stop the car with his "friends," and got out of defendant's car and went to check on the "friends." Defendant joined Ak Guan at the "friend's" car (Defendant: 901). Defendant stated that he did not have a gun, but that Ak Guan did have a gun (Defendant: 902). Defendant claimed that after defendant had driven for some time, Ak Guan told the male "friend" to get out of the car. Defendant gave the man two quarters (Defendant: 903). Finally, defendant drove to a location specified by Ak Guan (Defendant: 904). Ak Guan told defendant to ask for money for the two female "friends." Defendant claimed that he answered that he did not agree with Ak Guan's plan, at which point Ak Guan responded, "If you don't agree I will kill your family members in China." Defendant also claimed that Ak Guan also stated that defendant still owed money and threatened to send defendant back to China (Defendant: 905).

Defendant stated that Ak Guan spoke in a very rough manner and that co-defendant Zheng was also afraid of Ak Guan (Defendant: 905). The ransom money was to be taken to a location determined by Ak Guan (Defendant: 909). Defendant denied raping the victims (Defendant: 911, 916). But defendant did admit to kidnapping them and holding them for several days (Defendant: 917). Defendant stated that he

8

understood Ak Guan's threats to mean that he would kill defendant's family at a later time and that he would send defendant back to China at a later time (Defendant: 925-26). Defendant was free to call his friends, and one friend he called advised him to call the police, but defendant declined out of fear (Defendant: 932, 942). Defendant claimed to be afraid of the police because, if the police became involved, Ak Guan would believe that defendant had gotten them involved (Defendant: 960). Defendant also testified that co-defendant Zheng told defendant that if defendant did not cooperate, Ak Guan would kill defendant (Defendant: 938).

Defendant acknowledged that he made all the calls regarding the ransom (Defendant: 943). Defendant threatened the victims' sister, saying that if the police appeared after the money drop off, "bad things would happen" (Defendant: 959). Defendant tried to scare the woman on the telephone into giving money (Defendant: 964). Defendant tried to sound threatening over the phone, and threatened to kill the women (Defendant: 965). Defendant was able to leave the apartment by himself and make calls, without co-defendant Zheng knowing about it (Defendant: 966-67). Co-defendant Zheng never held a gun to defendant or even showed defendant a gun (Defendant: 969). Defendant never called his parents from the time of the kidnapping to the time of his arrest (Defendant: 971). Defendant had the keys to the car, and to the apartment where the women were being kept (Defendant: 972).

9

In determining whether to submit the affirmative defense of duress to the jury, defendant has the burden of establishing such defense by a preponderance of the evidence. Penal Law § 25.00(2). In determining if an affirmative defense, such as duress, should have been charged to the jury, the evidence must be viewed in the light most favorable to the defendant. People v. Padgett, 60 N.Y.2d 142 (1983). But a defense need not be charged if no reasonable view of the evidence establishes the basic elements of the defense. People v. Watts, 57 N.Y.2d 299, 310 (1982). The jury must be instructed on all claimed defenses that are supported by a reasonable view of the evidence -- but not those defenses which would only be supported by an artificial or irrational view of the evidence. People v. Butts, 72 N.Y.2d 746, 750 (1988).

In order to show that he is entitled to a charge on the affirmative defense of duress, the defendant must first show that he engaged in the illegal activity because he was coerced into doing so by the use or threatened immediate use of unlawful force upon him or a third party. Penal Law § 40.00(1). Duress in this context means immediate physical force, or immediate threat of force. Duress may not be used as a defense when the force or threat is incapable of immediate exercise of realization. People v. Brown, 68 A.D.2d 503 (2d Dept. 1979). Post-crime threats and force are irrelevant to duress as a matter of law, and prior threats and

assaults may support a claim of duress at the time of the crime, but only when combined with a present and immediate compulsion.   People v. Staffieri, 251 A.D.2d 998 (4th Dept. 1998).

Here, even when viewing the evidence in the light most favorable to defendant, defendant failed to show that he was coerced by Ak Guan into kidnapping the victims. Defendant was unable to show by a preponderance of the evidence that he was the victim of threats which were capable of immediate exercise.   Defendant himself admitted that he believed the threats were of such a nature that they would be executed at some later time (Defendant: 925-26).   Moreover, while defendant stated that he was concerned for the safety of his family in China, he himself admitted that the person who had made the threats was himself also in the United States and therefore not in a position to execute any threats in any immediate manner (Defendant: 899-900). Thus, defendant failed to establish the first element of the affirmative defense of duress: that the threats were threats of imminent force or execution.

Defendant attempts to argue that Ak Guan's threats were capable of immediate execution.   He argues that their "realization was only a telephone call, fax or e-mail away" (Defendant's Brief at 20, 23).   This argument is both unpreserved and without merit.   As an initial matter, defendant's argument is wholly unpreserved as defendant failed

to present this argument to the trial court.   C.P.L. §
470.05(2).   Moreover, defendant's argument also fails on the
merits.   Defendant, in his argument, misinterprets the type of
"immediacy" contemplated by the statute.   Section 40.00 (1) of
the Penal Law does not require that the <u>threat</u> be immediate,
but that the <u>force</u> be immediate.   In other words, Ak Guan's
ability to transmit his threat immediately to China is
irrelevant if there was no manner for him to execute the
threat.   In this case, there was no evidence put forth that Ak
Guan had associates in China who were capable of receiving the
"telephone call, fax or e-mail," let alone associates capable
of exercising the necessary immediate force on defendant's
family which would justify the court presenting the jury with
a charge on the affirmative defense of duress.   There was in
fact no evidence that anyone was, in fact, holding defendant's ·
family and awaiting a call from Ak Guan to execute them.[5]

Moreover, even if this Court were to interpret Ak
Guan's threats as capable of immediate execution, defendant
must also establish the second element of duress -- that the
force threatened reached a certain compelling level.   Section
40.00(1) of the Penal Law requires that a defendant wishing to
avail himself of this affirmative defense must show by a
preponderance of the evidence that the force or threatened

--------

[5]This argument is especially weak in light of defendant's
own admission, noted above, that defendant himself believed
that the threats to his family were of such a nature that they
would be executed at some later time (Zheng: 925-26).

force to which he was subjected to was of such a nature that a person of reasonable firmness in his situation would have been unable to resist.

Once again, even viewing the evidence in the light most favorable to defendant, he has failed to meet this prong of the statute. Defendant himself was unable to point to any acts performed by Ak Guan that would have caused defendant to fear him. In fact, when asked by his own attorney if defendant had ever seen what Ak Guan had done to other people who disobeyed him, defendant responded that Ak Guan had spoken "in very rough manner" (Defendant: 905). This is hardly the type of force that a person of reasonable firmness would have been unable to resist. In fact, it does not appear that defendant was placed in the type of situation where he was coerced in any way. Defendant admitted that he was free to come and go as he pleased from the apartment where he was holding the victims captive (Defendant: 966-67). He was also able to make calls as he pleased (Defendant: 932, 942, 966-67). In fact, while he could have called his family in China to determine the status of their safety, he did not (Defendant: 971).

Even assuming, which the Court should not, that defendant was able to meet the statutory criteria for the defense of duress, defendant would fall within the exception codified in Section 40.00(2). The Legislature has determined that the defense of duress should not be made available to

13

anyone who intentionally or recklessly places himself in a situation in which it is probable that he will be subject to duress.

Defendant's situation places him squarely within this exception. Defendant admitted that he had agreed to pay Ak Guan to smuggle him into this country illegally. Defendant also admitted that he had not paid off his debt to Ak Guan, a man who obviously operated outside the law (Defendant: 899-900). Defendant now comes to the Court to complain that he was forced to commit the crimes of which he has been convicted. This argument is without merit. Defendant voluntarily went to a "snakehead," a man who he knew to operate outside the law. Defendant agreed to pay this man an exorbitant amount of money to help him break the law, and sneak into the United States. Defendant agreed to pay that large amount, even though he knew he was not capable of re-paying the entire sum. Having failed to provide for repayment of the debt, defendant place himself under the power of Ak Guan, and cannot argue that he was not cognizant of the implications of placing himself in the power of a man he himself characterized as a "snakehead."

Similarly, defendant was aware of the implications of attempting to come into the United States illegally. Defendant was not forced to come to the United States, he was not forced to associate himself with a "snakehead," and he was not forced to incur such a huge financial debt to a person who

he knew operated in illegal enterprises.    Even crediting defendant's own version of events, defendant knowingly or recklessly placed himself into this situation where it was probable that he would be subject to pressure from Ak Guan. Defendant cannot argue that he did not place himself into this situation when he was aware that he owed Ak Guan a large sum of money, had no means of repaying the money, had no plans on how to repay the money, and knew that Ak Guan would be able to hold the debt over him.   Thus, defendant was not entitled to have the jury hear an instruction on the affirmative defense of duress.

In any event, even if the trial court had given the jury the requested charge, there is no reasonable possibility that the jury would have acquitted defendant.    People v. Holman, 172 A.D.2d 245 (1st Dept. 1991), aff'd, 79 N.Y.2d 986 (1992).   Defendant, who was arrested while driving a car with co-defendant Zheng and the two victims, was identified by all three kidnapping victims as one of the men who had abducted them (Guo Bang Liu: 356; Jin Hao Liu: 401; Liu Yan Wu: 468-471; Banks: 730).   Defendant was further identified by the two female kidnapping victims as one of the two men who had raped them (Jin Hao Liu: 407-08; Liu Yan Wu: 457-461).

Defendant confessed that he had been the driver of the car that stopped the victims, that he had held the women for ransom, that he had made threatening calls demanding money for the safe return of the two women, that he had keys to the

15

apartment where the women were being held and keys to the car, and that he owed the "snakehead" with whom he had kidnapped the victims $12,000 (Defendant: 899-901, 917, 943, 972). In addition, the women testified that defendant had possession of a gun during the time he held them (Jin Hao Liu: 404-05; Liu Yan Wu: 461). The loaded gun and three cell phones were recovered from the apartment where defendant had held the women (Banks: 737). Defendant also had a cell phone with him when he was arrested (Banks: 731).

Finally, defendant raped both of these women. The rapes of both female victims makes defendant's argument that he was forced into committing the kidnappings incredible on its face. Defendant's representation of himself as a man who unwillingly participated in a kidnapping is completely belied by the fact that he took the first opportunity available to commit further heinous acts against these victims. Thus, in light of the overwhelming evidence of defendant's guilt, even if it had been error for the trial court to fail to instruct the jury regarding the defense of duress, there is no reasonable possibility that the jury would have acquitted defendant.[6]

---

[6]Defendant acknowledges that the defense of duress was relevant only to the kidnapping and weapons charges. Defendant's argument that the rape convictions should be reversed because the verdict might have been different had the jury been instructed on duress is ludicrous. In light of the fact that the jury believed the victim's account of the rapes, there is no reasonable possibility that the jury would even have believed that defendant was acting under duress.

16

In sum, defendant's claim that he was entitled to a
jury charge on the affirmative defense of duress is without
merit.  Defendant failed to show that any threats were capable
of immediate execution.  Defendant also failed to show that
the threats were of such a nature that a person of reasonable
firmness would have felt compelled to obey.  Moreover, the
affirmative defense of duress was not available to defendant,
as he had intentionally or recklessly placed himself in the
situation.  Finally, any error was harmless as there was no
reasonable probability that the jury would have acquitted
defendant if given the requested charge.  As a result,
defendant's claim should be rejected.

## POINT TWO

**THE SENTENCING COURT PROPERLY EXERCISED ITS DISCRETION IN IMPOSING THE MAXIMUM TERM FOR DEFENDANT'S CRIMES (Responding to Defendant's Brief, Point Two).**

Defendant kidnapped three people from the airport and, even after it was determined that the wrong people had been kidnapped, defendant continued to hold the two female victims for ransom.   In addition to holding the women for ransom, defendant raped both women, holding a gun to one victim's head while he raped her.   These violent and depraved acts merited the maximum sentence.

Although sentencing is primarily a function of the trial court (People v. Felix, 58 N.Y.2d 156, 161 [1983]), this Court may modify the sentence "as a matter of discretion in the interest of justice." C.P.L. § 470.15 (3).   In order to exercise this power, however, the Court must determine not only that the sentence imposed was harsh and excessive, but also that there is some demonstrated "need to impose a different view of discretion than that of the sentencing Judge." People v. Suitte, 90 A.D.2d 80, 86 (2d Dept. 1982). Such a need will generally arise only if, pursuant to the statutory mandate that governs invocation of this Court's interest of justice jurisdiction, the sentence imposed was "unduly" harsh and excessive.   C.P.L. § 470.15(6)(b); People v. Thompson, 60 N.Y.2d 513, 519 (1983).   Here, defendant's sentence was not harsh and excessive -- and certainly was not

18

"unduly" so -- and there is thus no need for this Court to substitute its discretion for that of the court below.

Based on the trial evidence, defendant did not receive an unduly harsh or severe sentence. The evidence at trial showed that defendant had kidnapped three unsuspecting and innocent people at the airport at gunpoint. Even upon learning that the people he had kidnapped were not in fact the intended victims, defendant did not release them, but instead, acting in concert with others, decided to hold the two female victims. Not satisfied with simply holding the two innocent women at gunpoint, defendant raped both of his kidnap victims during the two days he held them against their will. Defendant's deeds were truly heinous and he deserved the maximum punishment available at law.

Before imposing defendant's sentence, the court noted the factors that it had considered. Specifically, it stated that this was a horrendous situation where defendant had agreed to participate in a kidnapping for which he showed no remorse (Sentencing: 16-17). The court noted that the crime would have lasting effects on the victims, who were not even the people defendant had intended to kidnap (Sentencing: 17). The court concluded that the sentence was appropriate in light of the impact on the victims and the horrendous and heinous nature of the crime (Sentencing: 17). Therefore, the court's sentence was proper.

19

While defendant argues that the sentence ignores defendant's "rehabilitative needs," (Defendant's Brief at 28) defendant himself admits that there are other purposes to incarceration, including "retribution, deterrence and isolation" (Defendant's Brief at 28). These alternative purposes are all served by sentencing defendant to the maximum period of incarceration.

Furthermore, defendant claims that he was a hard-working immigrant trying, like so many others to pay off a debt. But, unlike so many others, defendant chose a path of illegality. Defendant not only work with his alleged creditor to help him commit crimes, but went far beyond what was required to get money -- the kidnapping -- to commit wanton and pointless violence by raping two women who were his prisoners.

In sum, the trial court had a reasonable basis for imposing defendant's sentence because the sentence reflected the heinousness of the crimes for which defendant was convicted. Further, defendant has provided no basis to disturb this sentence on appeal and has not cited any extraordinary circumstances warranting a reduction of his sentence. Thus, defendant should not be permitted to benefit from his illegal activities by obtaining a reduction of his sentence.

## CONCLUSION

For the reasons set forth above, defendant's judgment of conviction should be affirmed.

Respectfully Submitted,

RICHARD A. BROWN
District Attorney
Queens County

JOHN M. CASTELLANO
SHARON Y. BRODT
JOAN YANG

Assistant District Attorneys
of Counsel

September 17, 1999

21

# SUPREME COURT OF THE STATE OF NEW YORK
## APPELLATE DIVISION : SECOND JUDICIAL DEPARTMENT

9338D
K/jv

_____ AD2d _____                                    Submitted - November 23, 1999

CORNELIUS J. O'BRIEN, J.P.
SONDRA MILLER
LEO F. McGINITY
NANCY E. SMITH, JJ.

1996-07827

The People, etc., respondent,                       DECISION & ORDER
v Hai Guang Zheng, appellant.
(Ind. No. 3282/95)

M. Sue Wycoff, New York, N.Y. (Paul Liu of counsel), for appellant.

Richard A. Brown, District Attorney, Kew Gardens, N.Y. (John M. Castellano, Sharon Y. Brodt, and Joan Yang of counsel), for respondent.

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Katz, J.), rendered August 15, 1996, convicting him of kidnapping in the first degree (four counts), rape in the first degree (two counts), kidnapping in the second degree, sexual abuse in the first degree (two counts), and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

ORDERED that the judgment is modified, on the law, by vacating the conviction of sexual abuse in the first degree under the 11th count of the indictment, vacating the sentence imposed thereon, and dismissing that count of the indictment; as so modified, the judgment is affirmed.

The Supreme Court properly refused to instruct the jury on the affirmative defense of duress. Viewing the evidence adduced at trial in the light most favorable to the defendant, there is no reasonable view of the evidence to support the defendant's claim of duress. The defendant failed to establish that the force or threat of force was capable of "immediate exercise of realization" (*People v Brown*, 68 AD2d 503, 513).

The 11th count of the indictment, charging the defendant with sexual abuse in the first degree, must be reversed because no evidence pertaining to that count was adduced at trial.

January 10, 2000                                                         Page 1.

PEOPLE v HAI GUANG ZHENG

The sentence imposed was neither harsh nor excessive (*see, People v Suitte*, 90 AD2d 80).

O'BRIEN, J.P., S. MILLER, McGINITY, and SMITH, JJ., concur.

ENTER:

James Edward Pelzer
Clerk

*Brod*



90 CHURCH STREET, NEW YORK, N.Y. 10007  TEL: (212) 577-3300  FAX: (212) 577-7999  www.legal-aid.org

*3282/95*

Daniel L. Greenberg
*President and*
*Attorney-in-Chief*

January 31, 2000

*Criminal Appeals Bureau*
Sue Wycoff
*Attorney-in-Charge*

The Honorable Judith S. Kaye
Chief Judge
Court of Appeals
Court of Appeals Hall
Eagle Street
Albany, New York  12207

Attn: Hon. Stuart M. Cohen

Re: <u>People v. Hai Guang Zheng</u>

Your Honor:

Pursuant to Criminal Procedure Law §460.20, I am submitting this letter as an application for permission to appeal to the Court of Appeals in the above-entitled case. An application has not been made to a justice of the Appellate Division.

On January 10, 2000, the Appellate Division, Second Department, modified with opinion a judgment rendered on August 15, 1996, by the Supreme Court, Queens County, convicting appellant of kidnaping in the first degree (four counts), rape in the first degree (two counts), kidnaping in the second degree, sexual abuse in the first-degree (two counts), and criminal possession of a weapon in the second degree and sentencing him to maximum consecutive terms, totaling 84⅔ years to life by vacating the conviction for sexual abuse under the 11th count of the indictment, dismissing that count, but otherwise affirming the judgment.

Defendant herein had the following named co-defendant on the indictment: Qin Guang Zheng.

I am enclosing copies of the briefs filed in the Appellate Division and that Court's order and opinion. Please advise me of the judge designated to decide this application.

The Honorable Judith S. Kaye                    January 31, 2000
People v. Hai Guang Zheng

     Appellant seeks leave to appeal based on all of the
issues raised in his Appellate Division brief (see
O'Sullivan v. Boerckel, _____ U.S. ____, 119 S.Ct. 1728
(1999)):

<u>POINT I</u> (pp. 19-26)

> THE TRIAL COURT'S REFUSAL TO SUBMIT
> APPELLANT'S DURESS DEFENSE TO THE JURY
> DEPRIVED HIM OF DUE PROCESS, WHERE THERE
> WAS UNCONTRADICTED EVIDENCE THAT A SMUG-
> GLER OF ILLEGAL ALIENS, WHO LIKELY HAD
> CRIMINAL TIES IN CHINA, HAD THREATENED
> TO KILL APPELLANT'S FAMILY IN CHINA IF
> HE REFUSED TO PARTICIPATE IN THE CRIME
> AND APPELLANT COULD NOT HAVE ENSURED HIS
> FAMILY'S SAFETY BY WITHDRAWING FROM THE
> CRIME OR BY CONTACTING POLICE.  U.S.
> CONST., AMENDS. VI, XIV; N.Y. CONST.,
> ART. I, §6.

Respectfully,

<em>Paul Liu</em>

PAUL LIU
Associate Appellate Counsel
(212) 577-3542

PL/cma
Encl.

cc:  Hon. Richard A. Brown
     District Attorney
     Queens County
     80-02 Kew Gardens Road
     Kew Gardens, New York 11415

# State of New York

# Court of Appeals

BEFORE: HON. CARMEN BEAUCHAMP CIPARICK,
Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

HAI GUANG ZHENG,

Appellant.

**CERTIFICATE
DENYING
LEAVE**

I, CARMEN BEAUCHAMP CIPARICK, Associate Judge of the Court of Appeals of the State of New York, do hereby certify that upon application timely made by the above-named appellant for a certificate pursuant to CPL 460.20 and upon the record and proceedings herein,* there is no question of law presented which ought to be reviewed by the Court of Appeals and permission is hereby denied.

Dated  June 15, 2000
at New York, New York

_____
Associate Judge

* **Description of Order:**  Order of the Appellate Division, Second Judicial Department, entered January 10, 2000, modifying a judgment of the Supreme Court, Queens County, rendered August 15, 1996.

Parolit/Drnly

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
---------------------------------------
PEOPLE OF THE STATE OF NEW YORK

      -against-

HAI GUANG ZHENG

                Defendant.

IND. NO. 3282/95
Notice of Motion
for New Trial
pursuant to CPL §440.10

---------------------------------------



    **PLEASE TAKE NOTICE,** that upon the annexed affirmation of Paul Goldberger, Esq., the affidavit of Hai Guang Zheng, and the proceeding had herein, the defendant will move the Supreme Court, County of Queens, 125-01 Queens Boulevard, Kew Gardens, before the Hon. Stanley Katz, at Part   , thereof, on the 15th day of June, 2001, at 9:30 o'clock in the forenoon of that day or as soon thereafter as counsel can be heard for Orders Granting the Defendant a New Trial pursuant to C.P.L. 440.10, Granting the Defendant DNA tests on the Serological Evidence of his trial, and for such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
          May 14, 2001

                              Goldberger & Dubin, P.C.

                              Paul A. Goldberger
                              Attorney for Defendant
                              401 Broadway, Suite 306
                              New York, NY 10013
                              (212)431-9380

To:   Richard A. Brown, District Attorney
      District Attorney's Office, Queens County
      125-01Queens Boulevard
      Kew Gardens, NY 11415

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
----------------------------------------
PEOPLE OF THE STATE OF NEW YORK

                -against-

HAI GUANG ZHENG,

                  Defendant.
----------------------------------------

IND. No. 3282/95
Affirmation in Support
of Motion for New Trial
pursuant to CPL §440.10

    Paul Goldberger, an attorney duly admitted to the practice of law in the courts of the State of New York, affirms the following under penalty of perjury:

1.    I have been retained by the defendant Hai Guang Zheng to prosecute this motion pursuant to CPL §440.10. As such, I have fully reviewed his entire file and am fully familiar with same. I make this affirmation in support of the defendant's Motion for post conviction relief.

2.    The defendant was tried before the Hon. Stanley Katz and a jury, jury selection having started on June 26, 1996, and a verdict having been reached on July 8, 1996.

3.    The defendant was convicted of the crimes of kidnaping in the first degree (P.L. §135(1),(2),(c)) four counts, rape in the first degree (P.L. §130.35(1)) two counts, kidnaping in the second degree (P.L. §130.20), sexual abuse in the first degree (P.L.§130.65(1)) two counts, and criminal possession of a weapon in the second degree (P.L. §256.03).

4. The defendant was sentenced on August 15, 199 to four 25-life terms on each of the four first degree kidnaping counts, two each to run consecutively for a total of 50-life; 8 1/3 - 2 years on each of the two first degree rape and second degree kidnaping counts; 2 1/3- 7 years on each of the two first degree sexual abuse counts; and 5-15 years on the second degree weapon possession count, all to run consecutively with each other for a total of 84 2/3 years to life.

5. A timely notice of appeal was filed, and the appeal denied in January of 2000. Permission to appeal to the Court of Appeals was denied on June 15, 2000.

6. The facts as generally proven at trial as as follows: On March 31, 1995, the defendant, with another male Asian, were driving in a car at Kennedy Airport. The testimony at trial was unclear as to who the driver of the vehicle was. At some point, the car the defendant was in cut off another car, in which two females and one male were being driven by a driver. These passengers were taken out of their vehicle by gunpoint, and placed in the defendant's vehicle. After driving for a while, and into Manhattan, the male passenger was released. The defendant, his ※accomplice※ and the 2 females went to a location in Queens, a basement apartment, where the females were held overnight.

7.  Upon arrival at the Queens apartment, the male accompanying

the defendant left, and was replaced by another Asian male. A number of phone calls were made by the defendant to the family of the females requesting ransom be paid for the release of the women. These phone calls, it was later revealed, were intercepted pursuant to an interception Order, signed a Justice of the Supreme Court, New York County.

8. Using the evidence gleaned from the wiretaps, Police were able to trace the phone calls to the location in Queens. Police engaging in surveillance of the location ultimately arrested the defendant and another Asian male, and recovered the women.

9. At trial, the women testified that they had not only been abducted, but that they had also been raped by the defendant and another male. The defendant, testifying in his own behalf, admitted to his participation in the abduction, vehemently denied participating in any rape, and stated that his participation in the crimes was a result of duress, in that the mastermind of the crime was a ❋snakehead❋[1] who threatened to kill the defendant and his family if he did not participate.

10. The serological evidence at trial demonstrated that vaginal, anal, and oral swabs were taken from each woman. In addition, the underwear of each woman was tested from the presence of semen. The woman who testified that she had engaged in sexual intercourse with her husband shortly before the

---

[1]

  A snakehead is an individual who illegally smuggles Chinese immigrants into the United States for a fee.

abduction had evidence of semen in her vagina and her underwear, while the other woman, who admitted to having sexual intercourse approximately 2 months prior to the abduction, only had evidence of semen in her underwear. The Police chemist testified that underwear will show evidence of semen for months after intercourse, and that evidence of semen can be found in the vagina for at least 72 hours after intercourse.

11. In this motion, the defendant submits that he was denied the effective assistance of counsel when counsel first, failed to have the serological evidence tested for DNA after the defendant's constant and vehement denial of any involvement in the rape of the two women, and second, when counsel failed to move in writing to have the wiretap evidence, and the fruits thereof, suppressed, when the District Attorney gave no notice as required under the CPL of its intention to use such evidence.

12. The import of counsel's failure to have the semen DNA tested is twofold. Not only would such a test have exonerated the defendant on the rape charges, but further, it would have served to further impeach the testimony of the two women, such testimony having formed the basis for the jury's verdict on the remaining charges. As an example, one of the women was unable to identify the defendant in the courtroom as the person who kidnaped her and/or raped her. Other testimony was equally confusing, i.e., from the record it is impossible to determine if the defendant was the driver or passenger of the vehicle which was used to initially stop the victims, and therefore, it is unknown whether it was the defendant or an accomplice who carried a weapon; the descriptions of the abductors were first given as equal in height, and then were given as "tall" and "short;"

and, the testimony regarding which perpetrator slept with a handgun was equivocal. Had evidence been submitted on behalf of the defendant that in fact it could not have been him that raped these women, it is extremely likely that the verdict would have been different, not only as to the rape charges, but on the gun possession and kidnaping charges as well.

13. The Court of Appeals in People v. Hobot, 622 N.Y.S.2d 675, 84 N.Y.2d 1021 (1995) set out the burden which a defendant bears in order to prevail upon a claim of ineffective assistance of counsel. A defendant must demonstrate "that he was deprived of a fair trial by less than meaningful representation (see, People v Flores, 84 N.Y.2d 184, 186, 615 N.Y.S.2d 662, 639 N.E.2d 19; People v Benn, 68 N.Y.2d 941, 942, 510 N.Y.S.2d 81, 502 N.E.2d 996). There is no precise definition of what constitutes legal representation, nor is there a particular standard applicable to every case (see, People v Bennett, 29 N.Y.2d 462, 466, 329 N.Y.S.2d 801, 280 N.E.2d 637). Rather, all of the evidence must be weighed in context and as of the time of representation to assess the alleged deficient representation. Where a single, substantial error by counsel so seriously compromises a defendant's right to a fair trial, it will qualify as ineffective representation (see, People v Flores, 84 N.Y.2d, at 188, supra; People v Baldi, 54 N.Y.2d 137, 146-147, 444 N.Y.S.2d 893, 429 N.E.2d 400).

14. In the instant case, the defendant admits that there are numerous instances in which it could be said that his trial counsel did an effective job. It cannot be argued that counsel did not object to evidence, make exception to various evidentiary issues nor cross examine

witnesses. However, there are two specific instances in which counsel failed to properly represent the defendant, and these two errors are so substantial that they seriously compromised this defendant's right to a fair trial.

### Counsel's Failure to Request DNA Testing of the Serological Evidence Denied the Defendant a Fair Trial

15. As is set out in the defendant's affidavit accompanying this application, and further demonstrated by the statement made at the time of his arrest, the defendant has always denied that he engaged in any type of sexual activities with the complainants in this action. It is clear from his affidavit that although he did not know that he could request DNA testing of the evidence produced at trial by the People, his properly prepared counsel should have known that such testing was available, and further that such testing would conclusively prove or disprove the defendant's guilt or innocence on the rape charges in the Indictment.

16. It is also clear, as this case was tried after January 1, 1996, that DNA testing was available in New York State at the time of defendant's trial. See, CPL §440.30. Counsel, having known that his defense was one of duress, could only have bolstered that defense by showing that the defendant was not involved in a rape. Being forced to kidnap individuals is one thing, but raping them as well tended to discount any chance that the defendant was coerced into the criminal conduct.

17. While there are limited cases involving this exact question, in addition to the New York State Court's decisions on this issue, a number of other jurisdictions have dealt with counsel's failure to seek either DNA or other scientific tests when available. Each of these courts has unanimously held that a counsel's failure to request such testing is an error so grievous as to deny a defendant a fair trial, when such testing would have an effect on the verdict reached.[2]

18. In <u>People v. Kellar</u>, 640 N.Y.S.2d 908, 218 A.D.2d 406 (3d Dept. 1996), the defendant was fully aware and discussed the options of DNA testing with counsel prior to trial. In a tactical decision made, DNA testing was not done. The facts of that case indicated that defendant did not ejaculate, and further there was no direct evidence demonstrating, nor did the People argue that is was the defendant's sperm found in the complainant. Instead, the People acknowledged that there was no connection between the sperm found and the defendant. The court held ⬚although a test result identifying defendant as the source of the sperm found in the victim would conclusively establish his guilt, a negative result could establish only that the victim had intercourse with a male other than defendant within a period of approximately three

---

2

In a decision, apparently filed on April 16, 2001, in the District of Virginia, a Federal Judge has has held that a State violates a defendant's civil rights when they refuse to do DNA tests on serological evidence.

days prior to the incident. In our view, such evidence would be probative of little more than the victim's prior sexual activity.▓

19. In <u>Dorsey v. Kelly</u>, No. 92 CIV 943, 1997 WL 400211 (SDNY 1997), the court granted a Writ of Habeas Corpus to the Petitioner on the grounds of ineffective assistance of counsel when counsel failed to offer into evidence the results of scientific testing that may have exonerated the defendant. In <u>Dorsey</u>, the defendant had been convicted of sodomizing a young boy upon evidence by the complainant that the defendant had sodomized him on two different occasions. The scientific evidence received at trial demonstrated that there had been no semen on a rectal swab, but there was semen on the complainant's underpants. Available at the time of trial, but not put into evidence by defendant's counsel, were antigen tests which demonstrated that the semen on the underpants could have come from the complainant, but not from the defendant.

20. In granting the habeas petition, the court acknowledged that while counsel for defendant had been competent throughout the trial, this one ▓single, serious error▓ was sufficient to uphold the ineffective assistance claim. Citing both <u>Kimmelman v. Morris</u>, 477 U.S. 365 (1986) and <u>Strickland v. Washington</u>, 466 U.S. 68 (1984), the court stated, that counsel's failure to ▓make the adversarial testing process

work in the particular case was unreasonable under
professional norms, and therefore, the defendant was denied
his right to counsel.

21. In _State of New Jersey v. Halsey_, No. A-3117-98T4
2000.NJ.0042191 <http://www.versuslaw.com>(N.J. App. Div.
2000), the defendant had been convicted of the murder and
sexual assault of two small children after having made full
oral and written confessions, failing a polygraph test, and
presenting an intoxication defense. In denying this
defendant's request the New Jersey court cited to various
cases in which other jurisdictions had held that it was not
ineffective assistance of counsel to fail to request a
scientific test, when such test would not affect the outcome.
See e.g. _Cooper v. United States_, 199 F.3d 898, 900-01 (7th
Cir. 1999) (counsel cannot be found ineffective for the
failure to request DNA testing of a hair sample when any test
result would prove nothing material to the trial); _La Fevers
v. Gibson_, 182 F.3d 705, 722 (10th Cir. 1999) (counsel cannot
be found ineffective "for failing to request DNA testing" when
such a test "would have been frivolous because even favorable
DNA test results would not make a difference in this case").
However, the court did cite _State v. Velez_, __ N.J. Super. __
(App. Div. 2000) where defendant's pro se petition for post
conviction relief asserted both a claim of ineffective
assistance of trial and appellate counsel and, independently,
that "he was entitled to newly developed DNA testing of the

semen samples that had yielded inconclusive results respecting their source." Slip op. at 6. The New Jersey court did indicate that in a situation in which it is likely that the failure to request a DNA test would have affected the outcome, that such failure would indeed be a clear example of the ineffective assistance of counsel.

22. In another New Jersey case, State v. Thomas, 586 A.2d 250, 245 N.J.Super. 428 (N.J.Super.App.Div. 1991), the court granted the defendant's request, after his conviction, for a DNA test even though such failure to do the test may have been trial strategy of counsel. In its decision the court cited their previous decision in State v. Harper, 128 N.J. Super. 270, 277, 319 A.2d 771 (App.Div.1974), ※relief must be afforded from tactical errors which "cut mortally into the substantive rights of the defendant." We can conceive of no course of action by counsel as more nearly affecting a defendant's substantive rights than a failure to pursue competent evidence which might conclusively prove his innocence of the crime charged. And we can conceive of no greater injustice, when that evidence is available, of depriving a convicted defendant of access to it. The prosecutor, the court, and the judicial system have an obligation to protect the innocent which is no less fundamental than the obligation to punish the guilty.※



23. In Jones v. Wood, 114 F.3d 1002, 97 Cal. Daily Op. Serv. 4459 (9th Cir. 1997), the defendant was convicted of stabbing his

wife 63 times and causing her death. Throughout the pretrial stages, the defendant asserted his innocence, and in fact hired investigators to follow up a lead on another who the defendant believed was the actual killer. At the time of the incident, the defendant was found by police, his pants covered in blood. The defendant insisted that the blood was his own, the defendant having tried to protect himself against the actual killer. Defendant's lawyer, although told repeatedly by defendant to have the blood tested to determine whose blood it was, never in fact had the blood tested.

24. The Ninth circuit held that the defendant was entitled to an evidentiary hearing on his habeas petition, reversing the District Court's decision. The Court stated that the attorney's failure to have the blood tested, even if part of some type of trial strategy fell below the Strickland standard.

> When an attorney fails to examine potentially exculpatory evidence, although he repeatedly assured the petitioner of his intention to do so, the Strickland presumption that the failure is "sound trial strategy" is surmounted. In Sims v. Livesay, 970 F.2d 1575, 1580 (6th Cir. 1992), the court observed that examination of a quilt for gunshot residue might establish whether it was between the gun and the victim at the time the shot was fired and seriously undermine the State's theory that the victim was shot from a distance. Counsel failed to have the quilt examined, and the court found this error rose to the level of ineffective assistance, holding that counsel's failure to have potentially exculpatory physical evidence examined "cannot be characterized as a reasonable exercise of professional judgment." Id. See also id. at 1581 ("counsel's failure to investigate key evidence may not be excused").

25. In <u>Pennsylvania v. Robinson</u>, 682 A.2d 831, 452 Pa. Super. 606 (1996), the defendant, after having been convicted of rape asserted ineffective assistance because of counsel's failure to request DNA testing. However, at the time of defendant's trial in 1990, DNA testing was not in use in any of the Pennsylvania trial courts nor commercially available. As a result, the court held that it was not ineffective assistance of counsel. However, the court held that the defendant would be entitled to have a DNA test on the semen samples if they were still in existence, and if the results demonstrated defendants innocence then the lower court was directed to have a new trial.

26. Although DNA testing is a relatively new tool, it is a tool the results of which are hard to dispute. For years, prosecutors have sought the ▒magic wand▒ which would tell us who was telling the truth, and who was not. Right here before us, in a way never imagined is that self same tool. It is now possible to determine the exact identity of perpetrators. The odds of there being an error are 1 in 750,000,000. The courts which have faced decisions regarding this tool accept it with open arms, and seek to do justice with this new tool. In any reported case in which DNA evidence might have made a difference in the verdict, courts have required that this evidence be used. Simply put, a defendant is denied the effective assistance of counsel when DNA evidence might demonstrate his innocence and testing is not done. This is

the rule is every jurisdiction which has faced the question, and this being so, must also be the rule in New York.

27. When this defendant's trial counsel did not request DNA testing on the serological evidence, after defendant's continued vehement protests of innocence to the rape charges, this defendant was denied the effective assistance of counsel. As such, he must be granted a new trial.

**The Defendant was Denied the Effective Assistance of Counsel when Counsel Failed to Make a Written Motion to Preclude use of Wiretap Evidence, and the Fruits Thereof**

28. CPL § 700.70 states:

The contents of any intercepted communication, or evidence derived therefrom, may not be received in evidence or otherwise disclosed upon a trial of a defendant unless the people, within fifteen days after arraignment and before the commencement of the trial, furnish the defendant with a copy of the eavesdropping warrant, and accompanying application, under which interception was authorized or approved. This fifteen day period may be extended by the trial court upon good cause shown if it finds that the defendant will not be prejudiced by the delay in receiving such papers. As interpreted by the Court of Appeals, the failure of the People to give notice in a timely fashion or to present good cause for such failure results in an absolute bar to the introduction of intercepted communications or the fruits of such interceptions. People v.

Libertore, 590 N.E.2d 219, 79 N.Y.2d 208(1992).

29. In the case at bar, counsel was first notified of the use of an interception Order at a hearing held on April 19, 1996. Although the People ⁂thought⁂ they had turned over the eavesdropping warrant and associated materials as part of their Rosario obligation in February of 1996, not only was that not the case, but further it was in violation of the statute.

30. At a hearing held on April 24, 1996, counsel for the defendant had not filed a written motion to have the warrant suppressed, nor the fruits thereof. Furthermore, counsel did not argue the statute, CPL §700.70, nor any of the Court of Appeals relevant decisions regarding violation of that section of the CPL.

31. Had counsel properly prepared, he would have learned that the Court of Appeals has interpreted the notice requirements of CPL §700.70 in the strictest manner possible. Counsel would have been able to argue to the Court that the eavesdropping warrant and all evidence obtained as a result thereof MUST have been suppressed. Counsel would have effectively been able to have the entire case dismissed, because all the People's evidence leading up the the arrest of the defendant came through information gleaned from the wiretaps. Without the wiretaps, the Police could never have located the

defendant, nor arrested him.

32. In <u>People v Schulz,</u> (67 N.Y.2d 144), the Court of Appeals reaffirmed the need for "strict compliance with the provisions of New York's eavesdropping statute" and held that "where there has been a failure to comply with the notice provisions of CPL 700.70 and ... neither an application for an extension of time within the 15 days provided in that statute nor a showing of good cause for noncompliance and lack of prejudice to defendant" evidence derived from an intercepted communication must be suppressed. The Court noted "[t]he insidiousness of electronic surveillance [which] threatens the right to be free from unjustifiable governmental intrusion into one's individual privacy" and concluded that "law enforcement officials [must] be sensitive to the fact that there must be meticulous adherence to the terms of the warrant and the statute pursuant to which it [was] issued". The Court of Appeals has imposed this requirement of meticulous compliance with the eavesdropping statute as being consistent with the mandate of the Legislature. <u>People v. Libertore</u>, 590 N.E.2d 219, 79 N.Y.2d 208(1992).

33. In the case at bar, a number of things are quite clear. The People <u>never</u> served proper notice of the eavesdropping warrant, and, counsel never required the People to do so nor informed the court, as a proper advocate, that such a failure by the People is subject to complete suppression of the

information gathered by the warrant, and all the fruits thereof. This unspeakable error in advocacy is exactly the type of serious error which demonstrates that the defendant failed to receive the effect assistance of counsel. As a result, the defendant must be granted a new trial.

**WHEREFORE**, the defendant respectfully requests that this Honorable Court grant him a new trial, require DNA testing of the serological evidence, and for such other and further relief that this Court may deem just and proper.

Dated:    New York, New York

          May 14, 2001

                                        Goldberger & Dubin, P.C.


                                        _____
                                        Paul A. Goldberger
                                        Attorney for Defendant
                                        401 Broadway, Suite 306
                                        New York, NY 10013
                                        (212)431-9380

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS
-------------------------------------
PEOPLE OF THE STATE OF NEW YORK

      -against-

HAI GUANG ZHENG,

               Defendant.
-------------------------------------

IND. NO. 3282/95
Affidavit in Support
of Motion for New Trial
pursuant to CPL §440.10

State of New York  :
County of Dutchess  :   ss:

     Hai Guang Zheng, being duly sworn, states the following under penalty of perjury:

1.   I am the defendant herein. I make this affirmation in support of my motion pursuant to CPL §440.10 for a new trial.

2.   I was arrested in March of 1995 for the kidnaping and rape of two women. After my arrest, I was beaten and forced to make a statement. Although I was forced to make this statement, I never, at that time, or any other, admitted to raping the women.

3.   The reason I did not admit to such a thing, is that I never had sexual intercourse with these women.

4.   All throughout the time I knew my trial counsel, Mr. Schechter, I told him over and over that I did not have any sexual relations with the women.

5. I told him that I was involved with the kidnaping, but only because I was forced to do so. Though I was never proud to admit it, I came to this country illegally. I was smuggled into the country by a person, a snakehead called Ak Guan. I was supposed to pay Ak Guan $30,000 to come to this country. I paid him some of this money, and was working in America to pay him the rest.

6. At The time of the kidnaping, I still owed Ak Guan $12,000. He told me that if I did not help him with the kidnaping that he would kill me, and my parents, who are still in China.

7. I know, and knew then, that he still had connections in China, which are very powerful, and that all he would have to do was make a phone call and my family would die.

8. Fearing for my life, I did as Ak Guan said, but no more. I did not rape those women, and in fact, they were safely on their way back home when I was arrested.

9. I do not have much education, and I still do not speak the English language. I understand that this statement that you are reading in English, and I will sign, is exactly the same statement that is attached to this one in Chinese, which I have also signed.

10. At the time of my trial, I did not know anything about scientific tests or DNA testing. I only knew, and made it

clear to my attorney, that I did not touch the women in any sexual way.   I believe my attorney failed to represent my interests when he did not request DNA testing of the semen. After all, it could not have been mine, and would have conclusively shown that I did not rape these women.

11.   It would have also shown that these women were lying about the rapes, and would have put into question all of the other things they said about me.

12.   I request that this Court grant me the opportunity to have that semen tested for DNA.   This will conclusively show that I did not rape these ladies.

Dated:      New York, New York
            April 23, 2001

SUBSCRIBED TO AND SWORN BEFORE ME
THIS 10TH DAY OF MAY, 2001

X _____
HAI GUANG ZHENG

PAUL J SHAUN
Notary Public State of New York
Qualified in Dutchess County
Commission # 01BR5070658
Commission Expires Dec 23 2002

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS

----------------------------------------

PEOPLE OF THE STATE OF NEW YORK

       -against-

HAI GUANG ZHENG,

              Defendant.

----------------------------------------

IND. NO.   3282/95
Affidavit in Support
of Motion for New Trial
pursuant to CPL §440.10

State of New York   :
County of Dutchess  :   ss:

    Hai Guang Zheng, being duly sworn, states the following under penalty of perjury:

1.   I am the defendant herein.  I make this affirmation in support of my motion pursuant to CPL §440.10 for a new trial.

2.   I was arrested in March of 1995 for the kidnaping and rape of two women.  After my arrest, I was beaten and forced to make a statement.  Although I was forced to make this statement, I never, at that time, or any other, admitted to raping the women.

3.   The reason I did not admit to such a thing, is that I never had sexual intercourse with these women.

4.   All throughout the time I knew my trial counsel, Mr. Schechter, I told him over and over that I did not have any sexual relations with the women.

5. I told him that I was involved with the kidnaping, but only because I was forced to do so. Though I was never proud to admit it, I came to this country illegally. I was smuggled into the country by a person, a snakehead called Ak Guan. I was supposed to pay Ak Guan $30,000 to come to this country. I paid him some of this money, and was working in America to pay him the rest.

6. At The time of the kidnaping, I still owed Ak Guan $12,000. He told me that if I did not help him with the kidnaping that he would kill me, and my parents, who are still in China.

7. I know, and knew then, that he still had connections in China, which are very powerful, and that all he would have to do was make a phone call and my family would die.

8. Fearing for my life, I did as Ak Guan said, but no more. I did not rape those women, and in fact, they were safely on their way back home when I was arrested.

9. I do not have much education, and I still do not speak the English language. I understand that this statement that you are reading in English, and I will sign, is exactly the same statement that is attached to this one in Chinese, which I have also signed.

10. At the time of my trial, I did not know anything about scientific tests or DNA testing. I only knew, and made it

clear to my attorney, that I did not touch the women in any sexual way.   I believe my attorney failed to represent my interests when he did not request DNA testing of the semen. After all, it could not have been mine, and would have conclusively shown that I did not rape these women.

11.   It would have also shown that these women were lying about the rapes, and would have put into question all of the other things they said about me.

12.   I request that this Court grant me the opportunity to have that semen tested for DNA.   This will conclusively show that I did not rape these ladies.

Dated:     New York, New York
           April 23, 2001

Subscribed to and sworn before me
this 10th day of May, 2001

X _Zhong Hai Guang_
**HAI GUANG ZHENG**

PAUL J BRAUN
Notary Public State of New York
Qualified in Dutchess County
Commission # 01BR5070658
Commission Expires Dec 23 2002

SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY: CRIMINAL TERM: PART K-25
------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

                 Respondent,

       -against-

HAI GUANG ZHENG,

               Defendant.

------------------------------------------------------------------x

    Return Date:
    June 15, 2001

    RESPONDENT'S
    AFFIRMATION IN
    OPPOSITION TO
    DEFENDANT'S
    MOTION TO VACATE
    JUDGMENT  PURSUANT
    TO C.P.L. §  440.10

    Queens County
    Indictment Number
    3282/95

          USHIR PANDIT, an attorney admitted to practice law in the State of New

York, affirms the following statements to be true under the penalties of perjury:

          1.  I am an Assistant District Attorney, of counsel to Richard A. Brown, the

District Attorney of Queens County.  I am submitting this affirmation in opposition to

defendant's May 14, 2001 motion pursuant to C.P.L. § 440.10 (1) (a) and (h) to vacate his

August 15, 1996 judgment of conviction.  I make the statements in this affirmation upon

information and belief and based on my review of the records and files of the Queens County

District Attorney's office.

          2.  In the evening of March 31, 1995, Jin Hao Liu went to the airport to meet

her brother, Guo Bang Liu, and his wife, Liu Yan Wu.  After meeting at the airport, the three

got into a car-service automobile to leave the airport.  Shortly after entering the car-service

automobile, the car was cut off by a second car driven by defendant, forcing the Liu's car to stop. A second man, known as Ak Guan, was in defendant's car in the passenger seat.

3. After defendant stopped the victims' car, Ak Guan and defendant got out of their car, went to the victims' car and, at gunpoint, ordered the victims to leave their car and get into the back seat of defendant's car. Ak Guan ordered the victims to produce their passports. After examining the passports, Ak Guan stated that the wrong people had been taken.

4. As a result, defendant stopped the car near the Brooklyn Bridge, and gave the man, Guo Bang Liu, one or two quarters and a piece of paper with telephone numbers written on it. Guo Bang Liu was then ordered to get out of the car, leaving his wife and sister with defendant and Ak Guan. Guo Bang Liu found a car to take him to his family's home in Chinatown. After he returned home, Guo Bang Liu went with one of his sisters to the 5th Police Precinct stationhouse to report the Kidnapping.

5. In the meantime, defendant and Ak Guan took Jin Hao Liu and Liu Yan Wu to a basement apartment in an unknown location. After some time, a third man, Qin Guang Zheng, arrived at the apartment. Shortly after co-defendant Zheng's arrival, Ak Guan left. The two women were forced to spend the night in the apartment with defendant and co-defendant Zheng. Defendant was in possession of a pistol, which he kept by his pillow when he slept. Neither woman was able to sleep.

6. The next morning, defendant took Liu Yan Wu into a separate room and began touching her breasts with his hands. He removed her clothing and put his penis into

2

her vagina while holding a gun to her head. Defendant then brought Liu Yan Wu back into the first room and took Jin Haw Liu into the other room and raped her. Co-defendant Zheng also raped both women.

7. Jin Hao Liu was asked for her phone number, which she wrote down for her captors. After receiving the telephone number, defendant left the apartment several times. Defendant also made and received several telephone calls in the presence of the women. At one point, Jin Hau was permitted to speak with her family over the phone. She asked her family to give the kidnappers the money.

8. On April 1, 1995, Jun Hao and Guo Bang Kiu's sister Emily Liu, received a call demanding $20, 000 for the return of each woman. Emily Liu received several more calls from the same man, which were monitored by the police. Ultimately, defendant and his accomplices reduced their demands to $7500.00 for the return of each woman. Emily Liu was told to bring the money in a bag of groceries to a location in Chinatown.

9. The police determined that the ransom calls were being made from a cellular phone in the vicinity of 133-34 59th Avenue, in the Flushing area of Queens. At approximately 12:05 a.m., on April 2, 1995, defendant and co-defendant Zheng were stopped in that area by the police with the two female victims in their car. A cellular phone was recovered from the front seat of the car.

10. Later, a search was made of the basement apartment where the two female victims had been held. There, detectives recovered three more cellular telephones, and a loaded gun.

3

11. The victims were taken to a hospital where rape kits were prepared. Tests revealed the presence of semen in Liu Yan Wu's vagina and on her panties. Semen was also found on Jin Hao Liu's underwear.

12. Guo Bang Liu identified defendant in a line-up. In addition, defendant made a statement to the police corroborating the victim's accounts of what had happened at the airport, and admitted that he was the person who had made the ransom demands. Defendant denied raping the two female victims.

13. For these acts, defendant was charged with eight counts of Kidnapping in the First Degree (Penal Law § 135.25[1], [2][c]), four counts of Rape in the First Degree (Penal Law § 135.36[1]), one count of Kidnapping in the Second Degree (Penal Law § 135.20), eight counts of Sexual Abuse in the First Degree (Penal Law § 130.65[1]), and one count of Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03) (Queens County Indictment Number 3282/95).

14. Defendant proceeded to trial before Justice Katz and a jury. The jury convicted defendant of four counts of Kidnapping in the First Degree, two counts of Rape in the First Degree, one count of Kidnapping in the Second Degree, two counts of Sexual Abuse in the First Degree, and one count of Criminal Possession of a Weapon in the Second Degree.

15. On August 15, 1996, this Court sentenced defendant to four indeterminate terms of imprisonment from twenty-five years to life for the first-degree Kidnapping counts, two of which were to be served consecutively to the other two. Defendant was also

4

sentenced to indeterminate prison terms of from eight and one-third to twenty-five years on each of the rape convictions, and eight and one-third to twenty-five years on the second-degree Kidnapping conviction. Defendant was also sentenced to indeterminate prison terms of from two and one-third to seven years incarceration for each of the sexual abuse counts, and from five to fifteen years on the weapons conviction. These sentences were each to run consecutively to each other, and to the sentence on the first degree Kidnapping counts, resulting in an aggregate sentence of from eighty-four years to life.

16. On August 16, 1996, defendant filed a notice of appeal.

17. In July of 1999, defendant filled a brief in the Appellate Division, Second Department. In that brief, defendant claimed that this Court erred by refusing to charge the jury on the defense of duress and that his sentence was excessive.

18. On September 17, 1999, the People filed a respondent's brief. The People argued that the trial court correctly refused to charge the jury on the defense of duress because defendant had failed to show that he engaged in the kidnappings because he was coerced into doing so, that the threats used to coerce him were capable of immediate realization, and that he had not placed himself into the situation that allegedly created the duress. The People also argued that defendant's violent and depraved acts merited the maximum sentence.

19. On January 10, 2000, the Appellate Division, Second Department, modified the judgment by vacating the conviction of Sexual Abuse in the First Degree under the eleventh count of the indictment and vacating the sentence thereon, finding that no

5

evidence pertaining to that count was adduced at trial, and, as so modified, the Court affirmed the judgment. People v. Hai Guang Zheng, 268 A.D.2d 443 (2d Dept. 2000).

20. On January 31, 2000, defendant appealed the judgment of the Appellate Division to the Court of Appeals. The People filed their letter in opposition in February, 2000.

21. On June 15, 2000, Justice Carmen Beauchamp Ciparick of the Court of Appeals denied defendant's leave application. People v. Hai Guang Zheng, 95 N.Y.2d 835 (2000).

22. By his current motion, dated February 1, 2001, defendant moves, through counsel, to vacate his judgment of conviction pursuant to Section 440.10 of the Criminal Procedure Law. Defendant claims that he was denied the effective assistance of counsel because his trial counsel failed to have the serological evidence tested for DNA after defendant denied any involvement in the rape of the two victims and because counsel failed to move in writing to have the wiretap evidence suppressed. But, defendant's claim is mandatorily procedurally barred pursuant to C.P.L. § 400.10 and, therefore, must be denied.

23. Defendant's claims are procedurally barred since an adequate record exists for the claims to have been raised on defendant's direct appeal. Moreover, to the extent that these claims are not procedurally barred, the claims are without merit.

6

WHEREFORE, defendant's motion to vacate the judgment of conviction should be summarily denied in its entirety.

Dated: Kew Gardens, New York
      June 13, 2001

                                          Ushir Pandit
                                          Assistant District Attorney

To: Paul A. Goldberger
    Attorney for Defendant
    401 Broadway, Suite 306
    New York, N.Y. 10013

SUPREME COURT OF THE STATE OF NEW YORK
QUEENS COUNTY: CRIMINAL TERM: PART K-25
-----------------------------------------------------------------x
                                                      :
THE PEOPLE OF THE STATE OF NEW YORK,
                                                      :
                Respondent,
                                                      :

                                                      :
        -against-                                     :        **MEMORANDUM OF LAW**

                                                      :

                                                      :

HAI GUANG ZHENG,                                      :

                Defendant.                            :
-----------------------------------------------------------------x

## ARGUMENT

**DEFENDANT'S CLAIM IS PROCEDURALLY BARRED
BECAUSE A SUFFICIENT RECORD EXISTED FOR
REVIEW UPON DEFENDANT'S DIRECT APPEAL AND
IN ANY EVENT, HIS CLAIM IS WITHOUT MERIT.**

Defendant's claim is procedurally barred because a sufficient record existed

for review of defendant's claim upon defendant's direct appeal.  Defendant nevertheless

claims that his counsel was ineffective because he failed to have the serological evidence

tested for DNA and failed to have the wiretap evidence suppressed when the prosecutor

purportedly failed to follow the notice requirements of the Criminal Procedure Law.  But

defendant's claim is based on matters that are on the record that should have been reviewed

on defendant's direct appeal.

A motion to vacate a judgment of conviction must be denied if, at the time of the motion, sufficient facts appeared on the record that would have allowed the appellate court to review the claim raised in the motion, but the appellate court did not review the claim because the defendant unjustifiably failed to raise it. C.P.L. § 440.10 (2)(c). As the ground for defendant's claims clearly appear on the record, such claims are procedurally barred from this Court's review. In fact, defendant refers to the trial testimony to support his current claim. Thus, it is apparent that defendant is now positing on-the-record claims.

Defendant's ineffective assistance of counsel claims should have been raised on appeal. When the record is sufficient to review a claim of ineffective assistance of counsel, then direct appeal is the proper remedy. People v. Crump, 53 N.Y.2d 824 (1981). And here, it is apparent that defendant's claims based on his attorney's performance appear on the record. Indeed, his attorney's purported failure to request DNA exam for the serological evidence obtained from the rape victims as well as his attorney's purported failure to move to suppress all the evidence obtained from the wiretaps because the People had not complied with the notice requirement of the Criminal Procedure Law are matters that are part of the record on appeal. As discussed below, defendant's claims of defense counsel's purported failures could have been reviewed on direct appeal and, therefore, are procedurally barred from review by this Court.

First, defendant's claim that his attorney failed to request a DNA test is clearly an on-the-record claim. The People's proof at trial showed that one of the victim's panties, and another victim's vaginal swabs tested positive for spermatozoa (Hickey: T-220-239).

9

And in his closing argument, defense counsel argued that the People's proof, as to the rape counts, was insufficient because they had failed to conduct a DNA test (Defense Summation: 1025-1026). Moreover, defendant testified at the trial and denied raping the two women, but stated that he participated in the kidnapping because his family was threatened (Zheng: T-904-917). Furthermore, a review of the court documents would reveal if defense counsel made a written motion for a DNA test. Therefore, sufficient facts appear on the record -- with regard to the fact that a DNA test was not conducted on the serology evidence obtained from the victims and that defendant denied raping the two women -- for an appellate review of any purported ineffectiveness of trial counsel claim on this ground.

Second, defendant's claim that his attorney failed to request in writing that an eavesdropping warrant, and any evidence obtained via that warrant, be suppressed because People failed to meet the notice requirement of the Criminal Procedure Law is also an on-the-record claim. Indeed, a review of the court documents would reveal whether defense counsel made a written motion to suppress evidence obtained vie the eavesdropping warrant. Thus, sufficient facts appear on the record for an appellate review with regard to defendant's claim of any purported ineffectiveness by his trial counsel on this ground as well.

And, at the hearing held on April 19, 1996, when counsel discovered that Detective Green had applied for an eavesdropping warrant, he immediately stated for the record that he had not been provided with an eavesdropping warrant or any paperwork related to that warrant (Green: April 19, 1996 Hearing: 26). Thereafter, at the end of the People's case at the hearing, defense counsel argued that any eavesdropping warrant in the

10

case may result in the suppression of all the evidence obtained after the warrant was issued in the event that the People had failed to comply with the statutory requirements of the Criminal Procedure Law (Proceedings: April 19, 1996 Hearing: 72). In fact, counsel refused to rest until he had been provided with the appropriate documents so that he could make the appropriate arguments to the Court (Proceedings: April 19, 1996 Hearing: 73). Therefore, any purported ineffectiveness of trial counsel for failing to file a written motion could have been reviewed on defendant's direct appeal. Thus, this Court should reject defendant's claim as it is procedurally barred.

In any event, defendant's claim that he did not receive effective assistance of counsel is meritless. In reviewing a claim of ineffective assistance of counsel, "a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance." Strickland v. Washington, 466 U.S. 668, 669 (1984). "The phrase 'effective assistance' is not, however, amenable to precise demarcation applicable in all cases." People v. Benevento, 91 N.Y.2d 708, 712 (1998); People v. Baldi, 54 N.Y.2d 137 (1981). To determine whether defendant's counsel provided "meaningful representation" (see People v. Jackson, 70 N.Y.2d 768 [1987]; People v. Noble, 231 A.D.2d 800 [3d Dept. 1996]), counsel's actions must be evaluated in terms of "the evidence, the law, and the circumstances of a particular case, viewed in totality, as of the time of the representation." People v. Wiggins, 89 N.Y. 2d 87 (1996); People v. Boodhoo, 191 A.D.2d 448 (2d Dept. 1993).

11

Here, defendant was not denied effective assistance of counsel. Indeed, defendant concedes that there were numerous instances in which his counsel effectively represented his interests at the trial (Defendant's Motion ¶ 14). Moreover, the jury verdict indicates that defendant received more than adequate representation of counsel. Although defendant was charged with eight counts of kidnapping in the First Degree, at the close of the evidence, only six counts of first degree kidnapping charges were submitted for the jury's consideration. And defendant was acquitted of two of those first-degree kidnapping counts (Proceedings: 1150-1153). The results of the trial reflect that defendant received meaningful representation. Thus, defendant's claim that his trial counsel was ineffective should be rejected.

Moreover, as the two specific instances of trial counsel's alleged shortcomings are without merit, defendant's ineffective assistance-of-counsel claim must fail. Indeed, counsel's decision not to conduct DNA testing on the serology evidence was sound trial strategy that should not be second guessed by this Court. Here, the two victims were raped by both defendant and co-defendant Qui Guang Zheng. And although one victim's underwear and the other victim's vaginal swabs showed the presence of spermatozoa, it is conceivable that that spermatozoa was from both defendant and co-defendant. Therefore, it was possible that DNA testing would actually have incriminated defendant. Moreover, the lack of a DNA test allowed counsel to argue to the jury that the spermatozoa was that of his co-defendant's and not defendant's. Given these facts, the better trial strategy in this case was the one chosen by trial counsel. His argument that the People's proof was insufficient

12

because they failed to conduct a DNA test -- although unsuccessful -- was more persuasive than if he had requested DNA testing and the results were inconclusive or incriminating. Such a result would have precluded trial counsel from making any arguments with regard to the serology evidence and would have led to an argument by the prosecutor that because the victims were raped by both defendant and the co-defendant, it was reasonable that the DNA testing was inconclusive. Thus, trial counsel was not ineffective because he failed to request DNA testing of the spermatozoa.

Defendant relies on many cases to support his claim that counsel was ineffective because he failed to have a DNA test conducted on the serology evidence (Defendant's Motion ¶¶ 18, 19, 20, 21, 22, 23, 24). But all of these cases are inapplicable to this case. Indeed, these cases hold that a counsel's failure to request a scientific test -- such as a DNA test -- would render him ineffective only in the event that the scientific test would exonerate the defendant or would be exculpatory. By contrast, in this case, DNA testing of the serology evidence would not have exonerated defendant of the crimes of raping the two women. In fact, although a test result identifying defendant as the source of the sperm found in the victims would conclusively establish his guilt, a negative result could establish only that the victim had intercourse with a male other than defendant -- the co-defendant. A DNA test in this case, therefore would have been of little probative value. Thus, theses cases are inapplicable.

In addition, defendant's claim that his trial counsel's failure to file a written motion to preclude the use of wiretap evidence constituted ineffectiveness assistance of

counsel is also without merit. Here, although trial counsel did not file a written motion to suppress any evidence obtained after the eavesdropping warrant was issued, he did orally argue to the hearing court that any evidence obtained by the use of eavesdropping warrant should be suppressed because the People had failed to serve defendant with the eavesdropping documents withing fifteen days of his arraignment as required by section 700.70 of the Criminal Procedure Law (Proceedings: April 24, 1996 Hearing: 8-13).[1] And defendant has failed to show how trial counsel was ineffective for failing to file a written motion to suppress all the evidence obtained by an eavesdropping warrant because of the purported failure of the People to comply with Criminal Procedure Law § 700.70 when counsel vigorously argued the same claim orally. Therefore, this Court should reject defendant's meritless claim.

---

[1]At the hearing, the prosecutor stated that this case began in Manhattan and that it had been transferred to Queens County because Queens had jurisdiction with regard to some of the crimes with which defendant was charged (Proceedings: April 24, 1996 Hearing: 2-3). The prosecutor also stated that defendant had been served with the eavesdropping warrant at his Manhattan arraignment and, therefore, the People did not have to serve defendant again in Queens County (Proceedings: April 24, 1996 Hearing: 7-8, 15-17).

14

In sum, this Court should deny defendant's claims because they are procedurally barred pursuant to C.P.L. § 440.30(4)(a). In any event, defendant's claims are meritless and should be denied in its entirety.

Respectfully submitted,

RICHARD A. BROWN
District Attorney
Queens County

JOHN M. CASTELLANO
LISA DRURY
USHIR PANDIT

Assistant District Attorneys
of Counsel

June 13, 2001

*F, le*

Short Form Order

### SUPREME COURT - STATE OF NEW YORK
### CRIMINAL TERM, PART K-25, QUEENS COUNTY
### 125-01A Queens Blvd., Kew Gardens, N.Y. 11415

P R E S E N T :      **HON. STANLEY B. KATZ**

_____
Justice

---------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK  :   IND. NO: 3282/95
                                     :   Motion: C.P.L. §440.10
             -against-               :   For New Trial
                                     :   _____
                                     :   _____
                                     :   Submitted _____
HAI GUANG ZHENG                      :   Argued    _____
---------------------------------------x Hearing   _____

The following papers numbered
1 to _____ submitted on this motion.

                              Paul A. Goldberger, Esq.
                                  For the Motion

                              Urshir Pandit, Esq.
                                  Opposed

                                   Papers Numbered

     Notice of Motion and Affidavits Annexed  .................

    Answering and Reply Affidavits  ...........................

     Exhibits  ................................................

     Minutes - Other  .........................................

     Upon a review of the papers submitted, and in the opinion of
the Court, the defendant's motion is decided as indicated in the
accompanying memorandum of this date.

Date: June 18, 2001                  ...................
                                     STANLEY B. KATZ, J.S.C.

**M E M O R A N D U M**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS:CRIMINAL TERM: PART K-25

------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK    :  BY:   **KATZ, J.**
                                       :
                                       :
              -against-                :  DATED: June 18, 2001
                                       :
                                       :
HAI GUANG ZHENG                        :  IND. No.: 3282/95
------------------------------------------x


The defendant, convicted after trial of Kidnapping in the first

degree (4 counts), Rape in the first degree (2 counts), Kidnapping in the

second degree, Sex Abuse in the first degree (2 counts) and Criminal

Possession of a Weapon in the second degree, moves for a new trial

pursuant to C.P.L. §440.10.

The defendant contends as follows:

(1) The defendant was denied a fair trial because his attorney

failed to request DNA testing which would have shown that the defendant

did not commit rape;

(2) The defendant was denied effective assistance of counsel when

his attorney failed to make a written motion to preclude use of wiretap

evidence, and the fruits thereof.

The motion of the defendant is denied for the following reasons:

(1) The claims of the defendant are procedurally barred pursuant to

C.P.L. §440.10(2)(c). Facts pertaining to these allegations are in the

record, and could have been reviewed on defendant's direct appeal.

(2) The claims of the defendant are without merit.

Order entered accordingly.

The Clerk of the Court is directed to forward copies of this decision to the office of the District Attorney and to the attorney for the defendant.

STANLEY B. KATZ, J.S.C.

2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------------

PEOPLE OF THE STATE OF NEW YORK

        -against-

 

HAI GUANG ZHENG,

             Defendant.
-------------------------------------------

IND. NO. 3282/95
Notice of Motion for
Application for Certificate
Granting Leave to Appeal
and/ or
Notice of Petition for Writ of
Error Coram Nobis

**PLEASE TAKE NOTICE**, that upon the annexed affirmation of Paul Goldberger, Esq., the affidavit of Hai Guang Zheng, and the proceedings previously had herein, Hai Guang Zheng will move before the Supreme Court of the State of New York, Appellate Division, Second Department, 45 Monroe Place, Brooklyn, New York, on the 3rd day of August, 2001, at 9:30 in the forenoon of that day, for a Certificate Granting Leave to Appeal the Order of Justice Katz, dated June 19, 2001 denying defendant's application to vacate his conviction, or in the alternative Granting the defendant a Writ of Error Coram Notice due to the ineffective assistance of Appellate counsel, and for such other and further relief that this Honorable Court may deem just and proper.

Dated:       New York, New York
            July 17, 2001

                                       Paul A. Goldberger, Esq.
                                       Goldberger & Dubin, P.C.
                                       401 Broadway, Suite 306
                                       New York, New York 10013
                                       (212)431-9380

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

------------------------------------------------------------------------

PEOPLE OF THE STATE OF NEW YORK

              -against-

HAI GUANG ZHENG,

                         Defendant.

IND. NO.  3282/95
A.D. NO. 96-07827
Affirmation in Support of
Application for Certificate
Granting Permission to
Appeal or for
Petition for Writ of
Error *Coram Nobis*

------------------------------------------------------------------------

Paul Goldberger, an attorney duly admitted to the practice of law in the courts of the State of New York, affirms the following under penalty of perjury:

1.   I am attorney for the defendant herein.  As such I am fully familiar with the facts and circumstances herein.  I make this affirmation in Support of defendant's Application for Certificate Granting Leave to Appeal or alternatively in support of the defendant's Petition for a Writ of Error Coram Nobis.

2.   The procedural history of the case is as follows: The defendant was tried before the Hon. Stanley Katz and a jury, jury selection having started on June 26, 1996, and a verdict having been reached on July 8, 1996.

3.   The defendant was convicted of the crimes of kidnaping in the first degree (P.L. §135(1),(2),(c)) four counts, rape in the first degree (P.L. §130.35(1)) two counts, kidnaping in the second degree (P.L. §130.20), sexual abuse in the first degree (P.L. §130.65(1)) two counts, and criminal possession of a weapon in the second degree (P.L. §256.03).

4. The defendant was sentenced on August 15, 1999 to four 25-life terms on each of the four first degree kidnaping counts, two each to run consecutively for a total of 50-life; 8 1/3 - 2 years on each of the two first degree rape and second degree kidnapping counts; 2 1/3- 7 years on each of the two first degree sexual abuse counts; and 5-15 years on the second degree weapon possession count, all to run consecutively with each other for a total of 84 2/3 years to life.

 5. A timely notice of appeal was filed, and the appeal denied in January of 2000. On Appeal, appellate counsel, who was not trial counsel, raised only two issues. Those issues related to the trial court's failure to submit a duress defense to the jury, as well as an argument that defendant's sentence served no legitimate purpose. Appellate counsel did not raise other important issues, especially the issue of ineffective assistance of trial counsel. Permission to appeal to the Court of Appeals was denied on June 15, 2000.

6. Defendant then made an application to the trial court for relief pursuant to CPL §440.10 based upon the ineffective assistance of trial counsel. On June 13, 2001, the Hon. Stanley Katz denied that motion, holding that "[f]acts pertaining to these allegations are in the record, and could have been reviewed on defendant's direct appeal." Defendant now seeks to either appeal Justice Katz's decision dated June 13, 2001, or alternatively, if this Court denies that application, defendant seeks a writ of error coram nobis due to the ineffective assistance of appellate counsel.

7. The facts as generally proven at trial are as follows: On March 31, 1995, the defendant, with another male Asian, were driving in a car at Kennedy Airport. The testimony at trial was unclear as to who the driver of the vehicle was. At some point, the car the defendant was in cut off another car, in which two females and one male were being driven by a driver. These passengers were taken out of their vehicle by gunpoint, and placed in the defendant's vehicle. After driving for a while, and into Manhattan, the male passenger was released. The defendant, his "accomplice" and the 2 females went to a location in Queens, a basement apartment, where the females were held overnight.

8. Upon arrival at the Queens apartment, the male accompanying the defendant left, and was replaced by another Asian male. A number of phone calls were made by the defendant to the family of the females requesting ransom be paid for the release of the women. These phone calls, it was later revealed, were intercepted pursuant to an interception Order, signed a Justice of the Supreme Court, New York County.

9. Using the evidence gleaned from the wiretaps, Police were able to trace the phone calls to the location in Queens. Police engaging in surveillance of the location ultimately arrested the defendant and another Asian male, and recovered the women.

10. At trial, the women testified that they had not only been abducted, but that they had also been raped by the defendant and another male. The defendant, testifying in his own behalf, admitted to his participation in the

abduction, vehemently denied participating in any rape, and stated that his participation in the crimes was a result of duress, in that the mastermind of the crime was a "snakehead"[1] who threatened to kill the defendant and his family if he did not participate.

11. The serological evidence at trial demonstrated that vaginal, anal, and oral swabs were taken from each woman. In addition, the underwear of each woman was tested from the presence of semen. The woman who testified that she had engaged in sexual intercourse with her husband shortly before the abduction had evidence of semen in her vagina and her underwear, while the other woman, who admitted to having sexual intercourse approximately 2 months prior to the abduction, only had evidence of semen in her underwear. The Police chemist testified that underwear will show evidence of semen for months after intercourse, and that evidence of semen can be found in the vagina for at least 72 hours after intercourse.

12. In this application, the defendant first submits that he was denied the effective assistance of trial counsel. Trial counsel was ineffective when counsel first, failed to have the serological evidence tested for DNA after the defendant's constant and vehement denial of any involvement in the rape of the two women, and second, when counsel failed to move in writing to have the wiretap evidence, and the fruits thereof, suppressed, when the District

---

[1]

A snakehead is an individual who illegally smuggles Chinese immigrants into the United States for a fee.

Attorney gave <u>no notice</u> as required under the CPL of its intention to use such evidence. Although Justice Katz's decision states that these issues are were amply demonstrated in the record, upon examination of the record, this is not the case. The record would need to be expanded to determine trial counsel's reasoning for his failure to request DNA testing of the serological evidence and/or his reasoning for failure to move to suppress the wiretap evidence. Alternatively, appellate counsel's failure to raise these issues on direct appeal, if this Court believes that sufficient evidence was contained in the record, supports this defendant's application for a writ of error coram nobis.

13. The import of counsel's failure to have the semen DNA tested is twofold. Not only would such a test have exonerated the defendant on the rape charges, but further, it would have served to further impeach the testimony of the two women, such testimony having formed the basis for the jury's verdict on the remaining charges. As an example, one of the women was unable to identify the defendant in the courtroom as the person who kidnaped her and/or raped her. Other testimony was equally confusing, i.e., from the record it is impossible to determine if the defendant was the driver or passenger of the vehicle which was used to initially stop the victims, and therefore, it is unknown whether it was the defendant or an accomplice who carried a weapon; the descriptions of the abductors were first given as equal in height, and then were given as "tall" and "short;" and, the testimony regarding which perpetrator slept with a handgun was equivocal. Had

evidence been submitted on behalf of the defendant that in fact it could not have been him that raped these women, it is extremely likely that the verdict would have been different, not only as to the rape charges, but on the gun possession and kidnaping charges as well.

14. The Court of Appeals in People v. Hobot, 622 N.Y.S.2d 675, 84 N.Y.2d 1021 (1995) set out the burden which a defendant bears in order to prevail upon a claim of ineffective assistance of counsel. A defendant must demonstrate "that he was deprived of a fair trial by less than meaningful representation (see, People v Flores, 84 N.Y.2d 184, 186, 615 N.Y.S.2d 662, 639 N.E.2d 19; People v Benn, 68 N.Y.2d 941, 942, 510 N.Y.S.2d 81, 502 N.E.2d 996). There is no precise definition of what constitutes legal representation, nor is there a particular standard applicable to every case (see, People v Bennett, 29 N.Y.2d 462, 466, 329 N.Y.S.2d 801, 280 N.E.2d 637). Rather, all of the evidence must be weighed in context and as of the time of representation to assess the alleged deficient representation. Where a single, substantial error by counsel so seriously compromises a defendant's right to a fair trial, it will qualify as ineffective representation (see, People v Flores, 84 N.Y.2d, at 188, supra; People v Baldi, 54 N.Y.2d 137, 146-147, 444 N.Y.S.2d 893, 429 N.E.2d 400).

15. Likewise, the defendant is also entitled to the effective assistance of counsel under the 6th Amendment of the Federal Constitution. Although the New York test for ineffective assistance is broader than that required under Strickland v. Washington, 466 US 669, 104 S. Ct. 2052, 80 L. Ed. 2d 674,

52 U.S.L.W. 4565 (1984), counsel's ineffective representation meets the Federal standard as well, because counsel's conduct, "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." It cannot be said that the result of this trial would not have been different had counsel performed his duties in a proper fashion.

16. In the instant case, the defendant admits that there are numerous instances in which it could be said that his trial counsel did an effective job. It cannot be argued that counsel did not object to evidence, make exception to various evidentiary issues nor cross examine witnesses. However, there are two specific instances in which counsel failed to properly represent the defendant, and these two errors are so substantial that they seriously compromised this defendant's right to a fair trial.

### Counsel's Failure to Request DNA Testing of the Serological Evidence Denied the Defendant a Fair Trial

17. As is set out in the defendant's affidavit accompanying this application, and further demonstrated by the statement made at the time of his arrest, the defendant has always denied that he engaged in any type of sexual activities with the complainants in this action. It is clear from his affidavit that although he did not know that he could request DNA testing of the evidence produced at trial by the People, his properly prepared counsel should have known that such testing was available, and further that such testing would

conclusively prove or disprove the defendant's guilt or innocence on the rape charges in the Indictment.

18. It is also clear, as this case was tried after January 1, 1996, that DNA testing was available in New York State at the time of defendant's trial. See, CPL §440.30. Counsel, having known that his defense was one of duress, could only have bolstered that defense by showing that the defendant was not involved in a rape. Being forced to kidnap individuals is one thing, but raping them as well tended to discount any chance that the defendant was coerced into the criminal conduct.

19. While there are limited cases involving this exact question, there is some New York and Federal authority, as well as authority from other jurisdictions on this issue. Each of these courts has unanimously held that a counsel's failure to request such testing is an error so grievous as to deny a defendant a fair trial, when such testing would have an effect on the verdict reached.[2]

20. In People v. Kellar, 640 N.Y.S.2d 908, 218 A.D.2d 406 (3d Dept. 1996), the defendant was fully aware and discussed the options of DNA testing with counsel prior to trial. In a tactical decision made, DNA testing was not done. The facts of that case indicated that defendant did not ejaculate, and further there was no direct evidence demonstrating, nor did the People argue

---

2

In a decision, apparently filed on April 16, 2001, in the District of Virginia, a Federal Judge has held that a State violates a defendant's civil rights when they refuse to do DNA tests on serological evidence.

that is was the defendant's sperm found in the complainant. Instead, the People acknowledged that there was no connection between the sperm found and the defendant. The court held "although a test result identifying defendant as the source of the sperm found in the victim would conclusively establish his guilt, a negative result could establish only that the victim had intercourse with a male other than defendant within a period of approximately three days prior to the incident. In our view, such evidence would be probative of little more than the victim's prior sexual activity.".

21. In Dorsey v. Kelly, No. 92 CIV 943, 1997 WL 400211 (SDNY 1997), the court granted a Writ of Habeas Corpus to the Petitioner on the grounds of ineffective assistance of counsel when counsel failed to offer into evidence the results of scientific testing that may have exonerated the defendant. In Dorsey, the defendant had been convicted of sodomizing a young boy upon evidence by the complainant that the defendant had sodomized him on two different occasions. The scientific evidence received at trial demonstrated that there had been no semen on a rectal swab, but there was semen on the complainant's underpants. Available at the time of trial, but not put into evidence by defendant's counsel, were antigen tests which demonstrated that the semen on the underpants could have come from the complainant, but not from the defendant.

22. In granting the habeas petition, the court acknowledged that while counsel for defendant had been competent throughout the trial, this one "single, serious error" was sufficient to uphold the ineffective assistance claim.

Citing both <u>Kimmelman v. Morris</u>, 477 U.S. 365 (1986) and <u>Strickland v. Washington</u>, 466 U.S. 68 (1984), the court stated, that counsel's failure to "make the adversarial testing process work in the particular case" was unreasonable under professional norms, and therefore, the defendant was denied his right to counsel.

23. In <u>State of New Jersey v. Halsey</u>, No. A-3117-98T4 2000.NJ.0042191 <http://www.versuslaw.com>(N.J. App. Div. 2000), the defendant had been convicted of the murder and sexual assault of two small children after having made full oral and written confessions, failing a polygraph test, and presenting an intoxication defense. In denying this defendant's request the New Jersey court cited to various cases in which other jurisdictions had held that it was not ineffective assistance of counsel to fail to request a scientific test, when such test would not affect the outcome. <u>See</u> e.g. <u>Cooper v. United States</u>, 199 F.3d 898, 900-01 (7th Cir. 1999) (counsel cannot be found ineffective for the failure to request DNA testing of a hair sample when any test result would prove nothing material to the trial); <u>La Fevers v. Gibson</u>, 182 F.3d 705, 722 (10th Cir. 1999) (counsel cannot be found ineffective "for failing to request DNA testing" when such a test "would have been frivolous because even favorable DNA test results would not make a difference in this case"). However, the court did cite <u>State v. Velez</u>, ___ N.J. Super. __ (App. Div. 2000) where defendant's pro se petition for post conviction relief asserted both a claim of ineffective assistance of trial and appellate counsel and, independently, that "he was entitled to newly

developed DNA testing of the semen samples that had yielded inconclusive results respecting their source." Slip op. at 6. The New Jersey court did indicate that in a situation in which it is likely that the failure to request a DNA test would have affected the outcome, that such failure would indeed be a clear example of the ineffective assistance of counsel.

24. In another New Jersey case, State v. Thomas, 586 A.2d 250, 245 N.J.Super. 428 (N.J.Super.App.Div. 1991), the court granted the defendant's request, after his conviction, for a DNA test even though such failure to do the test may have been trial strategy of counsel. In its decision the court cited their previous decision in State v. Harper, 128 N.J. Super. 270, 277, 319 A.2d 771 (App.Div.1974), "relief must be afforded from tactical errors which "cut mortally into the substantive rights of the defendant." We can conceive of no course of action by counsel as more nearly affecting a defendant's substantive rights than a failure to pursue competent evidence which might conclusively prove his innocence of the crime charged. And we can conceive of no greater injustice, when that evidence is available, of depriving a convicted defendant of access to it. The prosecutor, the court, and the judicial system have an obligation to protect the innocent which is no less fundamental than the obligation to punish the guilty."

25. In Jones v. Wood, 114 F.3d 1002, 97 Cal. Daily Op. Serv. 4459 (9th Cir. 1997), the defendant was convicted of stabbing his wife 63 times and causing her death. Throughout the pretrial stages, the defendant asserted

his innocence, and in fact hired investigators to follow up a lead on another who the defendant believed was the actual killer. At the time of the incident, the defendant was found by police, his pants covered in blood. The defendant insisted that the blood was his own, the defendant having tried to protect himself against the actual killer. Defendant's lawyer, although told repeatedly by defendant to have the blood tested to determine whose blood it was, never in fact had the blood tested.

26. The Ninth circuit held that the defendant was entitled to an evidentiary hearing on his habeas petition, reversing the District Court's decision. The Court stated that the attorney's failure to have the blood tested, even if part of some type of trial strategy fell below the Strickland standard.

> "When an attorney fails to examine potentially exculpatory evidence, although he repeatedly assured the petitioner of his intention to do so, the Strickland presumption that the failure is "sound trial strategy" is surmounted. In Sims v. Livesay, 970 F.2d 1575, 1580 (6th Cir. 1992), the court observed that examination of a quilt for gunshot residue might establish whether it was between the gun and the victim at the time the shot was fired and seriously undermine the State's theory that the victim was shot from a distance. Counsel failed to have the quilt examined, and the court found this error rose to the level of ineffective assistance, holding that counsel's failure to have potentially exculpatory physical evidence examined "cannot be characterized as a reasonable exercise of professional judgment." Id. See also id. at 1581 ("counsel's failure to investigate key evidence may not be excused").

27. In Pennsylvania v. Robinson, 682 A.2d 831, 452 Pa. Super. 606 (1996), the defendant, after having been convicted of rape asserted ineffective assistance because of counsel's failure to request DNA testing. However, at the time of defendant's trial in 1990, DNA testing was not in use in any of

the Pennsylvania trial courts nor commercially available. As a result, the
court held that it was not ineffective assistance of counsel. However, the
court held that the defendant would be entitled to have a DNA test on the
semen samples if they were still in existence, and if the results demonstrated
defendants innocence then the lower court was directed to have a new trial.

28. Although DNA testing is a relatively new tool, it is a tool the results of which
are hard to dispute. For years, prosecutors have sought the "magic wand"
which would tell us who was telling the truth, and who was not. Right here
before us, in a way never imagined is that self same tool. It is now possible
to determine the exact identity of perpetrators. The odds of there being an
error are 1 in 750,000,000. The courts which have faced decisions
regarding this tool accept it with open arms, and seek to do justice with this
new tool. In any reported case in which DNA evidence might have made a
difference in the verdict, courts have required that this evidence be used.
Simply put, a defendant is denied the effective assistance of counsel under
the New York and Federal Constitutions when DNA evidence might
demonstrate his innocence and testing is not done.

29. When this defendant's trial counsel did not request DNA testing on the
serological evidence, after defendant's continued vehement protests of
innocence to the rape charges, this defendant was denied the effective
assistance of counsel. If this Court should find that this issue is adequately
set out in the record, then when appellate counsel failed to raise this issue,

he too was ineffective. As such, defendant must be granted permission to appeal, and or granted a writ of error coram nobis.

### The Defendant was Denied the Effective Assistance of Counsel when Counsel Failed to Make a Written Motion to Preclude use of Wiretap Evidence, and the Fruits Thereof

30. C.P.L. § 700.70 states:

> The contents of any intercepted communication, or evidence derived therefrom, may not be received in evidence or otherwise disclosed upon a trial of a defendant unless the people, within fifteen days after arraignment and before the commencement of the trial, furnish the defendant with a copy of the eavesdropping warrant, and accompanying application, under which interception was authorized or approved. This fifteen day period may be extended by the trial court upon good cause shown if it finds that the defendant will not be prejudiced by the delay in receiving such papers.

31. As interpreted by the Court of Appeals, the failure of the People to give notice in a timely fashion or to present good cause for such failure results in an absolute bar to the introduction of intercepted communications or the fruits of such interceptions. People v. Libertore, 590 N.E.2d 219, 79 N.Y.2d 208(1992). In People v. McGrath, 385 N.E.2d 541, 46 NY.2d 12 (1978), the Court of Appeals stated that the New York eavesdropping statutes, having been modeled upon the Federal eavesdropping statutes of Title III, were to be interpreted in the same manner. Suppression is required under Title III for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the

use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." United States v. Giordano, 416 U.S. 505,527 (1974). In Katz v. United States, 389 U.S. 347 (1967) the Supreme Court held that notice to individuals whose conversations are intercepted is required under the Federal Constitution and Title III requires such notice in order to be in compliance with Constitutional Standards.

32. In the case at bar, counsel was first notified of the use of an interception Order at a hearing held on April 19, 1996. Although the People "thought" they had turned over the eavesdropping warrant and associated materials as part of their Rosario obligation in February of 1996, not only was that not the case, but further, it was in violation of statute, and the Constitutional guarantees of the Federal and New York Constitutions.

33. At a hearing held on April 24, 1996, counsel for the defendant had not filed a written motion to have the warrant suppressed, nor the fruits thereof. Furthermore, counsel did not argue the statute, CPL §700.70, nor any of the Court of Appeals relevant decisions regarding violation of that section of the CPL. Nor, did counsel argue that this illegal eavedropping violated the dictates of Katz, supra.

34. Had counsel properly prepared, he would have learned that the Court of Appeals has interpreted the notice requirements of CPL §700.70 in the strictest manner possible. Counsel would have been able to argue to the Court that the eavesdropping warrant and all evidence obtained as a result

thereof MUST have been suppressed. Counsel would have effectively been able to have the entire case dismissed, because all the People's evidence leading up the arrest of the defendant came through information gleaned from the wiretaps. Without the wiretaps, the Police could never have located the defendant, nor arrested him.

35. In People v Schulz, (67 N.Y.2d 144), the Court of Appeals reaffirmed the need for "strict compliance with the provisions of New York's eavesdropping statute" and held that "where there has been a failure to comply with the notice provisions of CPL 700.70 and ... neither an application for an extension of time within the 15 days provided in that statute nor a showing of good cause for noncompliance and lack of prejudice to defendant" evidence derived from an intercepted communication must be suppressed. The Court noted "[t]he insidiousness of electronic surveillance [which] threatens the right to be free from unjustifiable governmental intrusion into one's individual privacy" and concluded that "law enforcement officials [must] be sensitive to the fact that there must be meticulous adherence to the terms of the warrant and the statute pursuant to which it [was] issued". The Court of Appeals has imposed this requirement of meticulous compliance with the eavesdropping statute as being consistent with the mandate of the Legislature. People v. Libertore, 590 N.E.2d 219, 79 N.Y.2d 208(1992).

36. Likewise, Federal jurisprudence under Title III, and under the Supreme Court's dictates in Katz and Berger v. New York, 388 U.S. 41 (1967), would have

required suppression of the illegally seized evidence under the Federal Constitution.

37. In the case at bar, a number of things are quite clear.   The People <u>never</u> served proper notice of the eavesdropping warrant, and, counsel never required the People to do so nor informed the court, as a proper advocate, that such a failure by the People is subject to complete suppression of the information gathered by the warrant, and all the fruits thereof.    This unspeakable error in advocacy is exactly the type of serious error which demonstrates that the defendant failed to receive the effect assistance of counsel.    Under New York or Federal mandates, the defendant did not receive meaningful assistance of counsel.

38.   No previous applications have been made for this relief.

WHEREFORE, the defendant respectfully requests that this Honorable Court grant him a Certificate for Permission to Appeal from the denial of the §440.10 CPL motion or alternatively grant a Writ of Error Coram Nobis, on the grounds of inadequacy of counsel under both state and federal constitution, and require DNA testing of the serological evidence, and for such other and further relief that this Court may deem just and proper.

Dated:     New York, New York

        July 17, 2001

Paul A. Goldberger, Esq.
Goldberger & Dubin, P.C.
401 Broadway, Suite 306
New York, New York 10013
(212)431-9380

SUPREME COURT OF THE STATE OF NEW YORK

APPELLATE DIVISION: SECOND DEPARTMENT

-------------------------------------------------------------------

PEOPLE OF THE STATE OF NEW YORK,

      -against-

HAI GUANG ZHENG,

                   Defendant.

Ind. No. 3282/95
Affidavit in Support
of Petition for Writ of
Error Coram Nobis

-------------------------------------------------------------------

State of New York:
County of        :  ss:

      Hai Guang Zheng, being duly sworn, states the following under penalty of perjury:

      1. I am the defendant herein. I make this affirmation in support of my Petition for Writ of Error Coram Nobis.

      2. I was arrested in March of 1995 for the kidnaping and rape of two women. After my arrest, I was beaten and forced to make a statement. Although I was forced to make this statement, I never, at that time, or any other, admitted to raping the women.

      3. The reason I did not admit to such a thing, is that I never had sexual intercourse with these women.

      4. All throughout the time I knew my trial counsel, Mr. Schechter, I told him

over and over that I did not have any sexual relations with the women.

5. I told him that I was involved with the kidnaping, but only because I was forced to do so. Though I was never proud to admit it, I came to this country illegally. I was smuggled into the country by a person, a snakehead called Ak Guan. I was supposed to pay Ak Guan $30,000 to come to this country. I paid him some of this money, and was working in America to pay him the rest.

6. At the time of the kidnaping, I still owed Ak Guan $12,000. He told me that if I did not help him with the kidnaping that he would kill me, and my parents, who are still in China.

7. I know, and knew then, that he still had connections in China, which are very powerful, and that all he would have to do was make a phone call and my family would die.

8. Fearing for my life, I did as Ak Guan said, but no more. I did not rape those women, and in fact, they were safely on their way back home when I was arrested.

9. I do not have much education, and I still do not speak the English language. I understand that this statement that you are reading in English, and I will sign, is exactly the same statement that is attached to this one in Chinese, which I have also signed.

10. At the time of my trial, I did not know anything about scientific tests or DNA testing. I only knew, and made it clear to my attorney, that I did not touch the women in any sexual way. I believe my attorney failed to represent my interests when he did not request DNA testing of the semen. After all, it could not have been mine, and would have conclusively shown that I did not rape these women.

11. It would have also shown that these women were lying about the rapes, and would have put into question all of the other things they said about me.

12. I request that this Court grant me the opportunity to have that semen tested for DNA. This will conclusively show that I did not rape these ladies.

13. I was assigned counsel for my appeal. Even though I told my new attorney about the fact that I did not rape the women, he refused to discuss the issues he was going to raise on appeal with me.

14. After he sent me a draft of the appeal, I wrote back to him regarding the DNA issue, which I had subsequently learned about.

15. I was not happy with the brief as it was written, so I requested permission to file a supplemental brief with this Court. I am not sure whether such supplemental brief was considered.

16.   Although I was unable to pay for counsel on my appeal, I do not believe that I should be punished for his inability to present to pertinent issues to this Court. As a result, I respectfully request that this Court grant me a new trial and/or a DNA test so that I may show that I never raped anyone.

Dated:      New York, New York
            July 10, 2001

X  *Zheng - Hai Guang*
   Hai Guang Zheng

Sworn to before me on this
10_TH_ day of July, 2001

Notary Public

**PAUL J BRAUN**
**Notary** Public State of New York
Qualified in Dutchess County
Commission # 01BR5070658
Commission Expires Dec 23 2002

# *EXHIBIT A*

Short Form Order

SUPREME COURT - STATE OF NEW YORK
CRIMINAL TERM, PART K-25, QUEENS COUNTY
125-01A Queens Blvd., Kew Gardens, N.Y. 11415


P R E S E N T :        **HON. STANLEY B. KATZ**
                       _____
                              Justice

----------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK     :    IND. NO: 3282/95
                                        :    Motion: C.P.L. §440.10
             -against-                  :    For New Trial
                                        :    _____
                                        :    _____
                                        :    Submitted  _____
HAI GUANG ZHENG                         :    Argued     _____
----------------------------------------x    Hearing    _____

The following papers numbered
1 to _____ submitted on this motion.


                              Paul A. Goldberger, Esq.
                                   For the Motion

                              Urshir Pandit, Esq.
                                    Opposed


                                   Papers Numbered

    Notice of Motion and Affidavits Annexed  ...................

    Answering and Reply Affidavits  ..........................

    Exhibits  ..............................................

    Minutes - Other  ......................................


    Upon a review of the papers submitted, and in the opinion of
the Court, the defendant's motion is decided as indicated in the
accompanying memorandum of this date.

Date: June 18, 2001              ...........................
                                  STANLEY B. KATZ, J.S.C.

# M E M O R A N D U M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS:CRIMINAL TERM: PART K-25

---------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK   :  BY:   KATZ, J.
                                        :
        -against-              :  DATED: June 18, 2001
                                        :
HAI GUANG ZHENG                   :  IND. No.: 3282/95
---------------------------------------x

The defendant, convicted after trial of Kidnapping in the first degree (4 counts), Rape in the first degree (2 counts), Kidnapping in the second degree, Sex Abuse in the first degree (2 counts) and Criminal Possession of a Weapon in the second degree, moves for a new trial pursuant to C.P.L. §440.10.

The defendant contends as follows:

(1) The defendant was denied a fair trial because his attorney failed to request DNA testing which would have shown that the defendant did not commit rape;

(2) The defendant was denied effective assistance of counsel when his attorney failed to make a written motion to preclude use of wiretap evidence, and the fruits thereof.

The motion of the defendant is denied for the following reasons:

(1) The claims of the defendant are procedurally barred pursuant to C.P.L. §440.10(2)(c). Facts pertaining to these allegations are in the record, and could have been reviewed on defendant's direct appeal.

(2) The claims of the defendant are without merit.

Order entered accordingly.

The Clerk of the Court is directed to forward copies of this decision to the office of the District Attorney and to the attorney for the defendant.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
STANLEY B. KATZ, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------ X

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, | : | Return Date: August 24, 2001 |
| Respondent, | : |  |
|  | : | AFFIRMATION IN OPPOSITION TO |
| -against- | : | DEFENDANT'S APPLICATION FOR LEAVE TO APPEAL |
|  | : | AND FOR A WRIT OF |
| HAI GUANG ZHENG, |  | ERROR CORAM NOBIS |
|  | : |  |
| Defendant. | : | Queens County |
|  | : | Indictment Number 3282/95 A.D. No. 94-7406 |
|  | : |  |

------------------------------------------------------------------ X

USHIR PANDIT, an attorney admitted to practice law in the State of New York, affirms the following statements to be true under the penalties of perjury:

1. I am an Assistant District Attorney, of counsel to Richard A. Brown, the District Attorney of Queens County. I am submitting this affirmation in opposition to defendant's July 17, 2001 motion for leave to appeal the trial court's denial of his motion to set aside his conviction pursuant to section 440.10 of the Criminal Procedure Law. I make the statements in this affirmation upon information and belief and based on my review of the records and files of the Queens County District Attorney's office.

2.  In the evening of March 31, 1995, Jin Hao Liu went to the airport to meet her brother, Guo Bang Liu, and his wife, Liu Yan Wu. After meeting at the airport, the three got into a car-service automobile to leave the airport. Shortly after entering the car, the car was cut off by a second car driven by defendant, forcing the Liu's car to stop. A second man, known as Ak Guan, was in defendant's car in the passenger seat.

3.  After defendant stopped the victims' car, Ak Guan and defendant got out of their car, went to the victims' car and, at gunpoint, ordered the victims to leave their car and get into the back seat of defendant's car. Ak Guan ordered the victims to produce their passports. After examining the passports, Ak Guan stated that the wrong people had been taken.

4.  As a result, defendant stopped the car near the Brooklyn Bridge, and gave the man, Guo Bang Liu, one or two quarters and a piece of paper with telephone numbers written on it. Guo Bang Liu was then ordered to get out of the car, leaving his wife and sister with defendant and Ak Guan. Guo Bang Liu found a car to take him to his family's home in Chinatown. After he returned home, Guo Bang Liu went with one of his sisters to the 5th Police Precinct station house to report the Kidnapping.

5.  In the meantime, defendant and Ak Guan took Jin Hao Liu and Liu Yan Wu to a basement apartment in an unknown location. After some time, a third man, Qin Guang Zheng, arrived at the apartment. Shortly after co-defendant Zheng's arrival, Ak Guan left. The two women were forced to spend the night in the apartment with defendant and co-

2

defendant Zheng. Defendant was in possession of a pistol, that he kept by his pillow when he slept. Neither woman was able to sleep.

6. The next morning, defendant took Liu Yan Wu into a separate room and began touching her breasts with his hands. He removed her clothing and put his penis into her vagina while holding a gun to her head. Defendant then brought Liu Yan Wu back into the first room and took Jin Hao Liu into the other room and raped her. Co-defendant Zheng also raped both women.

7. Jin Hao Liu was asked for her phone number, which she wrote down for her captors. After receiving the telephone number, defendant left the apartment several times. Defendant also made and received several telephone calls in the presence of the women. At one point, Jin Hao was permitted to speak with her family over the phone. She asked her family to give the kidnappers the money.

8. On April 1, 1995, Jin Hao and Guo Bang Kiu's sister Emily Liu, received a call demanding $20, 000 for the return of each woman. Emily Liu received several more calls from the same man, which were monitored by the police. Ultimately, defendant and his accomplices reduced their demands to $7500.00 for the return of each woman. Emily Liu was told to bring the money in a bag of groceries to a location in Chinatown.

9. The police determined that the ransom calls were being made from a cellular phone in the vicinity of 133-34 59th Avenue, in the Flushing area of Queens. At approximately 12:05 a.m., on April 2, 1995, defendant and co-defendant Zheng were stopped

3