CA H
3/9/96

Copy

1                                    1

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF QUEENS: CRIMINAL TERM: PART K-11
3   ---------------------------------------------x

4   THE PEOPLE OF THE STATE OF NEW YORK,

5              -against-              Indictment No.
                                     3282/95
6
                                     Huntley Hearing
7

    HAI GUANG ZHENG and QIN GUANG ZHENG,
8

9                           Defendants.

10  ---------------------------------------------x

11                          February 8-9, 1996
                            125-01 Queens Boulevard
12                          Kew Gardens, New York   11415

13

    B e f o r e:
14
                   HONORABLE JOHN J. CLABBY,
15                          Justice.

16

    A p p e a r a n c e s:
17
                   RICHARD A. BROWN, ESQ.,
18                 For the People
                   District Attorney/Queens County
19                 By:   Scott Kessler, Esq.,
                   ASSISTANT DISTRICT ATTORNEY
20
                   LISA PELOSI, ESQ.,
21                 Attorney for Defendant Qin Guang Zheng

22                 DONALD SCHECHTER, ESQ.,
                   Attorney for Defendant Hai Guang Zheng
23

24                          NANCY SAMMS,
                            Senior Court Reporter
25

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

2

THE COURT CLERK:  This is Zheng and Zheng,

3282 of 95.  Huntley hearing, Hai Guang Zheng and

Qin Guang Zheng.  Both defendants are present.

MR. KESSLER:  Scott Kessler for the People.

MS. PELOSI:  Lisa Pelosi, 8 Adams Square.

MR. SCHECHTER:  Donald Schechter for Hai

Zheng.

THE COURT:  I want to comment on the fact that

Mr. Schechter and Miss Pelosi have been here since

9:30 this morning at the direction of the court.

They have been studying all of the Rosario material

handed to them by the district attorney.  They have

been working diligently on this case.  I think you

are both 18(b) assigned?Á

MR. SCHECHTER:  I am, your Honor, and I would

ask for a copy of the minutes hearing.

MS. PELOSI:  I am not, but my client has no

funds for any transcript.

THE COURT:  That's unfortunate.  I direct that

a copy of the transcript be given to

Mr. Schechter.

Do you have a witness?

MR. KESSLER:  Yes, I do.  I just realized that

the witness did testify in the grand jury.  I

3

2      didn't put him in, the bureau chief did, but he

3      does have a few more pages of Rosario material.

4         THE COURT: Put him on and before

5      cross-examination, they will get that.

6         MR. KESSLER: The People at this time call

7      Detective Keith Ng.

8   D E T.    K E I T H    N G, shield no. 4280, NYPD, having

9      been called as a witness by and on behalf of the

10      People, after having been first duly sworn, was

11      examined and testified as follows:

12         THE COURT OFFICER: The People call Keith Ng,

13      N-G, shield number 4280 from the Queens robbery

14      squad.

15 DIRECT EXAMINATION

16 BY MR. KESSLER:

17     Q.   What's your present assignment?

18     A.   Detective assigned to Queens robbery squad Asian

19 crime investigation team.

20     Q.   How long have you had that assignment?

21         MR. SCHECHTER: Your Honor, may I sit over

22      there because I am having a problem hearing because

23      the interpreter is translating?

24         THE COURT: Yes.

25     Q.   What's your duties and responsibilities in your

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1

2   assignment?

3       A.   My duties and responsibilities is investigation of

4   Asian gang crime related in Queens County in the city.

5       Q.   Have you ever had occasion to work with the major

6   case division of the New York City Police Department?

7       A.   Yes, I work so many times with the major case

8   squad.

9       Q.   Do you speak any other language other than English?

10      A.   Yes, Chinese.

11      Q.   What type of Chinese language do you speak?

12      A.   I speak Cantonese, Mandarin and Tiason,

13   T-I-A-S-O-N, and some Tijuan.

14      Q.   Is Mandarin your native language?

15      A.   Yes, one of my native languages, native dialects.

16      Q.   During your course of employment with the New York

17   City Police Department, did you have an opportunity to speak

18   to either Mr. Hai Guang Zheng or Qin Guang Zheng?

19      A.   Yes.

20      Q.   What date did you speak to them?

21      A.   I spoke to them on March 2, 1995 -- I'm sorry.

22   Excuse me.  Can I refresh my --

23      Q.   Sure.

24      A.   I made a mistake.  It was actually April 2nd, 1995.

25      Q.   Where did you speak to them?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1          Ng-People-Direct          5

2       A.    I spoke to them in police headquarters, One Police

3  Plaza in New York City.

4       Q.    Approximately what time did you speak to them?

5       A.    It was like early morning approximately from five,

6  approximately 4:30 to 5:00 to 7:00.

7       Q.    Do you recall who, if anyone, you spoke to first?

8       A.    Yes.

9       Q.    Who did you speak to first?

10      A.    I spoke to Qin Guang Zheng first.

11      Q.    Do you recall exactly what time you spoke to him?

12      A.    I have to refresh my recollection.

13      Q.    Sure.

14            MR. KESSLER:  With the Court's permission.

15            MR. SCHECHTER:  Your Honor, I ask what the

16            detective what is he looking at to refresh his

17            recollection.

18            THE COURT:  Could you tell us?

19      A.    It was a statement from Mr. Guang Zheng.  I spoke

20  to him at 0545 hours, at 5:45 a.m. on April 2, 1995.

21      Q.    As for the other individual, what time did you

22  speak to him?

23      A.    Approximately an hour later, it should be

24  approximately -- about 6 p.m., 6:05 a.m. in the morning.

25      Q.    Did you write down the time that you spoke to them?

1

2    A.    Yes.

3    Q.    Could you look at your notes and refresh your

4 recollection as to what time you wrote down as the time you

5 spoke to them?

6    A.    Okay.  Yes.  The second person I spoke to him Hai

7 Guang Zheng was 6:15 a.m. on April 2, 1995.

8    Q.    Let's talk about the first person you spoke to.

9 What was that person's name?

10   A.    Qin Guang Zheng, Q-I-N    H-U-A-N-G.

11   Q.    I will refer to him as Qin, okay, Q-I-N.  The

12 person Qin that you spoke to first, could you describe the

13 room that you spoke to him in?

14   A.    I spoke to him on the 11th floor of One Police

15 Plaza in the major case office in one of the interview in the

16 office right by major case squad.

17   Q.    At the time when you first saw him, how did he come

18 to be up on that floor?Who brought him there, do you know?

19   A.    The other members, detectives from major case squad

20 brought him into the squad location.

21   Q.    When Qin gets into the squad location, did the

22 other members stay there or did they leave?

23   A.    They left.  Earlier after the pedigree information,

24 I took them to the office to talk to them.

25   Q.    After the pedigree information, I couldn't hear the

1

2  last part?

3       A.   After the pedigree information, and I took them to

4  the interview room and spoke to him, the interview room.

5       Q.   This interview room is on what floor?

6       A.   Seventh floor of One Police Plaza.

7       Q.   Was there anyone else there or just you and Qin in

8  the interview room?

9       A.   Yes, just me and Qin.

10      Q.   Before you continued talking to Qin what, if

11  anything, did you do?

12      A.   First of all, before I spoke to him, I read him his

13  Miranda rights.

14      Q.   When you say you read him his Miranda rights, did

15  you use any special form?

16      A.   Yes, I read in English and in Chinese, and he

17  understand it and he document it.  He signed it, and I signed

18  it then I started to talk to him.

19      Q.   The form that you used is that a police department

20  form or your own form?

21      A.   It's police form we use --

22               THE COURT:   What was the second language other

23           than English?

24               THE WITNESS:   Chinese Mandarin dialect.

25               THE COURT:   Did you read the English warnings?

1
2      THE WITNESS:  I read English because the

3      Chinese one, Mandarin form the top was English then

4      Chinese writing.  I read the English first.

5           THE COURT:  Did you ask him if he understood

6      English?

7           THE WITNESS:  I asked him.  They said they did

8      not understand English.

9           THE COURT:  Why did you read English?

10          THE WITNESS:  It's my standard practice.

11     Q.  Now, the form that you used to read him the

12     Mandarin, do you have a copy of that with you today?

13     A.  Yes.

14          MR. KESSLER:  Could we possibly have that

15     marked as People's Exhibit 1 for identification.

16          THE COURT:  People's Exhibit 1 for

17     identification deemed marked.

18          (People's Exhibit 1, Miranda, deemed marked

19     for identification.)

20          THE COURT:  Okay.  Go ahead.

21     Q.  Officer, do you recognize what's been deemed marked

22     as People's Exhibit 1 for identification?

23     A.  Yes.

24     Q.  What is that?

25     A.  It is a copy of the Miranda warning I read to

1                          Ng-People-Direct          9

2   Mr. Qin Guang Zheng on April 2nd, 1995.

3        Q.   Is that copy a same thing of the original?

4        A.   Yes.

5        Q.   It's an exact same copy?

6        A.   Yes, it is.

7        Q.   Is that basically in the same or substantially the

8   same condition as the time that you read it as it is today?

9        A.   Yes.

10            MR. KESSLER:   For the purpose of the hearing,

11        I ask that People's Exhibit 1 be deemed in

12        evidence.

13            THE COURT:   Did you say your initials were on

14        that?

15            THE WITNESS:   My signature.

16            THE COURT:   Anybody else's signature?

17            THE WITNESS:   The defendant's Qin Guang

18        Zheng's signature.

19            THE COURT:   Did you fill out a separate form

20        for each of the defendants?

21            THE WITNESS:   Yes, I had two separate forms,

22        yes.

23            THE COURT:   Let it be -- any voir dire?Let it

24        be deemed marked People's Exhibit 1 in evidence.

25            (People's Exhibit 1, deemed marked and

1

2          received into evidence.)

3     Q.   Detective Ng, the warnings after you read first

4    warning in Mandarin, what if any was the response of Mr. Qin

5    Guang Zheng?

6     A.    After the warning, I read the six questions in the

7    warnings and each question after I read it, I turn around and

8    let him read it, and he wrote down himself in Chinese writing

9    as understood in Chinese writing, Chinese character next to

10   each question.

11        Then I go for the next question and next right, and I

12   read it to him in English and Chinese, and he marked down

13   understand and until the last question the sixth question,

14   then I read it again in Chinese, and he himself read it, and

15   he write down agreeing to, willing, agreed to be willing to

16   answer the question.

17    Q.   On that form, the Mandarin writing is that an exact

18   interpretation of the English of it?

19    A.    Yes.   It's not the Mandarin writing but Chinese

20   universal writing.   It's Chinese writing exactly interpreted

21   into English one.

22    Q.   Did you speak to him in Mandarin?

23    A.   Yes.

24    Q.   After you had read him all the warnings, who, if

25   anyone, signed the document?

1

2    A.   Mr. Qin Guang Zheng signed it.

3    Q.   Did he print his name anywhere as well?

4    A.   Yes, he signed in Chinese an in English name.

5    Q.   Did you sign the document?

6    A.   I signed my name.

7    Q.   Did you note the time?

8    A.   Yes, the time is 0545 hours.

9    Q.   And the date?

10    A.   April 2nd, 1995.

11    Q.   After you read the Miranda warnings to Qin in

12 Mandarin, and he signed it, and you signed the document, what

13 was the next thing that happened?

14    A.   Then I asked him to tell me what happened.

15    Q.   Did you speak to him regarding the incident after

16 you said what happened, just yes or no?

17    A.   Yes.

18    Q.   Did he speak to you?

19    A.   Yes.

20    Q.   How long did he speak to you for?

21    A.   For approximately 35 minutes, half hour.

22    Q.   Did you make any notation anywhere in your notes as

23 to the time the interview ended?

24    A.   I can refresh my recollection.

25    Q.   Any time, just let me know.

Ng-People-Direct          12

1

2    A.    I look at the statement.  I do not -- for Mr. Qin I

3  did not indicate exactly what time I finished the interview,

4  but I recall approximately half hour up to 45 minutes.

5    Q.    During the time that he was speaking, did he speak

6  to you in English or Mandarin?

7    A.    Mandarin.

8    Q.    Did you speak to him in English or Mandarin?

9    A.    Mandarin.

10.   Q.    At the time that you were speaking to him, did you

11  take any notes?

12    A.    No, I just listen to him speak to me first then I

13  translate in English.  I didn't take any notes.  After it's

14  done, then I said can I write down what he say, and you sign

15  and document it, he said yes.

16    Q.    During the interview with him, did you take

17  notations down as to what he said, yes or no?

18    A.    Yes.

19    Q.    Were they in English or Mandarin?

20    A.    English.

21    Q.    Did you take them contemporaneously at the same

22  time as he was speaking to you?

23    A.    No.

24    Q.    You took them before or after?

25    A.    After I spoke to him.

1               Ng-People-Direct        13

2       Q.    Now, after he spoke to him and you wrote down what

3    he said in English, what did you did next do with regard to

4    the statement?

5       A.    After I repeat to him, I read back to him in

6    Chinese, translated in Chinese.

7       Q.    What did you translate?

8       A.    Translate from the note the statement that he gave

9    to me.

10      Q.    Back up a second.  When you say the second, is this

11   the English writing that you wrote?

12      A.    The English writing.

13      Q.    Do you have a copy of that with you today?

14      A.    Yes.

15            MR. KESSLER:  Can we mark it People's Exhibit

16            2 for identification deemed.

17            THE COURT:  Deemed marked People's Exhibit 2

18            for identification.

19            (People's Exhibit 2, statement, deemed marked

20            for identification.)

21      Q.    Do you recognize what's been deemed marked as

22   People's Exhibit 2 for identification?

23      A.    Yes.

24      Q.    What is that?

25      A.    This is a copy of the estimate that I took from

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1

2  Mr. Qin Guang Zheng.

3      Q.    Is it your signature appearing on it?

4      A.    Yes, my signature is on the bottom.

5      Q.    Does his signature appear on it?

6      A.    Yes.

7      Q.    Did you make the notations on the day that you

8  interviewed him?

9      A.    Yes, that was actually the day. Qin Guang Zheng put

10 a notation of the date.

11     Q.    Who marked the date?

12     A.    Mr. Qin.

13     Q.    Is that in the same or substantially the same

14 condition as the time that you wrote it?

15     A.    Yes, but except in the back I wrote down the

16 complaint number.

17     Q.    Other than the complaint number being written on

18 the back, is there any other difference?

19     A.    No.

20              MR. KESSLER:  For purposes of the hearing, I

21         ask that it be deemed marked into evidence.

22              THE COURT:  Show it to counsel.

23              MS. PELOSI:  Yes.

24              (People Exhibit 2, deemed marked and received

25         into evidence.)

1          Ng-People-Direct          15

2        Q.    Now, the words that are written on People's Exhibit

3    2 in evidence, did you translate each and every one of those

4    words to Mandarin?

5        A.    Yes.

6        Q.    After you translated them to Mandarin, was there

7    any changes done?

8        A.    Yes, a mistake I make in the statement then I ask

9    myself to initial it and Mr. Zheng initialed that document.

10       Q.    Where on that document do you see where you made a

11   mistake, and he initialed, if anywhere?

12       A.    I have to look at the statement.

13       Q.    First paragraph?

14       A.    First paragraph third line, there is initial, and I

15   keep going still in the first paragraph the last three lines

16   he had also initial on it.

17       Q.    The Chinese writing that's after the word together

18   and right above the word on, whose initials or writing is

19   that?

20       A.    One is QGZ, that's Mr. Zheng's initial, and one is

21   mine.

22              THE COURT:  Are you offering that item into

23              evidence?

24              MR. KESSLER:  I think I put it in.

25              THE COURT:  Let it be deemed marked People's

1
2   Exhibit 2 in evidence.

3         THE COURT OFFICER:  Now it's in evidence.

4   Q.   After you had made the corrections and you
5   initialed and Mr. Qin initialed, what happened after that?

6   A.   I translate and read back to him, and he understand
7   it then I tell him I read it back exactly what he say on the
8   statement, and he agreed and signed it and document it.

9         THE COURT:  When you say he understood it, you
10        mean he said he understood it?

11        THE WITNESS:  Yes.

12  Q.   Did you ask him explicitly do you understand?

13  A.   Yes, I said do you understand, any change he said
14  no and then he signed it.

15  Q.   He signed it where?

16  A.   On the bottom of the statement and on the top on
17  the horizontal, he signed the statement.

18  Q.   After he sign it, did you sign it as well?

19  A.   Yes.

20  Q.   Did that conclude your interview at the time with
21  Qin Guang Zheng?

22  A.   Yes.

23  Q.   Who, if anyone, was the next person you
24  interviewed?

25  A.   I spoke to the next person Hai Guang Zheng.

2          THE COURT:  Off the record.

3              (Whereupon, an off-the-record discussion was

4          held.)

5          THE COURT:  All right.

6     Q.   You indicated that you spoke to somebody after you

7  spoke to Qin?

8     A.   Yes.

9     Q.   Who did you speak to?

10    A.   Hai Guang Zheng.

11    Q.   I will refer to the individual as Hai now.

12    A.   Yes.

13    Q.   Do you see him in the courtroom today?

14    A.   Yes.

15    Q.   Point him out?

16    A.   On the left-hand side, the person with the black

17  leather jacket on the table far in my left.

18          THE COURT:  Indicating that defendant.

19    Q.   The individual that you described as Qin do you see

20  him in the courtroom?

21    A.   Yes.

22    Q.   Describe an article of clothing.

23    A.   He is on my left hand table in the middle with the

24  multi-colored flowers, gray white T-shirt or sweater, long

25  sleeves.

1

2          THE COURT:   Let the record indicate that's the

3          other defendant.

4     Q.   What time did you interview Hai Guang Zheng?

5     A.   About 6:45.

6     Q.   Did you note anywhere the time?

7     A.   6:15.

8     Q.   Did you note the time anywhere is my question?

9     A.   Yes.

10    Q.   Where did you put the time?

11    A.   Let me refresh my recollection.   It's on quarter

12    after 6 a.m. in the morning, April 2, 1995.

13    Q.   Where did you interview him?

14    A.   I interviewed him in the same room on the 11th

15    floor, One Police Plaza in the major case squad office.

16    Q.   Was anyone present with you at the time?

17    A.   Yes, just me and him.

18    Q.   Before speaking to Hai Guang Zheng, what, if

19    anything, did you do?

20    A.   Again I read the Miranda in Chinese and English and

21    in Mandarin dialect.   He got a chance to read it.   He

22    understood each question, and he write understand on each

23    question.   The last question number six he is willing and

24    understand.

25    Q.   The last question number six?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                          Ng-People-Direct          19

2        A.   He agreed and willing to answer the question.

3             THE COURT:  Did he say he understood all the

4        questions?

5        A.   Yes, he wrote down in Chinese, yes.

6        Q.   Do you have the form with you today?

7        A.   Yes.

8        Q.   Do you have a copy of it?

9        A.   Yes.

10            MR. KESSLER:  Deemed marked People's Exhibit 3

11       for the purpose of the hearing.

12            THE COURT:  Deemed marked for identification

13       as People's Exhibit 3.

14            (People's Exhibit 3, Miranda warnings, deemed

15       marked for identification.)

16       Q.   I will hand you what is deemed marked as People's

17  Exhibit 3 for identification.  Do you recognize what that is?

18       A.   Yes, this is a copy of the Miranda warnings,

19  English and Chinese Miranda warnings that I read and also

20  Mr. Hai Guang Zheng read the Miranda warnings.

21       Q.   Does your signature appear on the document?

22       A.   Yes.

23       Q.   Does his signature appear on the document?

24       A.   Yes.

25       Q.   Is it in substantially the same condition as now as

1
2  then?

3      A.   Yes.

4           MR. KESSLER: I offer it for the purposes of
5      the hearing.

6           MR. SCHECHTER:  Your Honor, instead of having
7      a voir dire now, I prefer to let everything go
8      until cross-examination.

9           THE COURT:  Okay.  Let it be deemed marked as
10     People's Exhibit 4 in evidence, deemed marked.
11     That's the statement by Hai.

12          (People's Exhibit 4, deemed marked and
13     received in evicence.)

14     Q.   Did you read Hai each of the warnings in Mandarin?

15     A.   Yes, I read him each question and after each
16  question I let him read it in Chinese writing the Miranda
17  warnings.  He understand that he wrote down in Chinese
18  character that he understood.

19     We move to the next question the same thing I read them
20  in English and Chinese, and he got a chance to read it.
21  After that he mark down that he understood until the sixth
22  question, and I read to him the last number six that he
23  understood, and willing to answer questions.

24     Q.   After he had written that he was willing to answer
25  questions, what, if anything, did you do at that point?

 2    A.    I ask him to sign it. He sign it in English and
 3  Chinese, and on the bottom of the six questions and myself
 4  signed it and date it, and time.

 5    Q.    After you signed it, and dated it, what, if
 6  anything, did you do next?

 7    A.    Then I ask him talk about the incident.

 8    Q.    Now, how long did you speak to him for?

 9    A.    I have to look in the time to refresh my memory.
10  To refresh my memory I look in the statement.

11            THE COURT:   You said the first statement was
12        somewhere between half hour and 45 minutes. The one
13        with Hai was that longer or shorter?

14            THE WITNESS:   Longer.  Approximately an hour
15        and five minutes.

16            THE COURT:   All right.

17    Q.    Did you note anywhere the time that you finished
18  the interview?

19    A.    Yes.

20    Q.    What time was that?

21    A.    I finished 20 after 7 a.m., or 0720 on April 2,
22  1995.

23    Q.    Now, after you said to him what happened, did he
24  speak to you about the incident?

25    A.    Yes.

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1

2     Q.   Now, at the time that he spoke to you about the

3  incident, did you write down what he was saying?

4     A.   After I spoke to him yes, I bring it down at the

5  time.

6     Q.   First he spoke?

7     A.   Yes.

8     Q.   Did you take notes when he spoke?

9     A.   No.

10    Q.   After he finished, what did you do?

11    A.   Then I start writing the statement.

12    Q.   When you started writing the statement, did you

13 write it in English or Mandarin?

14    A.   English.

15    Q.   Do you have a copy of the English statement that

16 you wrote that day?

17    A.   Yes.

18         MR. KESSLER:  Can we deemed this marked

19         People's Exhibit 4 for purposes of the hearing.

20         THE COURT:  Yes, so marked.

21         (People's Exhibit 4, three-page document,

22         deemed marked for identification.)

23         THE COURT OFFICER:  Three pages.

24         THE COURT:  All right.

25    Q.   Detective, I show you what's been deemed marked as

1                                   Ng-People-Direct          23

2    number four for identification.  Do you recognize that?

3         A.   Yes.

4         Q.   What is that?

5         A.   This is a copy of the statement of the written

6    notes that I took from Hai Qin Zheng on April 2nd, 1995.

7         Q.   Is that an exact copy of the statement that you

8    took?

9         A.   Yes.

10        Q.   Is it in substantially the same condition now?

11        A.   Yes.

12        Q.   Is your signature appearing on the document?

13        A.   Yes.

14        Q.   Do you recognize your signature?

15        A.   Yes.

16        Q.   Does his signature appear on the document?

17        A.   Yes.

18        Q.   On the document does it appear anywhere the time

19   that the interview finished?

20        A.   Yes.

21        Q.   What time was that?

22        A.   That was at 7:20.

23             MR. KESSLER:  I ask that People's Exhibit 4 be

24             marked into evidence for purposes of the hearing.

25             THE COURT:  It's been marked.

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

MR. KESSLER:  Moved into evidence, your

Honor.

MR. SCHECHTER:  Your Honor, I just ask that I

reserve everything until cross-examination, voir

dire of whatever.

THE COURT:  You are saying that you want it

deemed marked in evidence?

MR. KESSLER:  Yes.

THE COURT:  All right.  So received.

(People's Exhibit 4, deemed marked and

received into evidence.)

MR. SCHECHTER:  Your Honor, I will reserve my

voir dire for cross-examination.

THE COURT:  Yes, I will give that same right

to Miss Pelosi.

MS. PELOSI:  Thank you.

THE COURT:  Was anybody in the room with you

when you examined Qin?

THE WITNESS:  When I talked to him?

THE COURT:  Yes.

THE WITNESS:  No.

THE COURT:  Was anybody in the room when you

interrogated Mr. Hai?

THE WITNESS:  I interrogated him in a room,

Case 1:16-cv-01166-RJD Document 8-3 Filed 11/30/16 Page 25 of 136 PageID #: 469

1
2     no.
3            THE COURT:  It was just you and him?
4            THE WITNESS:  The one other detective was
5     standing in the hallway.
6            THE COURT:  It was a one-on-one situation in
7     each case?
8            THE WITNESS:  Yes, sir.
9            THE COURT:  Now, after you wrote down his
10    statement in English, what did you do after you
11    wrote it down in English?
12           THE WITNESS:  Again I read it become to them,
13    I read it back to him to make sure he understand
14    the statement what I wrote down in Chinese, and is
15    there any mistake I made in the statement, he
16    initialed and I initialed.
17    Q.    Was there any corrections made with regards to his
18    statement?
19    A.    I got to look at the statements.
20    Q.    Take a look.
21    A.    (Witness reviews notes.) There is several
22    corrections was made in the statement.
23    Q.    There was a correction made?
24    A.    Yes.
25    Q.    On what page does the correction appear?

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

A.    On the first page under my -- in the middle of the statement, and it was like when I make a mistake and I cross and he initialed it, and I initialed it. On the bottom of the page on page 1 on the third line from the bottom the same thing it was a mistake and then he initialed and I initialed it. I move to the second page in the second paragraph again the middle of the page, he initialed it, and I initialed it. And go on move to the last page the first line of the page, there he initialed, and I initialed it. The third line on the third page, in the car, I crossed out the car, and he initialed it, and I initialed it.

Q.    So every correction he requested you crossed out and initialed it; is that correct?

A.    Yes, every correction he requested or I find mistake it was crossed out.

Q.    After you read him over the statement with the corrections, what happened in Mandarin what happened next?

A.    Then I translate in Mandarin, I read it back to him, he said this is the same thing what he said and then he signed it.

THE COURT:   Let me ask you this:   On the so-called mistakes that were made, were they mistakes that you made or mistakes that were made because he gave information different than you had

2    written down?

3          THE WITNESS:  Mistake I made.

4          THE COURT:  In other words, he told you

5    something different than you wrote down, and you

6    had to correct it?

7          THE WITNESS:  Like I said, no, it was not any

8    information that I wrote down and changed.

9          THE COURT:  Was it your information that you

10   changed or information that he gave you that you

11   changed?

12         THE WITNESS:  No, like a spelling error or

13   some information that he gave to me I wrote to down

14   wrong, and he catch.

15         THE COURT:  The information that he gave you

16   was wrong, and you changed it?

17         THE WITNESS:  Yes.

18   Q.   After you finished making the corrections, did you

19   read him the version with all the corrections in it?

20   A.   Yes.

21   Q.   After you read him the version with all the

22   corrections in it, what did he say and what did you do?

23   A.   He understand it, and he have no objection, and

24   then he signed it.

25   Q.   Did he say he has no objection?

1

2    A.    Yes.

3              THE COURT:  Did he say he understood it?

4    A.    Yes.

5    Q.    After he said that he understood and no more

6    corrections, what did you do and he did?

7    A.    He signed the statement documenting the time, and I

8    signed the statement, the end of the statement and also each

9    page of the each on the side, horizantally he signed it, and

10   I signed it.

11             THE COURT:  Do you know when they were

12        arrested?

13             THE WITNESS:  Yes, I do, sir.

14             THE COURT:  When?

15             THE WITNESS:  It was about early morning, if I

16        remember correctly.  I don't have the paperwork

17        with me.  It was about 1:00 in the morning.

18             THE COURT:  Did they ask for any food or

19        anything while they were with you?

20             THE WITNESS:  No.

21             THE COURT:  Did you give them anything, any

22        coffee or any food?

23             THE WITNESS:  No.

24             THE COURT:  Did they have to go to the

25        bathroom?

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

Case 1:16-cv-01166-RJD   Document 8-3   Filed 11/30/16   Page 29 of 136 PageID #: 473

1

2          THE WITNESS:  Yes.

3          THE COURT:  Did you let them go to the

4     bathroom?

5          THE WITNESS:  Yes.

6          THE COURT:  Were they under the influence of

7     any liquor if you know?

8          THE WITNESS:  No, sir.

9          THE COURT:  Narcotics?

10         THE WITNESS:  No, sir.

11         THE COURT:  Did they appear to be responsive?

12         THE WITNESS:  Yes, they respond intelligently

13    and cooperate no problem.

14         THE COURT:  Thank you.

15    Q.   Without telling us exactly what was said, what was

16    the gist of what each of them said?

17         MR. SCHECHTER:  Objection, Judge.  If there is

18    a statement in evidence or deemed marked in

19    evidence, that would go to the statement and the

20    gist of whatever said would be his interpretation.

21         THE COURT:  I think at this stage whatever

22    they wrote down would be all right.  Any other

23    questions?

24         Miss Pelosi, what do you want to do?

25         MS. PELOSI:  I only have a few questions.  I

1

2          am willing to go forward.

3                    THE COURT:  I am with you.

4                    MR. KESSLER:  The grand jury minutes are

5          downstairs.  It would take me a minute.

6                    THE COURT:  Why don't we finish the

7          examination if we can do it.  Send the minutes to

8          Miss Pelosi and Mr. Schechter.  They have a right

9          to reopen if they wish.

10                    MR. KESSLER:  Fine.

11                    THE COURT:  Miss Pelosi.

12                    MS. PELOSI:  Thank you, your Honor.

13  CROSS EXAMINATION

14  BY MS. PELOSI:

15      Q.    Detective, at the time that you went to Manhattan,

16  how did you get called to go to Manhattan?Major case called

17  you to go to Manhattan?

18      A.    Yes, major case called me, request assistance on

19  this case, the kidnapping case.

20      Q.    So they did the investigation, major case did the

21  investigation, and you were called after the arrest?

22      A.    No.  I was called as assistant investigation, I was

23  called from the beginning -- the middle of the investigation.

24      Q.    At the time that you went in to interrogate or

25  question my client, Mr. Qin, had you personally spoken to the

Ng-People-Cross(Pelosi)          31

2  victims in this case?

3       A.    Yes, I spoke to one of the victim briefly in this

4  case.

5       Q.    Were you aware before you entered to interrogate my

6  client, were you aware of the rape, the alleged rape that had

7  occurred, did you talk to the victim about the rape?

8       A.    Yes, after the victim release, I was informed by

9  other detective there was a rape.

10      Q.    Before you went in to question the defendants, you

11 were aware of the alleged rape?

12      A.    Yes.

13      Q.    When you first walked into the room that you were

14 alone with my client, you walk in and where is he seated, is

15 he standing or sitting, what was his position?

16      A.    I don't understand the question.

17      Q.    When you went into the room, was my client already

18 in the room or did you bring him in the room?

19      A.    I bring him to the interview room.

20      Q.    You brought him in?

21      A.    Yes.

22      Q.    Did he have handcuffs on at the time that you were

23 entering or did he not?

24      A.    No, there was no handcuffs on him during the

25 interview.

1

2   Q.   Was there a table or just chairs?

3   A.   Yes, there was a table pretty much like the table.

4   He was on the other side, and I was seated on this side.

5   Q.   How small was the room?

6   A.   The room is not that big.  I hate to use this

7   example, about the size of the judge.

8                THE COURT:   Indicating four foot eight inches

9                by seven foot.

10   Q.   Was there any window in the room?

11   A.   No, no window in the room.

12   Q.   Now, as you were walking into the room with my

13   client, did you have any conversation with him as you were

14   walking into the room?

15   A.   Yes, I said come with me I would like to talk to

16   you about, I will give you a chance to talk about your side

17   of the story.

18   Q.   You said come with me, I will give you a chance to

19   tell your side of the story?

20   A.   Yes.

21   Q.   Now, did you tell him at that point that it will

22   help him if he just talked with you to give his side, his

23   version of what happened?

24   A.   I told him to just give his side of the story.

25   Q.   To tell?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1

2          A.    Tell me what happened.

3          Q.    Just tell you what happened.  Were you present at

4    any time --

5                      MS. PELOSI:  Withdrawn.

6          Q.    What time did you get to One Police Plaza if you

7    recall?

8          A.    Early.  Are you talking about relating to your

9    client, or I was called on duty to assist in the

10   investigation?

11         Q.    Let me try to get more specific.  There came a

12   point in time that you were aware that my client was under

13   arrest, correct?

14         A.    Yes.

15         Q.    And you testified on direct that that happened

16   approximately 1:00 a.m.

17         A.    I cannot approximate.  It was early morning or late

18   evening, yes.

19         Q.    So your direct testimony was approximately 1:00

20   a.m.  Do you want to change that testimony?

21         A.    Like I said before, I cannot remember exactly what

22   time it was approximately early morning or late in the

23   evening if I remember correctly.

24         Q.    So it was either one in the morning or the day

25   prior sometime in the evening?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

A.   Yes.

Q.   It's your testimony that you started to speak to my client at about 5:45?

A.   Yes, for interview, yes.

Q.   That's the time that you started interviewing him?

A.   Yes.

Q.   So all the hours prior to you meeting with him in that four by ten interview room, had you seen him prior to that?

A.   Yes.

Q.   About what time was it the first time that you saw my client?

A.   If I remember correctly, around 2:00 or around 1:30.   I cannot recall exactly what time.

Q.   So the first time you saw my client was about 1:30 a.m. or so?

A.   Yes.

Q.   So between 1:30 a.m. until 5:45 where was my client?

A.   He was with the other peoples, with other at that time defendants in the squad room of major case.   It's a big room they were sitting there.

Q.   Were there any other Mandarin speaking officers or detectives present when you were present involved in the

1

2  investigation of this case?

3      A.    Yes.

4      Q.    Were they people from Manhattan or from Queens who

5  were those officers or detectives?

6      A.    Detectives from major cases.

7      Q.    There was a detective from major case and what is

8  that detective's name?

9      A.    Detective Christina Leung, L-E-U-N-G.  I could be

10  one or two wrong.

11     Q.    Were you present at any time when that detective

12  from major case Detective Christina Leung, were you present

13  when she spoke with my client?

14     A.    I didn't say she spoke to your client, not in my

15  presence.

16     Q.    My question was actually getting to were you aware

17  or do you know if she ever spoke to my client?

18     A.    Briefly about one or two probably spoke to them.  I

19  was not present.  She was midtown interviewing the two

20  victims.  That's her job to interview the female victims.

21     Q.    Is it fair to say that you meaning the

22  investigation people, the detectives involved in this

23  investigation waited until the interview with the victims

24  were concluded before you spoke to the defendants?

25     A.    No, it was same time interview, the victim and the

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Ng-People-Cross(Pelosi)            36

defendants.

Q.   So you say that the other detective from major case, the female detective briefly spoke to my client?

A.   I said could be briefly one or two, like pedigree information.  It's not your client.  We brought in about eight people that day.  In my person, I didn't see her speaking to anyone for longer than a minute.

Q.   When you were walking in the room, you told him to tell me what happened, I want to get your side of the story is that fair?

A.   Yes.

Q.   Now, is it also fair to say that the purpose for you -- your purpose was to get a statement from my client, that was your role at that time when you were alone with my client, that was your job to get a statement?

A.   No, it's my job to get the truth, the facts.

          MR. SCHECHTER:  Objection.

          MS. PELOSI:  I have no objection to the question or the answer.

          MR. SCHECHTER:  Withdrawn.

Q.   So you want to get to the truth?

A.   Yes.

Q.   And you are certainly not going to get to the truth if the defendant doesn't speak to you, correct?

1            Ng-People-Cross(Pelosi)        37

2                MR. KESSLER:  Objection.

3                THE COURT:  Overruled.

4        A.    No.

5        Q.    So it's fair to say that in this case as in any

6    investigation, it would be very helpful to you to get the

7    defendant's side of the story?

8        A.    I say helpful.  I cannot say very helpful.  I would

9    agree it would be very helpful, yes.

10       Q.    Now, what, if you know, based on the pedigree

11   information that you might have had or preliminary discussion

12   you might have had with my client, did you find out where in

13   my client my client was from?

14       A.    Yes.

15       Q.    Where would that be?

16       A.    Fuchzhou.

17       Q.    Based on your knowledge of where my client is from

18   and based on your discussion with my client pre-Miranda,

19   could you determine if my client had any kind of formal

20   education or what the level of education would be?

21                MR. KESSLER:  Objection as to form as to how

22                he would know.  If it came up, I don't mind a

23                specific question.

24                THE COURT:  As to form, sustained.

25       Q.    Did you have any discussions with my client

2  regarding his educational level?

3      A.   No.

4      Q.   Was there anything about the conversation you had

5  with my client that would indicate to you what his

6  educational level would be?

7      A.   No.

8      Q.   So there is nothing about the discussion that you

9  had with him that would lead you to believe that he had a

10  very minimal educational background?

11      A.   No.

12      Q.   So now there came a time where you were seated at

13  the table and so was my client, correct?

14      A.   Yes.

15      Q.   What was the very first thing you said to him when

16  you sat down at the table?

17      A.   I told him before I speak to you I have to read you

18  your rights so then I started to read the rights in English

19  and Chinese, and he got a chance to read it.

20      Q.   Based on those six questions, that's what you used

21  to determine whether or not he understood his constitutional

22  rights?

23      A.   Yes.

24      Q.   Now, prior to him sitting down with you, did he say

25  to you -- you testified that you said, you know, that you

1

2  wanted -- you said tell me what happened, I want to get your

3  side of the story.  Prior to you sitting down with him when

4  you read him his Miranda warnings, did he tell you okay?

5        A.    Yes.

6        Q.    Now, for about 35 minutes my client, based on your

7  testimony, you actually you said between half hour and 45

8  minutes he told you in a narrative form what happened?

9        A.    Yes.

10       Q.    And then when he was finished --

11       A.    Yes.

12       Q.    -- was there a pause, and then you said excuse me I

13 have to write something happen?

14       A.    He told me verbally what happened, and after that I

15 ask him I am going to write it down, and you are going to

16 sign it, and he said yes.

17       Q.    So you said I'm going to write it down after he

18 gave you the narrative, you said I'm going to write it down,

19 and you will sign it?

20       A.    Yes, I said if during the writing any question come

21 up, I would ask him again and then write it down.

22       Q.    It's still your testimony that at no time you said

23 to him look you can really help yourself if you tell me what

24 happened?

25       A.    No.

1

2      Q.    You never said that to him?

3      A.    No.

4      Q.    Well, you write your statement and based on

5   approximately half hour to 35 minutes conversation with

6   Mr. Qin, you came up with one page that you wrote?

7      A.    Yes.

8      Q.    You testified on direct that you had a correction

9   on the fourth line where you inserted the word together?

10     A.    Yes.

11     Q.    Now, this reads on 3/31/95 at 8 p.m. my friend

12  asked me to go to JFK Airport with him I and Hai Guang and

13  his friend, (I didn't know his name) went to the airport.

14  There is a period there.

15     Is it your testimony that after you read this statement

16  to him, he said, oh, no that's not correct, you should write

17  we went to the airport together.  Is that your testimony?

18     A.    No.  When after while I read it, it's not the way

19  he say I said together, then I put down together that's when

20  I added the word together on.

21     Q.    You added the word together?

22     A.    Yes.

23     Q.    And then had you had him sign it?

24     A.    Initial it when I read it back to him.

25     Q.    After you read it back to him, he said put together

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1

2  in?

3      A.    No.   I remembered this was not the way he said it

4  before.   That's why.

5      Q.    I'm sorry.   I don't understand?

6      A.    I remember it's not the way he said so I forget the

7  together, and I put the together on it.

8      Q.    In other words, you heard the dialogue for half

9  hour to 45 minutes, you write the notes and reread it, and

10  you forget to put we went to the airport together?

11     A.    Yes.

12     Q.    And then you asked him to initial it?

13     A.    After I read it to him.

14     Q.    Why was the word together so important that you had

15  to add that in?

16     A.    It is not important, but it was the way he said

17  together.  He said three people together go to the airport.

18  It's not important. I tried the best I could to get the best

19  exact meaning he told me in the statement and exactly what it

20  said and translate to English.

21     Q.    So the word together had nothing to do with the

22  fact of showing conspiracy?

23     A.    No.  He told me exactly what he said together, we

24  three people together went to airport together.

25     Q.    That wasn't an afterthought on your part?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5540

2    A.   No, that was what he say so when I put it down I
3  was missing together.  That's why I put it back to get
4  exactly what he said.

5    Q.   Then this bottom statement you write on the bottom
6  fourth line from the bottom, we were stopped by the police I
7  gave the above statement in Chinese.  We were stopped by
8  police.  I gave the above statement to Detective Ng in
9  Chinese, the Detective Ng translated to English and read it
10  back to me in Chinese.  I understand the above statement."

11    Now, is it your testimony that my client said that at
12  the end of his statement or at the end of the half hour or 45
13  minutes he said that to you?

14    A.   No, after I read the translated statement in
15  Chinese, I read back to him.

16    Q.   So those are your words not his words?

17    A.   Yes, I read it back to him.

18    Q.   My question is what I just read to you were your
19  words not what my client said to you?

20    A.   Yes, I read it back to him so he understand it.

21    Q.   That's not my question.  The words I gave the above
22  statement, I gave the above statement, I don't have to reread
23  it.  It was translated to me, I understand the above
24  statement.  My client never said those words the way you
25  wrote that down to you, in the half hour 45 minutes, he never

2  said let's get this clear, I understand the above statement,

3  he didn't exactly say that, you couldn't put quotes on that?

4      A.   Yes, I wrote it down.  It's the same thing I read

5  translated to him. He understand that mean the statement.  So

6  that statement I wrote it down, I gave -- I read it back to

7  him in English until he understand the paragraph.  It is not

8  what he said, but I read it back to him, and he agreed and

9  sign it.

10          THE COURT:  All right.

11          MS. PELOSI:  Thank you.

12          THE COURT:  We are going to get a date.  When

13     are you coming back from vacation?

14          (Whereupon, an off-the-record discussion was

15     held.)

16          THE COURT:  10:00 tomorrow, Hai Guang will be

17     back tomorrow.  Sometime after Miss Pelosi comes

18     back for the other defendant.

19          MS. PELOSI:  Either the fifth or six of March.

20          MR. KESSLER:  No good for me.

21          (Whereupon, an off-the-record discussion was

22     held.)

23          THE COURT:  March 11th as to Qin, and the

24     other one is on tomorrow.  Hai Quang Zheng is on

25     tomorrow.

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ng-People-Cross(Pelosi)          44

(Hearing adjourned to February 9, 1996.)

```
 1                        Proceedings              44

 2  February 9, 1996

 3  SUPREME COURT OF THE STATE OF NEW YORK

 4  COUNTY OF BRONX :    PART K-11

 5  THE PEOPLE OF THE STATE OF NEW YORK

 6              -against-

 7  HAI GUANG ZHENG and QIN GUANG ZHENG,

 8              Defendants.

 9  INDICTMENT NUMBER 3282/95

10  B e f o r e:

11          HONORABLE JOHN J. CLABBY,
                              Justice.
12
    A p p e a r a n c e s:
13
            (Same as previously noted.)
14               *******

15          (Whereupon, the following takes place on the

16  record in open court in the presence of the

17  Assistant District Attorney, the defense counsel,

18  and the defendant:)

19          THE COURT CLERK:  Number one on the calendar,

20  3282 of 95, Hai Guang Zheng.

21          THE COURT:  Mr. Kessler, just so we cover that

22  business about the grand jury testimony of this

23  witness, have you given that to defense counsel?

24          MR. KESSLER:  I have shown it to him.

25          MR. SCHECHTER:  Your Honor, I have had an
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

|     | Proceedings                45 |
| --- | --- |
| 1 |  |
| 2 | opportunity to read Detective Ng's grand jury |
| 3 | testimony. |
| 4 | THE COURT:  Okay.  Good enough.  And you will |
| 5 | make that available to counsel, Miss Pelosi? |
| 6 | MR. KESSLER:  Yes. |
| 7 | THE COURT:  Thank you.  Can we put the |
| 8 | detective on and bring out the defendant. |
| 9 | THE COURT CLERK:  Yes. |
| 10 | (Witness previously sworn.) |
| 11 | THE COURT:  Good morning, Detective. |
| 12 | THE COURT CLERK:  You are reminded you are |
| 13 | still under oath. |
| 14 | (Interpreter present.) |
| 15 | THE COURT:  Are you finished with your direct? |
| 16 | MR. KESSLER:  I am. |
| 17 | THE COURT:  You may cross examine. |
| 18 | MR. SCHECHTER:  Okay. |
| 19 | THE COURT:  Let the record show before you do |
| 20 | that, Miss Pelosi, when she was here yesterday with |
| 21 | the codefendant as counsel for that defendant, |
| 22 | indicated that she had no objection to the |
| 23 | cross-examination by Mr. Schechter today of |
| 24 | Detective Ng, and she was satisfied that she had |
| 25 | finished and completed her examination subject to |

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1                              Proceedings              46

2              getting a copy of the grand jury minutes where this

3              detective had testified.

4                   If it turns out that she wishes to reopen the

5              hearing because of those minutes, we would give her

6              that permission.

7    CROSS EXAMINATION

8    BY MR. SCHECHTER:

9         Q.   Detective, how do you pronounce your last name?

10        A.   Ng.

11        Q.   When was the first time you were contacted or

12   notified about this particular incident?

13        A.   On April 1st approximately.  I was contacted about

14   5:30 on April 1st.

15        Q.   Morning or evening?

16        A.   Evening.

17        Q.   That was prior to the arrest of the two

18   individuals?

19        A.   Correct, yes.

20        Q.   And at that time were you advised of what the

21   allegations were?

22        A.   Yes.

23        Q.   And who did you speak to at that time?

24        A.   I speak to -- I was informed by the supervisor from

25   major case, Sergeant Hines.

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/08/16   Page 48 of 136 PageID #: 492

1
2    Q.    At that time did you interview any of the civilian
3  witnesses?
4    A.    Yes.  After I respond to major case squad, I
5  briefly spoke to one of the victim, one of the victims.
6    Q.    You spoke on the phone?
7    A.    No, it was in person.
8    Q.    On April 1st you spoke to one of the victims?
9    A.    Yes.
10   Q.    Was that prior to Mr. Zheng's arrest?
11   A.    Yes.
12   Q.    Where did you speak to that person?
13   A.    In the major case squad.
14   Q.    Which victim was that?
15   A.    The male victim, the husband of one of the woman.
16   Q.    Now, at that time did you write down any notes?
17   A.    No.
18   Q.    Besides for the two statements and the Miranda
19  warnings that have been introduced into evidence, did you
20  make any other notes or memorandum concerning this incident,
21  did you prepare any police paperwork?
22   A.    No.
23   Q.    You didn't prepare any DD-5s?
24   A.    No.
25   Q.    Any memobook?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

```
 1
 2      A.    No.
 3      Q.    Do you have a memobook?
 4      A.    I do have a memobook.
 5      Q.    Well, did you make any entries for the date of
 6 April 1st in your memobook?
 7      A.    Yes, I did.
 8      Q.    How about for April 2nd?
 9            THE COURT:  Well, referable to this case, is
10      that the question?
11            In your memobook did you write anything about
12      this transaction, this case, this indictment in
13      your book?
14      Q.    In your book did you put down where you were?
15      A.    Yes.  I put down that I was in major case, that
16 they called me for overtime.
17      Q.    On April 2nd did you make notations about where you
18 were?
19      A.    Yes, I believe so.
20            MR. SCHECHTER:  Your Honor, I don't believe I
21      have been given a copy of the detective's
22      memobook.  I don't know what exactly he wrote
23      concerning that.  I would ask --
24            THE COURT:  Let's say, I think that you are
25      perfectly correct.
```

Detective Ng, would I be correct in saying

that the only items appearing in your memobook for

the days that we are talking about, April 1st and

2nd would be entries as to your assignment, the

time you got there, the time you left or something

of that sort?

THE WITNESS:  Yes, the detective memobook

always that way.

THE COURT:  Now, would it have anything

substantive, anything about the incident that you

were investigating, anything about that in the

memobook?

THE WITNESS:  No, not that I remember.

THE COURT:  Let me say just to double check, I

think that we ought to get a copy of that memobook,

Mr. Kessler, and copy those pages and send them to

Mr. Schechter so he can see them again with the

same proviso.  If it turns out he wishes to reopen

the hearing, he may do so.

MR. SCHECHTER:  Thank you, your Honor.

Q.   Now, on April 1st, did there come a time you left

major case and went home or back to a precinct, or did you

just stay there with them during this investigation?

A.   I stayed there with the investigation.  I was in

Case 1:16-cv-00166-RJD   Document 8-6   Filed 11/09/16   Page 51 of 136 PageID #: 495

1  

2  the victim's house, one of the victim's apartments in

3  Chinatown.

4       Q.   The male victim's house?

5       A.   Well, they all are from the same family.

6       Q.   So you were at that house.  At any time did you

7  receive a call or were you present when a phone call was made

8  from any of the female victims?

9       A.   Yes, I was monitor the phone call, I recognize the

10  voice of Mr. Guang Zheng as the same voice.  I monitored the

11  phone call in the house.

12       Q.   Were there tapes made, were there taped phone

13  conversations?

14       A.   I believe so, yes.

15       Q.   And did you translate those tapes for major case?

16       A.   Yes, I translate I leave information regarding the

17  case of the hostage I transferred the radio, I didn't do the

18  translator, but I do with everybody phone call, my duty is to

19  not to let the people outside the field, and the people in

20  the office going on what is the update, what is the new

21  information.

22       Q.   In other words, you were majorly(sic) involved in

23  this investigation from April 1st on?

24       A.   Yes, I do.

25       Q.   Now, were you present when Hai Zheng was arrested?

Case 1:16-cv-01160-RJD Document 8-3 Filed 11/08/16 Page 52 of 136 PageID #: 496

1

2    A.   Yes, Mr. Hai Guang Zheng -- no, I was not present,

3    sorry.

4    Q.   Do you know what time he was arrested?

5    A.   I cannot give you the exact time.

6    Q.   Can you approximate the time?

7    A.   I say early morning or late evening on April 1st or

8    early morning of April 2nd.

9    Q.   Okay.  When for the first time did you see Hai

10   Zheng?

11   A.   When they brought back to the major case squad, it

12   was early morning on April 2nd.

13   Q.   Do you know what time approximately?

14   A.   I could say approximately 1:30.  I cannot recall

15   exactly the time.

16   Q.   At that time did you speak to him, you personally?

17   A.   I speak to him, yes.

18   Q.   What was the conversation that you had with him at

19   that time?

20   A.   I took the time to get pedigree information from

21   him, like basic information.

22   Q.   What language -- you spoke to him in Chinese; am I

23   correct?

24   A.   Yes.

25   Q.   What dialect did you speak in?

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1

2    A.   Mandarin.

3    Q.   Did you ask Mr. Zheng where in China he was from?

4    A.   Yes.

5    Q.   Where was that?

6    A.   Fuchzhou, China.

7    Q.   Did he speak any English?áDid you see him speak any

8    English?

9    A.   No.

10   Q.   Did you attempt to converse with him in English?

11   A.   No.

12   Q.   There were other -- did you have any other

13   conversation with him at that time besides for pedigree?

14   A.   No.

15   Q.   He gave you his date of birth?

16   A.   Date of birth, yes.

17   Q.   He gave you where he was from.  Did he give you

18   where he was living?

19   A.   Yes.

20   Q.   What was that?

21   A.   I can refresh my recollection.  Whatever

22   information he gave to me, I transfer to another detective or

23   who put it on line books.

24   Q.   Am I correct that you were translating for other

25   detectives?

1

2      A.    Yes.

3      Q.    In other words, in your conversation -- what

4   detective was that?

5      A.    Detective Mike Green, he was one of the detectives.

6      Q.    In other words, you were just translating.  Did you

7   have any direct conversation with him?

8      A.    I don't understand your question.

9      Q.    Well, did Detective Green say Mr. Zheng, how old

10  are you, and then you would translate?

11     A.    No.

12     Q.    Or did he tell to you get the pedigree?

13     A.    Like I say, we were told to get pedigree

14  information.  As experienced detectives every time we make

15  arrest, we have to get pedigree information.

16     Q.    Did you have any other conversation with him at

17  that time?

18     A.    No.

19     Q.    At that time you had not advised him of his

20  constitutional rights?

21     A.    No, I did not advise him Miranda warnings, no.

22     Q.    Can you describe what he looked like at that time?

23     A.    At that time he looked like when he was handcuffed,

24  he was like what is called, he is like normal.

25     Q.    Did you see any marks or bruises on his body?

Case 1:16-cv-01166-RJD   Document 8-3   Filed 11/09/16   Page 55 of 136 PageID #: 400

2      A.    No.

3      Q.    Did you ask him if he wanted anything to eat?

4      A.    At that time, no.

5      Q.    Now, I believe you said you really didn't interview
6   him until 6:15 in the morning?

7      A.    Yes.

8      Q.    From 1:30 to 6:15 had you seen Mr. Zheng?

9      A.    Yes.

10      Q.    Where did you see him?

11      A.    In the squad room.  It's about six others or eight
12   others.

13      Q.    But did you have any conversation with him in the
14   next five hours approximately from the time after you asked
15   him the pedigree until you interviewed him?

16      A.    Yes, when he request to go to the bathroom.

17      Q.    Did you see him ever have anything to eat or drink?

18      A.    No.

19      Q.    Did you ever ask him if he wanted anything to eat
20   or drink?

21      A.    No, he didn't ask me, either.

22      Q.    Was he handcuffed the entire time?

23      A.    Yes.

24      Q.    That was your entire conversation with him during
25   the next four or five hours?

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 56 of 136 PageID #: 588

1

2    A.   Yes, basically, because we had a lot of work to do.

3    Q.   During that time, did you interview either of the

4  two female witnesses?

5    A.   No.

6    Q.   Were you present when either of the two female

7  witnesses were questioned?

8    A.   No.

9    Q.   Did either of the two females speak English, if you

10  know?

11        MR. KESSLER:   Judge, I object if he wasn't

12        present.  He would be just guessing.

13        THE COURT:   Yes.

14        Do I recall yesterday that you said there was

15        another interpreter present who interpreted for the

16        women?

17        THE WITNESS:   Yes, another female detective,

18        sir.

19        THE COURT:   Would that be exclusively her

20        interpreting for them, or did you occasionally

21        interpret for them to other people?

22        THE WITNESS:   Basically since she is exclusive

23        with her because we were told by the supervisor and

24        I would take information and interview the

25        prisoners or the defendants and Detective Leung

1

2          would interview the female victims.

3          Q.    The detective who interviewed the female, that was

4   in Chinese?

5          A.    Counsel, like I say, I cannot answer that question.

6          Q.    Were you ever in the room while the two females

7   were being interviewed?

8          A.    No.

9          Q.    Did you have any conversation with any of the

10  police officers about what they said prior to speaking to

11  Mr. Zheng?

12         A.    I don't understand that question.

13               THE COURT:   I don't understand that question,

14               either.

15         Q.    Okay.  At approximately I think you said 5:45 you

16  interviewed not Hai Zheng, the other person, am I correct?

17         A.    Yes.

18         Q.    And at 6:15 you interviewed Hai Zheng?

19         A.    Yes.

20         Q.    Okay.  Prior to your interviewing of either of

21  these two individuals, did you have any conversation with any

22  of the other police officers or detectives about what the two

23  females had told what happened?

24         A.    Yes.

25         Q.    So then prior to you speaking to Hai Zheng, you

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1

2  knew what the females had told the police their side of the

3  story?

4      A.   Briefly, yes.

5      Q.   Now, when you first spoke to Hai Zheng, the first

6  thing you said you did was advised him of his rights, am I

7  correct?

8      A.   Yes.

9      Q.   And you had a copy of that, am I correct, of the

10 statement?

11     A.   Yes.

12     Q.   Do you know where the original statement is?

13     A.   The original statement is in the major case file.

14     Q.   And did you Xerox what you had written?Were you the

15 one who xeroxed it, the copies that you have or did they

16 Xerox it?

17     A.   I don't understand your question, counsel.

18     Q.   You have a copy of the statements?

19     A.   Yes.

20          THE COURT:   Who produced it?

21          THE WITNESS:   I reproduced it myself.

22     Q.   Did you prepare the copy of the original?

23     A.   Yes, soon after I made a copy, you know.

24     Q.   So you made the copies?

25     A.   Yes.

1

2      Q.   And you gave them the original and you keep the

3  copies?

4      A.   Yes, correct.

5      Q.   Now, as to Hai Zheng, after the warnings in both

6  Chinese and English, am I correct?

7      A.   Yes.

8      Q.   And you said you advised him of the rights in both

9  English and Chinese?

10     A.   Yes.

11     Q.   But he didn't understand the English version to

12  your knowledge?

13     A.   To my knowledge, he could be, could be not.

14     Q.   Now, did he read that piece of paper?

15     A.   Yes.

16     Q.   After each one of the five rights, there is

17  writing.  Do you have a copy of the statement?

18     A.   Yes.

19     Q.   There is writing next to it.  That was not from the

20  preprinted form, am I correct?

21     A.   Correct.

22     Q.   What is that?

23     A.   That's a writing from the defendant Hai Guang Zheng

24  handwriting that means understand or past tense understood in

25  Chinese.  He wrote it.  After each question, I let him read

1                          Ng-People-Cross(Schechter)        59

2  it, and he understand, and he write next to it.

3          Q.    What did he write next to it?

4          A.    I said understand or understood.

5          Q.    Let me ask you this:  These Chinese -- what does

6  that mean?

7          A.    I said understand.

8          Q.    That's not his signature or anything?

9          A.    No.  See, you put yes.  It's not grammar, you have

10 to put down understand or in Chinese there is no past or

11 present tense, it's the same thing as understood.  That means

12 he read it and understood the question.

13                    MR. SCHECHTER:  May I have a moment, your

14              Honor.

15                    THE WITNESS:  You can ask the interpreter.

16                    THE COURT:  May I have a moment, your Honor?

17                    THE COURT:  Yes.

18                    (Whereupon, an off-the-record discussion was

19              held.)

20         Q.    But he didn't initial any of that, or sign that?

21         A.    No, that's his handwriting.

22         Q.    He did that all for all six of the questions?

23         A.    Yes.

24         Q.    Will you look at question number six, is there any

25 writing after that that says he understood?

Case 1:16-cv-01166-RJD   Document 8-3   Filed 11/30/16   Page 61 of 136 PageID #: 505

1

2    A.   Yes.

3    Q.   Please tell me where.

4    A.   Right next to the two Chinese writing it says

5  willing or agreed to answer the questions.

6    Q.   Look at the sixth question.

7    A.   I know where.

8    Q.   Show me where.

9    A.   Yes, understood and willing to answer the question.

10   Q.   That's after the fifth question?

11   A.   No, sixth question right here.  Okay, right here.

12   Q.   After that, he signed it, am I correct?

13   A.   Yes.

14   Q.   Did he sign the English name or did you?

15   A.   He did.

16   Q.   He was able to write his English name?

17   A.   He signed his English name and his Chinese name,

18  too.

19   Q.   Now, after you did that, you started questioning

20  him, am I correct?

21   A.   Yes.

22   Q.   How long did you question -- you asked him to tell

23  you his side of the story?

24   A.   Yes.

25   Q.   Did you tell him anything else?

Case 1:16-cv-01168-RJD   Document 8-3   Filed 11/30/16   Page 62 of 136 PageID #: 506

2    A.   No, just tell me what happened.

3    Q.   At any time while he was speaking, did you

4 interrupt him?

5    A.   No.

6    Q.   While he was speaking, did you write anything down?

7    A.   The first time I didn't.

8    Q.   You didn't write anything down?

9    A.   No.

10    Q.   For the first time did you speak to him?

11    A.   I spoke to him, it's about approximately about 15

12 to 20 minutes.

13    Q.   That's when he gave you the entire statement that's

14 here?

15    A.   Yes.

16    Q.   After he completely told you everything when he was

17 finished with his statement, did you then write this

18 statement out?

19    A.   Yes.

20    Q.   During that time that you were writing this

21 statement, were you speaking to him?

22    A.   Yes.

23    Q.   So, in other words, he went through the statement a

24 second time?

25    A.   Yes, basically, yes.

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

2    Q.   And when he went through the statement a second

3  time, did you stop him to write it down or did you let him

4  speak?

5    A.   No, I stop him and writing, and then a question

6  come up and ask again.

7    Q.   You said there were certain times when you were

8  speaking to him where you crossed something out, and he

9  initialed it and you initialed it?

10    A.   Yes?

11    A.   And the first time you did that, you crossed out

12  the word when?

13    A.   Yes.

14    Q.   In other words, he never use the words when, am I

15  correct?

16    A.   Yes.

17    Q.   Now, did you write verbatim exactly every single

18  word that he said or did you paraphrase it while you were

19  doing the statement?

20    A.   I translated exactly what he said.

21    Q.   How long did it take you -- he would give you a

22  statement.  You would stop and write it and then would you

23  read it to him in Chinese whatever you wrote down?

24    A.   Are you talking about the unfinished statement?

25    Q.   Yes.

2    A.   I could say approximately about 40 to 45 minutes.

3    Q.   It took you to write the statements?

4    A.   Yes, talk to him stop and write again, yes.

5    Q.   After you wrote you told him what he just said and
6    asked him if that was what he said?

7    A.   Yes, after completed statement, I translate, I read
8    back the English and translated into Chinese what it mean to
9    him.

10    Q.   When you got halfway through the first page and you
11    had, I then drove my car to the highway when I got -- what is
12    the word after I got, three words past where?

13    A.   I have to look at the statement.

14    Q.   Do you see where he initialed?

15    A.   Okay, yes.

16    Q.   What is the third, I got?

17    A.   I got lost.

18    Q.   When you were translating back to him and you told
19    him that you said I then drove my car to the highway when I
20    got lost, he said no, take out the word when?

21    A.   No.

22    Q.   How did that word then get crossed out?

23    A.   The word crossed out when I find out he said he got
24    lost in the highway, and that was grammar, and he told me he
25    said he got lost in the highway and end up in the China

Case 1:16-cv-01166-RJD Document 8-3 Filed 11/30/16 Page 65 of 136 PageID #: 509

1

2  building in Brooklyn.

3      Q.    In other words, he said no that's not grammatically

4  correct take out the word when?

5      A.    No.

6      Q.    He was the one who told you don't put in the word

7  when or did you make that determination?

8      A.    I make it.

9      Q.    Then you had him initial it?

10     A.    Yes, I told him this word not fit the grammar.

11     Q.    Did he use the word when?

12     A.    No, he didn't use it.  That's why.

13     Q.    You just wrote it down and realized it was

14  grammatically incorrect so you changed it?

15     A.    That's correct.

16     Q.    The next time down the bottom of the page, there is

17  another cross out.  What word was crossed out there?

18     A.    Which, the bottom page?

19     Q.    Yes.

20     A.    That was my writing or spelling error.

21     Q.    Then you changed it to get?

22     A.    Yes.

23     Q.    Did he use the word asked the family to got 30,000

24  or did he use the words get?

25     A.    Like I said in Chinese, there is no present tense

1  or past tense.  I got is the same as I get, depends on how

2  you read.  That's why you see my statements a lot of times

3  mixed up the present and past tense.

4      Q.   You say it took about 40 minutes this statement?

5      A.   Yes, approximately about 40 minutes.

6      Q.   The last three, four lines on page 3 where it says

7  I gave above statement to Detective Ng in Chinese, he

8  translated in English and read back to me in Chinese,

9  understand above statement; was that his wording?

10     A.   That's my wording.

11     Q.   Not his?

12     A.   No, because it's my job to make sure that he

13 understands the statement, and I let him know we didn't try

14 to trick him. I translated to him.  That's what he was

15 signing for.

16     Q.   Now, on the side of each page, pages one, two and

17 three, there is a signature Hai Guang Zheng, is that his

18 signature?

19     A.   Correct, counsel.

20     Q.   He didn't sign in Chinese, he signed in English?

21     A.   He only signed in English.

22     Q.   And then after you finished questioning him at

23 7:05, what happened to Mr. Zheng?

24     A.   Then I took him back to the squad room, and I

1

2  started interviewing other persons.

3      Q.   Now, the squad room, how far was that from the room

4  where you were originally in?

5      A.   It's not far.  It's just about from here to the

6  door.

7           THE COURT:  That would be 26 feet.

8      Q.   Was he in handcuffs while he was in the room with

9  you?

10     A.   Yes.

11     Q.   Was he handcuffed to a chair?

12     A.   Excuse me.  I don't understand the question.  Do

13  you mean in the squad room or the interview room?

14     Q.   Interview room?

15     A.   No, no handcuffs.

16     Q.   You took the cuffs off?

17     A.   Yes.

18     Q.   Did you have your weapon on you?

19     A.   My weapon was holstered.

20     Q.   There was nobody else in the room with the two of

21  you?

22     A.   No.

23     Q.   The door was closed?

24     A.   No, the door is open.  Somebody was right outside

25  to keep an eye on my room and keep an eye on the other people

Case 1:16-cv-01066-RJD   Document 8-3   Filed 11/30/16   Page 68 of 136 PageID #: 512

1

2 in the squad room.

3     Q.    When did you unhandcuff him, in the squad room or

4 in the interview room?

5     A.    In the squad room.

6     Q.    When you brought him back to the squad room, was he

7 re-handcuffed?

8     A.    Yes.

9     Q.    Was there a cell in the squad room where he was?

10     A.    No.

11     Q.    Would I be correct in saying there were a lot of

12 detectives around during this time as part of this

13 investigation?

14     A.    Yes, you could say that.

15     Q.    During your conversation with Mr. Zheng, did he

16 ever tell you -- there is a name in here Yi Guang or Al Yang,

17 am I correct?

18     A.    Yes.

19     Q.    Did he ever tell you that Yi Guang forced him to do

20 this?

21     A.    No.

22     Q.    He never told you that he was threatened by Yi

23 Guang?

24     A.    No.

25     Q.    At the time that you interviewed Mr. Zheng, had you

1

2    been advised that the two females were claiming that they

3    were molested?

4        A.    Yes, I did ask him the question did he rape those

5    girls.

6        Q.    What did he say?

7        A.    He said, no, I didn't rape her.

8        Q.    Did you ever mark it down in any part of the

9    statement?

10       A.    No.

11       Q.    You didn't think that was important to write down

12   in the statement?

13                 MR. KESSLER:   Objection.

14                 THE COURT:   No, overruled.

15       A.    Excuse me.

16       Q.    You didn't think that was important?

17       A.    I say when I tell the story --

18       Q.    Did you ask him anything else that you didn't write

19   down?

20       A.    No.

21       Q.    You are sure?êAfter you finished the statement, did

22   you ask him anything else about what happened, like the phone

23   numbers?àHe was able to give you the phone numbers that were

24   called?

25       A.    What phone number?

Ng-People-Cross(Schechter)       69

MR. SCHECHTER:  Withdrawn, your Honor.  Excuse me.

Q.   On page 2 of the statement, there is an address and a phone number, am I correct, towards the bottom?

A.   Where is it?

Q.   Seven lines from the bottom?

A.   On page 2.

Q.   Yes.

A.   Yes.

Q.   Do you see the phone number?

A.   Yes.

Q.   He was able to give you that phone number?

A.   Yes.

Q.   He remembered that phone number?

A.   Yes, because he called so many times that phone numbers.

Q.   You didn't have to supply the phone number for him?

A.   No.

Q.   But you knew the phone number, also, hadn't you, because you were monitoring it?

A.   No, he know better than I do.  I don't.

Q.   Was that the phone number that you had been monitoring?

A.   Yes, I monitor the phone conversation, yes.

Proceedings                              70

MR. SCHECHTER:  No further questions.

THE COURT:  All right.  We will reserve
motions until the end of the hearing.  We still
have a Mapp part.

MR. KESSLER:  Mapp and Wade hearing.

THE COURT:  This witness is only here because
of the statements, the Huntley aspect?

MR. KESSLER:  That's correct.

THE COURT:  Detective Ng, you were very good.
Thank you very much.

(Witness excused.)

MR. SCHECHTER:  Your Honor, I ask for copies
of the tapes from the district attorney and the
transcription of the audio tapes from the
monitoring of the calls.

THE COURT:  Yes, I think you should have
those.  Give them the blank tapes.

MR. SCHECHTER:  I will.

THE COURT: Matter adjourned to March 11, 1996.
Same conditions.

C E R T I F I C A T E

I, NANCY SAMMS, an Official Court Reporter of the
State of New York, do hereby certify that the

1                          Proceedings                    71

2           foregoing is a true and accurate transcript of my

3           stenographic notes.

4

5           *Nancy Samms*

6                         I N D E X

7

8

9   WITNESSES FOR THE PEOPLE:        Direct        Cross

10  Det. Keith Ng                      3           35, 53

11

12  PEOPLE'S EXHIBITS:                 ID           EVD

13  1                                  10           11

14  2                                  15           17

15  3                                  22            −

16  4                                  26           28

17

18

19

20

21

22

23

24

25

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5940

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS : TRIAL TERM PART K-11

----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK   :   Indictment No.
                                          :     3282/95
       - against -             :
                                            :
HAI GUANG ZHENG and QIN GUANG ZHENG,   :
                                          :
                     Defendants.  :    Hearing
----------------------------------------X

                    125-01 Queens Boulevard
                    Kew Gardens, New York

                    April 19, 1996


B E F O R E:

                    HONORABLE JOHN J. CLABBY,
                         J u s t i c e.

A P P E A R A N C E S :

                    RICHARD A. BROWN, ESQ.
                    District Attorney, Queens County
                    BY:  SCOTT KESSLER, Esq.
                    Assistant District Attorney

                    DONALD L. SCHECHTER, ESQ.
                    Attorney for the Defendant
                      Hai Guang Zheng

                    LISA PELOSI, ESQ.
                    Attorney for the Defendant
                      Qin Guang Zheng

                          Yi Wan,
                          Official Court Interpreter

                          Alan H. Kimbarow
                          Senior Court Reporter.

CA 319/96

2

1          Proceedings

2              THE CLERK:  Number three, 3282 of '95,

3     Hai Guang Zheng and Qin Guang Zheng.

4              MS. PELOSI:  Lisa Pelosi, P-E-L-O-S-I,

5     appearing for Qin Guang Zheng.

6              MR. SCHECHTER:  Donald L. Schechter, for

7     Hai Guang Zheng.

8              THE COURT:  Did we do some work on this

9     case back on February 8th?

10             THE CLERK:  Yes.

11             THE COURT:  And Detective Keith Ng.

12             LAW CLERK:  Yes.  All we did was Keith

13    Ng, cross-examined by both attorneys on

14    different days.

15             THE COURT:  I believe it's only a Huntley

16    Hearing or also Wade?

17             MR. KESSLER:  Wade and Mapp.

18             THE COURT:  I think the defendant had to

19    show standing.  What was taken?

20             MR. KESSLER:  Judge, with regard to the

21    Mapp Hearing, there was some property taken

22    from the person of the defendants and the

23    kidnapping location.  Inside the kidnapping

24    location was other property that was

25    vouchered.  Again, our argument is there is no

Case 1:16-cv-01166-RJD Document 8-3 Filed 11/30/16 Page 75 of 136 PageID #: 510

1                    Proceedings

2        standing for the stuff inside the apartment but

3        the stuff regarding on him I believe he does

4        have standing to.

5             THE COURT:  That's the way the Court

6        ruled.

7             MR. SCHECHTER:  Let me ask, Mr. Kessler,

8        do you know who the lessee of that apartment

9        is?

10            MR. KESSLER:  Yes, Judge.  What happened

11       is -- we can get into it slightly, if you want,

12       during the hearing with the officer -- after

13       the defendants were apprehended outside the

14       premises, the officers arrested them and

15       recovered property from them.

16            The police at that time didn't know if

17       there were any other victims or perpetrators.

18       They went to the landlord of the home and asked

19       the landlord if they could enter the home.  The

20       landlord gave them permission, unlocked the

21       doors, went in and got other property from

22       inside the house; cellular phones and --

23            THE COURT:  So you don't know the answer

24       to the question as to who the lessee is?

25            MR. KESSLER:  Right.

4

1            Proceedings

2            MR. SCHECHTER:  Did the landlord saying

3      he owns the property say that he leased it out

4      to someone?

5            MR. KESSLER:  Judge, the officer is going

6      to be on the stand; we can ask him those

7      questions.

8            MR. SCHECHTER:  There may be a question

9      of standing as to that if they're going to

10      allay that one of these two people had leased

11      the apartment, your Honor.

12            THE COURT:  Well, when we talk about

13      standing there's a right not to have it

14      violated if you lease or sublease; no

15      question.  And whatever's there ought not to be

16      seized if that ought be the case.

17            On the other hand, if they are

18      interlopers in a way in that they are not

19      related to the property then they have no right

20      to exert their claim.

21            MR. SCHECHTER:  That will be -- that will

22      have to be determined at the hearing, your

23      Honor.

24            MR. KESSLER:  Fair enough.

25            The People call Detective Michael Greene

5

| | |
|---|---|
| 1 | Proceedings |
| 2 | to the stand. |
| 3 | THE COURT:  Is that detective or police |
| 4 | officer? |
| 5 | MR. KESSLER:  Detective. |
| 6 | THE CLERK:  Raise your right hand. |
| 7 | Do you solemnly swear that the testimony |
| 8 | you're about to give in court will be the |
| 9 | truth, the whole truth and nothing but the |
| 10 | truth, so help you God. |
| 11 | THE WITNESS:  I do. |
| 12 | COURT OFFICER:  People call Detective |
| 13 | Michael, M-I-C-H-A-E-L, Greene, G-R-E-E-N-E. |
| 14 | Shield number 2826, major case squad, NYPD. |
| 15 | MR. KESSLER:  I just need one minute to |
| 16 | get organized, I'm sorry. |
| 17 | THE COURT:  Where do you work out of? |
| 18 | THE WITNESS:  Major case squad. |
| 19 | THE COURT:  Where is it? |
| 20 | THE WITNESS:  One Police Plaza, actually, |
| 21 | where the main office is. |
| 22 | DIRECT EXAMINATION |
| 23 | BY MR. KESSLER: |
| 24 | Q    Detective Greene, how long have you worked for |
| 25 | the major case squad? |

6

1               Proceedings

2    A    Since --

3               THE COURT:  Before we get into the

4    hearing -- this is off the record.

5               (A discussion was held off the record.)

6               THE COURT:  So that the record is clear,

7    if they wanted to, they could plead guilty to

8    the rape and the kidnapping and get 15 to life,

9    which would cover everything.  Whereas, if they

10   went to trial and lost, their exposure could be

11   50 to life, 25 and 25.

12              MR. SCHECHTER:  Your Honor, can we have

13   two minutes in the back just to speak to them.

14              THE COURT:  Yes.

15              (Whereupon, both defendants, both counsel

16   and the court interpreter left the courtroom.)

17              THE COURT:  Will you tell the attorneys

18   it appears we ought to continue the hearing.

19              (Whereupon, both defendants, both counsel

20   and the court interpreter returned to the

21   courtroom.)

22              MS. PELOSI:  My client appears to want

23   the plea.  He just asked for another minute to

24   think about it but he appears to want it.

25   Well, you can give it to him without the DA.

1                          Proceedings

2              THE COURT:  I wouldn't.  I run them

3      together.  Then let's go.

4              MR. SCHECHTER:  Just maybe if he wants it

5      then I'll speak to my client and explain how

6      he's messing with her client.

7              THE COURT:  All right, go and talk to

8      him.

9              (Whereupon, Mr. Schechter left the

10     courtroom and returned after which the

11     following occurred:)

12             MS. PELOSI:  Judge, we're ready to

13     continue.

14             MR. SCHECHTER:  Your Honor, since the

15     interpreter is speaking I'm going to be sitting

16     over here because I'm having a problem hearing

17     with the interpreter.

18             THE COURT:  By this time you ought to be

19     able to understand a little bit anyway.

20             You may continue.

21             MR. KESSLER:  Thank you.

22     BY MR. KESSLER:

23     Q    Detective Greene, we were talking about your

24     length of time you were working in the major case squad.

25     A    About seven years.

Case 1:16-cv-01188-RJD  Document 8-3  Filed 11/30/16  Page 80 of 136 PageID #: 524

1                    Det. Greene-For the People-Direct

2        Q      What generally does the major case squad do?

3        A      Pretty much what the name suggests, major

4    cases:  kidnapping, bank robberies, extortion cases.

5    Burglaries, major burglaries, major truck hijacking.

6        Q      Directing your a attention to the 1st of April,

7    1995, was the major case squad assigned an investigation

8    on that date?

9        A      Yes.

10       Q      And, generally, did that investigation get a

11   name?

12       A      You mean operation name?

13       Q      Yes.

14       A      Yes.

15       Q      What was the operation name?

16       A      I have to refer to my notes.

17              THE COURT:  You may do so.  Just tell us

18              what you're referring to.

19              THE WITNESS:  Just a case folder.  I

20              don't remember what the operation code name

21              was.

22       A      I don't think I have the code name for the

23   operation in these folders.  I don't remember.

24       Q      Were you assigned an investigation on that day?

25       A      Yes.

9

1                    Det. Greene-For the People-Direct

2     Q    What was the nature of that investigation, if

3   you can tell me?

4     A   It was kidnapping.  The number on it, or the

5   case number was case 107 of '95.

6     Q   And with regard to that kidnapping could you

7   tell us the sum and substance of the knowledge that you

8   had on April 1, 1995 in connection with the kidnapping?

9     A   I don't understand your question.

10    Q   With regard to the kidnapping, can you tell us

11  the sum and substance of what knowledge you had on the

12  kidnapping?

13    A   When we got notified, we got notified there was

14  an abduction.  Actually, the initial abduction was three

15  people, three Asian people, that were arriving at Kennedy

16  Airport and they were abducted before leaving with one

17  abductee, the male, being released to get a message back

18  to the family to work out arrangements for ransom

19  payment.

20    Q   And that male, do you know his name?

21    A   Yes, I do.  The last name is Bang.  If I can

22  just refer to my notes and I'll tell you exactly.  Lin,

23  L-I-N.  Middle name G-A-O and B-A-N-G.

24              THE COURT:  V or a B?

25              THE WITNESS:  B-A-N-G.

Case 1:16-cv-01166-RJD   Document 8-3   Filed 11/30/16   Page 82 of 136 PageID #: 526

1              Det. Greene-For the People-Direct

2                   MR. SCHECHTER:  Your Honor, I just ask

3              the officer what he's reading from so I would

4              know which report.

5                   THE COURT:  Okay.

6                   THE WITNESS:  Actually, what I have in

7              front of me are the case folders.  This

8              actually is the lineup record sheet.

9                   MR. SCHECHTER:  You're reading from the

10             lineup sheet?

11                  THE WITNESS:  Just now, yes.

12        Q    Now, Detective, in connection with this

13    kidnapping were there any ransom demands made with regard

14    to the females?

15        A    Yes.

16        Q    Briefly, what steps did the major case division

17    do in order to try to locate the whereabouts of the

18    kidnappers?

19        A    We actually get our technical unit involved,

20    TARU.  We obtain an eavesdropping warrant.  Surveillance

21    and recording devices were set up at the residence phones

22    and surveillance and searching equipment was used to

23    locate what we found out to be a cellular phone that was

24    being used.

25        Q    Did there come a time when you used this

11

1                  Det. Greene-For the People-Direct

2    equipment that you found the whereabouts of the cellular

3    phone?

4        A    Well, using the equipment we basically found

5    out the general areas where the calls were being made.

6        Q    Where was that?

7        A    In Queens.

8        Q    Now, did there come a time that ransom demands

9    were met and there was going to be a drop off of a

10   certain amount of money?

11       A    Yes.

12       Q    What date was that, if you recall?

13       A    The 1st, April 1st.

14       Q    That's the same day that you got the case?

15       A    Correct.  The same date that major case got

16   involved.  It was late April 1st that the drop was

17   actually supposed to be made, that evening.

18       Q    Now, did there come a time that you had any

19   conversations with Detective Banks on April 1st, going

20   into the 2nd?

21       A    Yes.

22       Q    What was Detective Bank's job on that

23   particular day?

24       A    He was actually, him and his partner were

25   actually in Queens searching the area with the technical

Case 1:16-cv-01166-RJD Document 8-3 Filed 11/30/16 Page 84 of 136 PageID #: 520

1          Det. Greene-For the People-Direct

2   team to see if we could pinpoint an exact location where

3   the calls were being made, ransom calls were being made.

4          Q    The women that were abducted, did you have any

5   photographs of those women in order to assist you?

6          A    Yes.

7          Q    Where did you obtain those photographs?

8          A    It was provided by the family and a majority of

9   the investigators involved in the case were given a copy.

10         Q    And on April 1, 1995, what was your job on that

11  date, that evening?

12         A    I was the case officer.  I was basically in the

13  base coordinating everything, getting all information

14  coming about the case about the whereabouts of where the

15  phones were coming in.  A majority of it was just

16  coordinating everything coming in about the case.

17         Q    Now, did there come a time later that day,

18  going into April 2, 1995, that Steven Banks had a

19  conversation with you about an arrest that was made?

20         A    Yes.

21         Q    Now, after the arrest was made what steps did

22  you take with regard to a lineup?

23         A    Well, there was only one particular lineup that

24  was needed.  That was for the male who was released at

25  the initial abduction to negotiate the ransom payments

Case 1:16-cv-01166-RJD Document 8-3 Filed 11/30/16 Page 85 of 136 PageID #: 529

```
 1            Det. Greene-For the People-Direct
 2  from the family.  He was at One P.P. and I arranged a
 3  lineup with the people apprehended for him to view in One
 4  Police Plaza.
 5            MR. KESSLER:  Your Honor, I had
 6            previously showed defense counsel a copy of the
 7            lineup.  I just need that back at this time so
 8            I can produce it.
 9            I ask that these five photographs be
10            marked People's 1 through 5, doesn't matter any
11            order, for purposes of identification.
12            THE COURT:  Let them be so marked.
13            MR. KESSLER:  Deemed marked.
14            THE COURT:  Deemed marked.
15            COURT OFFICER:  People's 1 through 5,
16            deemed marked.
17       Q    Detective, I'm going to ask you to take a look
18  at what's been deemed marked People's 1 through 5.  Do
19  you recognize what those are?
20       A    Yes.
21       Q    What are those?
22       A    Two photos of the subjects that were arrested
23  at the location by Detective Banks and three photos of
24  the lineup that I had set up for Mr. Bang to view.
25       Q.   What is Mr. Bang's connection with regard to
```

Case 1:16-cv-01166-RJD Document 8-3 Filed 11/30/16 Page 86 of 136 PageID #: 599

1              Det. Greene-For the People-Direct

2    that case again?

3        A    He's one of the initial victims that were

4    abducted at the airport and he was the gentleman that was

5    released.  I believe he's married to one of the other

6    females and he basically was released to negotiate the

7    ransom payments.

8        Q    Now, with regard to the photographs, did you

9    take all those photographs?

10       A    Yes.

11       Q    And the photographs of the two defendants in

12   this case, do they fairly and accurately depict what the

13   defendants looked like on the date of the lineup?

14       A    They do.

15       Q    What was the date of the lineup?

16       A    Early morning of April 2, 1995.

17       Q    And the three photographs of the lineup that

18   are there, do they fairly and accurately depict the

19   lineup as it appeared on the early morning hours of April

20   2, 1995?

21       A    They do.

22       Q    And did you take those photographs as well?

23       A    Yes.

24                   MR. KESSLER:  At this time, your Honor,

25                   for the purpose of the hearing, I ask they be

15

1    Det. Greene-For the People-Direct

2    introduced into evidence.  Deemed in.

3    THE COURT:  As People's 1A through E,

4    show them to counsel.

5    MR. SCHECHTER:  Are they deemed marked 1A

6    through E, your Honor?

7    THE COURT:  I think so.  Why don't you

8    want to mark them?

9    MR. KESSLER:  I'm sorry?

10   THE COURT:  Why don't you want to mark

11   them?  If there's testimony, if you're going to

12   start talking about them.

13   MR. KESSLER:  It's probably a better

14   idea, Judge.  We might as well mark them;

15   they're not all of the same thing.

16   THE COURT:  Then we'll mark them 1 to 5.

17   MR. SCHECHTER:  No objection, your Honor

18   MS. PELOSI:  No objection.

19   MR. SCHECHTER:  For the purpose of the

20   hearing only.

21   THE COURT:  Any voir dire?  Let them be

22   marked People's 1 through 5 in evidence.

23   (Whereupon, five photographs were marked

24   as People's Exhibits 1 through 5 in evidence.)

25   COURT OFFICER:  People's 1 through 5, so

1          Det. Greene-For the People-Direct

2          marked.

3     Q    Detective, I'm going to ask you to take a look

4     at No. 3.

5     A    Okay.

6     Q    What does People's No. 3 in evidence show?

7     A    Part of the lineup, numbers four through eight.

8     Q    Is there another photograph that shows the

9     numbers one through four?

10    A    Yes.

11    Q    What number is that?

12    A    Actually, the other two -- five and four --

13    show the whole lineup from one through eight.

14    Q    Look at People's 3, 4 and 5.  Could you tell us

15    how many people were in the lineup?

16    A    Eight.

17    Q    Now, with regard to the position of each of the

18    defendants, can you tell us what position they were?

19    A    Five and six.

20    Q    Who was number five, who was number six?

21    A    Hai Zheng was number five, Qin Zheng was number

22    six.

23    Q    Where did this lineup take place?

24    A    In a designated room for lineups in One Police

25    Plaza; in the career criminal office on the 11th floor.

17

1          Det. Greene-For the People-Direct

2     Q     Now, did there come a time when someone came to

3     view the lineup?

4     A     Yes.

5     Q     Who was that?

6     A     Mr. Bang.

7     Q     And did Mr. Bang speak English?

8     A     No.

9     Q     Did you have use of an interpreter?

10    A     Yes.  We use Detective Christine Leung, from

11    the major case squad.

12    Q     Now, did there come a time that Mr. Bang viewed

13    the lineup with Detective Leung?  Yes?

14    A     Christine Leung, yes.

15    Q     Who else was present?

16    A     I was.

17    Q     And approximately what time was that?

18    A     About 4:55 hours that morning.

19    Q     On the 2nd?

20    A     On the 2nd.

21               THE COURT:  That would be a.m.?

22               THE WITNESS:  Yes, a.m.

23    Q     When Mr. Bang viewed the lineup what, if any,

24    questions did you ask him and what, if anything, was his

25    response?

18

1             Det. Greene-For the People-Direct

2     A   I do the same thing always.  The normal

3 procedure for me is I read exactly what the lineup sheet

4 says.  I asked him --

5            MR. SCHECHTER:  Can I ask the officer

6            what he's reading from?

7            THE WITNESS:  The lineup record.

8            THE COURT:  Let me ask you:  Do you

9            recollect what you said or do you need to

10            refresh your recollection?

11            THE WITNESS:  Your Honor, I basically

12            always use the lineup sheet, the questions that

13            are on the lineup sheet.

14            THE COURT:  A good way to answer is just

15            to say I gave him certain admonitions or

16            warnings, period.  And what were they and then

17            you give them.

18     Q   Do you remember them or do you need the lineup

19 sheet to refresh your recollection?

20     A   I need the lineup sheet to refresh my

21 recollection.

22            THE COURT:  All right, you may use it.

23     Q   Why don't you take a look at it.

24        Tell us what, if anything, you said and what,

25 if anything, was the response?

1              Det. Greene-For the People-Direct

2        A.  I asked him, "Do you recognize anyone in the

3    lineup?"

4        Q    What, if anything, did he respond?

5        A    He said, "Yes." I asked him, "What number do

6    you recognize?" He answered, "Number five." And I asked

7    him, "Where do you know the person from?" And he said he

8    kidnapped him with a gun, he drove the car.

9                    THE COURT:  Who was five, number five --

10                   THE WITNESS:  Hai --

11                   THE COURT:  -- Hai Zheng or Qin Zheng?

12                   THE WITNESS:  Hai Zheng.

13                   MR. KESSLER:  Can I just look at the

14              exhibits for one second.

15                   THE COURT:  I take it the other defendant

16              was in the lineup also?

17                   THE WITNESS:  Yes.

18        Q    Detective, according to your information you

19    had on April 1st, was the other defendant, Qin Zheng,

20    present when the abduction took place?  Do you understand

21    my question?

22        A    Would you ask your question again.

23                   THE COURT:  Based on your investigation,

24              was the other defendant in the lineup, that

25              would be number four, was he present during the

Case 1:16-cv-01166-RJD   Document 8-3   Filed 11/30/16   Page 92 of 136 PageID #: 586

1          Det. Greene-For the People-Cross(Schechter)

2             course of the actual kidnap of Bang?

3     Q    Or did that person come later, is my question?

4     A    He came later.

5             MR. KESSLER:  Okay, I have nothing

6          further.

7             MS. PELOSI:  Judge, I have no questions

8          of this witness.

9             THE COURT:  Ms. Pelosi is finished.  Mr.

10         Schechter?

11            MR. SCHECHTER:  Yes, your Honor.

12    CROSS EXAMINATION

13    BY MR. SCHECHTER:

14    Q    Now, Detective, when for the first time were

15    you advised about this incident?

16    A    About the kidnapping itself; probably early

17    morning, April 1st.

18    Q    And what time did the -- in your investigation

19    did you ascertain what time the kidnapping actually

20    occurred?

21    A    Yes.

22    Q    What time was that?

23    A    Can I refer to my notes.  Occurrence time was

24    2200 hours on the 31st, March 31st.

25    Q    What time was your bureau or the police

21

1          Det. Greene-For the People-Cross(Schechter)
2     department first advised of the kidnapping?

3          A     I wouldn't be able to give you an accurate time
4     of actually who was the first in the major case squad to
5     be notified.  I was called in later on.

6               What normally happens is the incident is first
7     handled, first initially investigated by the precinct of
8     occurrence.  Once there is certain criteria found, like a
9     ransom demand, then the major case squad is called and
10    notified and then it's up to one of the supervisors to
11    bring in the personnel he wants to bring in.

12         Q     You were the coordinator of this investigation?
13         A     Yes.  The case was assigned to me at the point
14    where we actually took over the case, yes.

15         Q     What time was that?
16         A     It was early April 1st.  The exact time I
17    wouldn't be able to give you.

18         Q     Would you then, since you were the coordinator,
19    be given all DD-5s and other information that was
20    gathered by police officers at the precinct level?

21         A     Eventually, yes.

22         Q     And that would all be part of your major case
23    file?

24         A     Yes.

25         Q     Now, can you look through your notes and find

Case 1:16-cv-01100-RJD Document 8-3 Filed 11/30/16 Page 94 of 136 PageID #: 598

1        Det. Greene-For the People-Cross(Schechter)

2    out when for the first time anyone from the police

3    department was advised about this incident?

4                    MR. KESSLER:  Objection.  Irrelevant for

5                the purpose of the hearing.

6                    THE COURT:  Sustained.  With this

7                officer, with this detective, I think we can

8                kind of zero in on the ID process.

9        Q    Did there come a time, prior to April 1st or

10   April 2nd when the two individuals were arrested, where

11   Mr. Bang had been interviewed by anyone from the police

12   department?

13       A    Could you repeat your question, please.

14       Q    Was Mr. Bang interviewed by either your --

15       A    My office.

16       Q    -- your office or anyone else prior to the

17   arrest of the two individuals?

18       A    Yes.

19       Q    Were you present during that interview?

20       A    No.

21       Q    Do you know who conducted that interview?

22       A    I believe that Detective Ng was present.

23       Q    How do you spell that?

24       A    N-G.

25                    MR. SCHECHTER:  Your Honor, I would just

1            Det. Greene-For the People-Cross(Schechter)

2                note for the record, I've been given a lot of

3                police reports.  Unfortunately most of the

4                police reports I do not have the names of the

5                officer who filled them out because that part

6                on the bottom is deleted.  It's not deleted, it

7                just doesn't come out.

8                     THE COURT:  Okay.

9       Q    Did you have a copy of Detective Ng's report of

10   his interview with Mr. Bang prior to the arrest of the

11   two individuals?

12       A    I don't think so.

13       Q    Do you have that now?

14       A    I think so.

15       Q    Did you have that report when you spoke to Mr.

16   Bang prior to him viewing the lineup?

17       A    I don't recall.

18       Q    At the time prior to the lineup, do you know if

19   Mr. Bang gave a description of how many individuals he

20   saw that evening?

21       A    Yes.

22       Q    How many individuals did he see that evening?

23       A    That evening.  Could you clarify what evening

24   we're talking about.

25       Q    I'm talking about the evening of, I believe it

Case 1:16-cv-01166-RJD  Document 8-3  Filed 11/30/18  Page 96 of 136 PageID #: 540

1          Det. Greene-For the People—Cross(Schechter)

2    would be April -- March 31st.  Would that be the evening

3    when he was involved with any of the individuals who

4    allegedly partook in the kidnapping?

5          A     Yes.

6          Q     How many individuals did he view?

7          A     At the time of the abduction; that's your

8    question?

9          Q     At the time of the abduction.

10         A     Two.

11         Q     Did he give -- did you have any description of

12   the two individuals?

13         A     Whatever information that was initially put on

14   the 61, the complaint report, is the information that we

15   have the description of.

16         Q     You had that prior to him going to view the

17   lineup?

18         A     Yes.

19         Q     Could you tell me what that description was?

20         A     Can I refer to my notes?

21         Q     Just tell me what you're looking at, please,

22   just to use.

23         A     It would be the complaint report, and it should

24   be marked number 4340, and at the bottom there's spaces

25   for person number one, person number two and the

25

1          Det. Greene-For the People-Cross(Schechter)
2   description here is unknown, as far as last name.  As far
3   as first name, is unknown.  For person one it's:  Male
4   Asian, thirties, five-six, 125, short.

5          For person two it's the same thing for the
6   first name and last name, it's unknown.  But they did put
7   in Fuk, F-U-K, for both.  And then the same thing:  Male
8   Asian, thirties, five-six, 125, short.

9      Q    And that information, do you know who prepared
10  that?

11     A    Detective Lee, from the 5th Squad.

12     Q    Does it show who he got that information from?

13              MR. KESSLER:  Objection.

14              THE COURT:  Sustained.

15     Q    Prior to Mr. Bang attending the lineup, did you
16  speak to him?

17     A    Did I interview him?

18     Q    Yes.

19     A    No, that was left to Detective Ng.

20     Q    Now, you testified that prior to the arrest you
21  had tapes of phone conversations you were trying to zero
22  in on where the phone was coming from?

23     A    Correct.

24     Q    Were you monitoring telephone calls going back
25  and forth?

Case 1:16-cv-01106-BJD Document 8-3 Filed 11/08/16 Page 98 of 136 PageID #: 542

1       Det. Greene-For the People-Cross(Schechter)

2       A    No.

3       Q    Was any of the telephone calls that were made,

4    were tapes made of those calls?

5       A    Yes.

6       Q    Had you applied for an eavesdropping warrant?

7       A    Yes.

8       Q    Did you have an eavesdropping warrant?

9       A    Yes.

10                  MR. SCHECHTER:  Your Honor, I would just

11                  like to state for the record in this matter

12                  that I have not been supplied with any

13                  eavesdropping warrants and any of the other

14                  paperwork which, under the law, I think we

15                  would have to get within 15 days of the

16                  arraignment.  But I will deal with that at

17                  another time.  I just want the record to be

18                  clear about that.

19                  MS. PELOSI:  Judge, I also have not

20                  received that paperwork.

21                  THE COURT:  Okay.

22                  MR. SCHECHTER:  Also, your Honor, I have

23                  not received any tapes of any of the phone

24                  conversations that were recorded.

25                  MS. PELOSI:  Nor have I, your Honor.

Det. Greene-For the People-Cross(Schechter)

MR. KESSLER:   Judge, I have the tapes.   I just need duplicate copies.   They are in a foreign language so they may need interpreters regarding them.

Q     Now, when you met Mr. Bang on the early morning -- was the first time you met him personally on April 2nd or the evening of April 1st?

A     Evening of April 1st.

Q     Was he at the precinct or did he receive a phone call to come down to the precinct?

A     He was actually being moved around by police personnel for some time.  He was always in the company -- as a matter of fact, the family at the time was always in the company of police personnel.  So, he was actually moved from location to location where needed.

Q     When was the first time you had any conversation with him?

A     The morning of the 2nd or when I first was introduced to him on the 1st, the evening of the 1st.

Q     That would have been after these two individuals were arrested?

A     I was introduced to him prior to their arrest.

Q     Did you have any conversations with him?

A     No.

Case 1:16-cv-01166-RJD Document 3-3 Filed 11/06/16 Page 100 of 136 PageID #: 544

 1          Det. Greene-For the People-Cross(Schechter)

 2      Q    I mean through an interpreter or anyone else?

 3      A    No, not at that time.

 4      Q    At anytime prior to him attending the lineup

 5  did you have a conversation with him concerning the

 6  description of any individuals that he had seen on the

 7  night of March 31st?

 8      A    Could you repeat that question, please.

 9               THE COURT:  Did you talk to him about a

10          description prior to the lineup?

11               THE WITNESS:  No, no.

12      Q    Did you ever speak to him about the description

13  that was given on the complaint report, if he still said

14  that was his description of the two individuals?

15      A    No.

16      Q    How many people were totally arrested in this

17  incident?

18      A    In this incident, two.

19      Q    Well, were other people arrested as part of the

20  kidnapping?

21      A    As part of the investigation?

22      Q    Yes.

23      A    Yes.

24      Q    How many other people were arrested?

25               MR. KESSLER:  Objection.  Beyond the

1          Det. Greene-For the People-Cross(Schechter)

2          scope.

3               THE COURT:  Sustained.

4      Q    Now, after these two people were arrested was

5   Mr. Bang made aware of the fact that the two people were

6   arrested?

7      A    I don't know.  If you're asking me if I made

8   him aware, no, I did not.

9      Q    But he was not in your custody but he was in

10  the custody of other police officers?

11     A    Right.

12     Q    When for the first -- well, you said you spoke

13  to him on April 1st?

14     A    I was introduced to him on April 1st, yes.

15     Q    Is that face to face or on the phone?

16     A    No, once he was brought to One Police Plaza.

17     Q    So, in other words, you never told another

18  officer to speak to him on the phone as a translator?

19     A    No.

20     Q    And on April 1st when you spoke to him had the

21  two individuals already been arrested?

22     A    When I engaged in any lengthy conversation with

23  Mr. Bang I was setting up the lineup.

24     Q    So the two people had already been arrested?

25     A    Correct.

30

1                Det. Greene-For the People-Cross(Schechter)

2         Q    You advised him through a translator that you

3    wanted him to view a lineup?

4         A    Correct.

5         Q    Prior to him viewing the lineup do you know if

6    he had any conversations with his wife?

7              The other individual who was kidnapped was his

8    sister-in-law?

9         A    Yes.

10        Q    Do you know if he had any conversations with

11   the two females?

12        A    Prior to the lineup?

13        Q    Yes.

14        A    I don't believe so.  They had not arrived at

15   One Police Plaza.

16        Q    Do you know if he spoke to them on the phone?

17        A    No, I do not know.

18        Q    But there's a possibility he could have but he

19   had not been --

20                   MR. KESSLER:  Objection.

21                   THE COURT:  You're getting introspective.

22              Sustained.

23        Q    After the arrest Mr. Bang was not in your

24   presence during the entire time from the arrest until the

25   lineup?

31

1        Det. Greene-For the People-Cross(Schechter)

2        A     Are you asking me about while he's at One

3   Police Plaza is he, as you say, in my custody; no.

4        Q     Now, what conversation did you have with him

5   prior to him viewing the lineup or did you have a

6   conversation with him?

7        A     Through Detective Leung working as a

8   translator, basically I explained to him what he was

9   going to view, where he was going to view, not to be

10  afraid, be calm, take his time, if he wanted me to have

11  anyone stand up, sit down, move, just ask the detective.

12       Q     At the time you had that conversation did you

13  advise him that certain individuals had been arrested?

14       A     I believe he was told. He had been told

15  already that they had made an arrest. Actually, I

16  believe he had been told that his family members had been

17  recovered.

18       Q     And you don't know whether he was told if

19  anyone had been arrested or not?

20       A     No, I didn't tell him, no.

21       Q     When you had your conversation with him did you

22  ever advise him that the people who he was going to see

23  in the lineup were -- that certain of those people had

24  been arrested in connection with this?

25       A     No.

1    Det. Greene-For the People-Cross(Schechter)

2   Q  Now, you said when -- I'm now looking at

3 People's 5.  Will you look at it, please.

4     There are eight people in that picture of the

5 lineup?

6   A  Right.

7   Q  Now, who selected the numbers of the eight

8 individuals?

9   A  The individuals did.  They selected the two

10 numbers that they wanted and then the rest of the numbers

11 were given to the rest of the people in the lineup.

12   Q  Both of the two individuals were in the lineup;

13 am I correct?

14   A  Correct.

15   Q  Now, did you have a conversation with Mr. Bang

16 about how many people got out of the vehicle?

17   A  Prior to --

18     MR. SCHECHTER:  Withdrawn, withdrawn.

19   Q  The other six people in the lineup besides

20 these two individuals, were any of those six individuals

21 any of the other people who had been arrested?

22   A  I don't understand your question.  There was

23 only two people arrested.

24   Q  Well, you said as part of this investigation

25 other people had been apprehended?

33

1          Det. Greene-For the People-Cross(Schechter)

2     A     Correct.

3     Q     Am I correct?

4     A     You are correct.

5               THE COURT:  Why don't we put it this way.

6          Were the six fellows subjects of this arrest?

7               THE WITNESS:  No, not at the time.

8     Q    At anytime did any of those six fellows ever

9     get arrested in connection with this incident?

10              MR. KESSLER:  Objection.

11              THE COURT:  I didn't understand the

12         answer, "Not at the time."

13              MR. SCHECHTER:  That's why --

14              THE COURT:  The question was:  Were the

15         fellows related in any way to the happening?

16              THE WITNESS:  To the abduction, this

17         incident?

18              THE COURT:  Yes.

19              THE WITNESS:  No.

20    Q     How about to the incident?

21              MR. KESSLER:  Objection.

22    Q     To the entire incident?

23              THE COURT:  Sustained.

24    A     I understand.

25              MR. SCHECHTER:  Your Honor, I don't know

Case 1:16-cv-01166-RJD   Document 8-3   Filed 11/30/16   Page 106 of 136 PageID #: 558

1    Det. Greene-For the People-Cross(Schechter)

2         if the other people were arrested.  He said

3         they were not arrested at this time.

4              THE COURT:  Well, where did you get the

5         fillers?   These fillers you got from?

6              THE WITNESS:  Central booking.

7    Q    Were any of these six fillers ever arrested as

8    part of when the ransom was recovered or anything else in

9    connection with this incident?

10             MR. KESSLER:  Objection.  Irrelevant.

11             MR. SCHECHTER:  I'm entitled to know,

12        your Honor, not if they have anything to do

13        with the abduction but with the entire case.

14             MR. KESSLER:  I have a problem with the

15        question as to abduction.

16             THE COURT:  When you say, "central

17        booking" are you talking about people that work

18        there?

19             THE WITNESS:  No, no.  In One Police

20        Plaza we have central booking.  Your Honor,

21        it's almost five o'clock in the morning and

22        we're running lineups.

23             THE COURT:  But you understand the

24        question.

25             Are these people in the lineup in any way

1        Det. Greene-For the People-Cross(Schechter)

2        connected, directly or indirectly with the

3        abduction and/or rape of the complainants in

4        this case?

5            THE WITNESS:  No, not with the abduction

6        and/or the rape, no.

7    Q    How about the ransom demand?

8            MR. KESSLER:  Objection.  That's where I

9        have the objection, Judge.  If not in

10       connection with the abduction and/or the rape,

11       it's irrelevant.

12           THE COURT:  Sustained.

13           MR. SCHECHTER:  If your Honor pleases,

14       there are other people arrested in connection

15       with this matter.  I don't know what Mr. Bang

16       saw when he was not in this officer's custody

17       or whatever that may have influenced him

18       concerning the lineup.

19           THE COURT:  On the basis of the totality

20       of evidence I have so far, sustained.

21           MR. SCHECHTER:  Your Honor, can I just

22       have one moment.

23    Q    Detective Greene, in this case originally a

24   criminal court complaint was prepared and drawn in

25   Manhattan; am I correct?

1          Det. Greene-For the People-Cross(Schechter)

2      A      The complaint report?

3      Q      Yes.

4      A      Yes.

5      Q      And Mr. Hai Zheng was arrested and processed

6  through the Manhattan criminal court?

7      A      Yes.

8      Q      Now, the seventh person who was in the lineup,

9  what was his name?

10              MR. KESSLER:  Objection.

11              THE COURT:  Well, we have two defendants

12          and six other people.

13              MR. SCHECHTER:  Yes.  Well, now I'm

14          asking who the seventh person was.

15              MR. KESSLER:  And, Judge, as to the name

16          of the person in the lineup, I don't see the

17          relevance of finding out what his name is.

18      Q      Let me ask you this.  The seventh person was

19  Zhi Young Zheng; am I correct?

20      A      I have to refer to this.  Yes.

21      Q      And, Detective Greene, did you prepare a

22  complaint charging him with kidnapping and rape in

23  Manhattan?

24              MR. KESSLER:  Objection.

25              THE COURT:  Sustained.

37

1       Det. Greene-For the People-Cross(Schechter)

2       A       Did the --

3                   MR. KESSLER:   Objection.

4       Q       Yes?

5       A       No.

6                   MR. KESSLER   Judge, that question was

7       sustained.

8                   THE COURT:   It was sustained.

9                   MR. SCHECHTER:   Your Honor, can I have a

10      side bar?

11                  THE COURT:   You're getting into more of a

12      felony investigation than an investigation of

13      the identification process.   This fellow, that

14      seventh person, has not been in any way

15      connected with what he's talking about today.

16      He says there are two defendants in the thing

17      with the identification of one of them by Mr.

18      Bang.

19                  MR. SCHECHTER:   Your Honor, may I please

20      have a side bar with the court reporter.

21                  THE COURT:   Detective, you want to go

22      into my chambers.

23                  (Whereupon, the witness left the

24      courtroom.)

25                  MR. SCHECHTER:   If your Honor pleases,

1    Det. Greene-For the People-Cross(Schechter)

2         I've been given a copy of a criminal court

3    complaint in Manhattan where this one had four

4    individuals arrested, my client, Ms. Pelosi's

5    client, a Zhi Young Zheng and Gjian Chen.

6         Look at the lineup.  The fillers, number

7    seven and number eight, are the other two

8    people who were charged in Manhattan with

9    kidnapping and rape.

10        THE COURT:  You're talking about seven

11   and eight.  You're talking about numbers in the

12   lineup?

13        MR. SCHECHTER:  Yes.  They were charged

14   in a criminal court complaint which was done

15   after the lineup with the same charge as my

16   client and Mr. Pelosi's client.  I believe I

17   should be able to go into that.

18        THE COURT:  Well, let's pursue it a bit.

19   This witness so far, as the witness testified,

20   he said Mr. Bang, who had been released from

21   the car, looked at the lineup with these two

22   defendants in it, so far as he knew.  He was

23   only able to talk about people who were

24   involved in the kidnapping.

25        Now, if seven and eight are people not

1     Det. Greene-For the People-Cross(Schechter)

2         related to the kidnapping, I don't see where it

3         is material.

4             MR. SCHECHTER:  Your Honor, they

5         definitely are related to the kidnapping.  This

6         is one entire incident they were arrested for.

7             THE COURT:  They may have indirectly been

8         involved as backup people but you have to talk

9         about what he saw at his identification, not

10        about an identification in general.  It's what

11        this witness' involvement on identification

12        was.

13            MR. SCHECHTER:  Your Honor, I should be

14        able to ask him whether the other people in the

15        lineup were connected to this case, whether

16        they're connected to the actual kidnapping that

17        occurred on March 31st or part of the arrest.

18        He may not know but if he puts eight people in

19        who have all been arrested into one lineup, I

20        think that's highly prejudicial to my client to

21        have both of these people plus other people in

22        one lineup.

23            You're supposed to have a fair lineup,

24        not just throw everyone in hoping that he's

25        going to come up with someone.

1    Det. Greene-For the People-Cross(Schechter)

2         MR. KESSLER:   Judge, my response is this:

3    This defendant and the other defendant were the

4    subject the of the lineup.   The other people

5    that are in the lineup, this officer testified

6    he had no reason to believe were connected in

7    any way with either the rape and/or the initial

8    kidnapping of this defendant.   This witness is

9    only there to identify the person who was

10   involved with the initial kidnapping.   He

11   wasn't there for the rapes, he wasn't there for

12   whatever happened afterwards.

13        They were the subjects of this lineup.

14   Whether or not number seven or eight in the

15   lineup was one of the people later arrested as

16   a person in an apartment where the drop was

17   made is irrelevant for the purpose of this

18   hearing.

19        THE COURT:   That's the way I look at it.

20        MR. SCHECHTER:   Your Honor --

21        THE COURT:   You have an exception.   Bring

22   out the detective.

23        MR. SCHECHTER:   Your Honor, we don't know

24   it's irrelevant --

25        THE COURT:   Bring out the detective.   You

41

2          have an exception.

3                    (Whereupon, the witness resumed the

4          stand.)

5          Q    Now, Officer, you said the other six people

6    were obtained from central booking, that they had been

7    arrested maybe as part of this case or other cases; am I

8    correct?

9          A    I don't believe I said they were arrested; did

10   I.   I don't remember saying that they were arrested.

11         Q    You're saying you got them in central

12   booking.

13         A    They were brought in and that's where they were

14   being held.

15         Q    Were all eight people who were put in this

16   lineup possibly part of this investigation?

17                    MR. KESSLER:   Objection as to form.

18         Q    Prior to getting the fillers for Mr. Hai Guang

19   Zheng, did you know how tall he was.  Do you have a

20   physical description of him?

21         A    I have the description that's on the 61.

22         Q    Did you see Mr. Hai Zheng prior to -- you saw

23   him prior to the lineup; didn't you?

24         A    Yes.

25         Q    Because you were the one who designated where

42

1        Det. Greene-For the People-Cross(Schechter)

2   everyone is?

3        A    Yes.

4        Q    Now, the other six individuals, individual

5   number one, do you know his height and weight?

6        A    No, I do not.

7        Q    Individual number two?

8        A    No, I do not.

9        Q    When you obtained the other six fillers to the

10  lineup did you attempt to match them in height and weight

11  to Mr. Hai Zheng?

12       A    If I can explain to you this, Counselor.  It's

13  five o'clock in the morning, all right.  It was very

14  difficult, if near impossible, to secure the type of

15  fillers that would have been -- what's the word I'm

16  looking for -- in other words, I did the best that I

17  could do for the time of the day.  That's the best I

18  could do.

19       Q    Well, let me ask you this.  You were looking

20  for Chinese males?

21       A    Asian males, yes.

22       Q    Asian males, excuse me.  And when you went down

23  to central booking how many Asian males were in central

24  booking at that time?

25       A    The ones you see in those photos.

43

1          Det. Greene-For the People-Cross(Schechter)

2     Q    And that was the entire contingency?

3     A    Yes.

4     Q    You didn't attempt to go out on the street?

5     A    No.

6     Q    How far is central booking from Chinatown?

7               MR. KESSLER:   Objection.

8     Q    One Police Plaza from Chinatown?

9               MR. KESSLER:   Objection.

10              THE COURT:   Sustained.  Off the record.

11              (Whereupon, a discussion was held off the

12         record.)

13    Q    Officer -- excuse me, Detective, when the

14    lineup occurred were the eight individuals seated or

15    standing?

16    A    As the picture shows, standing.

17    Q    Now, did you ask Mr. Hai Zheng what number he

18    wanted, what number he wanted to wear?

19    A    The numbers were presented to him.  All the

20    numbers were spread around the table and they were told

21    to pick a number.

22    Q    With an interpreter?

23    A    Yes.

24    Q    Now, when Mr. Bang was brought into the room

25    who else was in the room?

Case 1:16-cv-01100-RJD   Document 8-3   Filed 11/08/16   Page 116 of 136 PageID #: 568

1          Det. Greene-For the People-Cross(Schechter)

2          A    I don't recall.  There was a supervisor and

3     probably one other detective but I don't remember exactly

4     who it was.

5          Q    Did you mark it down anywhere who else was in

6     the room?

7          A    I don't believe so.

8          Q    Now, when you picked up the screen, I assume

9     you picked up a screen and you advised him what was going

10    to happen first?

11         A    The setup of the viewing room in the CCIU, it's

12    actually a cubicle with a two-way mirror and I did not

13    -- we set up the lineup, we took photos of it.  There's

14    no screen.  We actually just brought the witness into the

15    room with the lights out.

16         Q    When he's brought into the room he would look

17    directly in or look at the six or eight individuals?

18         A    Correct.

19         Q    Did you ask -- prior to the lineup do you know

20    if Mr. Hai Zheng had been advised of his rights?

21         A    I'm sorry?

22         Q    Do you know if he had been advised of his

23    rights?

24         A    Yes.

25                    MR. KESSLER:  Objection.

45

1              Det. Greene-For the People-Cross(Schechter)

2                         THE COURT:  Sustained.  Asked and

3              answered.

4         Q    Did you ask Mr. Hai Zheng if he wanted an

5    attorney to be present at the lineup?

6                         MR. KESSLER:  Objection.

7                         THE COURT:  You may answer.

8         A    You asked me if I did?

9         Q    Right.

10        A    No, I didn't.

11        Q    Do you know if any other police officer had

12   asked him if he wanted an attorney present at the lineup?

13        A    I don't know.  His rights and statements I

14   think was taken by an Asian detective.

15        Q    Do you know if that was done prior to the

16   lineup or after the lineup?

17        A    Definitely prior.

18        Q    Now, how long was it that Mr. Bang came into

19   the room and viewed the lineup prior to there being any

20   conversation?

21        A    Conversation between?  I don't understand the

22   question.

23        Q    Did he view the lineup prior to you having any

24   conversation with him in that room?

25        A    As I stated before, the conversation where I

1      Det. Greene-For the People-Cross(Schechter)

2    told him what he was going to be looking at, to stay

3    calm, be comfortable, take his time. Those instructions

4    were given to him as we were walking down the hall.

5        Q    I'm talking about once you get into the room.

6        A    The questions that were on the sheet is what

7    was asked of him.

8        Q    In other words, Mr. Bang didn't make any

9    comments after he viewed the lineup until you asked him

10   those three questions?

11       A    I asked him those questions as he was viewing

12   the lineup. Those were the only statements with me and

13   him in that room at the time.

14       Q    How long was he looking at those eight

15   individuals prior to you asking him the first question?

16       A    He made an instant ID.

17       Q    One second. As soon as he came in you asked

18   him the first question?

19       A    He answered the questions right as -- he

20   answered the questions right after I asked him.

21       Q    How long had he been in the room prior to you

22   asking him the first question?

23       A    For the amount of -- that amount of time it

24   took me to ask those questions. That's how long the

25   whole lineup took.

1      Det. Greene-For the People-Cross(Schechter)

2      Q    In other words, he walked right in and then you
3    asked him the first question?

4      A    Correct.

5      Q    So you didn't give him a chance to look at the
6    eight individuals?

7      A    He didn't seem to need it.

8      Q    But he didn't make any comment to you prior to
9    you asking him the questions?

10     A    The only conversation we had walking down was
11   my instructions and then the questions once we entered
12   the room.

13     Q    Can you tell me how much time he was in the
14   room to view those eight individuals, the amount of time?

15     A    Just enough to make the ID then answer the
16   questions.

17     Q    Are you talking about five seconds?

18          THE COURT:   Estimate; 15 seconds, 20
19          seconds?

20          THE WITNESS:   Possibly.

21     Q    You don't know how long?

22     A    No.

23     Q    After he made his first comment did you ever
24   ask him if he recognized anyone else in the lineup?

25     A    I asked him exactly what the question says on

48

1        Det. Greene-For the People-Cross(Schechter)

2   the paper, "Do you recognize anyone in the lineup?" and

3   that's what you have on that form is exactly what he

4   said.

5                    MR. SCHECHTER:  Can I just have one

6            moment.

7                Nothing further, your Honor.

8                    MR. SCHECHTER:  Your Honor, I'm returning

9            to the district attorney the pictures and the

10           only thing --

11                   THE COURT:  Detective Greene, thank you.

12                   THE WITNESS:  Thank you.

13                   MR. SCHECHTER:  The only thing I would

14           ask him for is copies of the pictures.

15                   MR. KESSLER:  The People call Detective

16           Steven Banks.

17                   MR. SCHECHTER:  Your Honor, one thing.

18           I'm assigned pursuant to 18B.  I'd ask for a

19           copy of the minutes.

20                   THE COURT:  So ordered.  Also, a copy for

21           the Court.

22                   THE CLERK:  Raise your right hand.  Do

23           you solemnly swear the testimony you are about

24           to give in court will be the truth, the whole

25           truth and nothing but the truth, so help you

49

1                    Det. Banks-For the People-Direct

2           · God?

3                    THE WITNESS:  Yes.

4                    COURT OFFICER:  People call Detective

5           Steven, S-T-E-V-E-N, Banks, B-A-N-K-S, shield

6           4184, major case squad, NYPD.

7                    MR. KESSLER:  May I inquire?

8                    THE COURT:  You may inquire.

9                    MR. KESSLER:  Thank you.

10    DIRECT EXAMINATION

11    BY MR. KESSLER:

12         Q    Detective Banks, how long have you been with

13    the major case squad?

14         A    Three and a half years.

15         Q    Directing your attention to the date of April

16    1, 1995, at about 2200 hours, were you working at that

17    date at approximately that time?

18         A    Yes, I was.

19         Q    And on that date, at that time, were you in the

20    vicinity of 136th Street and 59th Avenue, in Queens?

21         A    Yes.  Yes, I was.

22         Q    What part of Queens is that?

23         A    Flushing.

24         Q    On that date did you have anything in your

25    possession?

Case 1:16-cv-01166-RJD   Document 8-3   Filed 11/30/16   Page 122 of 136 PageID #: 566

1              Det. Banks-For the People-Direct

2      A      Yes, I did.

3      Q      What did you have?

4      A      I had two Polaroid photographs of kidnap

5  victims on the case I was assigned to investigate.

6      Q      Were you working that case with Detective

7  Michael Greene?

8      A      Detective Greene was the assigned investigator,

9  that's correct.

10     Q      Now, what was your duty and responsibility on

11  that particular date, at that time?

12     A      Prior to my getting out at about 10 o'clock to

13  that location it was established that a cellular

14  telephone that the victim had been on several times that

15  day was used in a car that was parked in front of a

16  location on 59th Avenue between 134th Street and 136th

17  Street.

18     Q      Did there come a time that you arrived and

19  observed that vehicle?

20     A      Approximately 10 o'clock when we got there we

21  observed the vehicle.

22     Q      Now, directing your attention to about 12:05,

23  which is now just the 2nd of April, five minutes into the

24  2nd of April of 1995, what, if anything, did you observe

25  on the 2nd of April at about 12:05 a.m.?

51

Det. Banks-For the People-Direct

1

2    A    I observed four Asians exiting a driveway

3  walking to that particular car we were keeping under

4  observation.  Two male Asians got into the front seat and

5  two female Asians got into the rear seat.

6    Q    What steps did you take then?

7    A    The car drove off and we followed the car

8  approximately five or six blocks away to Horace Harding

9  Expressway and the Long Island Expressway service road.

10        They were stopped at a red light at which point

11  I was in the front passenger seat of the car I was in.

12  We pulled alongside them so I was right next to the

13  driver.

14        I looked into the car and I observed the two

15  female victims, whose photos I had, sitting in the rear

16  seat of the car.

17    Q    Did you recognize them from the photographs?

18    A    Yes, I did.

19    Q    And they appeared to be the same women?

20    A    Yes, they did.

21    Q    Based on that observation what, if any, steps

22  did you take next?

23    A    My partner pulled our car in front of their car

24  before our light turned green.  My partner and I exited

25  our car and we placed the two individuals under arrest.

52

1                    Det. Banks-For the People-Direct

2         Q    Now, did you have any radio contact with anyone

3    regarding this case at that time?

4         A    Yes, I did.

5         Q    And was there any type of interpreter provided

6    for you while you were on the scene?

7         A    What I did was I used a cellular telephone to

8    call the main office at One Police Plaza.   There was an

9    Asian speaking detective, I believe it was a Port

10   Authority detective or officer at that office.   What I

11   did was told him I wanted him to speak to the victims by

12   phone.   He interpreted through the phone for me.

13        Q    And, in substance, what, if anything, did the

14   victims tell you briefly at the scene?

15        A    The victims told me, through the interpreter,

16   that these two individuals are the ones that abducted

17   them, held them in a house and were leaving with them

18   from the place that they held them for the last day.

19        Q    Did you ask them any questions?

20        A    Yes, I did.

21        Q    What did you ask them?

22        A    I asked them if they knew where they were held

23   and they said they didn't know the address but they could

24   point the house out.   I asked if there were anymore

25   victims in the house and they told me they didn't know.

53

1          Det. Banks-For the People-Direct

2    They heard other voices in the house but they didn't know

3    if any other victims were in the house.

4        Q    Based upon those conversations where, if

5    anyplace, did you go?

6        A    Went back to the location where the car was

7    parked.  When we got back there the two females pointed

8    out an address on 59th Avenue where they were being

9    held.  They told me the entrance was the side door which

10   led to the basement.

11       Q    Now, did you speak to anyone who resided at

12   that place?

13       A    I rang the upstairs bell and spoke to a male

14   Asian who identified himself as the landlord.

15       Q    What, if any, conversation did you have with

16   the landlord of this establishment?

17       A    I asked him who rented the basement apartment.

18   He told me that two male Asians were renting the basement

19   apartment.  He had no knowledge if or how many were in

20   there or had been in or out of the house.

21       Q    Now after you had that initial conversation

22   about the two male Asians that had rented the apartment,

23   what, if anything, did you ask the landlord next?

24       A    I asked the landlord if I could enter the

25   apartment.

54

1                    Det. Banks-For the People-Direct

2       Q     Did he give you permission?

3       A     Yes, he did.

4       Q     How did you get into the apartment?

5       A     I had a key.

6       Q     Where did you obtain that key?

7       A     The key I got from the landlord.

8       Q     Had you ever been in this apartment before?

9       A     Up to that point, no.

10      Q     What happened as you entered the apartment?

11      A     My partner Detective Kelly and I entered the

12   apartment.  We secured the apartment inasmuch as there

13   were no more victims to be found in the apartment.  It

14   was a small apartment.  It was about a three bed --

15   three-room apartment.

16      Q     Now, if you would describe for us what, if

17   anything, you found inside the apartment?

18      A     Yes.  On one of the bedrooms there was no

19   furniture, just a mattress on the floor.  On the mattress

20   was a handgun and three cellular phones.

21      Q     What type of handgun?

22                    THE WITNESS:  If I could refresh my

23             memory, your Honor.

24                    THE COURT:  You may.  Tell us what you're

25             using.

55

1          Det. Banks-For the People-Direct

2               THE WITNESS:  I'm · ,ing the DD-5 that I

3          wrote.  I don't have the number on it, it was

4          cut off the top.

5               THE COURT:  What is the date.

6               THE WITNESS:  The date on it is April 2nd

7          of '95.  It is the DD-5 which is entitled the

8          Apprehension of H. Zheng and Q. Zheng and

9          recovery of the victims.

10     A    It was a .380 handgun.

11     Q    Where was that found?

12     A    On the bed.

13     Q    With regard to -- how many phones were near the

14   gun at this time?

15     A    There were three cellular phones on the bed.

16   During the apprehension on the Horace Harding Expressway

17   and the Long Island Expressway service roads there was a

18   cellular phone on the floor of the front passenger side

19   of the car.                                                ;

20     Q    So in total how many phones did you voucher?

21     A    Four.

22     Q    Three from the house and one from the car?

23     A    Yes.

24     Q    Where was it in the car?

25     A    On the floor, on the front passenger side of

Case 1:16-cv-01188-RJD   Document 8-8   Filed 11/09/16   Page 128 of 136 PageID #: 572

56

1          Det. Banks-For the People-Direct

2    the car the two defendants were in.

3          Q     Did you recover any other property from either

4    the defendants or the car at the time of the

5    apprehension?

6          A     From the defendants?

7          Q     Yes.

8                THE COURT:  Did you voucher anything?

9                THE WITNESS:  That's what I'm going to

10               check out, your Honor, if I could refresh my

11               memory.  I vouchered several things.  I'm going

12               to look for the vouchers.

13         A     From each of the defendants I recovered

14   beepers.

15         Q     And where were they?

16         A     They were on their persons.

17         Q     Now, did you recover any money from either of

18   the two defendants?

19     ;   A     Yes.  From one of the defendants I recovered a

20   hundred dollar bill.  I believe --

21         Q     Do you recall which defendant that was?

22         A     I'm just going to look at the voucher.  I

23   believe that was from Mr. Hai Zheng.

24         Q     Now, with regard to the voucher on this Hai

25   Zheng, on that voucher did you include pedigree

57

1          Det. Banks-For the People-Direct

2    information regarding an address for him?

3          A     Yes, I did.

4          Q     What was the address?

5          A     89 East Gun Hill Road.

6          Q     Now, with regard to Mr. Qin Zheng, did you fill

7    out pedigree information regarding his address on the

8    vouchers?

9          A     Yes, I did.

10         Q     What, if any, address was that?

11         A     50 Bayard Street, New York City, New York.

12         Q     Now, other than the three cellular phones and

13   the handgun, did you recover any other property, voucher

14   any other property from the house?

15         A     I vouchered the magazine clip for the handgun

16   which was in the gun.

17         Q     Regarding the automobile they were driving,

18   what, if any, steps did you take regarding the

19   automobile?

20         A     I vouchered the automobile also.

21              MR. KESSLER:   I have nothing further for

22              the purposes of the Mapp Hearing related to

23              those defendants, Judge.

24              THE COURT:   All right, this is your last

25              witness on the hearing?

58

1    Det. Banks-For the People-Cross(Pelosi)

2              MR. KESSLER:  Yes, it is.

3              THE COURT:  Ms. Pelosi, do you have any

4    questions?

5              MS. PELOSI:  Yes.  May I have a moment,

6    Judge.

7              THE COURT:  Of course.

8    CROSS EXAMINATION

9    BY MS. PELOSI:

10        Q    Detective, just a few questions.

11             The automobile that you described, how did you

12   get the license plate that that was the automobile

13   involved?

14        A    What happened was, the cellular phone being

15   used to make the ransom demands that the victims had been

16   on was being monitored by the technical unit.  At one

17   point while the phone was being used they were actually

18   following the car and watched it park at that location.

19        Q    So how long -- when you say, "that location,"

20   did you have a precise location as to where the calls

21   were coming from or just a general location?

22        A    No, I had a location -- actually they told me

23   it was on the south side of 59th Avenue, between 134th

24   and 136th Street, in the middle of the block.

25        Q    And where were you located?

59

```
 1              Det. Banks-For the People-Cross(Pelosi)
 2      A    I was in Manhattan.
 3      Q    Now, there came a time when you observed this
 4  vehicle?
 5      A    That's correct.
 6                   THE COURT:  Was it the vehicle or a
 7           vehicle.
 8                   THE WITNESS:  It was the vehicle that I
 9           was told, yes.
10      Q    Who was driving the vehicle?
11      A    When I observed it, it was parked, unoccupied.
12      Q    Then there came a time when people got into the
13  vehicle?
14      A    That's correct.
15      Q    Who drove the vehicle?
16      A    The driver was Mr. Hai Zheng.
17      Q    And at the time that the vehicle drove away you
18  observed that; correct?
19      A    We followed it, that's correct.
20      Q    The windows on the car, were they tinted on the
21  vehicle that you were watching?
22      A    Were they tinted windows; no, they weren't.
23      Q    And the woman was seated in the back?
24      A    Two women were seated in the back, that's
25  correct.
```

60

Det. Banks-For the People-Cross(Pelosi)

1

2    Q    So you drove in front of the car, right?

3    A    No, that's incorrect. What happened was we

4  followed the car about five or six blocks. They stopped

5  in the right-hand lane at a red light. We pulled in the

6  left-hand lane right adjacent to them. That's when I

7  observed the two women in the back seat.

8    Q    Did you see the women get into the car?

9    A    Yes, I did. But I was about half a block away

10  so I couldn't identify them when they got in.

11    Q    You couldn't identify them when they got in?

12    A    That's correct.

13    Q    Then you were driving behind them and you

14  couldn't identify them?

15    A    That's correct.

16    Q    Then there came a time when you pulled

17  alongside the car?

18    A    That's correct.

19    Q    Is it your testimony that you could immediately

20  identify both victims of the crime?

21    A    That's correct.

22    Q    What time was this?

23    A    This was approximately midnight.

24    Q    Well, did you actually -- how did you do that?

25  You were in the passenger side?

61

1            Det. Banks-For the People-Cross(Schechter)

2       A      I was in the front passenger seat of my car.

3 My partner pulled alongside so that the window was even

4 with the rear seat of the defendants' car.

5       Q      And as soon as you stopped that car, is that

6 the time that you put the two male Asians under arrest?

7       A      After identifying the two victims as being in

8 the car, my partner pulled in front of their car and

9 that's when I placed them under arrest.

10       Q      You had photographs of the two victims?

11       A      That's correct.

12       Q      Of the two women?

13       A      That's correct.

14       Q      At what time did you put the handcuffs on my

15 client, Mr. Qin Zheng?

16       A      Immediately.

17       Q      Then you searched him?

18       A      I patted him down and made sure he had no

19 weapons and he was searched when he got back to One

20 Police Plaza.

21                 MS. PELOSI:  I have no further questions.

22                 THE COURT:  Mr. Schechter.

23 CROSS EXAMINATION

24 BY MR. SCHECHTER:

25       Q      Detective Banks, what time was it that you

62

1          Det. Banks-For the People-Cross(Schechter)
2    first observed that vehicle?
3          A     About 10:00 p.m.
4          Q     And at that time you were not able to identify
5    any of the four individuals; am I correct?
6          A     Well, the vehicle was unoccupied, like I
7    testified to.
8          Q     I'm talking about when they got into the car.
9          A     Well, I first observed the car at 10:00 p.m.
10         Q     What time --
11         A     At midnight they got into the car.
12         Q     And it was obviously dark out?
13         A     That's correct.
14         Q     Do you have the two pictures of the two females
15   that you had?
16         A     No, I don't.
17         Q     What happened to those?
18         A     I gave them back to Detective Greene.
19         Q     Now, where was this vehicle stopped when you
20   looked into the vehicle?
21         A     It was stopped at the Long Island Expressway
22   service road and Horace Harding Expressway, heading
23   westbound, at a red light.
24                    THE COURT:   What is the side street?
25                    THE WITNESS:   College Point Boulevard.

63

1          Det. Banks-For the People-Cross(Schechter)

2     Q    Was it on the service ro~ ?

3     A    That's correct.

4     Q    Was the service road going the east side of the

5     service road or west service road?

6     A    West.

7     Q    Was this the first car stopped at that light?

8     A    It was the only car stopped at the light.

9     Q    That car was in the right-hand lane and you

10    then pulled into the left-hand lane?

11    A    That's correct.

12    Q    Were there any lights on in the interior of the

13    vehicle that had the four Asians?

14    A    Not that I recall, no.

15    Q    And where was the nearest street light that you

16    were able to see?

17    A    The nearest street light, I couldn't tell you

18    exactly where it was.  But it was illuminated enough

19    where there was enough light for me to identify these two

20    girls.

21    Q    Now, you said that you had received the address

22    -- well withdrawn.

23         When was the first time you had been involved

24    in this incident?

25    A    The afternoon of the 1st.

64

1         Det. Banks-For the People-Cross(Schechter)

2    Q    And was that when you were assigned to this

3    matter?

4    A    I was assigned to assist Detective Greene, yes.

5    Q    Did you have any conversation with any

6    individual of Asian extraction who was part -- who had

7    information to give concerning this incident?

8              MR. KESSLER:  Objection.

9              THE COURT:  Sustained as to form.

10   Q    Did you speak to any individual who was not a

11   police officer who was involved in this investigation?

12             MR. KESSLER:  Objection.  Beyond the

13        scope.

14             THE COURT:  Sustained.

15   Q    You said you were directed to go to an area in

16   Queens on 59th Street?

17             THE COURT:  Avenue.  59th Avenue.

18   Q    59th Avenue between what, 134th and 135th

19   Street?

20   A    134th and 136th.

21   Q    And you were directed to go there because of a

22   telephone that was being eavesdropped on?

23   A    The reason I was directed there was the

24   cellular phone that the kidnappers and the victim were on

25   was observed being used by two male Asians in that car by