Case 1:16-cv-01188-RJD Document 8-6 Filed 11/30/16 Page 1 of 145 PageID #: 878

1

2          told you would make -- effect you in this

3          particular trial?

4                  PROSPECTIVE JUROR:  No.

5              MR. SCHECTER:  Be fair and impartial?

6              PROSPECTIVE JUROR 7:   Yes, I will.

7              MR. SCHECTER:  If the People's proof is

8          deficient, you have a reasonable doubt, I don't

9          put on any witness, do you have any problem

10         standing up and saying not guilty?

11                 PROSPECTIVE JUROR 7:    No.

12             MR. SCHECTER:  And, Miss Pusung, do you have

13         any problems up to now?

14                 PROSPECTIVE JUROR 8:  No.

15             MR. SCHECTER:  People's proof is deficient,

16         any problem standing up and saying not guilty?

17                 PROSPECTIVE JUROR 8:  No.

18             MR. SCHECTER:  Mr. Hsu, any problems if the

19         People's proof is deficient to say not guilty

20         even if I don't put on any witnesses?

21             PROSPECTIVE JUROR 9:  Like I already

22         mentioned, I would base upon what I hear, what I

23         listen and what my knowledge is.

24             MR. SCHECTER:  Miss Benton, any problems with

25         any of the concepts up to now?

Voir Dire                                            269

1

2        PROSPECTIVE JUROR 10:  No.

3        MR. SCHECTER:  You say you have friends who

4   are police officers?

5        PROSPECTIVE JUROR 10:  Yes.

6        MR. SCHECTER:  Do they discuss with you their

7   work?

8        PROSPECTIVE JUROR 10:  Not in detail.

9        MR. SCHECTER:  It won't effect you?

10       PROSPECTIVE JUROR:  No.

11       MR. SCHECTER:  What type of crime?

12       PROSPECTIVE JUROR:  I was attacked by a

13   homeless person.

14       MR. SCHECTER:  Were you sexually assaulted?

15       PROSPECTIVE JUROR:  No.

16       MR. SCHECTER:  Was anyone ever arrested?

17       PROSPECTIVE JUROR 10:  No.

18       MR. SCHECTER:  Would that affect your

19   deliberations in this particular case?

20       PROSPECTIVE JUROR 10:  No.

21       MR. SCHECTER:  Anything that you've heard up

22   to now that would make you not want to sit on

23   this jury?

24       PROSPECTIVE JUROR 10:  No.

25       MR. SCHECTER:  Let me just one thing in

Case 1:16-cv-01166-RJD   Document 8-6   Filed 11/09/16   Page 3 of 145 PageID #: 880

1

2    conclusion.  If anyone wants to sit on a jury,

3    does anyone feel that something has not been

4    brought out that we should know that would help

5    us make a determination about your qualifications

6    for a juror?

7        Anyone have any problem about standing up and

8    saying not guilty?  Thank you all.

9        THE COURT:  Excuse us for a few moments.  You

10   can consult with your client.

11       (The following takes place in the robing room

12   outside the presence of the defendant and the

13   jury)

14       COURT CLERK:  First juror, Mentovay,

15   challenge for cause?

16       MR. KESSLER:  No.

17       COURT CLERK:  Defense?

18       MR. SCHECTER:  No.

19       THE COURT:  Perempt, people?

20       MR. KESSLER:  Yes.

21       COURT CLERK:  Next juror, Kilgore, cause?

22       MR. KESSLER:  I thought we discussed with the

23   woman -- says she has a problem sitting more than

24   twenty minutes.

25       THE COURT:  She said twenty, twenty five

MB

Case 1:16-cv-01166-RJD   Document 8-6   Filed 11/30/16   Page 4 of 145 PageID #: 881

1

2          minutes.

3               MR. SCHECTER:  It may be a problem if you

4     have a witness on the stand.

5               MR. KESSLER:  I happen to agree.

6               THE COURT:  I'll allow it.

7               COURT CLERK:  No objections.

8               THE COURT:  Number three, Gerke, cause?

9               MR. KESSLER:  No.

10              MR. SCHECTER:  No.

11              THE COURT:  Perempt?

12              MR. KESSLER:  Yes.

13              COURT CLERK:  Edward Ng, challenge for cause?

14              MR. KESSLER:  No.

15              MR. SCHECTER:  No.

16              THE COURT:  Perempt?

17              MR. KESSLER:  No.

18              THE COURT:  Perempt?

19              MR. SCHECTER:  Yes.

20              THE COURT:  Sonia Mejias, cause?

21              MR. KESSLER:  Yes.

22              MR. SCHECTER:  Consent.

23              THE COURT:  Miss Sullivan, cause?

24              MR. KESSLER:  No.

25              THE COURT:  Defense?

Case 1:16-cv-01166-RJD Document 8-6 Filed 11/30/16 Page 5 of 145 PageID #: 882

MR. SCHECTER:  No.

COURT CLERK:  Perempt?

MR. KESSLER:  No.

COURT CLERK:  Defense?

MR. SCHECTER:  Yes.

COURT CLERK:  Carmela Kutney, cause?

MR. KESSLER:  No.

MR. SCHECTER:  No.

COURT CLERK:  Perempt?

MR. KESSLER:  No.

COURT CLERK:  Perempt?

MR. SCHECTER:  She's acceptable.

COURT CLERK:  We have twelve jurors.

THE COURT:  Next?

COURT CLERK:  Next three, challenge for cause, people.

MR. KESSLER:  Pusung for cause, no, no.

MR. SCHECTER:  No cause.

THE COURT:  Perempt?

MR. KESSLER:  No.

COURT CLERK:  Perempt?

MR. SCHECTER:  Perempt.

THE COURT:  Mr. Hsu, cause, people?

MR. KESSLER:  No.

1       Voir Dire                                    273

2           COURT CLERK:  Cause, defense?

3           MR. SCHECTER:  Yes.  He gave very equivocal

4       answers, your Honor.

5           MR. KESSLER:  I have to agree, when I

6       understood him.  I think that's the problem.

7           THE COURT:  With the language?  He's a

8       financial consultant.  I'm not going to go by

9       language.

10          MR. SCHECTER:  He was very equivocal when he

11      said he had to hear both sides.

12          THE COURT:  Bottom line he said he'd be a

13      fair juror, listen to all of the evidence in the

14      case and make his decision based upon common

15      sense and his experience.

16          MR. SCHECTER:  When I asked him whether he

17      would hold it against my client if he didn't call

18      any witness.  He then said I would ask questions

19      and everything else, your Honor, never saying,

20      that he wouldn't hold it against my client.

21          THE COURT:  Look.  You want to excuse him, I

22      got all the time in the world, fellows.  You want

23      to go another three days picking a jury?  He's

24      excused.  It's okay.

25          MR. SCHECTER:  I challenge him for cause.

MB

1

2      I'll say this --

3          THE COURT:  You excused pretty good jurors in

4      my opinion.

5          Any objection by the People?

6          MR. KESSLER:  No.

7          COURT CLERK:  Miss Benton, cause?

8          MR. KESSLER:  No.

9          MR. SCHECTER:  No.

10         COURT CLERK:  Perempt?

11         MR. KESSLER:  No.

12         COURT CLERK:  Perempt?

13         MR. SCHECTER:  No.

14         COURT CLERK.  We have alternate number one.

15         THE COURT:  We are going to swear in this one

16     juror.  Then I'm going to take those two into the

17     jury room where the other jurors are with the

18     Court Reporter AND counsel and I'm going to

19     excuse them with the admonitions they shouldn't

20     discuss the case.  I have to do that in the

21     presence of the defendant.

22             (The following occurs in open court)

23         COURT CLERK:  Carmela Kutney and Miss Benton

24     remain seated.  All other jurors, you're excused

25     for this evening.  Return to central jury.  All

```
 1                           Voir Dire                    275

 2          right.  Only remaining seated are Miss Kutney and

 3          Miss Benton.

 4               COURT CLERK:  Remaining two jurors acceptable

 5          to the attorneys?

 6               MR. KESSLER:  Yes.

 7               MR. SCHECTER:  Yes.

 8               (Whereupon, 1 regular juror and 1 alternate

 9          juror was duly sworn by the Clerk of the Court)

10               THE COURT:  Would you escort these jurors

11          with the other jurors, please?

12               Don't discuss the case among yourself or with

13          the other jurors.  Thank you.

14               Fill the box.

15               COURT CLERK:  First seat, Robert Neal,

16          N-e-a-l.  Two, Sheri Glazer, G-l-a-z-e-r.  Donald

17          Cocheo, C-o-c-h-e-o.  First name Donald.  Laurie

18          Carlson, C-a-r-l-s-o-n.  Linda Saltzman,

19          S-a-l-t-z-m-a-n.  Virgilio Capolupo,

20          C-a-p-o-l-u-p-o.  Marisa Birmingham,

21          B-i-r-m-i-n-g-h-a-m.

22               THE COURT:  While you're waiting please

23          examine these questionnaires so you'll have the

24          answers.

25               COURT CLERK:  Linda Kaplan, K-a-p-l-a-n.
```

Case 1:16-cv-01006-RJD Document 8-8 Filed 11/30/16 Page 9 of 145 PageID #: 886

Marie Baccarella, B-a-c-c-a-r-e-l-l-a.  First

name Marie.  Malvina Kluger, K-l-u-g-e-r, first

name, M-a-l-v-i-n-a.

COURT CLERK:  Ten potential jurors.

THE COURT:  Ladies and gentlemen, would you

please do as the other jurors did, give us the

number of the question you're answering.  First

six have to be answered with a specific answer,

the others yes or no.

Start with you, sir.

PROSPECTIVE JUROR 1:  One, 62.  Two, Astoria,

Queens.  Retired, nursing assistant.

THE COURT:  Give us the number.

He HAS to write the number down so the record

will show.

PROSPECTIVE JUROR 1:  Number four, divorced.

High school, number five.  Number six, I have NO

spouse, no children.  Seven, no.  Eight, no.

Nine, no.  Ten, no.  Eleven, no.  Twelve, no.

Thirteen, no.  Fourteen, yes.  Fifteen, no.

Sixteen, yes.

THE COURT:  Thank you.  Next.

PROSPECTIVE JUROR 2:    One, 23.  Two,

Bayside, Queens.  Three, administrative assistant

Case 1:16-cv-01166-RJD Document 8-6 Filed 11/30/16 Page 10 of 145 PageID #: 887

for a known profit organization. Four, single.

Five, I have BA in biology. Six, I don't have

any spouse nor children. Seven, yes. This

summer of '94 there was a case, not in this

state.

THE COURT: In another state?

PROSPECTIVE JUROR 2: Yes, your Honor.

Number eight, no. Nine, yes. Ten, no. Eleven,

no. Twelve, no. Thirteen, no. Fourteen, no.

Fifteen, no. Sixteen, yes.

THE COURT: Thank you. Next.

PROSPECTIVE JUROR 3: Number one, 35. Two,

Astoria. Three, bridge and tunnel maintenance.

Four, married. I have six months of college.

Number six, my wife is a terminal service also in

the airport. Seven, is no. Eight is yes.

Number nine is no. Ten is no. Eleven is no.

Twelve is no. Thirteen is no. Fourteen is no.

Fifteen, no. Sixteen no.

PROSPECTIVE JUROR 4: One, 29. Two, Middle

Village. Three, administrative assistant. Four,

divorced. Five, I currently attend college at

night. Six, I don't have any. Seven, no.

Eight, yes. Nine, yes. Ten, yes. Eleven, no.

Case 1:16-cv-01008-RJD  Document 8-6  Filed 11/30/16  Page 11 of 145 PageID #: 888

Twelve, no.  Thirteen, no.  Fourteen, no.

Fifteen, no.  Sixteen, yes.

THE COURT:  Thank you.  Next.

PROSPECTIVE JUROR 5:  one, 45.  Two,

Astoria.  Three, editor in chief.  Four, mother.

Five, graduate school.  Six, lawyer.  Infant

child.  Seven, yes, about ten years ago, case was

fraud.  Eight, yes.  Nine, yes.  Ten, no.

Eleven, yes.  Twelve, no.  Thirteen, no.

Fourteen, no.  Fifteen, no.  Sixteen, yes.

PROSPECTIVE JUROR 6:  One, 55.  Two, Bayside,

Queens.  Retired, three.  Four, divorced.  Five,

I graduated high school.  They have clerical

jobs, number six.  Seven, I never served on a

jury.  Eight, I have no.

THE COURT:  Just answer yes or no.

PROSPECTIVE JUROR 6:  Eight is no, Nine is

no.  Ten is no.  Eleven is no.  Twelve is no.

Thirteen no.  Fourteen is no.  Fifteen is no.

Sixteen is no.

THE COURT:  Thank you.

PROSPECTIVE JUROR 7:  Number one, 26.  Two.

Kew Gardens Hills.  Three, technical assistant.

Four, single.  Five, one year of college.  Number

Voir Dire                                    279

six, not applicable.  Seven, no.  Eight, yes.
Nine, no.  Ten, yes.  Number eleven, -- excuse
me, number ten is no.  Number eleven is yes.
Twelve, no.  Thirteen, no.  Fourteen, no.
Fifteen, no, sixteen, yes.

PROSPECTIVE JUROR 8:  One, 42.  Two, Little
Neck.  Three, occupational therapist.  Four
divorced.  Five, four years of college.  Six not
applicable.  Seven, no.  Eight, no.  Nine, yes.
Ten, no.  Eleven, no.  Twelve, no.  Thirteen, no.
Fourteen, no.  Fifteen, no.  Sixteen, no.

THE COURT:  Next.

PROSPECTIVE JUROR 9:  One, 58.  Two, Bayside,
Queens.  Three, housewife.  Four, married.  Five,
12th grade.  Six, retired.  I have a son who's an
electrical assistant and one a window cleaner.
Seven, no.  Eight is no.  Nine is no.  Ten is
yes.  Eleven is yes.  Twelve is no.  Thirteen is
no.  Fourteen is no.  Fifteen is no.  Sixteen,
yes.

PROSPECTIVE JUROR 10:  One, 48.  Two, Kew
Gardens, Queens.  Three, researcher.  Four,
married.  Five, college graduate.  Six, my
husband is a neuropsychologist and I have an

| | |
|---|---|
| 1 | Voir Dire                                    280 |

2    eleven year old.  Seven, no.  Eight, no.  Nine,

3    yes.  Ten, no.  Eleven, yes.  Twelve, no.

4    Thirteen, no.  Fourteen, no.  Fifteen, no.

5    Sixteen, yes.

6         THE COURT:  Thank you.

7         Mr. Kessler?

8    VOIR DIRE EXAMINATION

9    BY:  MR. KESSLER:

10        MR. KESSLER:  Afternoon everyone.  My voice

11   is gone so I won't be speaking to long.  Welcome

12   to an American Court of law.  I'm Scott Kessler

13   and I'm an Assistant District Attorney.  I work

14   for Richard Brown.  I'll ask some questions.  If

15   at any time you want to answer my questions in

16   private you can answer them at side bar.

17        I think everyone has listened to some of the

18   questions I was asking the other jury members.

19        Police Kluger?

20        PROSPECTIVE JUROR 10:  Yes?

21        MR. KESSLER:  You heard me ask some of the

22   other members of the panel members do you have

23   any problems with the concept I was talking

24   about?

25        PROSPECTIVE JUROR:  No.

MB

Case 1:16-cv-01166-RJD   Document 8-6   Filed 11/30/16   Page 14 of 145 PageID #: 891

1

2          MR. KESSLER:  Have you ever spoken to a woman

3      about rape before?

4          PROSPECTIVE JUROR:  Personally experienced

5      rape?

6          MR. KESSLER:  Them telling you they were

7      raped?

8          PROSPECTIVE JUROR 10:  No.

9          MR. KESSLER:  Do you have any preconceived

10     notion of what a woman who was raped should

11     appear like on the stand?

12         PROSPECTIVE JUROR:  No.

13         MR. KESSLER:  I wanted to know if anyone

14     discussed it in real life?  It's not the movies

15     or T.V.  Any problem being fair and impartial?

16         PROSPECTIVE JUROR 10:  I don't believe so.

17         MR. KESSLER:  What do you think we are

18     looking for in terms of jurors?

19         PROSPECTIVE JUROR 10:  Someone who could

20     listen to the facts and make a fair decision.

21         MR. KESSLER:  Think you can do that?

22         PROSPECTIVE JUROR 10:  Believe so.

23         MR. KESSLER:  If I prove to you the

24     defendant's guilt beyond a reasonable doubt

25     what's your verdict going to be?

1                          Voir Dire                    282

2          PROSPECTIVE JUROR 10:  Guilty.

3          MR. KESSLER:  If I fail to prove his guilt?

4          PROSPECTIVE JUROR 10:  Not guilty.

5          MR. KESSLER:  Can you let the cards fall as

6     they may?

7          PROSPECTIVE JUROR 10:  Believe so.

8          MR. KESSLER:  At the end of this case someone

9     comes up to you in the jury room says, you know,

10    I believe the defendant is guilty as charged.  I

11    look over there, he doesn't look like someone who

12    would do that something that like, what would you

13    say?

14         PROSPECTIVE JUROR:  I don't think that's a

15    fair decision.

16         MR. KESSLER:  What would you say, Miss

17    Saltzman?

18         PROSPECTIVE JUROR:  I would say nothing.

19         MR. KESSLER:  Do you think there's a

20    particular type of person that would commit a

21    rape?

22         PROSPECTIVE JUROR 5:  No.

23         MR. KESSLER:  Could be any race, religion

24    gender or creed?

25         PROSPECTIVE JUROR 5:  No.

MB

1                          Voir Dire                          283

2              MR. KESSLER:  How long have you lived in

3        Astoria?

4              PROSPECTIVE JUROR 5:  All my life with the

5        exception of about four years when I went TO

6        Bayside.

7              MR. KESSLER:  Went to school there?

8              PROSPECTIVE JUROR 5:  NO.

9              MR. KESSLER:  Your son is a lawyer?

10             PROSPECTIVE JUROR 5:  Husband.

11             MR. KESSLER:  What type of law?

12             PROSPECTIVE JUROR 5:  Real estate law.

13             MR. KESSLER:  Does he ever dabble in criminal

14       law?

15             PROSPECTIVE JUROR 5:  Not so far.

16             MR. KESSLER:  Any problem with you being fair

17       and impartial to both sides?

18             PROSPECTIVE JUROR:  No.

19             MR. KESSLER:  You said you're an editor in

20       chief in a magazine?

21             PROSPECTIVE JUROR:  Yes, publishing.

22             MR. KESSLER:  How long?

23             PROSPECTIVE JUROR:  18 years.

24             MR. KESSLER:  Mr. Neal, how are you?

25             PROSPECTIVE JUROR 11:  I'm fine.

MR. KESSLER:  How are ever been on a jury?

PROSPECTIVE JUROR:  No.

PROSPECTIVE JUROR:

MR. KESSLER:  Ever served on a grand jury?

PROSPECTIVE JUROR:  No.

MR. KESSLER:  Never got your number called?

PROSPECTIVE JUROR 11 :  Once I've been called but I haven't served.  Several times.

MR. KESSLER:  What do you think a fair and impartial juror is?  What do you think the qualities they have?

PROSPECTIVE JUROR:  Innocent until proven guilty.

MR. KESSLER:  Understand I have the burden of proving his guilt in this case.  Let's suppose at the end of this case I prove to you he's guilty beyond a reasonable doubt, what's your verdict?

PROSPECTIVE JUROR:  He's guilty.

MR. KESSLER:  Any problem with the concept I was talking to some of the other jury members about, proving the testimony of one witness alone?  Understand sometimes crimes aren't committed in front of a lot of people?

PROSPECTIVE JUROR 1:  Right.

1

2          MR. KESSLER:  Would you agree with that, Miss

3     Glazer?

4          PROSPECTIVE JUROR 2:  I agree with that.

5          MR. KESSLER:  Anything what you heard so far

6     would cause you to believe you couldn't be fair

7     to both sides?

8          PROSPECTIVE JUROR 2:  No.

9          MR. KESSLER:  Mr. Cocheo, you indicated you

10    wouldn't be fair and impartial to both sides?

11         PROSPECTIVE JUROR 3:  No.

12         MR. KESSLER:  Mr. Capolupo, you said that as

13    well?

14         PROSPECTIVE JUROR 6:  Yes.

15         MR. KESSLER:  And, Miss Kaplan?

16         PROSPECTIVE JUROR 8:  Yes.

17         MR. KESSLER:  Is that based upon the nature

18    of the charges or criminal cases in general?

19         PROSPECTIVE JUROR 8:  Criminal cases in

20    general.

21         MR. KESSLER:  The same with you?

22         PROSPECTIVE JUROR 3:  No, it's what I see.

23         MR. KESSLER:  Mr. Capolupo?

24         PROSPECTIVE JUROR 6:  It's the rape charges.

25         MR. KESSLER:  Is that something based upon

```
1                          Voir Dire                    286

2        the background of your family?

3              PROSPECTIVE JUROR 6:  I could never

4        understand it.  It's something I would probably

5        go against, more or less as him being guilty.

6              MR. KESSLER:  You're saying just because of

7        the fact it's a rape charge?

8              PROSPECTIVE JUROR 6:  That's the reason,

9        yeah.

10             MR. KESSLER:  Is that the only type of crime?

11             PROSPECTIVE JUROR 6:  Anything else would be

12       no problem.

13             MR. KESSLER:  Any other case wouldn't be a

14       problem?

15             PROSPECTIVE JUROR 6:  Right.

16             MR. KESSLER:  How are you?

17             PROSPECTIVE JUROR 7:   Yes.

18             MR. KESSLER:  What type of work do you do?

19             PROSPECTIVE JUROR:  Re-insurance.

20             MR. KESSLER:  Some friend who are cops?

21             PROSPECTIVE JUROR:  Yes.

22             MR. KESSLER:  Do you ever discuss their work

23       with them?

24             PROSPECTIVE JUROR 7:   Not really.

25             MR. KESSLER:  Any problem with that concept I
```

MB

```
1                          Voir Dire                    287

2       spoke about, one witness?

3            PROSPECTIVE JUROR 7:  No.

4            MR. KESSLER:  Any reason you couldn't be fair

5       to both sides

6            PROSPECTIVE JUROR 7:  No.

7            MR. KESSLER:  Miss Carlson, how are you?

8            PROSPECTIVE JUROR 4:  Hi.

9            MR. KESSLER:  How are you?  You mentioned at

10      one point you knew someone who was accused of a

11      crime?

12           PROSPECTIVE JUROR 4:  Yes.

13           MR. KESSLER:  Want to talk about it here or

14      side bar, totally your decision?

15           PROSPECTIVE JUROR 4:  It's okay.

16           MR. KESSLER:  Tell me about it?

17           PROSPECTIVE JUROR 4:  My nephew was

18      convicted of robbery.

19           MR. KESSLER:  Did you follow that case at all

20      for?

21           PROSPECTIVE JUROR 4:  No.

22           MR. KESSLER:  Did you ever speak to him about

23      it?

24           PROSPECTIVE JUROR 4:  No.

25           MR. KESSLER:  Do you have an opinion as to
```

```
1                        Voir Dire                    288
2        whether he was guilty?
3             PROSPECTIVE JUROR 4:   I imagine he was
4        guilty.
5             MR. KESSLER:  Anything about that case that
6        would cause you not to be fair in this case?
7             PROSPECTIVE JUROR:  Four.
8             MR. KESSLER:  Were you close to him at all?
9             PROSPECTIVE JUROR 4:  No.
10            MR. KESSLER:  You didn't follow his case?
11            PROSPECTIVE JUROR 4:   No.
12            MR. SCHECTER:  Any problems with the concept
13       I've been talking about?
14            PROSPECTIVE JUROR 4:   No.
15            MR. KESSLER:  You also indicated you knew
16       someone who was accused of a crime as; well,
17       would you like to discuss it side bar?
18            PROSPECTIVE JUROR:  Side bar.
19            THE COURT:  Step up.
20            (Discussion held at bench off the record.)
21            THE COURT:  Are you having trouble sitting?
22            A JUROR:  Yes.
23            THE COURT:  You can stand up.
24            MR. KESSLER:  Couple of more questions.  You
25       indicated you knew some lawyers, Miss Carlson?
```

MB

1

2          PROSPECTIVE JUROR 4:    Friend's husband.

3          MR. KESSLER:  Do you know what type of law?

4          PROSPECTIVE JUROR 4:   Real estate.

5          MR. KESSLER:  I think I'm about done.  You

6     indicated you knew some lawyers as well?

7          PROSPECTIVE JUROR 5:  Yes.

8          MR. KESSLER:  A lot?

9          PROSPECTIVE JUROR:  Yes.

10          MR. KESSLER:  Any bad experiences with them?

11          PROSPECTIVE JUROR:  Not as friends, no.

12          MR. KESSLER:  Nothing could sway you about

13     being fair?

14          PROSPECTIVE JUROR 5:  No.

15          MR. KESSLER:  You indicated some of your

16     friends were police officers?

17          PROSPECTIVE JUROR 7:   Yes.

18          MR. KESSLER:  Are they close friends?

19          PROSPECTIVE JUROR 7:  No.

20          MR. KESSLER:  I ask if you're chosen as a

21     juror that you be fair and impartial, both to the

22     people and to the defense.  If I prove my case

23     beyond a reasonable doubt I would ask everyone to

24     stand up and find the defendant guilty.  If I

25     fail to find him not guilty.  Let it be based

```
 1                    Voir Dire                    290

 2          upon the evidence, no preconceived notions,

 3          prejudices against any one or sympathy.  Everyone

 4          seem fair with that?

 5               Thank you your Honor.

 6               THE COURT:  Mr. Schecter?

 7   VOIR DIRE EXAMINATION

 8   BY:  MR. SCHECTER:

 9               MR. SCHECTER:  Everyone hear my questions

10          before when the other people were sitting here?

11          Anyone have a problem with any of it?

12               Remember I said the burden of proof is on the

13          District Attorney.  We don't have any burden.  We

14          may or may not call any witnesses.  We may or may

15          not take the witness stand.  Do you have a

16          problem with that?

17               PROSPECTIVE JUROR 1:  No.

18               MR. SCHECTER:  Listen to the evidence, or

19          lack of evidence, make your decision on that and

20          that alone?

21               PROSPECTIVE JUROR 1:  Yes.

22               MR. SCHECTER:  And if you believe the people

23          failed to sustain their burden, do you have any

24          problem standing up and saying not guilty?

25               PROSPECTIVE JUROR 1:  No, I don't.
```

1

2          MR. SCHECTER: Anyone have any problems?

3     Mr. Capolupo, you said you had a problem with the

4     type of crime?

5          PROSPECTIVE JUROR 6: Yes.

6          MR. SCHECTER: Anyone else have a problem?

7     They feels if a female takes the stand they would

8     tend to side with her, they would feel more

9     sympathy for her? Can everyone here promise me

10    that -- anyone feel that they have to hear two

11    sides of a story?

12         PROSPECTIVE JUROR 4: I think so.

13         MR. SCHECTER: Well, there's no obligation on

14    my client to take the stand; would you hold that

15    against him if you don't hear him testify?

16         PROSPECTIVE JUROR 4: No, but I would assume

17    he would tell his side of the story.

18         MR. SCHECTER: He doesn't have any

19    obligation. I'm not saying he will or will not.

20    Can you put that aside if the Judge tells you to?

21         PROSPECTIVE JUROR 4: I guess so.

22         MR. SCHECTER: Unfortunately, guess so, is

23    not quite enough. You have to be able to tell me

24    you can?

25         PROSPECTIVE JUROR 4: I guess I can.

1                        Voir Dire                    292

2              MR. SCHECTER:  Miss Carlson, when you were

3        talking about your nephew you said he was

4        probably guilty?

5              PROSPECTIVE JUROR 4:   Yes.

6              MR. SCHECTER:  Did he plead guilty?  Do you

7        know if he pled guilty or went to trial?

8              PROSPECTIVE JUROR 4:  No idea.

9              MR. SCHECTER:  What makes you think he was

10       probably, do you know what happened to him?

11             PROSPECTIVE JUROR 4:   He was convicted.

12             MR. SCHECTER:  But you don't know whether

13       that was by a plea or --

14             PROSPECTIVE JUROR 4:   No, I don't.

15             MR. SCHECTER:  Do you have friends who are

16       police officers?

17             PROSPECTIVE JUROR 4:   Yes.

18             MR. SCHECTER:  Close friends?

19             PROSPECTIVE JUROR 4:  Yes.

20             MR. SCBECTER:  Do they ever discuss with you

21       their work?

22             PROSPECTIVE JUROR:  Sometimes.

23             MR. SCHECTER:  Have they given you their

24       feelings of the criminal justice system?

25             PROSPECTIVE JUROR:  No.

MB

1                              Voir Dire                    293

2              MR. SCHECTER:  Anything concerning that that

3        would make you tend to side with the prosecution?

4              PROSPECTIVE JUROR:  No.

5              MR. SCHECTER:  Thank you.  Miss Saltzman, you

6        have many friends.  I'm hoping you didn't say

7        your husband, you have friends who are police

8        officers?

9              PROSPECTIVE JUROR 5:  Yes.

10             MR. SCHECTER:  Close friends?

11             PROSPECTIVE JUROR 5:  Yes.

12             MR. SCHECTER:  Relatives?

13             PROSPECTIVE JUROR:  No.

14             MR. SCHECTER:  Good friends, neighbor?

15             PROSPECTIVE JUROR 5:  Yes.

16             MR. SCHECTER:  Does he ever discuss his work

17        with you?

18             PROSPECTIVE JUROR:  She.

19             THE COURT:  See that?

20             MR. SCHECTER:  Has she ever discuss her work

21        with you?

22             PROSPECTIVE JUROR 5:  Yes.

23             MR. SCHECTER:  Have you gotten any feeling on

24        the criminal justice system based on your

25        conversations with her?

1

2     PROSPECTIVE JUROR 5:  No.

3     MR. SCHECTER:  My guess is you'll hear police

4  testimony during this trial.  If at the end of

5  the case, and my client doesn't take the witness

6  stand, that won't affect you, will it?

7     PROSPECTIVE JUROR 5:  No.

8     MR. SCHECTER:  At the end of the entire case

9  you have a reasonable doubt reasonable doubt, do

10  you have any problems going back there, maybe

11  because of sloppy police work, do you have any

12  problem in finding him not guilty?

13     PROSPECTIVE JUROR 5:  No, no problem.

14     MR. SCHECTER:  You're not going to talk to

15  your husband about this case, are you?

16     PROSPECTIVE JUROR 5:  No.

17     MR. SCHECTER:  You've been the victim of a

18  crime, that wouldn't affect you?

19     PROSPECTIVE JUROR 5:  I wasn't the victim.

20     MR. SCHECTER:  Other member of your family?

21     PROSPECTIVE JUROR:  Yes.

22     MR. SCHECTER:  Will that affect you?

23     PROSPECTIVE JUROR 5:  I don't believe so.

24     MR. SCHECTER:  Can you tell us what type of

25  crime?

Voir Dire                                    295

2     PROSPECTIVE JUROR 5:  It was a rape.

3     MR. SCHECTER:  Close friend?

4     PROSPECTIVE JUROR 5:  Cousin.

5     MR. SCHECTER:  Did you discuss with her what

6     happened?

7     PROSPECTIVE JUROR 5:  Yes.

8     MR. SCHECTER:  A woman takes the witness

9     stand and says she was molested here, would you

10    feel because of your cousin -- you would give her

11    testimony more credibility because of that?

12    PROSPECTIVE JUROR:  My empathy would be with

13    her.

14    MR. SCHECTER:  Would you overlook certain

15    things in her testimony because of that?

16    PROSPECTIVE JUROR 5:  Overlook things in her

17    testimony, no.

18    MR. SCHECTER:  You can put that all aside,

19    whatever it was?

20    PROSPECTIVE JUROR 5:  Yes.

21    MR. SCHECTER:  If you find her testimony

22    deficient, would you have any problem standing up

23    and saying not guilty?

24    PROSPECTIVE JUROR 5:  I wouldn't have a

25    problem with that.

1                    Voir Dire                        296

2          MR. SCHECTER:  Miss Glazer, I believe you

3    said you've been a juror?

4          PROSPECTIVE JUROR 2:  Yes, I have.

5          MR. SCHECTER:  That was in --

6          PROSPECTIVE JUROR:  In the State of

7    Massachusetts in Cambridge.

8          MR. SCHECTER:  Criminal matter?

9          PROSPECTIVE JUROR:  No.

10         MR. SCHECTER:  There are different burdens of

11   proof.  You can put that all aside?

12         PROSPECTIVE JUROR 2:  I wasn't a trial.  It

13   was little decision that had to be made before

14   the trial started.

15         MR. SCHECTER:  Anything in your background or

16   anything I've asked up to now make you feel you

17   can't be fair juror?

18         PROSPECTIVE JUROR 2:  No.

19         MR. SCHECTER:  Any of your friends he ever

20   discuss with you your work?

21         PROSPECTIVE JUROR 7:  Other than funny

22   stores, no.

23         MR. SCHECTER:  That won't affect you?

24         PROSPECTIVE JUROR 7:   No.

25         MR. SCHECTER:  You've been the victim of a

                          MB

Case 1:16-cv-01166-RJD   Document 8-6   Filed 11/30/16   Page 30 of 145 PageID #: 907

1

2         crime?

3              PROSPECTIVE JUROR 7:   Yes.

4              MR. SCHECTER:  Would that affect you one way

5         or the other?

6              PROSPECTIVE JUROR 7:   No.

7              MR. SCHECTER:  Be fair and impartial?

8              PROSPECTIVE JUROR 7:   Yes.

9              MR. SCHECTER:  People's proof is deficient,

10        any problem standing up and saying not guilty?

11             PROSPECTIVE JUROR 7:  No.

12             MR. SCHECTER:  Thank you.

13             MR. SCHECTER:  Miss Baccarella, when you were

14        asked the last question for some reason -- can

15        you be a fair and impartial juror?

16             PROSPECTIVE JUROR 9:  Yes.

17             MR. SCHECTER:  Anything you've heard up to

18        now which would change your mind from being fair

19        and impartial?

20             PROSPECTIVE JUROR:  No.

21             MR. SCHECTER:  You've been the victim of a

22        crime?

23             PROSPECTIVE JUROR 9:  Yes.

24             MR. SCHECTER:  Would that affect you one way

25        or the other in this case?

Case 1:16-cv-01166-PJD Document 8-6 Filed 11/30/16 Page 31 of 145 PageID #: 900

1

2        PROSPECTIVE JUROR:  I don't think so.

3        MR. SCHECTER:  What type of crime was it?

4        PROSPECTIVE JUROR:  I was mugged twice.

5        MR. SCHECTER:  You won't hold it against my

6    client?

7        PROSPECTIVE JUROR:  No.

8        MR. SCHECTER:  Miss Kluger, you had friends

9    who are attorneys?

10       PROSPECTIVE JUROR 10:  Yes.

11       MR. SCHECTER:  Do any of them do criminal?

12       PROSPECTIVE JUROR 10:  No.

13       MR. SCHECTER:  You won't discuss whatever

14   happens here with them during the next few weeks?

15       PROSPECTIVE JUROR 10:  No.

16       MR. SCHECTER:  Anyone want to tell me

17   anything they think I should know to let me know

18   whether you'll be a fair and impartial juror?

19       THE COURT:  Consult counsel.  Come inside

20   when you're ready.  Excuse us jurors.

21   (The following takes place in the robing room

22   outside the presence of the defendant and the

23   jury).

24       COURT CLERK:  We need three alternates.  We

25   are going to go through them one at time.

1                    Voir Dire                299

2      THE COURT:  Yes.

3      COURT CLERK:  Robert Neal?

4      MR. KESSLER:  No cause.

5      MR. SCHECTER:  No cause.

6      THE COURT:  Perempt?

7      MR. KESSLER:  People.

8      MR. SCHECTER:  He's been knocked off the last

9  five men, especially like Mr. Neal.  Has given no

10  answers to any questions.  He wasn't even

11  questioned.  I don't know whether because he's

12  black or --

13      THE COURT:  What do you mean he wasn't even

14  questioned?

15      MR. SCHECTER:  He wasn't asked any questions

16  that would show any bias, prejudice for or

17  against the people, against the District

18  Attorney.  Any reason why he was knocking him

19  off, any of his answers.

20      THE COURT:  Do you have a reason?

21      MR. KESSLER:  I'm not sure.  The reason I

22  knocked him off I didn't think he could follow

23  directions.  He had a difficulty with the

24  questionnaire when your Honor was giving it to

25  him.  I think we need jurors that could follow

2          the Judge's instructions.  He was the only person

3          not following instructions the Court gave him.

4                THE COURT:  All right.

5                MR. SCHECTER:  I disagree with that.  I

6          think --

7                THE COURT:  I understand you disagree with

8          it.  He did appear to have some hesitancy.

9                COURT CLERK:  Sheri Glazer, cause?

10               MR. KESSLER:  No.

11               MR. SCHECTER:  No.

12               COURT CLERK:  Perempt?

13               MR. KESSLER:  No.

14               COURT CLERK:  Perempt?

                 MR. SCHECTER:  No.

16               COURT CLERK:  Alternate number two, Sheri,

           S-h-e-r-i G-l-a-z-e-r, alternate number two.

1.               COURT CLERK:  Donald Cocheo?

19               THE COURT:  He's for cause.  He said he

20         couldn't be fair.

21               COURT CLERK:  Laurie Carlson?

22               MR. KESSLER:  No, no cause.

23               MR. SCHECTER:  When she was talking about her

24         cousin she said she imagined he was guilty.  She

25         didn't know if he went to trial, or whatever.  I

1          Voir Dire                    301

2     believe that would show a prejudice. She didn't

3     know anything about the case or anything else.  I

4     believe she would be --

5         MR. KESSLER:  He was guilty.

6         THE COURT:  She answered he was guilty

7     because he was convicted.

8         MR. SCHECTER:  He doesn't know whether he was

9     convicted after trial.

10        THE COURT:  What's the difference?  We tell a

11    guy who pleads guilty it's the same as conviction

12    after a trial.

13        MR. SCHECTER:  If pleads guilty they are

14    guilty.  If they go to trial they may still not

15    be guilty.

16        THE COURT:  Once a jury says they are guilty

17    they are guilty.

18        MR. SCHECTER:  I'm asking she be exempt.

19        THE COURT:  Not for that reason.

20        Any challenge for cause, defense, on Laurie

21    Carlson?  No cause?

22        COURT CLERK:  Perempt?

23        MR. KESSLER:  No.

24        COURT CLERK:  Perempt?

25        MR. SCHECTER:  Yes.

```
1                        Voir Dire                      302

2              THE COURT:  You can except on the perempt.

3        Cause?

4              MR. KESSLER:  No.

5              MR. SCHECTER:  No.

6              THE COURT:  Perempt?

7              MR. KESSLER:  No.

8              COURT CLERK:  Perempt?

9              MR. SCHECTER:  Yes, perempt on Saltzman.

10             COURT CLERK:  Mr. Capolupo?

11             THE COURT:  For cause?

12             MR. KESSLER:  Yes.

13             COURT CLERK:  No objections?

14             MR. KESSLER:  No.

15             MR. SCHECTER:  No.

16             COURT CLERK:  Marisa Birmingham?

17             MR. KESSLER:  No cause.

18             MR. SCHECTER:  No cause.

19             COURT CLERK:  Perempt?

20             MR. KESSLER:  No.

21             COURT CLERK:  Perempt?

22             MR. SCHECTER:  I'm out of perempts on this

23        chair.  I don't have any more perempts.

24             COURT CLERK:  He has no cause for challenge.

25        Alternate three would be Miss Birmingham.
```

1                          Voir Dire                      303

2              COURT CLERK:  Kaplan?

3              THE COURT:  She says she couldn't be fair.

4              She's caused off.

5              COURT CLERK:  Miss Baccarella, cause, people?

6              MR. KESSLER:  No.

7              COURT CLERK:  Defense?

8              MR. SCHECTER:  No.

9              COURT CLERK:  Perempt, people?

10             MR. KESSLER:  No.

11             COURT CLERK:  Perempt, defense?

12             MR. SCHECTER:  Yes.

13             COURT CLERK:  Malvina Kluger, cause, people?

14             MR. KESSLER:  No.

15             MR. SCHECTER:  No.

16             COURT CLERK:  Perempt?

17             MR. SCHECTER:  No.

18             COURT CLERK:  We have alternate number four.

19             THE COURT:  I'll give them the preliminary

20       instructions so we can perhaps get started

21       tomorrow.

22             (The following occurs in open court;

23       defendant present)

24             COURT CLERK:  Sheri Glazer; Marisa Birmingham

25       and Malvina Kluger remain seated.  If I did not

1                           Voir Dire                      304

2          call your name you play be excused.  Return back

3          to central jury tomorrow at 9:30.

4               Remaining three jurors acceptable at this

5          time?

6               MR. KESSLER:  Yes.

7               MR. SCHECTER:  Yes.

8               COURT CLERK:  Shall I swear them in?

9               Jurors, rise.

10              (Whereupon, three alternate juror were duly

11         sworn by the Clerk of the Court)

12              THE COURT:  Bring in the other jurors.

13              COURT OFFICER:  Ready for the rest of the

14         jury?

15              THE COURT:  Yes.

16              (The full jury panel entered the courtroom)

17              COURT CLERK:  Twelve jurors and four

18         alternates as seated now acceptable to both

19         sides?

20              MR. KESSLER:  They are.

21              MR. SCHECTER:  Yes.

22              COURT CLERK:  Shall I swear them in?

23              THE COURT:  Yes.

24              COURT CLERK:  Please rise and raise your

25         right hand.

1

2          (Whereupon, a jury of twelve, plus 4

3      alternates were duly sworn and impaneled by the Clerk

4      of the Court)

5          THE COURT:   Members of the jury, we are about

6          to commence the trial of the case of the People

7          of the State of New York versus Guang Hai Zheng

8          concerning which you heard some detail during the

9          jury selection.

10          The law requires that the Court give

11          preliminary instructions to the jury and the

12          preliminary instruction and comments that I will

13          make are designed to acquaint you with duties,

14          functions, responsibilities of the Court, counsel

15          and jury and to give you a preview of how the

16          trial should be conducted and proceed to its

17          conclusion.   In these instructions I will refer

18          briefly to the rules of law generally applicable

19          to all criminal trials.  And may, if necessary,

20          refer to the specific provisions of law which are

21          applicable to this particular case.

22          In addition, the law requires that the Court

23          at the close of the trial charge and instruct

24          you, the jury, as to your duties and functions in

25          evaluating the evidence in arriving at your final

verdict. The law also requires the Court in its
final charge to instruct the jury as to the laws
applicable to the specific crime or crimes
charged in the indictment which will be submitted
to you for your final determination.

Some of the instructions that I will give you
now will be included in my final instructions to
the jury.

Now, as I've informed you this is a criminal
case brought upon by an indictment bearing the
title the People of the State of New York versus
Guang Hai Zheng. The People of the State of New
York are represented by the District Attorney of
this County and at this trial the people will be
represented by the Assistant District Attorney,
who you've met during jury selection.

Now, although the people are represented by
the District Attorney who is a publish official
doesn't necessarily entitle the people to any
special consideration nor any greater
consideration than the defense attorney.

Before discussing the constitutional
safeguards surrounding every person accused of a
crime let me emphasize that an indictment is

1

2    simply an accusation required by law solely for

3    the purpose of informing the defendant of the

4    offenses to which he's charged.  It is simply an

5    accusation in writing; it's not evidence of

6    anything.  The indictment sets forth allegations

7    only and is not evidence.  The indictment is

8    merely a device required by law to inform the

9    defendant of the charges against him and to bring

10   those charges to trial.

11       We turn now to the constitutional safeguards

12   surrounding every person accused of a crime.  The

13   defendant has pleaded not guilty to the

14   indictment.  By his plea of not guilty the

15   defendant puts in issue each and every allegation

16   charged in the indictment.  It's a fundamental

17   principle of our law that a person accused of a

18   crime is presumed to be innocent unless the

19   contrary is proved according to law.

20       The presumption of innocence remains with the

21   defendant throughout the trial unless and until

22   the trial jury finds, in its final deliberations,

23   that the presumption of innocence has been

24   overcome by proof of guilt beyond a reasonable

25   doubt.

MB

Case 1:16-cv-01166-RJD   Document 8-6   Filed 11/00/16   Page 41 of 145 PageID #: 918

1

2          The trial begins with no evidence against the

3     defendant and the presumption of innocence of the

4     defendant, standing alone, is sufficient to

5     require the acquittal of the defendant unless the

6     jury finds in its final deliberations that the

7     People have proved to the jury's unanimous

8     satisfaction beyond a reasonable doubt that the

9     defendant is guilty of the crime or crimes for

10    which he is charged.

11         The burden of proof is never on the defendant

12    to establish his innocence.  It is our law to

13    establish guilt is on the people.  The burden is

14    on the people to establish to your satisfaction

15    beyond a reasonable doubt every element of each

16    crime charged, as I shall later define such

17    elements for you, and that the defendant

18    committed those crimes.

19         The standard of proof required in every

20    criminal case is proof of guilt beyond a

21    reasonable doubt.  That standard does not,

22    however, require that the people prove the

23    defendant's guilt beyond all possibility of doubt

24    or beyond a shadow of a doubt.  It requires that

25    the people establish defendant's guilt beyond a

Case 1:16-cv-01166-BJD Document 8-6 Filed 11/30/16 Page 42 of 145 PageID #: 919

reasonable doubt.

Our law, therefore, requires that before this jury may convict the defendant each of you must be satisfied that the credible evidence is sufficient to convince you beyond a reasonable doubt that the defendant is, in fact, guilty.

The evidence must satisfy you beyond a reasonable doubt that the defendant is the person who committed the crime or crimes charged.

The evidence must also establish beyond a reasonable doubt each and every essential element of the crime or crimes charged.

What does the law mean when it requires proof of guilt beyond a reasonable doubt? When is a doubt of guilt a reasonable doubt under our law? A doubt of the defendant's guilt to be a reasonable doubt must be a doubt for which some reason can be given. A doubt to be reasonable must, therefore, arise because of the nature and quality of the evidence in the case or from the lack of or sufficiency of the evidence in the case. A doubt to be a reasonable doubt should be one which a reasonable person, acting in a matter of this importance, would be likely to entertain

1
2       because of the evidence or because of the lack of

3       evidence or insufficiency of the evidence in the

4       case.  A doubt of guilt is not a reasonable doubt

5       if instead of being based on the nature and

6       quality of the evidence or insufficiency of the

7       evidence, it is based upon some sort of a guess,

8       or whim or speculation unrelated to the evidence

9       in the case.  A doubt of guilt is not a

10      reasonable doubt if it is based merely on

11      sympathy for the defendant or from a mere desire

12      by a juror to avoid doing what he or she may feel

13      is a disagreeable duty.  A doubt of the

14      defendant's guilt to be a reasonable doubt must

15      arise either from the nature and quality of the

16      evidence in the case or from the lack of or

17      insufficiency of the evidence in the case.

18          It is the duty of each juror to consider and

19      weigh all of the evidence in the case and decide

20      what evidence you believe is credible and worthy

21      of your consideration.  It is the duty of each

22      juror to determine whether he or she has a

23      reasonable doubt of the defendant's guilt, as

24      that term is defined in our law.

25          It is the duty of each juror to carefully

MB

Case 1:16-cv-01166-RJD Document 8-6 Filed 11/30/16 Page 44 of 145 PageID #: 921

1

2    review and weigh and consider all of the evidence

3    in the case.  If after doing so you find that the

4    people have not proved the defendant's guilt

5    beyond a reasonable doubt, as I have defined that

6    term for you, then you must find the defendant

7    not guilty.

8        On the other hand, if you are satisfied that

9    the people have proved the defendant's guilt

10   beyond a reasonable doubt, as I have defined that

11   term for you, then you must find the defendant

12   guilty.

13       Now the verdict of a jury in a criminal case

14   must be unanimous.  In order for you, the jury,

15   to return a verdict the law requires that all

16   twelve jurors agree upon that verdict.  To

17   convict as to any specific charge all twelve

18   jurors must agree that the people have proven the

19   defendant's guilt as to each and every element of

20   such charge beyond a reasonable doubt, and, if so

21   satisfied, they must return a verdict of guilty.

22       Similarly, if all twelve jurors agree that

23   the people have failed to prove the elements of

24   any specific charge beyond a reasonable doubt,

25   then the jury must return a verdict of not

MB

Case 1:16-cv-01166-RJD Document 8-6 Filed 11/30/06 Page 45 of 145 PageID #: 922

guilty.

     In determining your verdict you may not
consider or speculate concerning matters
regarding sentence or punishment.  You must not
even discuss such matters, nor should your
deliberations in any way be influenced by such
matters as to sentence or punishment.

     If you render a verdict of guilty I am
required under the law to impose a sentence in
accordance with the law and the jury has no
function relating to sentence or punishment and
such matters are wholly immaterial to your
deliberations.

     Following the opening statements witnesses
will be called to the stand and after being sworn
will be examined and cross-examined.  You must
concentrate and gave careful attention to the
testimony of the witnesses.

     However, permit me to caution you that some
things up may hear during the trial will not be
evidence and must not, under any circumstances,
be considered by you as evidence in this case.

     For example, colloquy or discussions or
verbal exchanges between or among the attorneys

Case 1:16-cv-01166-RJD Document 8-6 Filed 11/30/16 Page 46 of 145 PageID # 923

is not evidence in the case.  The same is true of

any colloquy or discussion between the Court and

counsel.  Neither the Court nor the attorneys are

witnesses in the case.  Whatever discussions we

may have concerning the law is not evidence in

the case.  Under no circumstances are you to draw

any inferences one way or another from anything

that may be said during discussions between or

among the attorneys and the Court.

    The questioning of a witness by the lawyer

calling that witness to the stand is called

direct examination.  Questioning of that same

witness by the lawyer on the opposite side is

called cross.  There will be times when you will

hear a lawyer object to the asking of a

particular question.  That means that that lawyer

making the objection urges that the question is

not a proper question.  The Court must then rule

as to whether it is or is it not proper.

    If I believe, under our rules of evidence,

that the question is a proper one I'll say the

objection is overruled.  If I believe that the

objection is a valid objection I will say

"objection sustained."  In other words, when I

MB

1

2      say "objection sustained" I am ruling that the

3      question is an improper question.

4          When I so rule you, as jurors, must draw no

5      inference either from my ruling or from the

6      question itself.

7          When I sustain an objection of a question I

8      ruled improper, under our rules of evidence you

9      have no right to draw any inference from the mere

10     asking of a question.  You have no right to draw

11     any inference from my rulings.  This is so

12     because questions as such are not evidence.  Any

13     rulings which prevent an answer or permits an

14     answer to a question is made as a matter of law.

15     And, as I said, you must draw no inferences from

16     my rulings.

17         There may be times when a witness will answer

18     a question before the Court has had an

19     opportunity to rule upon an objection.  In such

20     an event, if I sustain the objection, I will then

21     direct that the answer be stricken from the

22     record and that you disregard it.  It then

23     becomes your duty to strike it from your minds

24     and disregard the fact that the premature answer

25     was ever given or made.

MB

1

2         Do not resent the fact that the attorneys

3   will make objections during the course of the

4   trial; that's their function.

5         When the Court makes a ruling on motions or

6   objections, these rulings are based solely upon

7   the issues of law involved.  Thus, you need not

8   be concerned with the rulings on the law, by the

9   Court.

10        In your deliberations you may consider only

11   such evidence that the Court has ruled admissible

12   and, of course, you must not, under any

13   circumstances, consider any evidence which the

14   Court has ruled inadmissible.

15        Please be advised and bear in mind that the

16   rulings of the Court are simple rulings and under

17   no circumstances are such rulings to be

18   considered by you as indication that the Court

19   has any opinion as to the guilt or innocence of

20   the defendant.

21        Under our law the Court may not and will not

22   entertain any opinion as to the guilt or

23   innocence of the accused.  You, jurors, and you

24   alone are the sole and exclusive judges of the

25   facts in this case.

From time to time during the course of the

trial various tangible objects, commonly referred

to as real evidence, such as perhaps diagrams,

maps, sketches or printed or hand-written records

or other documents or photographs of persons,

places, conditions or real objects such as

clothing, tools or furniture, or other things

like that, may be offered as exhibits for your

inspection and consideration.

The purpose of such exhibits is to enable the

Court and the jury to acquire knowledge by direct

use of their senses and usually by actually

seeing the real evidence.

Whenever any object, photograph or document,

that is, real evidence is offered as an exhibit,

you will observe that the Court will first direct

that the Court Reporter tag that specific exhibit

with a number or letter of the alphabet and be

marked at that point for identification only.

The initial marking of an exhibit for

identification only indicates that the particular

exhibit has not been formally accepted, admitted

and received into evidence.  After the particular

exhibit has been properly identified,

authenticated by the testimony of the witnesses,
and after the court is satisfied, as a matter of
law, that the exhibit is admissible and relevant
to the issues upon the trial, then the Court then
directs the exhibit should be marked and such
exhibits will be open to your consideration and
evaluation.

Obviously, if I'm not satisfied, as a matter
of law, that the particular exhibit is relevant
and may be properly received in evidence, then
the jury will, of course, will not see and
consider that exhibit.

During deliberations in the deliberation
room, if you so request, any or all exhibits
introduced into evidence during the trial, with
the consent of the Court, it will be delivered
for your inspection and consideration.

During the trial evidence will probably be
presented in the form of testimony of witnesses,
exhibits and perhaps stipulations.  Basically,
there are two kinds of evidence, direct evidence
and circumstantial evidence.

Direct evidence is direct proof of a fact,
such as the testimony of an eyewitness.

1
2      Circumstantial evidence is proof of a chain of
3      circumstances from which you may infer or
4      conclude that a fact exists, even though that has
5      not been proved directly.
6          You are entitled to consider both types of
7      evidence.  The word infer or the expression to
8      draw an inference means to find that a fact
9      exists based upon proof of another fact.
10         The example I usually give is, before you go
11     to bed in the evening, if you look out the window
12     and you see the streets are perfectly dry and you
13     wake up in the morning and you look out the
14     window and the streets are all wet, you can infer
15     that it rained during the night.
16         Now, that may explain the presence of water.
17     Now, there are other explanations which may
18     explain why there's water in the street other
19     than rain; a water main may have broken, people
20     may have watered their lawns.  Therefore, in
21     deciding to draw an inference you must look at
22     and consider all of the facts with common sense,
23     and after you have done that the question as to
24     whether or not as to draw a particular inference
25     is for you, the jury, to decide.

Case 1:16-cr-01166-RJD Document 8-6 Filed 11/30/16 Page 52 of 145 PageID #: 929

1

2          At the close of the trial and following

3     summations of counsel I will instruct you on the

4     rules of law applicable to this case and then you

5     will retire for your deliberations. Your

6     functions as jurors is to determine what the

7     facts are and to apply the rules of law as I give

8     them to you to the facts as you determine them to

9     be.

10         The conclusion thus reached will be your

11    verdict. You will determine what the facts are

12    from all of the evidence in the case. Again, you

13    and you alone are the exclusive judges of the

14    facts. In that field neither I nor anyone else

15    may invade your province. I shall endeavor to

16    preside impartially and not to express any

17    opinion concerning the facts. Any views of mine

18    on the facts would, in any event, would be

19    totally irrelevant to what you find the facts

20    are.

21         On the other hand, and with equal emphasis, I

22    instruct you are bound to accept the rules of law

23    as I give them to you, whether you agree with

24    them or not.

25         Now, the law requires that you weigh all of

the evidence that the Court receives and admits.
You must make your own evaluation of the
testimony as given by each witness and determine
the weight, if any, you choose to give to that
testimony.

Now, the testimony of a witness may fail to
conform to the facts as they occurred because the
witnesses is intentionally telling a falsehood or
the witness didn't see or hear that about which
the witness is testifying or perhaps the witness'
recollection of the event is faulty or because he
has not expressed himself or herself clearly in
giving the testimony.

Suffice to say, you are at liberty to accept
and consider either in whole or in part the
testimony you believe and reject in whole or in
part the testimony you do not believe.

There's no magic formula by which one may
evaluate testimony.  You bring with you to this
courtroom all of the experience and background of
your lives.  And in your everyday affairs you
determine for yourselves the reliability or
unreliability of statements made to you by
others.  The same tests you apply in your

1

2          everyday dealings are the tests you should use in

3          your deliberations in this case.

4                In your evaluation you should consider the

5          interest or lack of interest of any witness in

6          the outcome of the case, the bias or prejudice of

7          a witness, if there be any, the age, the

8          appearance, the manner in which the witness gives

9          his or her testimony, the opportunity the witness

10         had to observe that which the witness is

11         testifying, the probability or improbability of

12         the witness' testimony when viewed in light of

13         all the of the evidence are some of the items,

14         are some of the tests you should apply.

15               If it appears that there are any

16         discrepancies in the evidence you will have to

17         consider whether any apparent discrepancy may be

18         reconciled by fitting the various versions

19         together.  If that is not possible you must then

20         determine which of the conflicting versions you

21         will accept.

22               Now, you and you alone will make the final

23         decisions in this case.  You will decide the

24         facts after applying the law as given to you by

25         the Court.  You will make your final

MB

determinations of what the facts are, as I know

you will, giving careful and patient attention to

all of the evidence you will hear and see during

the course of the trial.

The collusion thus reached will be your

verdict.  We will begin tomorrow after opening

statements by counsel for the people and the

defendant, if he wishes to do so.  And the people

will then call witnesses to the witness stand and

seek to offer evidence and testimony in direct

proof of the People's case.

I'll recess until tomorrow morning at 10:30.

Don't discuss this case among yourselves or with

anyone else.  Don't let anybody discuss this case

with you or in your presence.  If anybody does

that report that to the court officer.  Don't

discuss it with your fellow jurors.  I'll deal

with it.

Don't visit any of the locations that you

hear about during the course of this trial

because, the areas may have changed during that

period of time.  And if you go there without any

proper instructions you may get the wrong view.

I'm going to recess, as I said, until

Case 1:16-cv-01166-RJD   Document 8-6   Filed 11/08/16   Page 56 of 145 PageID #: 933

tomorrow morning at 10:30.  Don't come to the

courtroom.  The court officer will tell you where

to report at 10:30.  Please try not to be late.

If one person is late,  We can't start until

everybody is in the courtroom; every juror must

be here.  So, I appreciate if you'd be here on

time and listen to me when I tell you what times

to come back to Court each day that the Court is

on.

     So, have a nice evening.  I'll see you

tomorrow morning at 10:30.  The court officer

will tell you where to report.  If you're late

don't come to the courtroom.  I have other

matters on.  If you walk in you may see or hear

something that you shouldn't and will compromise

your positions as jurors.  Again, have a nice

evening.  See you tomorrow.

          COURT OFFICER:  Jurors, rise, and follow me.

          (The twelve jurors and four alternates exited

the courtroom

          THE COURT:  Jurors have left the courtroom.

          Mr. Schecter, you indicated you have another

matter in the morning so I expect you to be here

at 11:00 o'clock sharp.

```
 1                          Opening/Court                    324

 2           MR. SCHECTER:  Yes.

 3           THE COURT:  And you said you wanted to speak

 4      to your client for a few moments?

 5           MR. SCHECTER:  Yes, a few moments.

 6           THE COURT:  All right.  Would a court officer

 7      allow him in?

 8                    *         *         *

 9           CERTIFIED THAT THE FOREGOING IS A TRUE AND
        ACCURATE TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC
10      MINUTES IN THIS CASE.

11

12                    MICHAEL BERMAN, RPR
                      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                              325

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF QUEENS:  CRIMINAL TERM, PART K-25
3   ----------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
4                                          Ind. No.
                                           3282/95
5                   -against-
                                           Jury Trial
6   HAI GUANG ZHENG,

7                         Defendant.
    ----------------------------------------X
8

9                                   June 27, 28, 1996

10                                  Queens Supreme Court
                                    125-01 Queens Boulevard
11                                  Kew Gardens, NY 11415

12  B E F O R E :
                 THE HONORABLE STANLEY B. KATZ,
13                                  Justice, Supreme Court

14  A P P E A R A N C E S :
    For the People:
15       THE HONORABLE RICHARD A. BROWN,
         District Attorney, Queens County,
16       By:  SCOTT KESSLER, ESQ,
         Assistant District Attorney
17
    For the Defendant:
18       DONALD SCHECHTER, ESQ.

19                                  Catherine R. Parker,
                                    Official Court Reporter
20

21
                    CN 319/96 LP
22

23

24

25

```
1                    Proceedings         326
2            THE CLERK:  Calendar number 6,
3       indictment 3282 of '95, People versus Hai
4       Guang Zheng.
5            Let the record reflect presence of
6       official Mandarin interpreter, Mr. Wong.  And
7       sir, for the record, good morning.  What's
8       your name?
9            THE DEFENDANT:  Zheng Hai Guang.
10           MR. KESSLER:  Scott Kessler for the
11      People.
12           MR. SCHECHTER:  Donald Schechter, 10
13      Cuttermill Road, Great Neck, your Honor.
14           Your Honor, when the defendant looked at
15      the jury, he tells me that he wants half men,
16      half women.  What I told him was when the
17      jury panel came over by random lot,
18      approximately 80 percent of them happened to
19      be women.  That is why the jury is composed
20      as it is that we used challenges as required.
21           THE COURT:  All right.  Are you ready to
22      proceed?
23           MR. SCHECHTER:  If your Honor pleases,
24      -- your Honor, I understand the woman in the
25      front row is an interpreter.  I'd just ask
```

cp

Proceedings        327

1
2      who the other three individuals are.

3              THE COURT:   I understand they're

4      newspaper reporters.

5              MR. SCHECHTER:   Your Honor, in view of

6      the type of crime this is and the allegations

7      against my client, I would ask they be

8      excluded based on the type of crime that

9      we're dealing here with.

10             THE COURT:   I'm sorry.   They have

11     Constitutional rights to come into Court.

12             MR. SCHECHTER:   Respectfully except.

13             THE COURT:   Of course.

14             MR. SCHECHTER:   Your Honor, the district

15     attorney has just turned over to me the

16     second part of a DD-5 that I did not receive

17     which is DD-5 taken of one of the complaining

18     witnesses.   It would appear to me reading

19     that there's a page, another page that would

20     go along after this that I have not received.

21             MR. KESSLER:   I have a copy -- I brought

22     in the original file from the detectives so I

23     wouldn't be working off of copies.   There was

24     a page in here that says the word over which

25     is a continuation of the DD-5.   The 5 appears

```
 1                    Proceedings        328

 2        to end, the women were allowed to talk to

 3        their family occasionally during the

 4        negotiations of the ransom threats were made

 5        during and there is no -- the next sheet is

 6        simply a sheet involving the case closed, so

 7        I have every single piece of paper connected

 8        with the case.  While it appears it's done

 9        mid-sentence, I have nothing else that is a

10        continuation.  Oh -- oh, no.  That's

11        something else.  I have nothing else that

12        could possibly be.  I can have defense

13        counsel look at their entire file, but if I

14        had it, honestly your Honor, I would gladly

15        turn it over.

16             MR. SCHECHTER:  Well, I would ask at his

17        first opportunity, Mr. Kessler speak to

18        Detective Green and find out about that.

19             THE COURT:  Would you do that, please?

20             MR. KESSLER:  Sure.  I'll call him

21        during lunch and I'll fax him if I have to,

22        what it is.

23             THE COURT:  Other than that, can we

24        proceed with this trial?

25             MR. SCHECHTER:  Yes.
```

cp

People - Opening          329

1

2          THE COURT:  Thank you very much.  Would

3     you please bring the jurors in?

4          (Whereupon, the jury entered the

5     courtroom.)

6          THE CLERK:  Case on trial continued,

7     indictment 3282 of '95, People versus Hai

8     Guang Zheng.  Let the record reflect the

9     presence of the defendant, official Mandarin

10    interpreter, defense attorney and the

11    assistant district attorney, 12 regular

12    jurors, four alternate jurors all present and

13    properly seated.  All sides waive formal

14    reading of the roll this morning?

15         MR. SCHECHTER:  So waived.

16         MR. KESSLER:  So waived.

17         THE COURT:  Good morning, ladies and

18    gentlemen.  Sorry for the delay, but it was

19    unavoidable.  We're now going to hear

20    openings by counsel and then we're going to

21    the testimony of the case.  Counsel?

22         MR. KESSLER:  Good morning.  Welcome

23    again to an American court of law.  As I said

24    in the beginning during voir dire, my name is

25    Scott Kessler and I'm the assistant district

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

People - Opening        330

attorney.  And my job throughout the course
of this trial is to present the evidence to
you during the course of this case.

Now, we have gone through a number of
days of jury selection and some of you may be
wondering why were you chosen to be on this
particular case.  The answer is pretty
simple.  You were chosen because you all
assured us that you could be fair and
impartial.  You assured us at the end of this
case if I proved to you the defendant's guilt
beyond a reasonable doubt you'd be able to
return a verdict of guilty.

This case involves kidnaping, rape,
sexual abuse, gun possession and it starts
out on March 31st of 1995.  Because on March
31st of 1995, two young women were kidnaped
in our county.  They were held almost two
days.  During a point in time they were held,
they were raped repeatedly and held for
ransom of $15,000.

March 31st, 1995 is when it began
because on that particular day, a gentleman
named Guo Bang Liu -- you'll get a chance to

1          People - Opening      331

2      meet him -- he's a chef.  He's married to

3      another young woman who's 24 years old.  Her

4      name is Liu Yan Wu.  They fly from Los

5      Angeles into our county, Kennedy Airport.

6      They're met there by Mr. Guo Bang Liu's

7      sister.  Her name is Jin Hao Liu.  She's 21

8      years old.  Liu Yan was 24.  So they arrive

9      in our airport and Jin Hao Liu lives in

10     Brooklyn at the time.  She takes a car

11     service to pick up the brother and brother's

12     wife at Kennedy Airport on March 31st about

13     10 o'clock in the evening.  The flight is

14     fine.  They land normally.  They go and they

15     get their luggage.  There's a Lincoln

16     limousine service there waiting for them.

17     They greet each other.  They go into the

18     Lincoln limousine service.  They start to

19     leave the airport.

20          As they're driving around Kennedy

21     Airport, a point in time comes when this cab

22     is cut off by another vehicle, absolutely

23     just cut off right in front and the defendant

24     and one of his accomplices get out of that

25     car that cuts off this cab with Liu Yan Wu

cp

People - Opening      332

1
2      and Guo Bang Liu and Jin Hao Liu. They take
3      guns, they point it at the driver and all the
4      passengers and order the passengers out of
5      their car. Let's call this other accomplice
6      for the sake of argument a man Yu Cam
7      (phonetic.
8                MR. SCHECHTER:  Objection.
9                THE COURT:  Sustained.
10               MR. KESSLER:  You'll hear through the
11     testimony in this trial through the
12     defendant's statement, he identified this
13     other person as Yu Cam (phonetic,) so the
14     defendant and his accomplice now with guns,
15     take the two visitors and the young woman
16     from Brooklyn and holds them in their car and
17     drive off leaving the cab driver.
18               It's a kidnaping, plain and simple. The
19     problem is he kidnaped the wrong people.
20     Those weren't the people he intended on
21     kidnapping. They don't have a lot of money
22     and they start asking for the passports of
23     all the women and the men. They hand over
24     their passports. They realize now these
25     aren't the right people. They just kidnaped

1

2      the wrong people.  Well, rather than let them

3      out, the defendant decides at this point in

4      time that he's going to hold these women for

5      ransom right or wrong.

6           What he does is he takes the only man,

7      Guo Bang Liu.  He drops him off in the middle

8      of Brooklyn and takes the women in his car

9      and brings them to a location in Queens

10     County, middle of the night.  They have no

11     idea where they are.  Guo Bang Liu, he

12     doesn't really know where he is either.  He's

13     not too familiar with Brooklyn or the city,

14     but he manages to meet a Chinese gentleman

15     and get a cab to go back to a woman who we'll

16     call her English name is Emily.  And Emily --

17          MR. SCHECHTER:  Objection to the term

18     "we'll call," your Honor.

19          THE COURT:  Yes.  Don't use that term.

20          MR. KESSLER:  I'm sorry, Judge.

21          THE COURT:  Don't use the term "we'll

22     call."

23          MR. KESSLER:  We'll call.  Okay.  You'll

24     hear from Emily who will tell you that she

25     had made these plans for -- for the pick up

People - Opening      334

1  
2      from the airport of Jin Hao Liu and Mr. Guo

3      Bang Liu and all of a sudden, they're not

4      there.  The police are contacted.  The fifth

5      precinct is the precinct that they report it

6      to and as soon as they hear what type of case

7      this is involving a kidnaping of two women

8      from our county at the airport, it's

9      immediately assigned to this division of the

10     New York City Police Department.  The

11     division is called the Major Case Squad.

12     They are New York City's finest detectives.

13          MR. SCHECHTER:  Objection.  Your Honor,

14     can we approach for a moment?

15          THE COURT:  Sustained.

16          MR. SCHECHTER:  Can we approach for a

17     moment?

18          THE COURT:  Step up.

19          (Whereupon, a discussion was held off

20     the record, at the side bar, among the Court,

21     defense counsel and the assistant district

22     attorney.)

23          MR. KESSLER:  May I continue, your

24     Honor?

25          THE COURT:  Yes.

People - Opening          335

1

2          MR. KESSLER:  You'll hear about the

3     backgrounds of these detectives.  You'll hear

4     about their experience they have in these

5     types of cases.  You'll hear about their

6     experience in the New York City Police

7     Department and you'll hear what they do in

8     this particular case is immediately put a

9     trace or a trapid (phonetic) trace on Emily's

10    phone because that's their really only

11    contact in New York City.

12         Sure enough, phone calls are now

13    starting to come to Emily's house, okay, and

14    the next morning, Emily starts receiving

15    phone calls from the defendant.  He starts

16    telling Emily that he is holding these women

17    for ransom and she has to get money together.

18    Otherwise, they'll be killed.  He starts out

19    by demanding $20,000; $10,000 apiece.

20         Now, Emily is there and these police

21    detectives who are with her at the time and

22    they keep trying to get Emily to keep the

23    defendant on the phone so long as possible

24    keep him talking.  She starts negotiating

25    now, with the price.  That's a lot of money.

cp

People - Opening        336

1
2     Can you come down a little bit keeping the
3     defendant on the phone.
4          In the meantime, the New York City
5     Police Department now learned that this is
6     not a regular telephone, but a cell phone and
7     they obtain search warrants and proper
8     documents in order to trace this cell phone
9     as to its exact location as it were this
10    defendant is calling from.  The phone calls
11    are being made.  They're now making
12    arrangements as to how they're going to drop
13    off the money and the monies negotiated down
14    to $7,500 apiece, in total $15,000.
15         The defendant demand the 15,000 be
16    delivered to an address on Henry Street in a
17    particular way in a tea can with tea on top,
18    the money on the bottom, vegetables all
19    around.  You'll hear about this during the
20    course of this trial through the testimony.
21         In the meantime, we still have the women
22    who are now in the basement of this home in
23    our county.  There are guns there.  The
24    defendant is there.  Now, the defendant
25    initially took the two women with let's call

cp

People - Opening        337

1
2   this accomplice number 1.  Accomplice number
3   1, when they get to the house leaves.
4   Accomplice number 2 now comes.  Accomplice
5   number 2 is a little shorter, a little
6   heavier than the defendants.  Now, these two
7   men now have these two women held captive in
8   the basement.  They have guns.  They have
9   cellular phones now demanding ransom for the
10  two women.
11      The women are now basically at their
12  mercy and you'll hear a point in time comes
13  the next morning when the defendant orders
14  Liu Yan Wu into his bed.  Now, if you recall,
15  Liu Yan Wu is Guo Bang Liu's husband, 24
16  years old.  He orders her into his bed in a
17  basement apartment.  While in his bed, he
18  starts now fondling her.  He starts now
19  touching her breasts.  He now tries to take
20  her hands and put it on his penis.  She's now
21  struggling with him.  He starts to choke her.
22  He starts to threaten her with a gun.  He is
23  now using physical force to try to have
24  sexual abuse against this woman.  He then
25  orders her into another bedroom out of sight

cp

People - Opening        338

of the other woman and his accomplice.

Well, once inside the other bedroom, he
continues.  He starts taking his hands and
fondling her chest.  He then starts to take
off his clothes and take off her clothes.  A
point in time comes where he tries to take
his penis and puts it into her vagina and
you'll hear testimony in this case his penis
partly goes into her vagina and he
ejaculates.  He takes a piece of clothes, he
wipes it.  He throws it to her, says, wipe
yourself.

In the meantime, the other woman who you
heard about, 21-year-old Jin Hao Liu, she's
being raped as well.

MR. SCHECHTER:  Objection.

THE COURT:  Overruled.

MR. KESSLER:  She's being raped in the
other bedroom.

MR. SCHECHTER:  Objection, your Honor.

THE COURT:  This is what he intends to
prove.

MR. SCHECHTER:  Your Honor, that's an
uncharged crime.  My client is not charged

1

2     with that.

3          MR. KESSLER:  Judge, if I could be

4     heard, Judge, I'll --

5          THE COURT:  Step up.  Step up.

6          (Whereupon, a discussion was held off

7     the record, at the side bar, among the Court,

8     defense counsel and the assistant district

9     attorney.)

10         THE COURT:  All right.  The objection is

11    overruled.

12         MR. KESSLER:  Now, at a point in time

13    where Liu Yan Wu is being raped in one

14    bedroom.  She, her sister-in-law, is being

15    raped in the other bedroom by the other man

16    and what happens is she finally, struggling,

17    doesn't have enough strength to finally stop

18    him, but the defendant's penis entered her

19    vagina.  He ejaculates.  As I indicated,

20    takes a cloth, wipes and hands to her after

21    she was being raped from that bedroom.  She

22    now leaves that bedroom, comes back.  She

23    comes back into the room where her

24    sister-in-law is and her sister-in-law now is

25    taken back to the bedroom where she is.  The

1               People - Opening      340

2     defendant takes her sister-in-law into the

3     bedroom.

4           Once back in that bedroom, the same

5     thing occurs.  The defendants starts touching

6     her chest, starts taking off his clothes,

7     starts taking off her clothes and in fact,

8     rapes her sister-in-law.  The same time her

9     sister-in-law is being raped in the other

10    bedroom, she's now being raped by the

11    accomplice.

12          MR. SCHECHTER:  Objection.

13          THE COURT:  Overruled.

14          MR. KESSLER:  You'll learn his name,

15    Quin Guang Zheng (phonetic).  You'll learn

16    his name because he's arrested at the same

17    time the defendant is arrested which we'll

18    get to later on.  You'll hear about these

19    rapes that are occurring.  You'll hear about

20    the testimony, about the ransoms that are

21    being called.  Point in time comes where the

22    defendant allows one of his two victims to

23    make a phone call beyond the phone to let

24    them know they're alive and make sure the

25    money is being sent.

People - Opening          341

1

2              Well, once the Major Case Squad now has

3         narrowed down the area of Queens County where

4         these phone calls are being made, they

5         realize it's in the Flushing area and they

6         realize at this point of time we're talking

7         about the vicinity of 136th Street and 59th

8         Avenue in Flushing and a squad of Major Case

9         Division detectives now go to that area to

10        try to find these women, try to trace that

11        cellular phone the Defendant's been using on

12        his ransom demands.  He's the one on the

13        phone.  He's the one asking for the money.

14        He's the one who abducted them.

15             A point in time comes where it's time

16        for the money to be delivered.  So Emily

17        takes the money, brings it to Henry Street,

18        drops it off.  The detectives are now in the

19        area of 136th Street and 59th Avenue, the

20        area they think the cellular phone is being

21        used for the ransom demand.  They see know

22        the two women coming from a basement

23        apartment as they're in their car.  They have

24        photographs of these women, so they know what

25        they look like because obviously, the

People - Opening        342

 1
 2    detectives never met them before, but the
 3    family turned over photographs of these
 4    women.
 5        Detectives look at the photographs of
 6    the women and realize immediately those are
 7    the women who were kidnaped and they see the
 8    defendant leaving the place where he had
 9    raped them, leaving the place where he had
10    brought them after abducting them at Kennedy
11    Airport with the women right next to him and
12    go into an automobile.
13        MR. SCHECHTER:  Objection; is more
14    summation.
15        THE COURT:  Well, the jury is being
16    instructed this is what he intends to prove.
17        MR. KESSLER:  I will proof to you he was
18    standing right next to the women.  Detectives
19    saw him standing right next to the women.
20    The detectives saw him leave the basement
21    apartment with the women.  The detectives saw
22    him go into the automobile with the women.
23    The detectives then looked inside the
24    automobile and recognized those women as the
25    kidnap victims.  The women have no idea

cp

1          People - Opening          343

2          what's going on now because the detectives

3          are not in a marked patrol car.  They're not

4          in regular police uniforms.  They think

5          they're being kidnaped again, but in reality,

6          it's now the New York City Police Department

7          that's stopping the defendant and his

8          accomplice, Quin Zheng (phonetic) right

9          outside the place where they held him,

10         stopped the car, draw their guns, arrest

11         defendant and his accomplice right then and

12         there.

13              The women show the detectives the house

14         they were at.  They go right back to where

15         they were before.  Inside the house they find

16         guns, cellar phones, beeper.  Inside the car

17         there's a cellular phone and a beeper.  Now,

18         at that point in time, two people are

19         arrested.  This defendant, Quin Gang Zheng

20         (phonetic).  As you recall, Quin Gang Zheng's

21         a person little shorter, heavier.  He came

22         later, not one of the people who initially

23         abducted the women and Guo Bang Liu, but Guo

24         Bang Liu saw the defendant when he was

25         abducted because he was the one with the gun.

People - Opening       344

1
2      He was the one abducting him, so the New York

3      City Police Department do a line-up.  Take a

4      number of people, Asian, puts them in a

5      line-up.  Guo Bang Liu comes into the police

6      station.  Looks, points to the defendant and

7      says, that's the man that took us at gun

8      point and took two women.  So he's identified

9      on the scene by the women.  He's identified

10     later that day by Guo Bang Liu as being one

11     of the people.

12          He's caught immediately after leaving

13     the house and he's now brought to 1 Police

14     Plaza to be interviewed.  There's a detective

15     who speaks his native language, interviews

16     him, gives him Miranda warnings, advises him

17     of all the Constitutional rights we have here

18     in the United States.  He makes a statement

19     and he -- and he admits he kidnaped the women

20     making phone calls and holding them for

21     ransom.  Oh, he admits that, but you know

22     what he doesn't admit?  He does not admit he

23     raped them.  No, never raped them.

24          Ladies and gentlemen, at the end of this

25     case, I will prove to you not only did he

cp

People - Opening     345

1
2    kidnap them, not only did he hold them for
3    ransom, he raped those two women that night,
4    the next morning.  He has to be held
5    responsible for that.  He's held responsible
6    for the kidnaping.  He has to be held
7    responsible for those rapes.
8        At the end of this case based upon all
9    the evidence you'll hear, the evidence will
10   be overwhelming showing you the defendant is
11   guilty on each and every count; raping those
12   women, kidnaping those women, sexually
13   abusing those women, terrorizing those women
14   during that kidnaping.  Every single count
15   will be proved to you beyond a reasonable
16   doubt.
17       So at the end of this case, I'll be
18   standing here again on summation.  I'm asking
19   you to do a simple thing.  Follow the Judge's
20   instruction on the law, determine the facts
21   from the evidence.  If you do that in this
22   case, it will be very simple and very clear.
23   Defendant is guilty not only of the
24   kidnapings that he admits and holding it for
25   ransom that he admits, but those rapes that

cp

```
 1                  Guo Bang Liu - People - Direct346

 2              he would not admit he is guilty of those and

 3              should be held responsible.

 4                  I have nothing further.  Thank you for

 5              your time.  I've concluded with my opening.

 6              Your Honor, thank you.

 7                  THE COURT:  Do you wish to open?

 8                  MR. SCHECHTER:  Your Honor, I'll defer

 9              my opening until after the People's case.

10                  THE COURT:  All right.  Put on your

11              first witness.

12                  MR. KESSLER:  People call Mr. Guo Bang

13              Liu to the stand.

14                  Your Honor, I believe we'll need a

15              Cantonese interpreter.

16                  (Whereupon, the Official Court

17              Interpreter, Rose Eng, was duly sworn.)

18                  THE COURT:  What dialect?

19                  THE INTERPRETER:  Cantonese.

20     G U O   B A N G   L I U, a witness called on behalf of

21     the People, a resident of Wayne County, Michigan, after

22     having first been duly sworn by the Clerk of the Court,

23     took the witness stand and testified as follows:

24     DIRECT EXAMINATION

25     BY MR. KESSLER:
```

1              Guo Bang Liu - People - Direct347

2        Q     Mr. Liu, if you could turn your chair towards

3   me so it's not at an angle.  Mr. Liu, I'm going to ask

4   you a series of questions and if there's anything that

5   you don't understand from the interpreter, just let me

6   know and I'll try to rephrase it, okay?

7        Are you having any problem with the interpreter so

8   far Mr. Liu?

9              THE INTERPRETER:  Can I say a few words

10             with him so I know exactly --

11             (Pause.)

12             THE INTERPRETER:  Okay.  We're all

13             right.

14        Q     Okay.  Fair enough.  Mr. Liu, how old are

15   you?

16        A     32.

17        Q     Are you married?

18        A     Yes, I'm married.

19        Q     What is your wife's name?

20        A     Liu Yan Wu.

21        Q     What do you do for a living?

22        A     I'm a cook in a restaurant.

23        Q     Now, Mr. Liu, I'm going to direct your

24   attention to the date of March 31st, 1995.  Do you

25   recall that day?

1                    Guo Bang Liu - People - Direct348

2          A     I remember, but there's sometimes because

3     it's been a long time that I might not remember

4     everything.

5          Q     Do you remember where you were that day and

6     where you were going to?

7          A     That day I came from LA to New York at the

8     airport.

9          Q     And was anyone with you when you came?

10         A     I came with my wife.

11         Q     Now, do you recall approximately what time

12    you landed -- your plane landed in Kennedy Airport on

13    March 31st?

14         A     As I recall, it's in the evening around 9

15    o'clock.

16         Q     After your plane landed, what did you and

17    your wife do next?

18         A     My sister was to come to me at airport.

19         Q     What's your sister's name?

20         A     Jin Hao Liu is my sister name.

21         Q     And did she meet you at the airport?

22         A     Yes.

23         Q     After you met your sister at the airport,

24    what did you and your wife and your sister do next?

25         A     After my sister met me, we boarded the

1              Guo Bang Liu - People - Direct349

2    Lincoln car service.

3          Q     And who was in the car at that point in time?

4          A     That time it was the driver, myself, my wife

5    and my sister.

6          Q     Would you tell us what happened after you

7    began to leave Kennedy Airport with those people in the

8    car?

9          A     After the car service start in a short

10   distance all of a sudden, a car stopped us.

11         Q     And how did the car stop you?

12         A     They had the car approached the front of our

13   car.

14               MR. KESSLER:  Judge, for the record, the

15               witness has indicated his two hands were in a

16               crossing gesture.

17         Q     After the car went in front of your car, what

18   is the next thing that happened?

19         A     They had a gun with a newspaper covering and

20   asked my two sisters -- all right.

21               THE INTERPRETER:  I gonna say again.

22         A     He came out.  He had a gun.  The cover -- he

23   had a paper to cover his gun and he ordered my wife and

24   my sister to get out of the car.

25         Q     How many people did this?

                                              cp

```
1                    Guo Bang Liu - People - Direct350
2          A      Two people, two person.
3          Q      What did you do after these two people --
4     were they men or women?
5          A      Male.
6          Q      What did you do after these two men ordered
7     you out of your car after they showed you the gun?
8          A      That time I was very scared, very afraid.
9                      MR. SCHECHTER:  Objection, your
10                Honor.
11                     THE COURT:  Sustained.  It's not
12                responsive.
13         Q      Could you tell us what you did at that point
14    in time after they had ordered you to go out of the car
15    with their gun?
16         A      They pointed to go into their car.
17         Q      And did you go into their car?
18         A      Yes.
19         Q      Who went with you into their car?
20         A      The two of them ordered my wife, my sister
21    and I into the car.
22         Q      And what did you do?
23         A      Then they started the car.
24         Q      Where was the taxicab driver at this point?
25         A      I did not know what happened to the driver of
```

```
 1                    Guo Bang Liu - People - Direct351
 2    the taxi.
 3         Q    What happened after you were in this other
 4    automobile?
 5         A    They ordered me to show them documents.
 6         Q    What did you do?
 7         A    I gave him -- I gave them my passport and my
 8    wife's passport and showed it to them.
 9         Q    What happened after you showed that to them?
10         A    Then he said, "Oh, we pick up the wrong
11    persons."
12                   MR. SCHECHTER:  Objection.
13                   THE COURT:  I'm sorry?
14                   MR. SCHECHTER:  I'm objecting to the
15              term "he."
16                   THE COURT:  Be more specific.
17         Q    When you say "he," who are you referring to?
18         A    The two bad people.
19         Q    And what if anything did you say to them and
20    what if anything did they say to you?
21         A    Then they said, "Oh, there's no problem.  We
22    pick up the wrong persons."
23         Q    What if anything did you say to them?
24         A    At that time I was very frightened and I
25    didn't talk to them no more.
```

Guo Bang Liu - People - Direct352

Q    Well, what happened after they had told you they had picked up the wrong persons?

A    Then I asked him to release us.

Q    Did they?

A    Then they wrote their telephone number and gave it to me.

Q    And what did you do at this point?

A    That's a building -- then we went to June Wah Apartment, the name of the apartment, June Wah.   Near the bridge, there's a June Wah apartment house.

Q    When you say near the bridge, did you stay in the car or were you now out of the car at this point in time?

A    That time I was still in the car.

Q    Did you ever leave the car?

A    Yes.   I left the car and he had a gun on me. And he told me to close his door.   And then and then they drove off.   That time they drove my wife and my sister in the car and drove away.   I wasn't in the car.

Q    Did you know where your wife and your sister were going at that point in time?

A    I didn't know.

Q    After -- do you know where you were dropped off?

1                    Guo Bang Liu - People - Direct353

2        A     What bridge I'm not -- I'm not sure, but it's

3   near this June Wah Apartment House.

4        Q     Had you ever been near this bridge before

5   this time?

6        A     These -- these areas I have never been there

7   before.

8        Q     Did there come a point in time where you were

9   finally able to see someone that you did know?

10       A     That time I saw an Asian man.  At that time,

11  I saw an Asian man and asked him to -- asked him to help

12  me call up for car service to go home.

13       Q     Did a car service come?

14       A     Yes.  A Lincoln towncar came to pick me up.

15       Q     When you say you went home, where was home at

16  this point?

17       A     It's in Chinatown, Grant Street.

18       Q     And who lived there?

19       A     My mother lives there.

20       Q     And does anyone else live there with your

21  mother?

22       A     And my sister.

23       Q     What's her name?

24       A     Jim Ji Liu (phonetic) sister's name.

25       Q     Does she also have an American name that she

1              Guo Bang Liu - People - Direct354

2   uses?

3       A    Her English name is Emily Liu.

4       Q    I'm just going to refer to her as Emily for

5   one moment.  Did there come a time that you arrived and

6   Emily was present?

7               THE INTERPRETER:  By home?

8               MR. KESSLER:  Yes.

9       A    When I went home, Emily was downstairs.  That

10  time my sister asked the driver to bring my luggage back

11  to my house.

12              MR. SCHECHTER:  Objection; hearsay.

13              THE COURT:  Sustained.

14      Q    Just tell me yes or no.  Did you have a

15  conversation with Emily when you got back home?  Yes or

16  no without telling us what you said.

17      A    Yes.

18      Q    After you had that conversation with Emily,

19  did there come a time that you went to another location?

20      A    I went to the fifth precinct to report this

21  incident.

22      Q    And when you got to the fifth precinct, --

23  strike that.

24      After you had left that car, did there come a

25  time --

1                    Guo Bang Liu - People - Direct355

2                         THE COURT:  What car are you referring

3               to?

4          Q    I'm referring to the car that you were being

5     held at gunpoint in.

6                    MR. SCHECHTER:  Objection to that.

7                    THE COURT:  Overruled.

8          Q    Did there come a point in time that you saw

9     either of the two men who were in that car again?

10                   THE INTERPRETER:  Could I have that

11              question again?

12         Q    Sure.  After you had left the car where the

13    two men were, did there come a point in time -- did you

14    ever see either one of those two men again?

15         A    I saw one of them.

16         Q    Where did you see one of them?

17         A    When they had him in the precinct I saw him.

18         Q    Was he standing by himself or was he standing

19    with other people?

20         A    That time there was five or six people with

21    him.

22         Q    And did each of these people have a number

23    assigned to them?

24         A    Yes, everyone had a number.

25         Q    What number was the person that you recognize

cp

Guo Bang Liu - People - Direct356

as being one of the two people in the car?

A     The one that I recognize was number five.

Q     And where did you recognize number five from?

A     I saw this man in the precinct but I also saw him in the car.

Q     The man that you saw as number five, was that also one of the men who was in the car with you with your sister -- your wife and your sister-in-law?

A     Yes.

Q     I want you to take a look around this courtroom from this wall to that wall, from this wall to that wall, the entire courtroom and look around and see if you see the person who you recognized as number five and the person that you recognize as being in the car with you.

(Pause.)

A     Yes, I see the person with the green shirt on.

MR. KESSLER:  Let the record indicate the witness has identified the defendant.

THE COURT:  Defendant.

Q     The person that you pointed to, was he the person that you were having the conversations with about the passport or was it the other person in the car?

cp

1              Guo Bang Liu - People - Cross 357

2        A    I don't really recall which one.

3        Q    Was both of the people in the car speaking to

4    you or was it all one person?

5        A    Mostly one person spoke to me.

6              MR. KESSLER:  I have nothing further for

7              this witness.

8              MR. SCHECHTER:  Your Honor, could I just

9              have a few moments?

10             (Pause.)

11   CROSS-EXAMINATION

12   BY MR. SCHECHTER:

13       Q    Mr. Liu, can you hear me from here?

14       A    Yes, I can hear you.

15       Q    Now, you said you're 32 two years of age?

16       A    Yes.

17       Q    How long have you -- do you live in the

18   United States?

19       A    Yes.

20       Q    Were you born in the United States?

21       A    No.

22       Q    How long have you been in the United States?

23       A    Five years.

24       Q    And your wife, has she been in the United

25   States five years with you?

1              Guo Bang Liu - People - Cross 358

2       A    No.

3       Q    How long has she been in the United States?

4       A    A little more than a year.

5       Q    Now, are you a United States citizen?

6       A    No, a green card.  I hold a green card.

7       Q    Now, in the five years that you've been in

8   the United States, have you ever lived in New York?

9                   THE INTERPRETER:  I have to ask him to

10              say it again.

11      A    I've lived in New York most -- all five years

12  except going on vacation.

13      Q    Do you remember what airline you took to get

14  from Los Angeles to New York?

15      A    I took the Tower Airline.

16      Q    Now, prior to you going to the precinct and

17  viewing this gentleman -- well, withdrawn.

18      Do you remember what day it was that you saw your

19  sister and your wife again after the original date?

20                  THE INTERPRETER:  Could I have that

21              question?  Could I have that question again?

22      Q    What date did you come into New York?

23      A    March 31st.

24      Q    And that was at 9 o'clock at night about?

25      A    Around 9 or 10 o'clock in the evening.

1              Guo Bang Liu - People - Cross   359

2        Q    How long had you been at the airport before

3    you saw your sister?

4              THE COURT:  Listen to me.  What's the

5         question?  Please.  What's the question you

6         want asked by the witness?

7              MR. SCHECHTER:  How long had he been at

8         the airport.

9              THE COURT:  Well, there was an original

10        question you asked.  You asked him when he

11        saw his sister and wife next after the 31st.

12             MR. SCHECHTER:  I withdrew that

13        question.

14             THE COURT:  I didn't hear it withdrawn.

15             If it's withdrawn, go on to something

16        else.

17             THE INTERPRETER:  He still didn't get

18        it.

19             MR. KESSLER:  Judge, it appears the

20        witness doesn't understand the question.  I

21        would ask a new question be asked to the

22        witness.

23             THE COURT:  No, please.  You can't have

24        conversations with the witness.

25             THE INTERPRETER:  I'm trying to explain.

1                  Guo Bang Liu - People - Cross 360

2                       THE COURT:  No, you can't.  You just

3              have to ask the question and give the answer.

4              That's all your role is.

5                       Would you please rephrase the question?

6                       MR. SCHECHTER:  Can I just have a

7              moment?

8                       (Pause.)

9          Q     Your plane came into Kennedy Airport, am I

10    correct?

11         A     Yes.

12         Q     And you then went out to get your luggage?

13         A     Yes.

14         Q     How long was it from the time your plane

15    landed at Kennedy until you saw your sister?

16         A     When the plane arrived and we were at the

17    luggage carousel, I saw my sister and my wife.

18         Q     Now, your sister was not on the plane with

19    you from Los Angeles?

20         A     No, no.

21         Q     Did -- prior -- when -- from the time you

22    were in the car when you were then let out of the car,

23    do you remember that time?

24         A     What car are you talking about?

25         Q     The car with your sister and your wife in

```
1              Guo Bang Liu - People - Cross 361
2    Brooklyn.
3                   THE COURT:  No, please.
4         Q    By the bridge and the apartment building.
5                   THE INTERPRETER:  You're talking about
6              the car service?
7                   THE COURT:  We've got two cars involved
8              here and you have to be more specific.
9         Q    There came a time that you were let out of
10   the car by yourself?
11        A    What are you talking -- what car are you
12   talking about?
13        Q    When you first got into one car, am I
14   correct?
15                  THE COURT:  Is that the limousine you're
16             referring to?
17                  MR. SCHECHTER:  I don't want to use --
18                  THE COURT:  Use whatever term you want,
19             but you're confusing the witness, obviously.
20        Q    Then did you get into a second car?
21        A    Yes.
22        Q    Okay.  And then you were let out of the
23   second car?
24        A    Yes.
25        Q    Okay.  When you were let out of the second
```

1                     Guo Bang Liu - People - Cross 362

2      car, when was the next time you saw your wife and

3      sister?  How many hours, days, weeks passed?

4           A     On the 31st day, he let me go and then until

5      the 2nd.  Then about until the 2nd around 2 or 3

6      o'clock, I saw my wife.

7                          THE COURT:  2nd of what?

8                          THE WITNESS:  April the 2nd.

9           Q     And what time was it on April 2nd that you

10     saw your wife?

11          A     I saw them on April the 2nd after midnight.

12          Q     Now, was that also when you were taken in

13     that room to look at people?

14                     THE INTERPRETER:  Question again?

15          Q     Was that at about the same time that you were

16     taken into a room to look at certain people, certain

17     males?

18          A     Yes.

19          Q     Now, prior to that time on April 1st, did you

20     ever speak to any police officers about what happened?

21          A     Yes.

22          Q     Now, do you know the name of the police

23     officer who you spoke to?

24          A     I don't know.

25          Q     If I gave you the name have a Police Officer

cp

```
 1                    Guo Bang Liu - People - Cross 363
 2    Daniel Murphy, would you know if that was the police
 3    officer who you spoke to?
 4         A     I don't recall.
 5         Q     Would you have spoken to him on April 1st?
 6         A     Yes.
 7         Q     Okay.  And at that time when you spoke to
 8    Detective Murphy, did you tell him that you along with
 9    your wife, Liu Yan Wu, and her sister arrived at JFK
10    airport on March 31st at approximately 9:30 in the
11    hours -- at 2130 hours on a Tower Air flight that
12    originated in Los Angeles?
13                    THE INTERPRETER:  Could you make that
14                question a little shorter, please?
15                    THE COURT:  We will break it up.  Break
16                it up into segments.
17         Q     Did you tell that officer that you, your wife
18    and her sister arrived at JFK at about 9:30 in the
19    evening on March 31st?
20         A     Yes, I told him.
21         Q     That's what you told him?
22         A     Yes.
23         Q     And that the flight had originated in Los
24    Angeles?
25         A     Yes.
```

```
1                    Guo Bang Liu - People - Cross 364

2         Q      And that the three of you, you, your sister

3    and her -- you your wife and her sister had left China

4    and connected in LA to visit family in New York?

5         A      Yes, to see my mother.

6         Q      Okay.  But is that what you told that police

7    officer?

8         A      I didn't tell him.

9         Q      You didn't tell him that?

10        A      No.

11        Q      You never told him that you, your wife and

12   your sister-in-law had left from China?

13                    THE INTERPRETER:  From China?

14                    MR. SCHECHTER:  From China.

15        A      It's been a long time.  I don't know.

16        Q      Could you have told him that?

17                    MR. KESSLER:  Objection as to form.

18                    THE COURT:  Sustained.

19        Q      When you spoke -- do you speak any English?

20        A      No.

21        Q      When you were speaking to that detective, was

22   there a person there translating?

23        A      Yes.

24        Q      Okay.  So you don't remember if that's what

25   you told him?
```

cp

1                    Guo Bang Liu - People - Cross 365

2          A    It's been a long time.  I don't remember.

3          Q    Now, how long was it that you were in the

4     limo car prior -- how long were you driving in the limo

5     car prior to this other car blocking your way?

6          A    I'm not quite sure, but it's not too long,

7     not too far.

8          Q    Can you approximate the amount of time?

9          A    About 10 to 15 minutes.

10         Q    And had you left Kennedy Airport yet?

11         A    I'm not -- I don't quite understand.

12              THE COURT:  He says he doesn't quite

13              understand.

14         Q    The place where the limo car was that picked

15    you up, did you put your luggage in the limo car?

16         A    My sister asked the chauffeur to pick up the

17    luggage and take it to the car.

18         Q    Was the car -- the car moved; am I correct?

19         A    Yes.

20         Q    And then the other car blocked your way?

21         A    Yes.  There's a car that came to block us.

22         Q    Do you know where -- what parkway or road you

23    were on at that time?

24         A    I don't know the road, street.

25         Q    Were there other cars around at that time?

```
 1                   Guo Bang Liu - People - Cross 366
 2                   MR. KESSLER:  Judge, I'm sorry.  Could
 3              the interpreter just finish the witnesses'
 4              answer before the next question?
 5                   THE COURT:  I didn't know it was over.
 6              Finish the answer.
 7                   THE INTERPRETER:  Now I forgot the
 8              answer.
 9                   THE COURT:  Finish.  Next question was
10              there any other cars around.
11         A    It does -- I don't recall much, but I think
12    there was another car.
13         Q    Now, the area where the cars were blocked --
14    withdrawn.
15         It was dark out that evening when this occurred?
16         A    Yes.
17         Q    Now, the place where the cars stopped, were
18    there any lights in that area?
19         A    No.
20         Q    And it would have been dark there if those
21    two individuals then get out of the one car and get into
22    the limo car?
23         A    Yes, the two got out of the car and had a gun
24    at us, at our car.
25         Q    Where were you seated in the car, in the
```

1              Guo Bang Liu - People - Cross 367

2   limo?

3        A     I sat in the back seat.

4        Q     Was anyone else in the back seat with you?

5        A     My wife, my sister and I.  All three of us

6   sat in the back seat.  No, no, no, no.  I forgot now.  I

7   don't know if the three of us are sitting together.

8        Q     Do you remember whether you were on the

9   driver's side or passenger side of the vehicle?

10       A     I was at the passenger side.

11       Q     Did both men approach your side of the

12  vehicle who had the guns?

13       A     No.

14       Q     How many approached your side?

15       A     One person came to my side.

16       Q     Did you see where he had gotten out of the

17  other vehicle?

18       A     I'm not quite -- I'm not quite sure.

19       Q     Now, the person who came over to your side of

20  the vehicle, when you then got into the second car, was

21  he the driver of the vehicle or on the passenger side?

22       A     I'm not -- I don't recall.

23       Q     Now, you said -- did you see -- where did the

24  -- one person came over to your side.  Where did the

25  other person go?

cp

```
1                    Guo Bang Liu - People - Cross 368

2        A      The other person was in the car.

3        Q      Was in the limo?

4        A      What time are you talking about?

5        Q      When the car was originally stopped.

6        A      One person, one person came to my side.  The

7    other person was the driver.

8        Q      So you weren't able to see the other person?

9        A      Not quite clear.

10       Q      Okay.  Now, what was the conversation that

11   the person by your side had?

12       A      Say hurry up and get out of the car.

13       Q      What language was this said in?

14       A      I didn't quite understand his dialect.

15                     THE COURT:  What language was it in?

16                     THE WITNESS:  It sounds like Mandarin,

17              but I'm not sure what kind of language it

18              was.

19       Q      What dialect -- but it was in some sort of

20   Chinese?

21       A      Yes.

22       Q      Okay.  What dialect of Chinese do you speak?

23       A      I speak Taiwanese and Cantonese.

24       Q      Did you immediately get out of the car with

25   your sister and your wife?
```

```
 1                    Guo Bang Liu - People - Cross 369
 2         A      Yes, they told me to get out of the car and
 3     gone into their car.
 4         Q      What kind of car did you get into?
 5         A      I don't know.  I only know it's a car.
 6         Q      Do you remember what color the car was?
 7         A      I'm not sure what color is.  It's dark.  It's
 8     not white, it's not green.  It's dark.  I couldn't make
 9     clear what the color was.
10              MR. SCHECHTER:  Can I just have one
11              moment?
12                      (Pause.)
13         Q      Did you ever tell the police officer on April
14     1st that it was a black car?
15         A      I told him that I don't recognize what color
16     it was.
17         Q      So if he wrote down that it was a black car,
18     that would be incorrect?
19         A      I don't remember.
20         Q      Okay.  And while the time you were in the
21     limo car and the people -- the only thing they told you
22     was to get out of the car?
23              THE INTERPRETER:  I have to explain it
24              to him.
25              THE COURT:  You have to tell us just
```

cp

```
 1                    Guo Bang Liu - People - Cross 370
 2            what he said.
 3                    THE INTERPRETER:  Question again.
 4                    MR. SCHECHTER:  Can I have the Court
 5            Reporter read?
 6                    THE COURT:  Would you repeat the
 7            question, please?
 8                    (Whereupon, the Court Reporter read
 9            back the requested portion.)
10        A     Yes.
11        Q     And while you were in the limo car, did he
12   ever ask you to see your passport?
13        A     No.
14        Q     Now, Mr. Liu, do you remember testifying on
15   July 17th, 1995 before a grand jury in Queens County?
16        A     Yes.
17        Q     And let me ask you this.  Had you ever seen
18   these two people before?
19                    THE COURT:  Which two people are you
20            referring to?
21        Q     The two people from the other car, not the
22   limo driver.
23        A     After they were arrested --
24        Q     I'm talking about prior to their arrest.
25        A     No.  Okay.  Do you remember on July 17th
```

1                   Guo Bang Liu - People - Cross 371

2    being asked these questions and giving these answers?

3                   THE COURT:  One at a time.

4        Q     Page 21, line 10.

5              "QUESTION:  Have you ever seen any of these

6    men before?

7              "ANSWER:  No, never."

8              THE COURT:  Give him that question

9              ((Pause.)).

10       A     Yes.

11       Q     "QUESTION:  After they had asked you for your

12   passport, what if anything occurred?  What's the next

13   thing that occurred?

14             "ANSWER:  And after reviewing my passport, he

15   told me he identified the wrong person."

16       A     Yes, I did.

17       Q     "QUESTION:  What car were you in when he said

18   that?  Were you in a car or on foot?  Where were you?

19             "ANSWER:  We were in the limousine car."

20       A     No.  I said that it was in his car, in their

21   car.

22             MR. SCHECHTER:  Your Honor, I would ask

23             the district attorney if that's what the

24             minutes say, the grand jury proceeding.

25             MR. KESSLER:  That's correct, your

cp

```
 1                  Guo Bang Liu - People - Cross 372
 2              Honor.
 3       Q      So you never told the grand jury that that
 4  occurred in the limousine car?
 5       A      No.
 6       Q      And that the minutes would say that from the
 7  grand jury proceeding they would be incorrect?
 8                  MR. KESSLER:   Objection as to form.
 9                  THE COURT:  Sustained as to form.
10                  Speak for themselves.
11       Q      Do you remember if there was a person similar
12  to this lady taking down notes on a machine similar to
13  her in the grand jury?
14       A      I don't recall.
15       Q      Now, when the person -- were you able to see
16  what type of weapon the person had who was by you?
17       A      I don't know anything about that.
18       Q      Were you able to see the weapon?
19       A      Yes.
20       Q      Were you able to see the entire weapon?
21       A      I just saw part of it.  There was a newspaper
22  that was covering part of it.
23       Q      Okay.  Could you tell what color that weapon
24  was?
25       A      I don't recall.
```

cp

Guo Bang Liu - People - Cross 373

1
2     Q     The other person, did you ever see that other
3  person with a weapon?
4     A     The other person after I went into their car,
5  I saw that he had a gun.
6     Q     Were you able now -- were there ever any
7  lights on in the other car, not the limo car while you
8  were in that car?
9     A     It's a long time.  I don't remember.
10    Q     You don't remember if there were?
11    A     No.
12    Q     Now, the person who was standing by you, do
13 you know what part of the other car he got into?
14    A     I don't remember.
15    Q     Okay.  The person who you saw on April 2nd in
16 the line-up who you identified as number five, was he
17 the person who was standing by you on the passenger side
18 of the vehicle?
19    A     I don't know.  It's a long time.  I don't
20 remember.
21    Q     On April 1st when you were -- withdrawn.  How
22 long were you in the second vehicle before they let you
23 off?
24    A     The time I don't remember.
25    Q     Do you remember what either of the two

```
 1                  Guo Bang Liu - People - Cross 374
 2    individuals were wearing?
 3        A     A short T-shirt like the one is not the color
 4    of the inside of my T-shirt, but it had lines across the
 5    front.
 6        Q     The one individual who was standing by you
 7    outside of the vehicle, can you tell the members of the
 8    jury if you remember how tall he was?
 9        A     I don't remember, but I think he's shorter
10    than I am.
11        Q     How tall are you?
12        A     5'10.
13        Q     The other person who was on the other side of
14    the vehicle, do you remember how tall he was?
15        A     I don't remember how tall.
16        Q     Do you remember speaking to a police officer
17    on April 1st and did he ask you for a description of the
18    two people?
19        A     I'm not quite sure.
20        Q     Well, do you ever remember giving a
21    description of the two people as follows:  Person number
22    one:  Race Asian, age 20, height 5'6.
23                  THE INTERPRETER:  All right.  That's
24              enough.  The year is what?  The age is what?
25                  MR. SCHECHTER:  Age twenties.
```

cp

Guo Bang Liu - People - Cross 375

THE COURT:  Let's do it one at a time.

THE INTERPRETER:  Make your questions short, please.

Q   Do you remember giving a description to a police officer about the two individuals?

A   I'm not quite sure.

Q   Well, did you give a description that the first person was an Asian in his twenties?

A   I didn't tell them.

Q   You never gave any police officer a description?

THE COURT:  No, he didn't say that.

Sustained.

Q   Well, if I give you a description, would that help refresh your recollection?

A   No.

Q   Are you sure?

THE COURT:  He said it wouldn't refresh his recollection.  Go to something else.

Q   Well, did you ever give his weight as 130 pounds of the first individual?

MR. KESSLER:  I object.

THE COURT:  Sustained.  Sustained.

Please.

```
 1                    Guo Bang Liu - People - Cross 376
 2        Q    Did you give a description of the second
 3   individual as 5'6, 130 pounds?
 4                   MR. KESSLER:  Objection.
 5                   THE COURT:  You have to establish
 6                   whether he recalls giving a description.
 7        Q    Do you remember giving a description to
 8   police officers?
 9        A    No.
10        Q    Do you remember being asked by a police
11   officer what the two men looked like?
12        A    They asked me, but I'm not sure.
13        Q    Well, did you give them a description at that
14   time?
15        A    I told the police if I see the person, I
16   would recognize them.
17        Q    Did they ever ask you for a description and
18   did you give them a height and weight of the two
19   individuals?
20                   MR. KESSLER:  Objection; asked and
21                   answered.
22                   THE COURT:  Well, overruled.  I'll allow
23                   one more try at it.
24        A    No.
25        Q    You never gave them a height and weight
```

1                    Guo Bang Liu - People - Cross 377

2    description?

3         A    No.

4         Q    And if they wrote it down, they would not

5    have gotten it from you?

6                    MR. KESSLER:  Objection.

7                    THE COURT:  Sustained.

8         Q    Now, the person who you say you saw was

9    number five, was he the driver of the car or the

10   passenger in the car?

11        A    I don't remember.

12        Q    Was he the person who was -- who asked for

13   your passports and your proof?

14        A    The one on the passenger side asked me for my

15   documents.

16        Q    And was he the one who you were looking at?

17        A    Yes.

18        Q    Did you ever look at the driver of the

19   vehicle?

20        A    Yes, I see him.

21        Q    But did he turn around to you or was he

22   looking forward driving the car?

23        A    He turned around and looked at me.

24        Q    But there were no lights on in the vehicle,

25   in the car?

```
 1              Guo Bang Liu - People - Cross 378
 2                  THE INTERPRETER:  There are no what?
 3       Q     Lights on in the car?
 4       A     I'm not --
 5       Q     It was dark in the car.
 6       A.    I'm not sure.
 7       Q     The one in the passenger side was the one who
 8  looked at your documents and said we have the wrong
 9  people?
10                  THE COURT:  Are you going to be much
11             longer?
12                  MR. SCHECHTER:  Yes, for a while.
13                  THE INTERPRETER:  Yes.
14                  THE COURT:  The answer his yes and we'll
15             recess now until 2 o'clock.
16                  Ladies and gentlemen, don't discuss the
17             case among yourselves or with anyone else.
18             Don't allow anyone to discuss the case with
19             you.  Report back where the Court Officers
20             tell you at 2 o'clock.  See you then.  Have a
21             nice lunch.  Everybody stay seated until the
22             jury leaves.
23                  (Whereupon, the jury left the
24             courtroom.)
25                  THE COURT:  Everybody be back at 2
```

1        Guo Bang Liu - People - Cross 379

2    o'clock sharp.

3        MR. SCHECHTER:  Your Honor, I'll put

4    something --

5        THE COURT:  Do it at 2 o'clock.

6        Mr. Kessler, don't discuss his testimony

7    with anybody.  Don't let him talk to anybody.

8        MR. KESSLER:  He has to eat with his

9    family.

10       MR. SCHECHTER:  Not about this matter.

11       THE COURT:  About the case.  He can

12    order lunch.

13       L U N C H E O N   R E C E S S.

14       AFTERNOON SESSION.

15       THE CLERK:  3282 of '95, trial

16    continues, Hai Guang Zheng.  Let the record

17    reflect presence of the official Mandarin

18    interpreter, presence of the defendant,

19    defense attorney and assistant district

20    attorney, outside the presence of any sworn

21    jurors at this time.

22       THE COURT:  Mr. Schechter, you wanted to

23    make a record on something said by counsel in

24    the opening?

25       MR. SCHECHTER:  I was objecting to the

Guo Bang Liu - People - Cross 380

1     district attorney's opening when he said

2     testimony would come out about Sing Quin Yang

3     (phonetic) the co-defendant on this matter.

4     He was saying there would be testimony

5     about a rape by that defendant as to the two

6     females and I objected to that at that time,

7     your Honor.  I object for the following

8     reason.  My client is not charged with any

9     acting in concerts with any of the alleged

10    rapes that were committed by him.  He's

11    charged by himself with raping one of the two

12    females.  He is not charged with acting in

13    concert with the other gentleman as to any

14    rape.  I believe that would be, if any

15    testimony comes out concerning that, it would

16    be an uncharged crime that the rape was and

17    as such, your Honor, there would be no need

18    for that.  The district attorney was making

19    argument about the crime of terrorizing these

20    females during this time, your Honor.  I

21    believe there would be more than ample other

22    testimony based on his opening that would

23    show if the jury choses to believe the

24    witnesses that there was terrorization

cp

Guo Bang Liu - People - Cross 381

occurring here and I don't believe there
would be any point in having anyone testify
as to what the co-defendant did with the
females as to any alleged rapes.

MR. KESSLER: Actually, Judge, there is
a count that does charge this defendant being
aided by others on the fourth count of the
indictment, abducting the women and holding
them for a period of more than 12 hours with
intent to violate and abuse them sexually, so
in reality, there's a charge where they're
charged with acting in concert with sexually
abusing them for the purpose of kidnaping.

While it is not a rape, the rape
Count is a sole and separate count on the
defendant. This is the fourth --

THE COURT: At the appropriate time, I
will advise the jury that anything regarding
the rape by the other defendant, former other
defendant is not chargeable to this
gentleman and has no relationship with what
he did.

MR. KESSLER: Judge, with regards to the
fourth count, though the defendant is charged

cp

Guo Bang Liu - People - Cross 382

acting in concert with another person, okay,

holding these women for more than 12 hours

with intent to violate and abuse them

sexually --

THE COURT:  What I'm saying as to

whether or not they believe that he raped,

this present defendant raped them, the fact

that the other one may have raped them does

not mean that he raped them.

MR. KESSLER:  If the other person, if

they do not believe that he had raped them,

but the other person had raped them --

THE COURT:  That would be to the sexual

abuse charges.

MR. KESSLER:  If I could just finish,

your Honor?  If they do not believe that he

raped them, but in fact, believe that the

other co-defendant raped these women, then

they can find him guilty of the fourth count

where he acting in concert with another holds

these women with intent to abuse and violate

them sexually.

THE COURT:  As to the sexual abuse

charge, but not as to whether he it or did,

cp

1    Guo Bang Liu - People - Cross 383

2    not rape the two women.

3        MR. KESSLER:  Actually, that's a

4    kidnaping charge, but now I understand your

5    Honor.

6        MR. SCHECHTER:  I'm excepting.

7        THE COURT:  Okay.  Ready to proceed

8    then?

9        MR. KESSLER:  Yes.

10        THE COURT:  Have the witness take the

11    witness stand.  As soon as that's

12    accomplished, bring the jury in.

13        (Whereupon, the jury entered the

14    courtroom.)

15        THE CLERK:  Case on trial continued.

16        Let the record reflect the presence of

17    the  defendant, defense attorney, assistant

18    district attorney, official Mandarin

19    interpreter for the defendant.  12 regular

20    jurors, four alternates jurors all present,

21    properly seated.  All sides waive formal

22    reading roll?

23        MR. KESSLER:  Yes.

24        MR. SCHECHTER:  Yes.

25        THE COURT:  Good afternoon, ladies and

Guo Bang Liu - People - Cross 384

1     gentlemen.

2

3          THE CLERK:   The witness having resumed

4     the stand, sir, you're reminded you were

5     previously sworn this morning and you're

6     still under oath.  Do you understand that?

7          THE WITNESS:   I do.

8          THE COURT:   You may continue.

9  DIRECT EXAMINATION CONTINUED

10  BY MR. KESSLER:

11     Q   Mr. Liu, can you tell the members of the jury

12  how long it was from the time that the first individual

13  came up to you with the weapon while you were in the

14  limo until the time you then got into the second car

15  until you got out of the second car?

16     A   The time is not clear to me.  I don't recall.

17     Q   Can you tell us whether it was more than one

18  hour or less than one hour?

19     A   I don't know what you mean when you say it

20  was more than an hour or less than an hour.

21     Q   Were you in the second car for more than one

22  hour?

23     A   I don't understand.

24     Q   Do you know -- do you own a watch?

25     A   I didn't wear a watch then.

1            Guo Bang Liu - People - Cross 385

2        Q    I'm not saying -- but do you know how long

3   one hour is on a watch?

4        A    An hour is 60 minutes.

5        Q    Was it more than 60 minutes that you were in

6   the second car?

7        A    I'm not clear when I entered, when I --

8            THE COURT:   Can you estimate how long

9            you were in the car from the time that they

10           put you into the car 'till the time that you

11           got out of the car?

12           THE WITNESS:   Approximately one hour.

13       Q    Now, during that time, how long were the two

14   people speaking to you?

15       A    One spoke to me.

16       Q    Excuse me?

17           THE COURT:   One spoke to him?

18       A    One spoke to me.

19       Q    Did the driver ever speak to you?

20       A    Yes.

21       Q    What did he say?

22       A    He told me not to make any noise.

23       Q    Is that the only thing he ever told you?

24       A    But the other one that's all he said, but the

25   other one continuously talking.

1                    Guo Bang Liu - People - Cross  386

2          Q      And he was the one who asked for your

3    documents?

4          A      He asked me for my documents.

5          Q      And did he ever ask you for any money?

6          A      No.

7          Q      Did he ever take any property from you?

8          A      No.

9          Q      Did he ever give you anything?

10         A      No.

11         Q      Well, did he --

12         A      Yes.  He gave me a paper.  I don't know if he

13   gave me one quarter or two quarter.

14         Q      And on the paper were there phone numbers?

15         A      Yes.

16         Q      Now, when he spoke to you, was he angry or

17   upset when he looked at your papers?

18         A      Yes.

19                THE COURT:  Well, which one is it?

20         Q      Was he angry?

21         A      I'm not quite clear.

22         Q      Okay.  Did he ever threaten you?

23                THE COURT:  See, if you put two

24                questions in one, you're not going to get a

25                definitive answer.

1                    Guo Bang Liu - People - Cross 387

2                         MR. SCHECHTER:  Well, okay.

3          Q    Was he upset?

4          A    I don't know his feeling.

5          Q    Did he ever threaten you with harm?

6          A    He pointed the gun at me and told me to get

7    out of the car.

8          Q    Was that the only gun that you saw?

9          A    I saw one -- I saw one gun and then I saw the

10   other person holding a gun next to the seat.

11         Q    Would that be the driver?

12         A    Yes.  The one that -- the one on the

13   passenger side had the gun on me.

14         Q    Can you describe that gun?

15                   MR. KESSLER:  Objection; asked and

16              answered.

17                   THE COURT:  Sustained.

18         Q    After you got out of the car, you eventually

19   went to your sister's house?

20         A    Which car are you talking about?

21         Q    The second car.

22         A    After I left the car, I went to get help to

23   look for --

24                   THE COURT:  He said eventually.

25         Q    Did you at sometime --

1    Guo Bang Liu - People - Cross 388

2         THE COURT:  Please.  The question was

3    did he eventually go to his sister's

4    house.

5         THE INTERPRETER:  I said to him his

6    sister, but in Chinese, older sister and

7    younger sister is two different versions so

8    he said it's the younger sister.

9         THE COURT:  What's the answer to the

10   question?

11   A    I went back to my mother's house.  My mother

12   and my sister lives in the same house.

13   Q    Was that where Emily was?

14   A    Yes.

15   Q    Okay.  Now, at any time after you were at

16   Emily's house, did you ever have any conversation on the

17   phone with anyone who asked you for money?

18   A    Yes, my sister told me that --

19   Q    Not your sister.  Did you personally have any

20   conversation with anyone?

21   A    No.  When I went back home, I didn't get a

22   call yet.

23        THE COURT:  All right.  The answer is

24   no.

25   Q    Did you go with Emily to Henry Street on

cp

```
 1                  Guo Bang Liu - People - Cross 389

 2    April 2nd?

 3        A    No.

 4        Q    Did you ever see Emily prepare a can, a tea

 5    can that she put stuff in?

 6        A    I didn't -- I didn't see it.

 7             THE COURT:  That's the answer.

 8        Q    Were you in the house when Emily left to go

 9    to Henry Street?

10        A    No.

11        Q    Now, when you went to the precinct to look at

12    those men in a separate room, do you remember that?

13        A    Yes.

14        Q    Now, prior to going there, did they tell you

15    that --

16             THE COURT:  Who's "they"?

17        Q    Did the police tell you that people had been

18    arrested?

19        A    After I went back with my sister to the

20    precinct, then the police told me that they had arrested

21    the defendant.

22        Q    Was that before you looked at the people in

23    the line-up?

24             THE INTERPRETER:  Can you give that

25             question again?
```

```
 1                  Guo Bang Liu - People - Cross 390
 2                  THE COURT:  Would you repeat the
 3           question please, reporter?
 4                  (Whereupon, the Court Reporter read
 5           back the requested portion.)
 6      A     When the police told me to go identify the
 7   defendant, that's when I saw.
 8      Q     And then at that time you knew that people
 9   had been arrested?
10      A     Yes.
11      Q     And when you spoke to your sister prior to
12   looking at the line-up, did you discuss with her what
13   the two people looked like?
14      A     No.
15      Q     Now, when you looked at the people in that
16   room, do you remember how many people were in that room?
17      A     Six persons were there.
18      Q     Were they seated or standing?
19      A     They were standing.
20      Q     And you picked one of those people out?
21      A     I picked number five.
22      Q     Did you tell -- was there a police officer in
23   the room with you when you looked at those people?
24      A     No.  Yes, there was a policeman.
25      Q     And was there someone who translated for you
```

1                    Guo Bang Liu - People - Recross391

2      into Chinese what he said?

3          A     Yes.

4          Q     Do you remember telling that police officer

5      that number five was the driver of the car.

6          A     I only know that I picked number five.  I

7      didn't say that he was the driver.

8          Q     You never told that police officer that he

9      was the driver of the car?

10         A     No.

11                   MR. SCHECHTER:  Okay.  I have no further

12                 questions, your Honor.

13                   THE COURT:  Any redirect?

14                   MR. KESSLER:  Just one question.

15     REDIRECT EXAMINATION

16     BY MR. KESSLER:

17         Q     Did the police tell you what number to pick

18     or did you pick that number on your own?

19         A     No.  I picked him out myself.

20                   MR. KESSLER:  Nothing further.

21     RECROSS-EXAMINATION

22     BY MR. SCHECHTER:

23         Q     How long were you in that room prior to

24     picking out a number?

25         A     Very fast.  I saw him immediately.

1                    Jin Hao Liu - People - Direct 392

2                    MR. SCHECHTER:  Nothing further, your

3          Honor.

4                    MR. KESSLER:  Thank you.

5                    THE COURT:  All right.  You can step

6          down.

7                    MR. KESSLER:  People call Jin Hao Liu.

8    J I N    H A O    L I U, a witness called on behalf of the

9    People, after having been first duly sworn by the Clerk

10   of the Court, was examined and testified as follows:

11   DIRECT EXAMINATION

12   BY MR. KESSLER:

13       Q    Miss Liu, take a look at me, okay, and I'm

14   going to ask you some questions.  Try not to be nervous.

15                    THE INTERPRETER:  I want to ask her if

16          she understands me.

17       Q    I ask you if you could talk to the

18   interpreter for a minute and see if you understand each

19   other.

20                    THE INTERPRETER:  Okay.  We're fine.

21       Q    Miss Liu, just keep your attention focused on

22   me for a few minutes.  How old are you?

23       A    22 years old.

24       Q    What do you do for a living?

25       A    I'm at home now taking care of my daughter.

Jin Hao Liu - People - Direct 393

1

2      Q      Were you ever -- did you ever do anything

3  other than take care of your daughter?  Before that what

4  did you do?

5      A      No, I haven't done any work.

6      Q      How about being a student?  Were you ever a

7  student?

8      A      Yes.

9      Q      Okay.

10            MR. SCHECHTER:  Can the interpreter just

11            speak up a bit?

12            THE COURT:  You mean the English part of

13            it?

14            MR. SCHECHTER:  Yes.

15            THE COURT:  Would you please speak up?

16     Q      Back on March 31st of 1995, on that date were

17  you living in New York City at that time?

18     A      Yes.

19     Q      And what were your plans for the day of March

20  31st, 1995?

21            THE COURT:  Excuse me just a moment.

22            Would you step back please so the jurors can

23            see the witness?

24     Q      The question was what were her plans for

25  March 31st, 1995?

cp

```
1              Jin Hao Liu - People - Direct 394
2      A      I planned to go to the airport to meet my
3  brother and sister-in-law coming into New York.
4      Q      And about what time do you recall that you
5  were planning on meeting them at?
6      A      I planned to meet them around 9, between 9
7  and 10 o'clock.
8      Q      And how did you get to the airport that day?
9  I called for limousine service.
10     Q      Do you know the name of the limousine
11 service?
12     A      Lincoln.
13            And did there come a time that you arrived at
14       :port on March 31st, 1995?
15     A      Yes.
16            And when you got there, who if anyone did you
17
18     A      When I went there, I waited a little while
19 and then I saw my brother and sister-in-law.
20     Q      And after you saw your brother and
21 sister-in-law, where did you go next?
22     A      After I met my brother and sister-in-law, we
23 were planning to go back home.
24     Q      Okay.  And how were you planning on going
25 back home?
```

cp

Jin Hao Liu - People - Direct 395

1

2    A     We were ride on the Lincoln limousine.

3    Q     Can you tell us what if anything occurred

4    while you were riding in the Lincoln limousine?

5    A     After we were in the car, in a short period

6    of time, there was another car came upon us.

7    Q     And how did that car come to block you?

8    A     They block us in the front of the car.  One

9    person came out and pointed a gun at us.

10   Q     How many people were in the other car that

11   blocked your car?

12   A     There were two.

13   Q     And what occurred when they got out of their

14   car?

15   A     After they got out of the car, we went over

16   to the Brooklyn Bridge and they let my brother go.

17   Q     Let's talk about the car that blocked yours.

18   How many people were in your car and how many people

19   were in the other car?

20   A     My car had four persons.  The other car had

21   two persons.

22   Q     Tell me about what happened immediately after

23   your car was blocked?

24   A     They told me to get out of the car and go

25   into their car.

cp

```
 1                    Jin Hao Liu - People - Direct  396

 2          Q     And did they have anything in their hands at

 3      that point?

 4          A     Yes.  One of them had a gun in his hands.

 5          Q     Did you see if the other person had a gun?

 6                    MR. SCHECHTER:  Objection, your Honor.

 7                    THE COURT:  Overruled.

 8          A     It was very dark and I was very scared so I

 9      didn't notice.

10          Q     The person that you saw that had the gun,

11      what if anything did that person say?

12          A     He told me to get into their car and not to

13      say anything.

14          Q     What if anything did you do?

15          A     So, so we didn't make any noise and my

16      brother asked him what are you going to do to them.

17          Q     Did you ever get into their car?

18          A     Yes.

19          Q     Had you ever seen either of these men before?

20          A     No.

21          Q     What if anything happened once you were

22      inside the car with these men?

23          A     When we got in the car, they asked me if I

24      just arrived in this country.  And they asked my

25      brother.
```

1                    Jin Hao Liu - People - Direct 397

2                    MR. SCHECHTER:  Your Honor, I'm going to

3              -- the term "we".  Which one are we talking

4              about?

5                    THE COURT:  If possible, try to

6              ascertain that.

7         Q    Well, did both of the men speak or did one of

8    the men speak?

9         A    One spoke.

10        Q    The man that spoke, what did he say?

11        A    He asked my brother if we were new immigrants

12   and they asked to look at our passports.

13        Q    And did your brother show them the passports?

14        A    Yes.

15        Q    After your brother showed the passports, what

16   happened next?

17        A    They looked at it for a long time and then

18   they gave it back to my brother.

19        Q    Did they say anything when they gave it back

20   to him or did he say anything?

21        A    No.

22        Q    What occurred after they -- after he handed

23   back the passports?

24        A    They -- they -- when they gave us back --

25   when he gave us back the passport, then they drove off

```
1                    Jin Hao Liu - People - Direct 398
2    to Brooklyn Bridge and let my brother go.
3         Q      After they let your brother go, where if
4    anyplace did you go?
5         A      I don't know where we went, but I know we
6    went to a basement.
7         Q      Who was with you at that point in time?
8         A      Just myself and my sister-in-law.
9         Q      The two men that were with you in the car,
10   did they go into the apartment with you or did they stay
11   in the car?
12        A      Yes.
13        Q      Yes to they stayed in the apartment?
14        A      Yes, they went into the apartment.
15        Q      What happened once the two men and you were
16   inside the apartment basement?
17        A      After we went in together, they asked me for
18   telephone numbers.
19        Q      After they asked you for telephone numbers,
20   what happened?
21        A      That time I didn't give them phone numbers.
22        Q      After you didn't give them the phone numbers,
23   what happened next?
24        A      After, after he did --
25               THE INTERPRETER:  Have the question
```

1              Jin Hao Liu - People - Direct 399

2         again?

3              MR. SCHECHTER:  Your Honor, could we do

4         that outside the jury?

5              THE COURT:  I'm sorry?

6              MR. SCHECHTER:  She has a question.

7              MR. KESSLER:  Want me to repeat the

8         question?

9              THE INTERPRETER:   Yeah, repeat the

10        question.

11     Q    Can you tell me what happened immediately

12   after you wouldn't give them the phone numbers they

13   wanted, the very next thing?

14     A    Then they didn't say anything.  They asked me

15   if I was hungry or not.  If you're hungry, you can help

16   yourself to food.

17     Q    Now, how many people are in the basement

18   apartment at this time?

19     A    That time there was two people.

20     Q    Other than you and two or including you?

21     A    Including myself there were four persons.

22     Q    Did anyone else ever arrive other than the

23   four of you who were there?

24     A    Of the two, the two male that went into the

25   apartment with us, he left and exchanged another person

1                  Jin Hao Liu - People - Direct 400

2   in the basement to come into the basement.

3        Q      The other person that came into the basement,

4   can you describe that person's physical appearance

5   generally?

6        A      No, no.

7        Q      Was the person that came into the apartment

8   taller or shorter than the two people that were already

9   there?

10       A      He was shorter than the one that left.

11       Q      Was he heavier or skinnier than the person

12   that left?

13       A      Heavier.

14       Q      Now, the person that remained, was the person

15   that came also shorter and heavier than the person that

16   remained?

17                  THE INTERPRETER:   The person?

18       Q      The person that stayed in the apartment was

19   this new person also shorter and heavier than that

20   person?

21       A      He's taller.

22       Q      Who's taller?

23       A      The person that stayed is taller than the one

24   that came in to replace the second one.

25       Q      This person that left, after they left, how

cp

```
1                Jin Hao Liu - People - Direct 401

2    many people were in the apartment?

3         A    Four persons.

4         Q    The person that you said was the taller one

5    of the two men, is that the person that was initially in

6    the car with you?

7         A    Yes.

8         Q    And the person that's shorter and heavier,

9    was that the person that came later?

10        A    Yes.

11        Q    I'm going to ask you to take a look around

12   this entire courtroom from that wall to that wall, from

13   that wall to this wall and ask if you see either one of

14   those two men in this courtroom right now.

15        A    Yes, that one.

16        Q    Could you just describe an article of

17   clothing that person you're pointing at is wearing?

18        A    He's wearing a green shirt.

19             THE COURT:   Indicating the defendant.

20        Q    The person that you're pointing at with the

21   green shirt on, is that the person you're describing as

22   the taller person or the shorter person?

23        A    It's the tall one.

24        Q    And the person that you're pointing at, was

25   that one of the two people that you initially saw in the
```

1                   Jin Hao Liu - People - Direct 402

2      car that you were driving in?

3           A     Yes.

4           Q     Now, tell us what happened after they had

5      asked you if you needed something to eat.

6           A     I -- I went and ate a small portion of food.

7           Q     That night, where did you stay that night?

8           A     I was in his -- I was in their basement.

9           Q     Did you sleep at all that night?

10          A     No.

11          Q     Could you tell us what if anything happened

12     the next morning?

13          A     He said -- he said you haven't slept at all.

14          Q     When you say he --

15                THE COURT:  Who's he?

16          Q     Let's call them the tall person and the short

17     person?

18          A     The tall person said you haven't slept all

19     night.  Ask your sister-in-law to come in the room.

20          Q     What happened next?

21          A     So he said you haven't slept at all so he

22     took my sister-in-law into another room.

23          Q     When your sister-in-law went into the other

24     room with the tall person, where were you at that point?

25          A     I was in the original room in the basement.

```
 1                  Jin Hao Liu - People - Direct 403

 2        Q      Who else was with you in that room?

 3        A      With the heavier one with me.

 4        Q      What if anything happened with regards to you

 5   and the heavier person after they had left to the other

 6   room?

 7                    MR. SCHECHTER:  Objection, your Honor.

 8                    THE COURT:  Overruled.

 9        A      The short one, the short heavy one took all

10   my clothes off.

11        Q      The guns that you had seen earlier, were any

12   of them in the room at that point in time?

13                    MR. SCHECHTER:  Objection to the term

14               guns.

15                    MR. KESSLER:  Gun.  I'll change it to

16               gun.

17        Q      The gun you had seen earlier was the gun in

18   the room at that point in time?

19        A      There's another person that was holding a

20   gun.

21        Q      When you say another person are you talking

22   about the taller one or the shorter one?

23                    MR. SCHECHTER:  Objection, your Honor.

24                    THE COURT:  Overruled.

25        A      The tall one.
```

```
 1                  Jin Hao Liu - People - Direct    404

 2          Q    Do you know -- I'll ask this question.

 3          When you got back to the basement for the first

 4     time when you were in the basement, did you ever see a

 5     gun there?

 6          A    In the beginning we arrived in the basement,

 7     the shorter one had the gun.

 8          Q    Did you ever see the gun that night when you

 9     did not sleep?

10          A    When I didn't sleep all night, I did not see

11     a gun.

12          Q    The next morning did you ever see a gun?

13          A    The next morning I did see a gun.

14          Q    Where did you see the gun?

15          A    I saw it in the room.

16          Q    Where in the room?

17          A    When he slept, he put the gun under the

18     pillow.

19                    THE COURT:   When you say "he," who do

20                    you mean?

21          Q    When you say "he," are you referring to the

22     person you pointed out in the courtroom or the other

23     one?

24          A    The tall one.

25          Q    Is that the person you pointed out in this
```

cp

```
 1              Jin Hao Liu - People - Direct 405
 2    courtroom?
 3         A     Yes.
 4         Q     When he went into the other room, did you see
 5    him carry the gun with him?
 6                   MR. SCHECHTER:  Objection, your Honor.
 7                   There's been no testimony of --
 8         Q     The question was you said you saw a gun at
 9    one ponit with the tall man.  My question is when he
10    went into the other room, did you see the gun with him
11    at that point in time?
12         A     Yes.
13         Q     Now, we were up to the point in time where
14    you indicated the shorter man was in the room with you.
15    Describe what happened with you and the shorter man in
16    that room.
17         A     He took all my clothes off and he raped me.
18         Q     When you say he took off your clothes, what
19    happened right after he took off your clothes?  You have
20    to describe it in detail if you can.
21                   MR. SCHECHTER:  Your Honor, I'm going to
22                   object to this whole line of questioning.
23                   THE COURT:  Overruled.
24         A     After he took my clothes off, he took off his
25    clothes.
```

cp

1                   Jin Hao Liu - People - Direct 406

2        Q      And after he took off his clothes, what

3   exactly did he do?

4        A      After he took his clothes off, he put his

5   penis into my vagina.

6        Q      Did you touch you at all with his hands?

7        A      He used -- he touched my upper part.

8        Q      When you say your upper part, would you

9   describe that a little bit more in detail?

10       A      My breast.

11       Q      Did there come a point in time that they

12  returned from the other bedroom?

13       A      Yes.

14       Q      When your sister-in-law returned with the

15  taller man, what happened next?

16              THE INTERPRETER:  I have to ask her to

17              make it short.

18       Q      I'll tell her.  Keep your answers short so

19  the interpreter will answer.  I'll then ask you a

20  follow-up, okay?

21       A      Yes, sir.

22       Q      Tell me what immediately happened after the

23  tall person and your sister-in-law came back from the

24  room?

25       A      My sister-in-law came back near me.  When my

cp

1                Jin Hao Liu - People - Direct 407

2    sister-in-law came back into the room, she came next to

3    me but they wouldn't let her be near me.

4         Q     And what happened next?

5         A     Then he asked me to go to another room with

6    him.

7         Q     Who asked you?

8         A     The tall one.

9         Q     The person you had pointed out with the green

10   sweatshirt?

11        A     Yes.

12        Q     What exactly did he say to you and what

13   exactly did you do?

14        A     He asked me to go into the other room and

15   asked me to take my clothes off.

16        Q     And what if anything did you do?

17        A     He asked me so I took my clothes off.

18        Q     What happened after you took your clothes

19   off?

20        A     Then the same thing.  He took his clothes off

21   and he did the same thing as the other person.  He put

22   his penis into my vagina.

23        Q     What happened after he put his penis into

24   your vagina?

25        A     There was something pressing against my head

```
 1                    Jin Hao Liu - People - Direct 408
 2    and I said, it's very painful.  Then he removed it.
 3         Q    Were you on the bed, on a floor?  Tell us
 4    where you were.
 5         A    I was on the floor.
 6         Q    And was this thing that was pressing against
 7    your head also on the floor or on the wall?
 8                   MR. SCHECHTER:  Objection.
 9                   THE COURT:  Overruled.
10         A    Yes.
11         Q    To which one?
12                   THE INTERPRETER:  On the floor.
13         Q    Did he touch you with his hands at all?
14         A    No.
15         Q    Did he have any conversation with you at all
16    while you were in that other room?
17         A    No.
18         Q    When you -- did there come a time that you
19    left that room with the taller man?
20         A    Yes, there's a time I left that room and went
21    back to the original room.
22         Q    Did there ever come a time that you gave
23    either one of these people phone numbers to contact your
24    family?
25         A    Yes.  Later on I gave my home phone number.
```

Case 1:16-cv-01166-RJD Document 8-6 Filed 11/30/16 Page 142 of 145 PageID #: 1019

1     Jin Hao Liu - People - Direct 409

2   Q Did you ever speak on the phone when you were

3 in that basement apartment?

4   A They asked me to write the phone number down

5 and they did the calling.

6   Q Did you ever speak on the phone at all after

7 they did the calling?

8   A Yes. After he finished calling, I called my

9 home with my sister.

10   Q And were the men still there when you spoke

11 to them?

12   A Yes, yes, they were there. Spoke a little

13 while, then I spoke a little.

14   Q Could you hear the conversations they were

15 having on the phone with the person on the other end?

16   A I understand a little bit. They were asking

17 my sister for money.

18       MR. SCHECHTER: Objection, your Honor.

19       THE COURT: I'm sorry?

20       MR. SCHECHTER: Objection. That was not

21     the question.

22       MR. KESSLER: I asked if she heard. She

23     said yes. I'll ask her a follow-up.

24   Q What if anything could you understand about

25 the conversations that were taking place?

1          Jin Hao Liu - People - Direct 410

2                    MR. SCHECHTER:  Objection.

3                    THE COURT:  Well, sustained to the form

4               of the question.

5     Q      Did you hear the conversations that were

6     taking place with the person on the phone and the person

7     on the other end?

8                    MR. SCHECHTER:  Objection.

9                    THE COURT:  You're asking if she heard

10              what was said on the other end?

11                   MR. KESSLER:  I'm asking if she heard

12              the person, the male voice on her end of the

13              phone.

14                   THE COURT:  That I'll allow.

15    A      When he was speaking to my sister, I didn't

16    hear it.

17    Q      When you were speaking to your sister, what

18    were you and your sister talking about?

19                   MR. SCHECHTER:  Objection.

20                   THE COURT:  Sustained.

21    Q      What did you say to your sister?

22    A      He asked my sister for money.

23                   MR. SCHECHTER:  Objection.

24                   THE COURT:  Sustained; not responsive.

25                   MR. SCHECHTER:  Ask the answer be

```
 1                      Jin Hao Liu - People - Direct 411

 2              stricken.

 3                      THE COURT:  Strike it.  Jury disregard.

 4        Q       My question is simply what did you say to

 5   your sister when you spoke to her on the phone?

 6        A       I asked my sister to give them money.

 7        Q       Now, did there come a time when you finally

 8   left that basement apartment?

 9        A       Yes.

10        Q       When you left the basement apartment, where

11   did you go?

12        A       They drove me back.

13        Q       When you say they drove you back, did you go

14   into a car after you left?

15        A       The tall one and the short one together drove

16   us.

17        Q       Okay.  How long were you driving for with the

18   tall one and the short one.

19        A       Not too long.  It's about two blocks away,

20   two streets away.

21        Q       What happened when you got two streets away?

22        A       At that time there were a lot of people.

23   There were a lot of policemen there.

24        Q       What happened when you reached the car

25   reached two blocks away.  Describe exactly what happened
```

```
1              Jin Hao Liu - People - Direct 412
2    next.
3         A    There was there were a lot of people there.
4         Q    What were these people doing?
5         A    They were policemen.
6         Q    Did you know they were policemen at first?
7         A    In the beginning I was very frightened.  I
8    wasn't very sure if they were policemen.
9         Q    What if anything did you think at that point
10   in time?
11                  MR. SCHECHTER:  Objection.
12                  THE COURT:  Sustained.
13        Q    Describe how you were feeling at that point
14   in time when you were still in the car with the tall one
15   and the short one at the point these other men
16   approached.
17                  MR. SCHECHTER:  Objection.
18                  THE COURT:  Sustained.
19        Q    After you saw all these people, what's the
20   next thing that you remember happening?
21        A    At that time a lot of people outside.  They
22   had a gun and pointed at the tall one and the short one.
23        Q    Did you ever see these people before that
24   pointed the gun at the tall one and the short one?
25        A    No.
```