1                        Hickey - People - Cross      562

2          Q      And you did that in this case?

3          A      Yes, I did.

4          Q      And then when you looked under the

5    microscope, does it turn any color when you do that?

6          A      It stains the sperm sell a specific shade,

7    shading and specific color.

8          Q      Now, when you dealt with the panties, you

9    said you cut out a little spot and you used some

10   chemicals on that?

11         A      Yes.

12         Q      What chemicals were those?

13         A      It's called an AP test, acid phosphatase.

14   That is an enzyme that's present in semen in very high

15   concentrations and that's what we use as a screening

16   test to test for the presence of semen.

17         Q      Mr. Hickey, when you did your test, were you

18   able to determine whose sperm or spermatozoa those

19   substances were?

20         A      No, I did not.

21         Q      Are you familiar with DNA tests?

22         A      Very slightly.

23         Q      Was -- have you -- to your knowledge, was any

24   DNA testing ever done on this -- on these materials?

25                        MR. KESSLER:  Objection.

1                    Hickey - People - Redirect   563

2                    THE COURT:  Overruled.

3      A      Not to my knowledge, no.

4      Q      Spermatozoa, vaginal spermatozoa, how long

5  would the spermatozoa, if you know, stay in a female

6  where you can get a positive reaction to your test?

7      A      The literature that we use states up to 72

8  hours.

9      Q      And spermatozoa on panties, how long would be

10  sufficient that you would get a positive reaction?

11      A      That I really can't give a definite answer,

12  but once it's there and it's dried, it stays there for

13  an extremely long time.

14      Q      A few days, weeks?

15      A      Years.

16      Q      Years.

17                    MR. SCHECHTER:  I have nothing further.

18                    THE COURT:  Anything else?

19  REDIRECT EXAMINATION

20  BY MR. KESSLER:

21      Q      With regards to spermatozoa, would it be fair

22  to say that washing a substance with a detergent over

23  and over again would make it less likely for you to see

24  spermatozoa?

25                    MR. SCHECHTER:  Objection, your Honor.

cp

```
 1              Hickey - People - Redirect   564
 2                  THE COURT:  Sustained.
 3        Q      Well, you indicated on cross-examination that
 4   spermatozoa can stay on a substance for a year or so?
 5        A      I've had cases well over a year that still
 6   tested positive when examined.
 7        Q      With regards to -- strike that.  When you say
 8   you see spermatozoa, can you define that a little bit
 9   more for me?  What do you mean by seeing?
10                  MR. SCHECHTER:  Objection.
11                  THE COURT:  Overruled.
12        A      The actual sperm cells itself.
13        Q      You actually see the sperm cells?
14        A      Yes.
15                  MR. KESSLER:  I have nothing else.
16                  MR. SCHECHTER:  Nothing further.
17                  THE COURT:  Okay.  You can step down.
18                  Do you have any other witnesses?
19                  MR. KESSLER:  Approach, your Honor?
20                  (Whereupon, a discussion was held off
21              the record, at the side bar, among the Court,
22              defense counsel and the assistant district
23              attorney.)
24                  THE COURT:  Ladies and gentlemen, we're
25              going to recess until the Monday morning
```

1             Hickey - People - Redirect   565

2     9:30.  Don't discuss this case among

3     yourselves or with anyone else.  Don't let

4     anybody discuss the case with you or in your

5     presence.  Don't visit any of the locations

6     you heard about during the course of the

7     trial.  Of course they may have changed and

8     you might get the wrong impression if you go

9     there without proper instruction.

10        Have a nice weekend and report on Monday

11    morning 9:30 where the Court Officer tells

12    you, not to the courtroom.  See you then.

13        (Whereupon, the jury left the

14    courtroom.)

15        (Whereupon, the trial was adjourned to

16    July 1, 1996.)

17          *       *       *

18        CERTIFIED THAT THE FOREGOING IS A TRUE
      AND ACCURATE TRANSCRIPT OF THE ORIGINAL
19    STENOGRAPHIC MINUTES IN THIS CASE.

20

21    CATHERINE R. PARKER,
      Official Court Reporter

22

23

24

25

cp

1          Hickey - People - Redirect   566

2              I - N - D - E - X

3                        DX       CX      RDX      RCX
   FOR THE PEOPLE:
4  Guo Bang Liu           23       33       67       67

5  Jin Hao Liu            68       96

6  Liu Yan Wu            126      156

7  Jin Zhu Liu           178      196      209      212

8  Dr. Howard Kurtz      213      219

9  Thomas Hickey         220      237      239

10
                    E X H I B I T S
11 No.                Id.            In Evid.
   FOR THE PEOPLE:
12 1 - hospital records                 93
   2 - medical records                 152
13 3 - rape kit          228
   4 - rape kit          228
14

15

16

17

18

19

20

21

22

23

24

25

1                                                    695

2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF QUEENS:  CRIMINAL TERM:  PART K-25

3    ------------------------------------------x

4
     THE PEOPLE OF THE STATE OF NEW YORK        Indictment
5                                               No. 3282-95
                   -against-
6                                               KIDNAP1
     HAI GUANG ZHENG,
7                                               Trial
                              Defendant.
8
     ------------------------------------------x

9
                  (July 1, 2, 3, 8, 1996)

10
                         July 1, 1996
11                       125-01 Queens Boulevard
                         Kew Gardens, NY   11415

12

13   B E F O R E:

14       HONORABLE STANLEY B. KATZ,

15           Justice, and a jury

16                                              CA   Jup
     A P P E A R A N C E S:                     3/9/96
17
         HONORABLE RICHARD A. BROWN
18       District Attorney, Queens County
         BY:  SCOTT KESSLER, ESQ.
19            Assistant District Attorney

20       DONALD SCHECTER, ESQ.  (18-B)
         Attorney for Defendant
21
         YI WAN
22       Official Mandarin Interpreter

23                   DEBRA DUNN
             Official Court Reporter
24

25

Proceedings                     696

THE CLERK:   This is the case on trial,
calendar number 4, indictment 3282 of '95,
People versus Hai Guang Zheng.   Let the
record reflect the presence of the official
Mandarin interpreter, Mr. Yi Wan.

For the record, sir, good morning.   What
is your name?

THE DEFENDANT:   Hai Guang Zheng.

THE CLERK:   Counsel, your appearances.

MR. SCHECTER:   Donald Schecter, 10
Cutter Mill Road, Great Neck.

MR. KESSLER:   Scott Kessler for the
People.

THE COURT:   You ready to proceed?

MR. SCHECTER:   I just have one request
for the District Attorney.   I believe when we
left here last week, up to then there was one
police report that was left off the middle.
I would ask the District Attorney if he made
an inquiry and has any information concerning
that.

MR. KESSLER:   Judge, basically the
detective was here.   He looked through the
paperwork.   He has said there was an -- after

Proceedings                    697

or during there was a short additional DD5
that is lost.  So we cannot obtain that DD5.
So it appears I would have to have a negative
inference drawn.

THE COURT:  What?

MR. KESSLER:  My understanding of the
law, your Honor, if I cannot turn over the
complete Rosario material, the Court has to
instruct the jury there was a piece of
paperwork missing regarding one of the
detectives and they can draw negative
inference based on the detective's testimony.

MR. SCHECTER:  Your Honor, I don't know.
At this stage I don't know what sanctions I'm
going to ask for until after the detective
takes the witness stand.  I'll see what he
says concerning it.  I will then at that time
request the Court.

THE COURT:  And I'll make a ruling.

MR. SCHECTER:  Yes.

THE COURT:  Other than that, is there
anything else?

MR. KESSLER:  We are ready.  He is the
first witness, your Honor.

| | | |
|---|---|---|
| 1 | Proceedings | 698 |

2      THE COURT:  Bring the jury in.

3      Who is your next witness?

4      MR. KESSLER:  Detective Greene.

5      THE COURT:  Spell it.

6      MR. KESSLER:  G-R-E-E-N-E.

7      THE COURT:  Michael?

8      MR. KESSLER:  Yes.

9      THE COURT:  Yes.

10      (The jury entered the courtroom.)

11      THE CLERK:  Case on trial continues

12  indictment number 3282 of '95.  Let the

13  record the presence of defendant, defense

14  attorney, official Mandarin interpreter,

15  Assistant District Attorney, 12 regular and

16  four alternate jurors.

17      Do counsel waive the formal reading of

18  the roll?

19      MR. KESSLER:  Yes.

20      MR. SCHECTER:  Yes.

21      THE COURT:  Call your next witness.

22      Good morning, ladies and gentlemen.

23      MR. KESSLER:  People call Detective

24  Michael Greene.  Your Honor, could I have one

25  second.

```
 1                    Greene - People - Direct              699

 2                    (Pause in the proceeding.)

 3    M I C H A E L   G R E E N E, Detective, a witness

 4              called on behalf of the People, after

 5              having been first duly sworn and having

 6              stated his shield number as 2826 and his

 7              command as the Major Case Squad, New York

 8              City Police Department, took the witness

 9              stand and testified as follows:

10                    THE COURT:  You may inquire.

11                    MR. KESSLER:  Thank you.

12    DIRECT EXAMINATION

13    BY MR. KESSLER:

14         Q    Detective Greene, how long have you been a

15    member of the New York City Police Department?

16         A    Going on 17 years.

17         Q    How long have you been a detective?

18         A    Since '89.  About seven years.

19         Q    Which specific division of the New York City

20    Police Department do you work?

21         A    Major Case Squad.

22         Q    Tell us briefly what the --

23                    MR. SCHECTER:  Objection.

24                    THE COURT:  Overruled.

25         Q    What are the duties and responsibilities of
```

1                    Greene - People - Direct          700

2    the Major Case Squad?

3         A     Pretty much what the title of the squad --

4                    MR. SCHECTER:  Your Honor, could we have

5              a sidebar?

6                    THE COURT:  Sustained.

7                    Just answer the question.

8                    THE WITNESS:  I'm sorry.

9                    MR. SCHECTER:  Your Honor, could we have

10             a sidebar for a minute?

11                   (Sidebar discussion off the record.)

12        Q     Detective, can you tell us the duties and

13   responsibilities of the division you work -- can you

14   tell us the duties and responsibilities of the Major

15   Case Division where you work?

16        A     We handle city-wide cases, city-wide unit.

17   We handle cases such as major hijackings, kidnappings,

18   bank robberies, high profile cases that --

19                   MR. SCHECTER:  Objection, your Honor.

20                   THE COURT:  Sustained.

21                   MR. SCHECTER:  I ask it be stricken.

22                   THE COURT:  Strike.  The jury will

23             disregard.

24        Q     Have you ever handled a kidnapping prior to

25   April 1, 1995?

2      A    Yes.

3      Q    Now, directing your attention to April 1,

4  1995, were you assigned a specific kidnapping,

5  specifically the name of the operation, Nevada?

6      A    Yes.

7      Q    Tell us briefly why you used the name,

8  operation Nevada.

9                MR. SCHECTER:  Objection.  Why the term

10               Nevada --

11               THE COURT:  Sustained.

12     Q    Could you tell us briefly after you were

13 assigned this operation Nevada, what steps did the Major

14 Case Squad, specifically you, do in order to continue

15 your investigation?

16     A.   Major Case's called in after the preliminary

17 investigation.

18               MR. SCHECTER:  Objection to --

19               THE COURT:  Sustained.

20               Just answer the question, please.

21     Q    In this case what did you do?

22     A    We took over the investigation.  We ran the

23 investigation of the kidnapping.

24               MR. SCHECHTER:  Objection to the term

25               "kidnapping."

```
1                    Greene - People - Direct            702

2                         THE COURT:  Overruled.

3         Q    What, if anything, did you or members of the

4    Major Case Squad do once you were assigned this

5    investigation to pursue this investigation?

6         A    May I ask a question?

7         Q    Just answer my question.

8         A    We -- we -- the unit was called in.  We

9    notified the other specialty units we needed to proceed

10   with the investigation of the case.  We got the legal

11   documentations such as eavesdropping warrants --

12                    MR. SCHECTER:  Objection.

13                    THE COURT:  What is the objection?

14                    MR. SCHECTER:  Legal documentation.

15                    THE COURT:  Sustained as to the term

16              legal documentation.

17        Q    Without telling us --

18                    MR. SCHECTER:  Your Honor, can we have a

19              sidebar?

20                    (Sidebar discussion off the record.)

21                    THE COURT:  Overruled based upon the

22              sidebar.

23                    MR. SCHECTER:  Can I have just have one

24              moment, your Honor?

25                    THE COURT:  Sure.
```

1

2          MR. SCHECTER:  Thank you.

3          THE COURT:  Continue.

4     Q     Detective, we were at the point you indicated

5     that the Major Case Squad was assigned this case and

6     obtained visiting tools, such as eavesdropping warrant.

7     Could you tell us specifically with regard to the

8     technical unit what assignments were made with regard to

9     the technical unit?

10          MR. SCHECTER:  Objection, your Honor.

11          He is not part of the technical unit.

12          THE COURT:  Sustained.

13    Q     What, if anything, was done with the

14    documents you obtained?

15    A     Again, we run the operation --

16          MR. SCHECTER:  Objection to the term

17          "we."

18          THE COURT:  Please just answer the

19          questions.

20    A     Would you repeat --

21    Q     Were you assigned the investigation?

22    A     Yes, sir.

23    Q     Were you -- were you the assigned officer in

24    terms of the investigation?

25    A     Yes.

1                    Greene - People - Direct          704

2        Q    After you obtained the warrants, what steps

3    did you do in order for you to pursue this

4    investigation?

5        A    I assigned teams and sent teams to cover

6    certain -- certain things that had to be covered.

7                    MR. SCHECTER:  Your Honor, can he speak

8                up a little.

9                    THE COURT:  Yes.  There is a microphone

10               there.

11       A    Teams were assigned to do certain things as

12    far as surveillance.

13                   MR. SCHECTER:  Objection to what

14               teams --

15                   THE COURT:  He said he assigned them.

16               Objection is overruled.

17       Q    Go ahead.

18       A    Teams were assigned to do certain particular

19    functions in the investigation such as surveillance,

20    tracking of telephone calls, things of that nature.

21       Q    Now, specifically with the tracking of

22    telephone calls, how does the investigation track a

23    particular telephone call?

24       A    There's particular tracking devices, mobile

25    devices set up in vans that pinpoint telephone waves to

2      certain locations throughout the city.

3          Q      Now, with regard to monitoring telephone

4      calls, what is done to monitor telephone calls?

5          A      Again, after securing proper paperwork,

6      surveillance devices, recording devices, are placed on

7      the resident phones for incoming calls to the residents.

8          Q      Now, specifically in this case was there a

9      team assigned to try -- to a mobile unit with regard to

10     the phone calls that you mentioned?

11                    MR. SCHECTER:   Objection.   What phone

12                    calls were you talking about?

13                    THE COURT:   You want to be more

14                    specific.

15         Q      During your investigation did there come a

16     time that phone calls were being made to a certain

17     residence?

18         A      Yes.

19         Q      After phone calls were being made to the

20     certain residence, what steps did you take in your

21     investigation regarding the mobile unit you mentioned

22     earlier?

23         A      As far as the residences is concerned?

24         Q      I'm sorry?

25         A      Are you referring to the residences?

 2      Q     Yes.

 3      A     There is surveillance -- surveillance

 4   equipment, recording devices, and a resident team is set

 5   up at the residence to monitor incoming calls reference

 6   to the case.

 7      Q     And regarding the other team you mentioned

 8   that would be in the field, what, if anything, was their

 9   assignment?

10      A     Well, once we had established a portable

11   phone, would be a cellular phone was being --

12            MR. SCHECTER:  Objection.  He is using

13            the term "we."  We have to know what he did,

14            not what anyone else did.

15            THE COURT:  Want me to make a ruling?

16            You want to keep talking?

17            May be just a quirk of the work as you

18            describe it, but you can't use the term we.

19            You have to state what you did.

20      Q     Tell us, detective, did there come a time

21   that you ascertained that a cellular phone was being

22   used?

23      A     Yes.

24            MR. SCHECTER:  Objection to what he

25            ascertained.  If he is not the one that did

1                    Greene - People - Direct            707

2              that, it would be hearsay.

3                    THE COURT:  He asked him if he

4              personally ascertained.

5         Q    Did there come a time you were -- you became

6    aware a cellular phone was being used?

7         A    Yes.

8                    MR. SCHECTER:  Objection other than --

9                    THE COURT:  Overruled.

10        Q    My question is, what steps did you take after

11   you became aware that a cellular phone was being used?

12        A    A team was assigned to -- a mobile team was

13   assigned, sent out to pinpoint, try to pinpoint where

14   these calls were being made from, whether it was from a

15   car or whether a home location.

16        Q    Did there come a point in time, detective,

17   that a drop of ransom money was going to be done in this

18   investigation?

19        A    Yes.

20        Q    Could you tell us what assignments were made

21   at that point in time, what you were and what every one

22   else was supposed to do?

23                   MR. SCHECTER:  Objection to what someone

24              else was supposed to do.  Just what he was

25              supposed to do.

2          THE COURT:  If he made the assignments I

3          will permit testimony.  .

4      A    Assignments were made --

5          THE COURT:  Did you make the

6          assignments?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.

9      A    The assignments were made to send a team to

10   the drop location, teams to the drop location, for

11   surveillance.  And also we still had a team out

12   monitoring the calls to see if we could pinpoint the

13   location where these telephone calls were coming from.

14     Q    Now, were you in connection -- in contact

15   with both teams?

16     A    Yes.

17     Q    Now, detective, without telling us what was

18   said, did there come a point in time that you became

19   aware of the fact, from your drop team, that the drop of

20   the money had been made?

21     A    Yes.

22     Q    And did you have conversations with the team

23   regarding that?  Without telling us what was said.

24     A    Yes.

25     Q    With regard to the mobile team that was out

1

2    in the field, do you know what county they were located

3    in?

4                    MR. SCHECTER:  Objection.  Unless he was

5                    there, your Honor, anything he was told would

6                    be hearsay.

7                    THE COURT:  He said he was personally

8                    aware of what county they were in.  If he was

9                    personally aware, he can testify.

10                   MR. SCHECTER:  Your Honor, unless he was

11                   there -- the only way he was personally aware

12                   if someone told him where there were --

13                   THE COURT:  There may be other ways

14                   how --

15                   MR. SCHECTER:  The questions are being

16                   phrased to get around the hearsay objection.

17                   It's an improper way of doing --

18                   MR. KESSLER:  Judge, I will rephrase the

19                   question.

20                   THE COURT:  Please.

21        Q    Did you have a conversation with Detective

22   Banks?

23        A    Yes.

24        Q    What team was Detective Banks assigned?

25        A    He was part of the surveillance team trying

1                  Greene - People - Direct              710

2      to locate where these calls were being made.

3           Q    Now, detective, did there come a time,

4      detective, that after you were in contact with both

5      teams you proceeded to a hospital in the City of New

6      York?

7           A    Yes.

8           Q    Which hospital did you go to?

9           A    Beekman Downtown.

10          Q    And while you were at that hospital, what, if

11     anything, did you obtain?

12          A    I obtained the rape kit from the hospital in

13     connection -- that was in connection with this case.

14          Q    And did you obtain the rape kit from both of

15     the women that were there?

16          A    Yes.

17          Q    After you obtained the rape kits that were --

18     both the women there did, where, if anyplace, did you

19     bring them?

20          A    I took them directly to the police lab.  I

21     vouchered them.

22          Q    When you say, "vouchered them," describe to

23     the jury what that means.

24          A    It's given a police code number and then

25     given to the lab technician to do whatever testing they

| | | |
|---|---|---|
| 1 | Greene – People – Direct | 711 |

2    have to do.

3        Q    Now, Detective Greene, did there come a time

4    during this investigation that you proceeded to do a

5    lineup in connection with this case?

6        A    Yes.

7        Q    And do you recall at that time the subject of

8    the lineup?  Who was the subject of the lineup?

9        A    Hai Zheng.

10       Q    Detective, do you recall the date of that

11   lineup?

12       A    I believe it was early morning April 2nd.

13       Q    Is this 1995?

14       A    1995.

15       Q    Now detective, did you memorialize the lineup

16   in anyway?

17       A    Yes, I took photos.

18       Q    How did you do that?

19       A    I took photos.

20            MR. KESSLER:  Your Honor, could I have

21            this marked People's 3 and 4 for

22            identification?

23            THE COURT:  We already have 3 and 4.

24            MR. KESSLER:  4 and 5.

25            THE COURT:  4 and 5 for identification.

2                    MR. SCHECTER:  5 and 6, your Honor.

3                    THE COURT:  We have 3 and 4, so they

4            will be 5 and 6.

5                    MR. KESSLER:  5 and 6.

6                    (People's Exhibits 5 and 6 marked for

7            identification.)

8        Q    Detective, I'm going to show you what has

9    been marked People's 5 and 6 and ask if you recognize

10   what that is?

11       A    It's photos of the lineup I took.

12       Q    Did you take those photographs?

13       A    Yes.

14       Q    Do they fairly and accurately depict what the

15   lineup looked like on April 2nd, 1995?

16       A    Yes, they do.

17                   MR. KESSLER:  I ask they be moved into

18           evidence, your Honor.

19                   THE COURT:  Show them to defense

20           attorney.

21                   MR. SCHECTER:  Your Honor, could I have

22           a brief voir dire?

23                   THE COURT:  Yes.

24   VOIR DIRE BY

25   MR. SCHECTER:

1          Greene - People - Voir Dire/Defendant        713

2          Q       Detective, do you know what time these

3    pictures were taken?

4          A       Right before the lineup, so somewhere

5    around -- if I can refer to my notes?

6                        THE COURT:  If it will refresh your

7                        recollection.

8          A       Somewhere about 4:50.  4:50.

9          Q       4:50 in the morning?

10         A       Yes.

11         Q       Could you tell the members of the jury what

12   you're looking at?

13         A       It's a lineup sheet that we use.

14         Q       And were these pictures taken before or after

15   the lineup?

16         A       Before.

17         Q       And approximately how long prior to the

18   lineup were these pictures taken?

19         A       Five minutes at the most.

20         Q       Were there any other people in the lineup who

21   were not in these pictures?

22         A       No.

23                      MR. SCHECTER:  I have no objection, your

24                      Honor.

25                      THE COURT:  Mark them into evidence, 5

1                    Greene - People - Direct              714

2              and 6.

3                    (People's Exhibits 5 and 6 marked in

4              evidence.)

5    DIRECT EXAMINATION

6    BY MR. KESSLER:

7         Q    Detective, I ask you to take a look at those

8    photographs for one moment.  Could you tell me,

9    detective, number 5 in the lineup, who was number 5 in

10   the lineup?

11        A    Who is number 5?

12        Q    Yes.

13        A    Hai Zheng.

14        Q    Did you know the name of number 6 in the

15   lineup?

16        A    Yes.

17        Q    Who was number 6?

18        A    Qin Zheng.

19        Q    In regards to numbers 5 and 6, did you take

20   it or did someone in your office take individual photos

21   of those people?

22        A    I believe I took the individual photos.

23             MR. KESSLER:  Your Honor, could I have

24             these marked as 6 and 7 now?

25             THE COURT:  7 and 8.

1               Greene - People - Voir Dire/Defendant      715

2                        (People's Exhibits 7 and 8 marked for

3                        identification.)

4          Q     Detective, I'm going to ask you to take a

5     look at what has been marked exhibits 7 and 8 and ask if

6     you recognize what that is.

7          A     They're the photos I took that morning.

8          Q     And who, if anyone, is depicted in number 7?

9          A     Hai Zheng.

10         Q     And who, if anyone, is depicted in number 8?

11         A     Qin Zheng is.

12         Q     Do those photographs fairly and accurately

13    depict what Hai Zheng and Qin Zheng appeared like on

14    April 2nd, 1995?

15         A     They do.

16                   MR. KESSLER:  Move them into evidence at

17                   this time, your Honor.

18                   THE COURT:  Show them to defense

19                   attorney.

20                   MR. SCHECTER:  May I have a voir dire,

21                   your Honor?

22                   THE COURT:  Yes.

23    VOIR DIRE BY

24    MR. SCHECTER:

25         Q     Detective, what time were these pictures

1                          Greene - People - Direct                716

2      taken? Were they taken the same time the other pictures

3      were taken?

4          A    Yes.

5          Q    Did you take any other individual pictures?

6          A    I don't remember.

7          Q    Would there be anywhere you make notations if

8      you took any other individual pictures?

9          A    No.

10         Q    Would that be any notation of how many

11     pictures you took total --

12                    MR. KESSLER: Objection. Beyond the

13                scope of voir dire.

14                    THE COURT: Sustained. That's not voir

15                dire.

16                    MR. SCHECTER: I have no objection.

17                    THE COURT: If there be no objection, 7

18                and 8 are now marked in evidence.

19                    (People's Exhibits 7 and 8 marked in

20                evidence.)

21     DIRECT EXAMINATION

22     BY MR. KESSLER:

23         Q    Detective, did you get an opportunity to look

24     at both Hai Zheng and Qin Zheng on April 2nd, 1995?

25         A    Yes.

1                    Greene - People - Cross              717

2        Q     In your opinion, detective, who appeared to

3    you to be the taller of the individuals?

4                    MR. SCHECTER:  Objection.

5                    THE COURT:  Well, sustained.

6        Q     You saw both individuals, correct?

7        A     Correct.

8        Q     Who was taller?

9                    MR. SCHECTER:  Objection.

10                   THE COURT:  Overruled.

11       A     Hai Zheng.

12       Q     That person you said was taller Hai Zheng, do

13   you see that person in the courtroom today?

14       A     Yes.

15       Q     Point him out.  Describe an article of

16   clothing he is wearing.

17       A     Blue, green, and white striped shirt.

18                   THE COURT:  Indicating the defendant.

19                   MR. KESSLER:  I have nothing further.

20   CROSS EXAMINATION

21   BY MR. SCHECTER:

22       Q     Detective, did you make any notes or

23   memoranda concerning this investigation?

24       A     I'm sorry?

25       Q     Did you make any notes or memoranda

| | | | |
|---|---|---|---|
| 1 | | Proceedings | 718 |

2  concerning this investigation?

3     A     Memorandum?

4     Q     Notes, memorandum DD5, police reports?

5     A     As far as the case is concerned?

6     Q     Yes.

7     A     Yes.

8     Q     Were you the one who coordinated the entire

9  investigation?

10    A     Yes.

11    Q     You have your file with you?

12    A     Yes.

13    Q     Can I see your file?

14    A     Excuse me?

15    Q     Can I see your file?

16    A     Yes.

17            MR. SCHECTER:   Your Honor, can we

18            approach for one moment?

19            (Sidebar discussion off the record.)

20            THE COURT:   We will take a short recess.

21            Ladies and gentlemen, don't discuss the case

22            among yourselves or anyone else.   Don't let

23            anybody discuss the case with you in your

24            presence.

25            (The jury left the courtroom.)

1          Proceedings          719

2          THE COURT:  The jury has left.

3          MR. SCHECTER:  Your Honor, could I have

4     the case --

5          MR. KESSLER:  I'm going to object to him

6     taking any case file.  There is no ruling in

7     the law that says he's entitled to the case

8     file.  I have turned over my obligations

9     under Rosario.

10          THE COURT:  If there's anything specific

11     you want in that file, I will make a ruling

12     on it.

13          MR. SCHECTER:  Your Honor, I can't know

14     what I want, what I haven't been turned over,

15     unless I look through it to make a

16     determination.

17          THE COURT:  His testimony here, which is

18     the subject of your cross examination, has

19     been very limited.  If you want to see things

20     that are the basis of his testimony here, I

21     would permit to you look through it, but

22     if --

23          MR. SCHECTER:  I will give you an

24     example, your Honor.  The District Attorney

25     never asked the detective whether he ever had

| | Proceedings                              720 |
|---|---|
| 1 | |
| 2 | any conversations or did any interviews with |
| 3 | any of the complaining witnesses. |
| 4 | THE COURT:  Do you want to ask him that? |
| 5 | MR. SCHECTER:  Your Honor, if there are |
| 6 | DD5s in his case file from the complaining |
| 7 | witnesses, then I'm entitled to them, and I |
| 8 | can ask him about that.  That doesn't mean -- |
| 9 | THE COURT:  I would assume he turned |
| 10 | them over to you.  That would be Rosario |
| 11 | material. |
| 12 | MR. SCHECTER:  Your Honor, he is the one |
| 13 | making the determination he turned over all |
| 14 | Rosario material.  If I don't look through |
| 15 | the file, I can't make that determination. |
| 16 | THE COURT:  I'm going to let him look |
| 17 | through the file or else we'll be here for |
| 18 | another month.  Let him see it. |
| 19 | THE WITNESS:  Everything, Judge? |
| 20 | THE COURT:  Give him everything.  Search |
| 21 | for the truth. |
| 22 | (The entire file handed over to defense |
| 23 | counsel.) |
| 24 | MR. SCHECTER:  You want to put the |
| 25 | defendant back in? |

Proceedings                    721

1

2          THE COURT:  You want five minutes?

3          MR. SCHECTER:  If I may.

4          THE COURT:  When you reach five minutes,

5      if you want more than five minutes, let me

6      know.

7          You can step down.

8          (The witness left the witness stand.)

9          THE COURT:  Put the defendant in.  Don't

10     send him downstairs.

11         (A recess was taken.)

12         THE CLERK:  Case on trial continued.

13     Let the record reflect the presence of

14     defendant, defense attorney, official

15     Mandarin interpreter, and the Assistant

16     District Attorney, outside the presence of

17     any sworn jurors at this time.

18         Are there any applications?

19         MR. SCHECTER:  No.

20         (The witness retook the witness stand.)

21         THE COURT:  You read the file you wanted

22     to peruse?

23         MR. SCHECTER:  Yes.

24         THE COURT:  Are you ready to proceed?

25         MR. SCHECTER:  Yes.

```
 1                    Greene - People - Cross            722

 2                    (The jury entered the courtroom.)

 3                    THE CLERK:   Case on trial continues.

 4              Let the record the presence of defendant,

 5              defense attorney, official Mandarin

 6              interpreter, Assistant District Attorney, 12

 7              regular and four alternate jurors, all

 8              present and properly seated.

 9                    Do counsel waive the formal reading of

10              the roll?

11                    MR. SCHECTER:   So waived.

12                    THE CLERK:   Detective, you are reminded

13              you were previously sworn this morning.

14              You're still under oath.   Do you understand

15              that?

16                    THE WITNESS:   Yes.

17                    THE COURT:   You may proceed.

18         CROSS EXAMINATION

19         BY MR. SCHECHTER:

20              Q    Detective, I'm going to return you to your

21         file.  Detective, on April 1st what was your shift

22         assignment on that date?

23              A    Because of the case, we were called in.

24         There wasn't necessarily a regular tour assigned.

25              Q    Were you supposed to work that day?
```

2          A     I don't remember what day of the week April

3     1st was.  I'm not sure.

4          Q     Do you work a steady tour?

5          A     Yes.

6                         MR. SCHECTER:  Would the District

7                    Attorney stipulate April 1st, 1995 was a

8                    Saturday?

9                         MR. KESSLER:  Sure, okay.  That's good.

10         Q     Were you scheduled to work on that Saturday;

11    if you know?

12         A     I don't think so.

13         Q     What time was the first time that you

14    received a phone call asking or ordering you to come in

15    to work?

16         A     I don't remember.  It was early that day.

17    Early that morning.

18         Q     Do you keep a memo book?

19         A     Yes.

20         Q     Do you have your memo book with you?

21         A     No.

22         Q     Is it part of your case file?

23         A     No.

24                        MR. SCHECTER:  Your Honor, please could

25                    I have a sidebar?

1                          Banks - People - Direct            724

2                               (Sidebar discussion off the record.)

3                               THE COURT:  We will recess this

4                          witness's testimony until he produces his

5                          memo book.

6                               You can step down.

7                               THE WITNESS:  Thank you, your Honor.

8                               THE COURT:  Call your next witness.

9                               MR. KESSLER:  People call Detective

10                         Keith Ng -- I'm sorry.  The People call

11                         Detective Steven Banks.  He is outside.

12                         Judge, could I have just one moment.

13                              (Pause in the proceeding.)

14     S T E V E N   B A N K S, Detective, a witness

15                         called on behalf of the People, after

16                         having been first duly sworn and having

17                         stated his shield number as 4184 and his

18                         command as the Major Case Squad, New York

19                         City Police Department, took the witness

20                         stand and testified as follows:

21                              THE COURT:  You may inquire.

22                              MR. KESSLER:  Thank you.

23     DIRECT EXAMINATION

24     BY MR. KESSLER:

25          Q     Detective Banks, how long have you been

1                    Banks - People - Direct            725

2      working for the New York City Police Department?

3           A      16 years.

4           Q      How long have you been a detective in the New

5      York City Police Department?

6           A      Since 1990, six years.

7           Q      And specifically the Major Case Squad you're

8      presently assigned, how long do you work there for?

9           A      Three years.

10          Q      Directing your attention to April 1st, 1995.

11     Were you working on an investigation on that date?

12          A      Yes, I was.

13          Q      Was also Detective Michael Greene assigned

14     that investigation?

15          A      Yes, he was.

16          Q      Could you tell us, detective, specifically

17     the investigation you were assigned on April 1st, 1995,

18     what, if anything, was your assignment regarding that

19     investigation?

20          A      I was assigned to assist Detective Greene in

21     the abduction of a male and two females.  Two females

22     were being held for ransom.  On the night of April 1st

23     at approximately 9:00 p.m. I was in 1 Police Plaza in

24     Manhattan, downtown Manhattan, main office of the Major

25     Case Squad.  And I was dispatched to go to an address in

```
1                      Banks - People - Direct          726

2    Queens to do a surveillance on the location.

3         Q    Now, do you recall that location in Queens

4    you were dispatched to?

5         A    Yes.

6                   THE WITNESS:  If I can refresh my

7              memory, your Honor --

8                   THE COURT:  Yes.

9                   THE WITNESS:  -- with the voucher?

10                  THE COURT:  Refresh your memory.

11        A    It was 133-34 59th Avenue.

12        Q    In what section is that in?

13        A    That's in Flushing, Queens.

14                  MR. SCHECTER:  Your Honor, I would ask

15             the detective what he was using to refresh

16             his recollection?

17                  THE WITNESS:  That was one of the

18             vouchers I had prepared.

19        Q    And who was it that sent to you that

20   particular location?

21        A    I was sent there by my supervisor, Lieutenant

22   Tartaglia.

23        Q    Now, could you tell us were you in that

24   vicinity at about 12 o'clock that night?

25        A    Yes, I was.
```

1                    Banks - People - Direct            727

2          Q     Could you tell the members of the grand

3     jury --

4                THE COURT:  This is a regular jury.

5          Q     I'm sorry.  Could you tell the members of the

6     jury approximately what you saw at that time at that

7     location?

8          A     About 12:05 a.m. into the, just into the

9     morning of April 2nd, I observed two male and two female

10    Asians walking from a house.  And they entered a car.

11    The two males got into the front of -- the two front

12    seats of the car.  The two females got into the rear

13    seats of the auto.

14         Q     After -- where did you first see these two

15    men and two women?

16         A     I observed them as they were walking and just

17    about got to the sidewalk from the house.  The house is

18    set back from the sidewalk.  Residential neighborhood.

19         Q     And describe what happened as they entered

20    this auto.

21         A     As I said, they entered an auto that I had

22    been having -- had under observation from 10 o'clock.

23    Two males entered the front of the auto; one in the

24    driver's seat, one in the passenger seat.  The two

25    females entered the rear; one on the driver's side, one

Case 1:16-cv-01166-RJD Document 8-8 Filed 11/30/16 Page 39 of 156 PageID #: 1211

2     on the passenger side.

3          Q     After they entered the car, what steps did

4     you take next?

5          A     The car pulled off -- it's a one-way street

6     going westbound.  The car pulled from the curb.  We

7     followed the car for approximately five or six blocks.

8          Q     Were you in a marked patrol car or --

9          A     I was in an unmarked, which is the Crown

10    Victoria with tinted windows.

11         Q     Were you in uniform or plainclothes?

12         A     Plainclothes.

13         Q     Approximately how far did you follow this car

14    for?

15         A     About five or six blocks.

16         Q     What happened during that five or six blocks?

17         A     We just kept the car under observation.  It

18    got to the corner of College Point Boulevard and Horace

19    Harding Expressway.  It was on Horace Harding

20    Expressway, the service road of the Long Island

21    Expressway at College Point Boulevard, in the right-hand

22    lane when it stopped at a red traffic light.

23         Q     Could you see into their car from where you

24    were?

25         A     What happened was my partner was driving.  I

1

2     was in the front passenger seat.  We pulled alongside

3     their car.  I was even with the rear seat when my

4     partner stopped the car.  I observed two females sitting

5     in the back seat of the car.  The two females I observed

6     were the two kidnap victims we were investigating.

7          Q     How did you know they were the kidnap --

8                     MR. SCHECHTER:  Objection.

9                     MR. KESSLER:  I'm sorry?

10                    THE COURT:  He objected to the term

11              kidnapping.

12         Q     The two women you saw, have you ever seen

13    them or pictures of them before?

14         A     Yes, I had.

15         Q     Could you tell us the circumstances of that?

16         A     I had Polaroid photographs of them in my

17    possession at that time.

18         Q     Do you know where those Polaroid photos came

19    from?

20                    MR. SCHECTER:  Objection.

21                    THE COURT:  Overruled.

22         A     Detective Greene supplied me with them.

23         Q     Now, once you observed the two women in the

24    car were the same two you had the two Polaroid photos

25    of, what steps did you take next?

2        A    My partner, Detective Matt Kelly, was

3    driving.  Pulled our car directly in front of their car.

4    The light was still red.  I exited the passenger door.

5    My partner exited the driver's door.  We approached the

6    auto and placed the two males under arrest.

7        Q    The two males that you placed under arrest,

8    do you know their names?

9        A    Yes, I do.

10                 THE WITNESS: If I can again refresh my

11                 memory, your Honor?

12                 THE COURT:  You can refresh your

13                 recollection.  Just tell us --

14                 THE WITNESS:  Yes, it's from the

15                 vouchers I prepared, your Honor.  It's

16                 Mr. Hai Zheng.

17                 MR. SCHECTER:  Your Honor, I'm going to

18                 object.  He is reading from something.

19                 THE COURT:  All right.  Sustained.

20                 Don't read.  If you're refreshing your

21                 recollection, refresh your recollection and

22                 then testify.

23       A    That's Mr. Hai Zheng and Mr. Qin Zheng.

24       Q    Who was driving?

25       A    Mr. Hai Zheng.

1                        Banks - People - Direct              731

2          Q      Was there anything in front of the automobile

3     after you stopped it?

4          A      No.  Other than our car, no.

5          Q      In their car was there anything in the front

6     of their car, any property?

7          A      Oh, I'm sorry.  I thought you meant in front

8     of their auto.  When we took them out of the car, I

9     recovered a cellular telephone on the front passenger

10    floor of their auto.

11         Q      And that cellular telephone you recovered

12    from the front passenger side of their auto, did you

13    give that a particular voucher number?

14         A      Yes, I did.

15         Q      And do you remember it by heart or do you

16    have to use something to refresh your recollection?

17                        THE WITNESS:  If I can take a copy of

18                        the voucher again.

19                        THE COURT:  You can refresh your

20                        recollection.

21         A      Yes, I do.

22         Q      Does that refresh your memory as to that?

23         A      Yes, I do.

24         Q      What voucher number is that?

25         A      That's F as in Frank 877805.

| | | |
|---|---|---|
| 1 | Banks - People - Direct | 732 |

2          MR. KESSLER:  Can I have this marked

3     again People's 9.

4          THE COURT:  People's 9.  Mark that

5     People's 9 for identification.

6          (People's Exhibit 9 marked for

7          identification.)

8     Q    Detective, I'm going to ask you to take a

9     look -- open up People's number 9.

10    Detective, do you recognize what People's number 9

11    is?

12    A    Yes, I do.

13    Q    What do you recognize that to be?

14    A    I recognize this to be the cellar phone I

15    recovered on the night of, or the morning of, April 2nd

16    from the defendant's auto at Horace Harding Expressway.

17    And I vouchered it.

18    Q    How do you know that's the same telephone?

19    A    I had vouchered it, sealed the bag.  And

20    beside recognizing the phone, I recognize the similar

21    voucher number in the sealed envelope.

22    Q    You say the same voucher number.  In the New

23    York City Police Department is each voucher number

24    distinct?

25    A    Yes, they are.

1                    Banks - People - Voir Dire/Defendant        733

2          Q     How did you -- when was the next time you saw

3     that cellular phone you identified?

4          A     When I removed it from the property clerk

5     last Thursday afternoon.

6          Q     When you went to the property clerk, what

7     voucher number did you ask for?

8          A     Was the same one I had vouchered it under.

9          Q     Is that phone in the same or substantially

10    the same condition now as it was at the time you

11    vouchered it?

12         A     Yes, it is.

13                    MR. KESSLER:  I'd ask People's 9 be

14               moved into evidence.

15                    (Shown to defense counsel.)

16                    MR. SCHECTER:  May I have a brief voir

17               dire?

18                    THE COURT:  Yes.

19    VOIR DIRE BY

20    MR. SCHECTER:

21         Q     Detective, did you make any markings on the

22    phone itself?

23         A     Yes, I believe I initialed it.

24         Q     Can you show me where, if you can

25    determine --

```
 1                    Banks - People - Voir Dire/Defendant     734

 2          A     Not unless it's opened.  It's on the inside

 3    flap of the phone.

 4                      (The detective opened the bag.)

 5          A     I'm sorry, counselor.  It's on the outside of

 6    the phone on -- it's on the side carved in, S.B.

 7          Q     Detective, do you know when you made that

 8    marking?

 9          A     Yes, when I vouchered it.

10          Q     And what time was that?

11          A     Sometime the early morning of the 2nd of

12    April.

13          Q     Did you -- when you originally discovered

14    that phone in the vehicle, what did you do with it?

15          A     Put it in my pocket.

16          Q     Did there come a time -- between the time

17    that you vouchered it at the property clerk and the

18    time -- from the original time, did you ever recover any

19    other phones?

20          A     Yes, I did.

21          Q     Where did you put them?

22                      MR. KESSLER:  Objection.  Beyond the

23                      scope.

24                      THE COURT:  Sustained.  That's not a

25                      voir dire.
```

```
 1                    Banks - People - Direct            735

 2                    MR. SCHECTER:  Your Honor, could I have

 3               just one moment?

 4        Q      And the voucher, detective, the voucher that

 5   you were referring to originally, when did you prepare

 6   that voucher?

 7        A      When I vouchered it the early morning hours

 8   of April 2nd.

 9                    MR. SCHECTER:  Your Honor, I would

10               object to it.  I don't believe there's been

11               enough to link it at this stage.

12                    THE COURT:  Overruled.  Mark it in

13               evidence.  It will People's 9.

14                    (People's Exhibit 9 marked in evidence.)

15   DIRECT EXAMINATION (Continued)

16   BY MR. KESSLER:

17        Q      Now, detective, when you were at the scene

18   did you have a cellular phone?

19                    THE COURT:  What scene are you talking

20               about?

21                    MR. KESSLER:  At Horace Harding

22               Expressway.

23        Q      Did you have a cellular phone of your own?

24        A      Yes, I did.

25        Q      And were you in contact with anyone while you
```

1                          Banks - People - Direct                736

2      were on Horace Harding Expressway?

3          A      Yes, I was.

4          Q      Who were you in contact with?

5          A      I called my office in One Police Plaza in

6      Manhattan.  And I spoke to an Asian speaking

7      detective -- actually it was a police officer, I'm

8      sorry, from the Port Authority Police Department that

9      was in my office.

10         Q      What was the purpose of you contacting the

11     Asian port authority officer?

12                     MR. SCHECTER:  Objection.

13                     THE COURT:  Overruled.

14         A      The two women didn't speak English.  I wanted

15     to be able to speak to them.  I called the Asian officer

16     at my office to act as interpreter.

17                     MR. SCHECTER:  Objection to what he

18                     wanted.

19                     THE COURT:  Sustained.

20         Q      Without telling us what was said, did you use

21     the person from the port authority as an interpreter for

22     the two of them?

23         A      Yes, I did.

24         Q      After that conversation where did you go

25     next?

1

2       A       I went back to the location of 59th Avenue,

3    134th Street.

4       Q       When you got back to that location, what, if

5    anything, did you do when you got there?

6       A       I spoke to the landlord who lived in the

7    upstairs of the house.

8       Q       And after the conversation with the landlord,

9    where did you go?

10      A       I entered the side entrance which led to the

11   basement apartment.

12      Q       Once inside the basement apartment, what, if

13   anything, did you observe?

14      A       There was a two -- it was a two-bedroom

15   apartment.  I observed in the one bedroom a mattress on

16   the floor.  On the floor of the mattress I observed an

17   automatic handgun and three cellular phones.

18      Q       With regard to the automatic handgun, what,

19   if anything, did you do with that?

20      A       I vouchered it later on at the Major Case

21   Squad office.

22      Q       The handgun, do you have that with you today?

23      A       Yes, I do.

24              MR. KESSLER:  Could we have that marked?

25              THE COURT:  People's 10 for

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 49 of 156 PageID #: 1221

2                    identification.

3                         (People's Exhibit 10 marked for

4                    identification.)

5          Q      Detective, I'm going to hand you what has

6     been marked People's 10 for identification.  Do you

7     recognize what that is?

8          A      Yes, I do.

9          Q      What do you recognize that to be?

10         A      I recognize this to be the handgun I

11    recovered from the basement apartment on 59th Avenue on

12    April 2nd.

13         Q      At the time you recovered the handgun it was

14    loaded or unloaded?

15         A      It was loaded.  There were six rounds in the

16    clip.  The clip was in the gun.

17         Q      What, if anything, did you do with the gun --

18    strike that.

19         What, if anything, did you do with the clip and the

20    ammo when you vouchered it?

21         A      I removed the clip from the gun.  Later on

22    that night I vouchered both.

23         Q      On either the clip or the gun did you

24    anywhere indicate your initials?

25         A      No, I did not.

1                        Banks - People - Direct                739

2          Q     On the clip itself did you put your initials?

3          A     Yes, I did.

4          Q     With regard to the gun itself, did you

5     voucher that under a particular voucher number?

6          A     Yes, I did.

7          Q     Tell us if you have to refer to your notes.

8     The voucher number you vouchered the handgun under --

9          A     F as in Frank 881238.

10         Q     And regarding the clip and the ammunition,

11    you vouchered that under a particular voucher number?

12         A     Yes, I did.

13         Q     What voucher number was that?

14         A     That was F as in Frank 881239.

15         Q     The clip, the ammunition, and the gun that is

16    in -- has been marked for identification as People's 10,

17    other than those two other papers that are attached to

18    that, are the handgun, the clip, and bullets, in the

19    same or substantially the same condition now as the time

20    you vouchered it?

21         A     Yes, they are.

22               MR. KESSLER:  Your Honor, at this time

23               I'd ask the gun, the clip, and the ammunition

24               be introduced into evidence.

25               THE COURT:  Show it to counsel.

1          Banks - People - Voir Dire/Defendant    740

2                 (Shown to defense counsel.)

3                 MR. SCHECTER:   Your Honor, could I have

4           a brief voir dire?

5                 THE COURT:   Yes.

6   VOIR DIRE BY

7   MR. SCHECTER:

8         Q    Detective, did you mark anything on the gun

9   itself?

10       A    No, I did not.

11       Q    The only thing you marked was on the clip?

12       A    On the clip and the rounds itself.

13       Q    Now, do you know what time you recovered that

14   weapon?

15       A    Approximately -- no, I guess between 12:30

16   and 1:00 a.m.

17       Q    Did you -- did you put in any papers marking

18   where it was recovered?

19       A    No, I did not.

20       Q    Did you have -- did you just put it in your

21   pocket?

22       A    No, I did not.

23       Q    Where did you put it?

24       A    I unloaded it.  I put the clip in my pocket.

25   I put the gun in my waistband.

1                          Proceedings                    741

2          Q      What?

3          A      Waistband.

4          Q      And you had it in your waistband until you

5    vouchered it?

6          A      That's correct.

7                 MR. SCHECTER:   Your Honor, could I

8          have a sidebar?  I have an objection to it.

9          I would like to go on the record prior to it

10         being introduced.

11                (The following proceeding occurred at

12         sidebar.)

13                MR. SCHECTER:   Your Honor, I'm objecting

14         to this weapon as being an uncharged crime,

15         the reason being as follows.  The only count

16         in the indictment charges my client with

17         possession with intent to use unlawfully

18         against another person.  There's been no

19         connection of this gun to my client.  There's

20         been no testimony it was ever shown to either

21         of the complaining witnesses at the time that

22         it was recovered to show that it was the same

23         gun that he used, which will show that

24         possession with intent to use -- or it was

25         the gun that was used in any of the

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 53 of 156 PageID #: 1225

1

2      kidnapping related incidents -- that would

3      show this was the gun.

4           Secondly, your Honor, there's been no

5      testimony from any of the women at this trial

6      they have used the gun in saying this was the

7      same gun that was used to quote, terrorize

8      them, or hold them hostage or whatever.

9           MR. KESSLER:  Judge --

10          MR. SCHECTER:  Thirdly, your Honor, he

11     says he went into some basement apartment.

12     He went into some apartment.  There's been no

13     testimony linking my client to that

14     apartment.  The women said they did not see

15     where any police officers went.  There's been

16     no testimony he was directed to go into that

17     apartment by any of the women, your Honor.

18          As such, in the totality, there's been

19     no link of this by any of the complaining

20     witnesses to my client.  Yes, I would say a

21     gun was recovered in a basement apartment.

22     He's not being charged with possession.  He's

23     been charged with possession with intent to

24     use.  And it would have to be some link of it

25     from any of the complaining witnesses linking

1                     Proceedings                743

2          him to this weapon, or the co-defendant to

3          this weapon, which has not been done in this

4          case.

5              MR. KESSLER:  We have shown that, one,

6          the gun was used during the abduction.  Two,

7          the gun was used and used against them

8          during -- in the apartment in the basement

9          they were held.  The witnesses testified they

10         brought the police back to the basement

11         apartment where they were being held.  This

12         gun is found in the basement apartment.

13         Circumstantially this jury can infer this was

14         the gun being used to terrorize these people.

15             Mr. Schecter can argue regarding the gun

16         that someone else planted it thereafter.

17         That's an argument he can present.  But I

18         think inferentially, based upon all the

19         evidence, the jury can infer that was one of

20         the guns used during the abduction and/or

21         during the kidnapping.

22             THE COURT:  I'm going to overrule the

23         objection.

24             MR. SCHECTER:  I respectfully except.

25             (The following proceeding took place in

1               Banks - People - Direct          744

2          open court.)

3               THE COURT:  Your objection is overruled.

4          Mark People's 10 in evidence.

5               (People's Exhibit 10 marked in

6          evidence.)

7    DIRECT EXAMINATION

8    BY MR. KESSLER:

9          Q     Detective, while you were inside that

10   basement apartment, other than the handgun you testified

11   that you recovered, did you recover any other property?

12         A     Yes, I did.

13         Q     What else did you recover inside the

14   premises?

15         A     Three additional cellular phones.

16         Q     Tell us where they were.

17         A     They were lying on the bed, the mattress,

18   along with the gun.

19         Q     Did you -- what did you do with the three

20   cellular phones you saw in the house?

21         A     I vouchered them also.

22         Q     Did you voucher this under a particular

23   voucher number?

24         A     Yes, I did.

25         Q     Could you tell us what number that was?

1                      Banks - People - Direct                745

2        A     F as in Frank 877804.

3                    MR. KESSLER:   Your Honor, could I have

4              this marked People's 11.

5                    THE COURT:   Mark People's 11 for

6              identification.

7                    (People's Exhibit 11 marked for

8              identification.)

9        Q     Detective, I'm going to hand you what has

10   been marked People's number 11 for identification and

11   ask if you recognize what that is?

12       A     Yes, I do.

13       Q     What do you recognize that to be?

14       A     I recognize this to be the three cellular

15   phones recovered from the basement apartment on 59th

16   Avenue on April 2nd and vouchered back in my office

17   sometime later that morning.

18       Q     After you vouchered them, when was the next

19   time you saw them?

20       A     When I took them out of the property clerk's

21   office last Thursday morning.

22       Q     Is there a particular voucher number you

23   vouchered them under?

24       A     Yes, there was.

25       Q     What voucher number was that?

1                Banks - People - Voir Dire/Defendant      746

2        A     F as in Frank 877804.

3        Q     When you went to the property clerk's, what

4    voucher number did you give them?

5        A     The same voucher number.

6        Q     What, if anything, did they supply you?

7        A     Same cellular phones they were vouchered

8    under.

9        Q     Are they in the same, substantially the same

10   condition, now they were then at the time you vouchered

11   them?

12       A     They appear to be, yes.

13             MR. KESSLER:  I ask People's 11 be

14             marked in evidence.

15             (Shown to counsel.)

16   VOIR DIRE BY

17   MR. SCHECTER:

18       Q     Detective, did you make any markings on

19   this -- on these phones?

20       A     No, I did not.

21       Q     What did you do with these phones when you

22   recovered them?

23       A     I carried them out in my hands to the car,

24   carried them to 1 Police Plaza, and vouchered them.

25       Q     Were you the driver of your vehicle?

1

2       A     No, I wasn't.

3       Q     So they were always in your hands?

4       A     Or sitting next to me on the seat.   That's

5  correct.

6       Q     On one of the phones there is a number.   Was

7  this on the phone like that?

8       A     No, it was not.

9       Q     Did you put this paper on the phone?

10      A     No, I did not.

11      Q     Do you have any idea how this number got

12  there?

13      A     Yes, I do.  When I got back to 1 Police --

14            THE COURT:  The answer is yes you do?

15            THE WITNESS:  Yes, I do.

16            MR. SCHECTER:  Your Honor, I would have

17            no objection, but if it's shown to the jury

18            that this piece of paper would be withdrawn,

19            as it was not part of the original vouchering

20            of the phone.

21            THE COURT:  Let me see that.  Give it to

22            the court officer.

23            Well, I will admit it into evidence

24            without that number.

25            MR. SCHECTER:  Okay.

```
1                    Banks - People - Direct          748

2                    THE COURT:  That is not included in the

3             evidence.

4                    There being no objection other than

5             that, People's 11 is now in evidence, the

6             three cellular phones.

7                    (People's Exhibit 11 marked in

8             evidence.)

9     DIRECT EXAMINATION

10    BY MR. KESSLER:

11        Q     Detective, did you recover any other gun on

12    the day of April 2, 1995 other than the one that's been

13    marked in evidence?

14        A     No, I did not.

15        Q     Did you recover any other phones other than

16    the one that's been marked in evidence?

17        A     No, I did not.

18        Q     Did you arrest any other people on that day

19    other than the two people that you say you stooped in

20    the automobile?

21        A     No, I did not.

22                   MR. SCHECTER:  Objection.

23                   THE COURT:  Overruled.

24                   I assume you mean pertaining to this

25             case.
```

1                    Banks - People - Direct                749

2          Q      I'm saying any case on April 2nd.   Did you

3     make any other arrest?

4          A      No, I did not.

5          Q      When you stopped the car could you tell us

6     were the women kept with the two men you stopped or

7     separated?

8          A      They were in the rear seat, both.   One was in

9     the rear passenger -- one was behind the passenger.   One

10    was behind the driver.   Both females were in the rear

11    seat.

12         Q      That's not my question.

13                     MR. KESSLER:   Move to strike.

14         A      I'm sorry.

15         Q      My question is, after you stopped the car,

16    what did you do with the women?   What did you do with

17    the men?

18         A      The women were placed in my car.   The two

19    arrested defendants were placed in separate police cars.

20                     MR. KESSLER:   Can I have just ask the

21                     witness be shown what is in evidence as 7, 6

22                     and 7.

23                     (Shown to witness.)

24         Q      Detective, do you recognize what is depicted

25    in number 6 and 7?

1                          Banks - People - Direct              750

2        A      Yes, I do.

3        Q      What do you recognize that to be?

4        A      I recognize it to be the lineup that was

5     conducted on the 2nd of April.

6                       MR. KESSLER:  Have him shown People's 5

7                and 6.

8                       COURT OFFICER:  Did you want 5 and 6 and

9                7 and 8?

10                      MR. KESSLER:  I think it would be the

11               other --

12                      THE COURT:  6 and 7 are separate.

13                      MR. KESSLER:  Can I have the number on

14               this one -- 7 and 8.

15                      (People's Exhibits 7 and 8 shown to

16               witness.)

17       Q      Detective, do you recognize what is depicted

18    in number 7 and 8 that's been marked in evidence?

19       A      Yes, I do.

20       Q      What do you recognize them to be?

21       A      Exhibit 7, I recognize a polaroid photo of

22    the driver of the auto I arrested on that night.  And --

23       Q      Do you know the name of the driver?

24       A      Excuse me?

25       Q      The name of the driver?

1                 Banks - People - Direct          751

2     A     Yes, Mr. Zheng.

3     Q     Do you know his first name?

4     A     Yes, I do.

5            MR. KESSLER: Your Honor, if I can,

6       Mr. Hai Zheng.

7     Q     Now, you pointed at an individual and

8 indicated he was the driver. Could you just describe an

9 article of clothing the person you just previously

10 pointed --

11     A     He is wearing -- sitting at defense table

12 wearing a green, white, and blue striped shirt.

13            THE COURT: Indicating the defendant.

14     Q     After you arrested the defendant Hai Zheng

15 behind the wheel of the automobile, what happened to him

16 next?

17     A     He was placed in one of the police cars that

18 were on the scene, one of the unmarked cars. After I

19 spoke to the victims via the translator, we responded

20 back to the address on 134th Street and 59th Avenue.

21            MR. SCHECTER: Your Honor, I'm going to

22            object to this. Asked and answered already

23            before.

24            THE COURT: Overruled.

25     Q     What, if anything, happened to the defendant

1

2    Hai Zheng whom you say appeared behind the wheel of the

3    auto?

4        A.    He was -- he was in one of the police cars,

5    unmarked cars.  He was also brought back to the scene of

6    the apartment and then taken to 1 Police Plaza.

7        Q    Regarding the other individual that you

8    arrested who was not the driver, Qin Zheng, what, if

9    anything, happened to him?

10        A    He also was placed in a separate unmarked

11    car, brought back to 59th Avenue and taken back to 1

12    Police Plaza.

13        Q    Detective, to your knowledge were those the

14    only two people arrested in connection with this case?

15        A    To my knowledge, yes, they were.

16                MR. KESSLER:  I have nothing further for

17                this witness.

18                THE COURT:  Cross examination.

19    CROSS EXAMINATION

20    BY MR. SCHECTER:

21        Q    Detective Banks, you were referring to

22    paperwork that you prepared.  Did you prepare any notes

23    or memorandum in connection with this incident?

24        A    Notes, no.

25        Q    Memorandum?

1

2    A    No.

3    Q    DD5s?

4    A    Yes.

5    Q    DD5s?

6    A    Yes, I did.

7    Q    Police vouchers?

8    A    Yes, I did.

9    Q    Any other paperwork?

10    A    Not to my knowledge, no.

11    Q    Well, you have your file of what you prepared

12 here?

13    A    Excuse me?

14    Q    Do you have your file of what you prepared?

15    A    I didn't have a file.  Detective Greene had a

16 file.

17    Q    Well, do you have your paperwork here today?

18           MR. KESSLER:  Objection.

19           THE COURT:  Sustained.

20    Q    Do you have copies of what you prepared?

21    A    I have copies of the vouchers.

22    Q    You have any copies of your DD5s?

23           MR. KESSLER:  Objection.

24           THE COURT:  Sustained.

25    Q    Did you have -- did you prepare a memo book

1

2    in connection with this?

3         A     No, I did not.

4         Q     Do you have a memo book?

5                    MR. KESSLER:  Objection.

6                    THE COURT:  Sustained.

7         Q     I would ask you to show me what you referred

8    to before to refresh your recollection in connection

9    with this matter.

10                   MR. KESSLER:  Objection.

11                   THE COURT:  He stated the vouchers.  Do

12                   you see the vouchers?  Show him.

13                   (Shown to counsel.)

14                   THE COURT:  Let the record reflect

15                   counsel looked through the papers.

16                   MR. SCHECTER:  I'm returning it.

17        Q     Detective, at what shift were you working on

18   April 1st?

19        A     It was my day off.

20        Q     Did you get called -- called in?

21        A     Yes, I did.

22        Q     Do you know what time you got called in?

23        A     Sometime in the late morning, early

24   afternoon.

25        Q     Was that reflected in your memo book?

1                    Banks - People - Cross              755

2                    MR. KESSLER:  Objection.

3                    THE COURT:  Sustained.

4          Q     Did you mark down anywhere in any paperwork

5     what time you were called in?

6                    MR. KESSLER:  Objection.

7                    THE COURT:  Sustained.

8                    MR. SCHECTER:  Your Honor, please may I

9                    have a sidebar?

10                   THE COURT:  No.  Whatever record you

11                   want to make, make it later.  I don't see any

12                   relevance to that question.  That's my

13                   ruling.  You can make your record later.

14         Q     Detective, when you got to 1 Police Plaza,

15    who did you meet with?

16         A     Well, I first responded to the 5th Precinct

17    in Chinatown.

18         Q     Who did you meet with at that precinct?

19         A     Lieutenant Tartaglia, my superior officer.

20                   THE COURT:  You want to spell your

21                   partner's name for the court reporter.

22         A     The lieutenant, T-A-R-T-A-G-L-I-A.

23                   THE COURT:  Go ahead.

24         Q     Did there come a time that you went back to

25    the Major Case Squad office?

1                    Banks - People - Cross              756

2        A      Yes.

3        Q      What time was that?

4        A      A couple of hours after I was responding to

5    the 5th Precinct.

6        Q      When you were at the 5th Precinct did you

7    have any conversation with any civilian personnel who

8    may have been part of this incident?

9                    MR. KESSLER:  Objection.

10                   THE COURT:  Sustained as to the form of

11               the question.

12       Q      Beside for police officers, did you speak to

13   anyone else at the 5th Precinct?

14       A      No, I didn't.

15       Q      At that time were you advised -- who advised

16   you of what occurred in this incident?

17                   MR. KESSLER:  Objection, calls for

18               hearsay, which defense counsel has been

19               objecting to all through the trial.

20                   THE COURT:  Sustained as to the form of

21               the question.

22       Q      At the 5th Precinct, beside for Lieutenant

23   Tartaglia, who else did you have conversations with?

24       A      I don't recall what other detectives were

25   there other than Detective Greene and Detective Kelly.

Q    You said that you had a conversation with
Detective Greene and he gave you two pictures; am I
correct?

A    That's correct.

Q    Do you have those pictures with you?

A    No, I do not.

Q    What did you do with those pictures?

A    I returned them to Detective Greene.

Q    Now, when he showed you the two -- withdrawn.

Was that at the 5th Precinct where that occurred or
was that at 1 Police Plaza?

          THE COURT:  What occurred?

Q    Where you got the pictures.

A    That was at 1 Police Plaza.

Q    Were you present when he received the
pictures?

A    No, I was not.

Q    When he gave you the pictures did he tell you
where those people were?

A    No, he did not.

Q    Did he give you any information of why he was
giving you those pictures?

A    He didn't give me any information.

          THE WITNESS:  If I can explain myself,

1                    Banks - People - Cross              758

2              your Honor.

3                    THE COURT:   Just answer the questions.

4         Q    Did someone else give, give you information

5    concerning those two pictures?

6         A    The pictures were given to me shortly after I

7    arrived at 1 Police Plaza.

8         Q    Now, what time was it you were sent out to

9    a -- what time did you leave 1 Police Plaza?

10        A    About 9:00 p.m.

11        Q    Were you given a specific -- when you left 1

12   Police Plaza, were you given a specific street address

13   to go to or a general vicinity?

14        A    Yes, a specific street, specific location, a

15   specific auto --

16        Q    Excuse me?

17        A    A specific --

18                   THE COURT:   Wait a minute.  Let the

19                   court reporter read that back.

20                   (The court reporter read back the

21                   requested testimony.)

22        Q    What time did you arrive there?

23        A    About 9:30, 940.

24                   THE COURT:   Arrive where?

25                   MR. SCHECTER:   At the -- at that

1                          Banks - People - Cross            759

2                     location.

3                          THE COURT:  What location?

4                          MR. SCHECTER:  Where he was sent, that

5                     specific street.

6                          THE COURT:  You haven't gotten there.

7                     The question was, did he get specific

8                     information.

9          Q     Is that where you went?

10         A     I went to the location that I was sent to.

11    That's correct.

12         Q     Make any stops on the way?

13         A     No, I did not.

14         Q     And it was a little after midnight when you

15    first observed people in that area?

16         A     No, that's not correct.  It's a residential

17    area.  I observed people for the two hours I was there.

18         Q     Was it at a little bit after midnight that

19    you first took any action in connection with this

20    incident?

21         A     Yes, that's correct.

22         Q     Now, the four people that you say you saw got

23    into a vehicle, did you see where they came from?

24         A     I saw the area they came from.  It was one of

25    two houses.

Case 1:16-cv-01156-RJD   Document 8-8   Filed 11/30/16   Page 71 of 156 PageID #: 1243

1

2          Q      Am I correct in saying you were not able to

3    determine exactly which house they came from?

4          A      That's correct.

5          Q      How far were you from them at the time you

6    observed these four individuals?

7          A      Approximately one half block.

8          Q      Were you able to see what these four

9    individuals looked like?

10          A      Other than being two males and two females,

11    no.

12          Q      Can you describe the vehicle that they got

13    into?

14          A      Yes, I can.  It was a 4-door Nissan.

15                 THE WITNESS: If I can refresh my memory,

16                 your Honor, I will give you the license

17                 plate.

18          A      It was a gray 4-door Nissan, New York license

19    plate G as in George, 480 R as in Robert, F as in Frank.

20          Q      Now, you say it was a gray car, vehicle?

21          A      Correct.

22          Q      Do you know if it was a light gray or dark

23    gray?

24          A      I don't recall.

25          Q      Would you have made any notes or memoranda

1                        Banks - People - Cross          761

2     that would indicate what color gray?

3           A     No, I wouldn't.

4           Q     You have nothing with you that would help you

5     refresh your recollection?

6           A     No, I don't.

7           Q     You said that Hai Zheng was driving the

8     vehicle?

9           A     That's correct.

10          Q     And what was the other person's name who was

11    in the vehicle?

12          A     Qin Zheng.

13          Q     When did you get those names?

14          A     When I got back to the Major Case Squad

15    office.

16          Q     Do you remember what time that was?

17          A     No, I don't.

18          Q     Do you remember testifying in the Grand Jury

19    in this proceeding on July 17th?

20          A     Vaguely, yes.

21          Q     Do you remember being asked these questions

22    and giving these answers?  Page 45, we will start on

23    line 4.

24                      "QUESTION:  What did you do next?

25                      "ANSWER:  My partner and I entered the

1

2          car and placed the two males under arrest."

3      Do you remember you being asked that question and

4   giving that answer?

5      A     I don't recall that.  I don't recall that,

6   but that's what occurred.

7      Q     "QUESTION:  And tell us what was -- what were

8   the names of the people that you placed under arrest?

9                  "ANSWER:   The driver of the auto was Qin

10                  Zheng, Q-I-N.   The passenger was Hai, H-A-I

11                  Zheng."

12      Do you remember being asked those questions and

13   giving those answers?

14      A     No, I don't.

15                  MR. SCHECTER:   Will the District

16                  Attorney stipulate that was his testimony on

17                  July 17th?

18                  MR. KESSLER:   I will stipulate that is

19                  the recording the grand jury stenographer

20                  made, yes.

21      Q     Do you remember being asked this question and

22   giving this answer?

23                  "QUESTION:   And tell us if there is any

24                  difference in physical characteristics

25                  between these two people?

1               Banks - People - Cross          763

2                    "ANSWER: Yes.  The driver Qin Zheng had

3               a crew cut, as he was a little bit heavier

4               weight wise.  The passenger was Mr. Hai

5               Zheng, who had longer hair and was thinner."

6          Do you remember being asked that question and

7     giving that answer?

8          A    No, I don't.

9                    MR. SCHECTER:  Will the District

10              Attorney stipulate that's what the minutes

11              say?

12                   MR. KESSLER:  I will stipulate what is

13              what the grand jury stenographer had written.

14              Same stipulation, yes.

15         Q    Now, detective, is your memory better today

16    concerning this incident than it was on July 17th?

17         A    It's the same as it was July 17th.  I don't

18    know what I testified to that day, but what I'm telling

19    you today is that was the driver.

20         Q    Did you ever read -- you have had

21    conversation with the District Attorney over the past

22    few days; am I correct?

23         A    Yes, I have.

24         Q    And during that time did you read the grand

25    jury testimony?

1

2      A      No, I did not.

3      Q      Well, let me show you your grand jury

4   testimony.

5                   MR. KESSLER:   Judge, I object.

6                   THE COURT:   Sustained.

7      Q      Are you saying that in the grand jury you

8   never testified to Hai Qin -- Hai Zheng being the

9   passenger --

10                  MR. KESSLER:   Objection, asked and

11                  answered.

12                  THE COURT:   Sustained.

13     Q      Now, you said that you called for a -- you

14   called back 1 Police Plaza.  There was someone there who

15   was used as an interpreter?

16     A      That's correct.

17     Q      Do you know that person's name?

18     A      No, I don't have it in front of me.

19     Q      Did you have anything that would help you

20   refresh your recollection as to who that person was?

21     A      No, I don't.

22     Q      Did you at any time mark down on any pieces

23   of paper the name of that person?

24     A      No, I did not.

25     Q      While you were out in the field, either on

1   Horace Harding Boulevard --  am I correct in saying

2   that's the service road to the Long Island Expressway?

3       A     Horace Harding Expressway -- that's correct,

4   yes.

5       Q     There or any place else -- when you were back

6   at the other location in Queens --

7               THE COURT:  What other location are you

8               talking about?

9               MR. SCHECTER:  I believe we are talking

10              about 59th Avenue.

11      Q     At any time after you made any -- did you

12  take any notes?

13      A     No, I did not.

14      Q     With the two pictures did you have the names

15  of the two individuals?

16      A     I'm sorry, I didn't understand the question.

17      Q     Did you have the names of the two

18  individuals --

19              THE COURT:  At what point?

20      Q     -- that were on the pictures?

21      A     The names of the victims?

22      Q     Yes, the two females.

23      A     No, I didn't.

24      Q     When you had conversation -- withdrawn.

2          Now, where you stopped the vehicle, where was that

3     exactly?

4          A      That was on the Horace Harding Expressway

5     westbound at College Point Boulevard.

6          Q      Eastbound or westbound?

7          A      Westbound.

8          Q      Now, when you used the translator at the

9     scene, did you ask either of the two women what had

10    occurred?

11         A      Yes, I did.

12         Q      Did you mark it down anywhere?

13         A      No, I did not.

14         Q      How long were you -- was that at Horace

15    Harding Boulevard where you asked them what occurred?

16         A      Horace Harding Expressway, that's correct.

17         Q      How long did you speak to them at that time?

18         A      Between five and ten minutes.

19         Q      Where was Hai Zheng at that time?

20         A      In one of the unmarked police cars.

21         Q      Did you have any conversation with the women

22    when you were on 59th Avenue?

23         A      Yes, I did.

24         Q      Did you have any conversation with the women

25    back at 1 Police Plaza?

1

2      A     No, I did not.

3      Q     Any of the conversation that you had with the

4   women on 59th Avenue, did you ever mark anything down?

5                MR. KESSLER:  Objection, asked and

6                answered.

7                THE COURT:  No, overruled.

8      A     No, I did not.

9      Q     Do you remember how many DD5s you personally

10  filled out?

11     A     No, I do not.

12               MR. KESSLER:  Objection, relevance.

13               THE COURT:  Overruled.

14     Q     When you went into the basement apartment on

15  59th Avenue how many different rooms did you see?

16     A     There was -- as you walk down the stairs,

17  there was a hallway.  There were two bedrooms and a

18  kitchen area.

19     Q     Now, when my client Mr. Zheng was arrested,

20  did you search him?

21     A     Yes, I did.

22     Q     Did he have any weapons on him?

23     A     No, he did not.

24     Q     Did he have any keys on him?

25     A     I don't recall.

1

2     Q     Do you know if you found on my client or the

3  other gentleman any keys to the basement apartment?

4     A     I don't recall if either of them had keys on

5  them.

6     Q     Detective Banks, while you were speaking to

7  the District Attorney did you have an opportunity to

8  read your prior testimony of April 19th?

9     A     Was that the hearing?

10    Q     Yes.

11    A     Yes, that's correct.

12    Q     Will you look at the bottom of page 65.

13              THE COURT:  Wait a minute.  Do it the

14              right way.  Ask him questions.

15    Q     Will you look at the bottom of page 65 to see

16  if that helps refresh your recollection about whether

17  you found any keys on my client?

18              THE COURT:  You can do that.  Just

19              answer yes or no.

20              THE WITNESS:  Yes, your Honor.

21    Q     And go into the top of page 66.

22    A     No, it doesn't refresh my memory.

23    Q     Huh?

24    A     No.

25    Q     It doesn't refresh your memory.  Let me ask

1                      Banks - People - Cross              769

2       you this.  You just read this.  And do you remember on

3       April 17th being asked the following question and giving

4       the following answer?  Page 65, line 24.

5                       "QUESTION:  Did you find any keys on

6                   either of the two individuals for that

7                   apartment in the basement?

8                       "ANSWER:  Did I, no."

9       Do you remember being asked that question and

10      giving that answer?

11          A     Yes, I do.

12          Q     Well, at that time -- withdrawn.

13      And then do you remember being asked the following

14      question?

15                      "QUESTION:  Did you find any keys on

16                  either individual?

17                      "ANSWER:  Did I find any, no."

18      Do you remember being asked that question and

19      giving that answer?

20          A     Yes, I do.

21          Q     But that does not refresh your recollection

22      now whether you found any keys?

23                      THE COURT:  Sustained.  That's his

24                  testimony.

25          Q     But on April 17th do you remember testifying

1

2      that you didn't find any keys?

3                      THE COURT:  Sustained.  Asked and

4                answered.

5          Q      Now, how many different entrances were there

6      to the basement apartment that you saw on April, on the

7      morning of April 2nd?

8          A      There were two entrances to that apartment.

9      One would be the side door from the driveway which led

10     directly downstairs.  The other would be from the main

11     floor of the house.  Inside the house there was a door

12     that led to that same stairway.

13         Q      Which way did you get into the basement

14     apartment?

15         A      Driveway door.

16         Q      And was that door open when you went there?

17         A      No, it was not.

18         Q      How did you get -- did you get a key for that

19     location?

20         A      Yes, I did.

21         Q      Who did you get the key from?

22         A      The landlord that I spoke to.

23         Q      Now, when you went down the stairs you said

24     there were two bedrooms?

25         A      Correct.

1

2      Q      Can you describe the first bedroom coming

3      down the stairs that you saw?

4      A      As soon as you got to the bottom of the

5      stairs, the rooms were to the right.  There was -- it

6      would have been the second bedroom was adjacent to the

7      bottom of the stairs.  That's the first room I entered.

8      Q      How big was that room?

9      A      Very small bedroom.

10      Q      Can you approximate the size?

11      A      10 by 12.

12      Q      Now, what was in that bedroom?  Was there

13      anything in that bedroom?

14      A      Yes, it was -- there was a mattress on the

15      floor.  There was no furniture other than the mattress

16      and I think a quilt in the corner.

17      Q      The other bedroom, how big was that bedroom?

18      A      Approximately the same size.

19      Q      Was there anything in that room?

20      A      No, there was not.

21      Q      Do you remember what time you got back to the

22      basement apartment?

23      A      I'd say within a half hour of the arrest.

24      Q      And what time did you -- did you then go to 1

25      Police Plaza?

1

2          A    Yes, I did.

3          Q    And you took the two females and the two

4    males to 1 Police Plaza?

5          A    I took the two females.

6          Q    And do you know what time you got to 1 Police

7    Plaza?

8          A    I don't recall what time.  I guess it would

9    have been sometime after 2 o'clock.

10         Q    And do you remember what time you signed out

11   that day?

12         A    No, I don't.

13         Q    Were you present when a lineup was conducted?

14         A    No, I was not.

15         Q    Did you ever go into the room where the

16   lineup was conducted?

17         A    No, I did not.

18              MR. SCHECTER:   Can I see pictures 5 and

19              6, please.

20              (Shown to counsel.)

21              MR. SCHECTER:   Will you show these to

22              the witness.

23              (Shown to witness.)

24         Q    Detective, do you remember on direct

25   examination being shown those two pictures?

1                    Banks - People - Cross                773

2          A     Yes, I was.

3          Q     Now, you have no personal knowledge that's

4     what the lineup looked like?

5          A     No, that would be incorrect.

6          Q     So, in other words, when you say you

7     recognized it earlier as being the lineup, that would be

8     incorrect?

9                    MR. KESSLER:  Objection.

10         A     No.

11                   THE COURT:  Sustained.

12         Q     Then I'm correct in saying you have no

13    personal knowledge that was the lineup?

14                   MR. KESSLER:  Objection, asked and

15              answered.

16                   THE COURT:  Sustained.

17                   MR. SCHECTER:  It's still cross

18              examination, your Honor.

19                   THE COURT:  Go ahead.

20                   MR. SCHECTER:  I would ask he be allowed

21              to answer.

22                   THE COURT:  Answer the question.

23                   You repeat the question.

24                   MR. SCHECTER:  Will the court reporter

25              repeat the question?

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 85 of 156 PageID #: 1257

```
1
2              THE COURT:  Do you want me to ask the
3         court reporter to read the question?
4              MR. SCHECTER:  Yes.
5              THE COURT:  Yes, read the question.
6              (The court reporter read back the
7         question.)
8    A    No, that is not correct.
9    Q    Am I correct in saying you were not present
10   in the lineup when people were given numbers?
11   A    That's correct.
12   Q    And you never -- you said you never went into
13   the lineup to see what numbers anyone was given?
14   A    That's correct.
15   Q    Detective, did you ever see any of those
16   cellular phones being used?
17   A    No, I did not.
18   Q    And did you ever see that weapon being used
19   that you recovered?
20   A    No, I did not.
21   Q    Do you know if that weapon was ever sent for
22   fingerprint evidence?
23   A    No, I don't.
24   Q    Have you in the past ever sent weapon for to
25   be analyzed for fingerprints?
```

1                    Banks - People - Cross              775

2                    MR. KESSLER:  Objection.

3                    THE COURT:  Sustained.

4                    MR. SCHECTER:  Your Honor, can I have a

5          brief sidebar?

6                    (Sidebar discussion off the record.)

7          Q     If fingerprints evidence is requested, is it

8          the responsibility of the person vouchering the evidence

9          to make the request?

10                   MR. KESSLER:  Objection.

11                   THE COURT:  Sustained.

12                   MR. SCHECTER:  Just one moment, Judge.

13                   (Pause in the proceedings.)

14                   MR. SCHECTER:  Your Honor, I have

15         nothing further.

16                   MR. KESSLER:  Nothing further.  Thank

17         you.

18                   THE COURT:  You have another witness?

19                   MR. KESSLER:  Can I approach one moment?

20                   (Sidebar discussion off the record.)

21                   THE COURT:  You are going to recall

22         Detective Greene?

23                   MR. KESSLER:  Yes, Judge.  That will be

24         one second.

25                   (Detective Greene retook the witness

```
 1                    Greene - People - Cross              776

 2             stand.)

 3                  THE CLERK:  Detective, you're reminded

 4             you were previously sworn this morning and

 5             you're still under oath.  Do you understand

 6             that?

 7                  THE WITNESS:  Yes.

 8                  THE COURT:  You may cross examine,

 9             Mr. Schecter.

10                  MR. SCHECTER:  Your Honor, could I have

11             one moment to look at the memo book?

12                  (Pause in the proceeding.)

13     CROSS EXAMINATION

14     BY MR. SCHECTER:

15        Q     Detective, now what time did you arrive on

16     Saturday April 1st at Major Case?

17        A     Tell you the truth, counselor, I don't

18     remember.

19        Q     Do you have -- will you look at your memo

20     book.  Do you have your memo book with you?

21        A     No, what we have is the fax.  I believe what

22     I have there is the time Saturday from 1400 hours to --

23     I'm sorry, 2200.

24        Q     Why don't you take a --

25                  THE COURT:  Why don't you take look at
```

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 88 of 156 PageID #: 1260

1

2          it and refresh your recollection.

3     A    1400 hours Saturday to 2215 hours Sunday.

4     Q    That's time worked?

5     A    Yes.

6     Q    Now, when -- where was the first place that

7     you went on April 1st in connection with this incident?

8     A    1 Police Plaza.

9     Q    And at that time were you advised about this

10    incident?

11    A    Yes.

12    Q    And was it at that time that your lieutenant

13    assigned you to be the person who would oversee the

14    operation?

15    A    Correct, yes.

16    Q    And what exactly are the duties of the person

17    who -- would you consider yourself in charge of the

18    operation?

19    A    I think proper term would probably be

20    coordinate, to coordinate everything.

21    Q    You were the coordinator of the operation.

22    Would that mean you're in charge of all the paperwork

23    that is prepared during the course of the investigation?

24    A    No.

25    Q    Are you the one who directs people to go to

Case 1:16-cv-01166-RJD Document 6-8 Filed 11/30/16 Page 89 of 156 PageID #: 1261

2    different locations?

3         A    I assist, yes.

4         Q    You assist.  Did anyone else assist you in

5    coordinating this operation?

6         A    Just the commanding officers.

7         Q    Okay.  You showed me case files earlier, am I

8    correct, your case files?

9         A    Yes.

10        Q    To your knowledge does that have all the

11   paperwork from all the different officers who were

12   involved in connection with this incident?

13        A    I'm sorry.  Could you repeat your question?

14             THE COURT:  The court reporter will read

15             it back.

16             MR. KESSLER:  Judge, I object to this.

17             Does that question pertain to this officer,

18             to what paperwork he had?

19             THE COURT:  Read it back.

20             (The court reporter read back the

21             question.)

22             THE COURT:  I will allow the answer, if

23             he knows the answer.

24             If you know the answer, you can answer

25             it.

1

2      A     I really don't know the answer to that.

3      Q     Now, were you the officer who made the

4   determination to record phone conversations?

5      A     There are procedures that are followed

6   normally in regarding kidnappings, so.

7      Q     Well, do you know what time phone

8   conversations started to be recorded?

9             MR. KESSLER:  Judge, again I object

10            unless he has personal knowledge.

11            THE COURT:  All the questions are asked

12            of you referring to personal knowledge.

13     A     No.

14     Q     Would there be anything in your file that

15   would show what time phone conversations were started to

16   be monitered?

17            MR. KESSLER:  Objection.

18            THE COURT:  Sustained.

19            MR. SCHECTER:  Your Honor, on direct

20            examination the District Attorney was asking

21            him questions far afield about what he did.

22            THE COURT:  That may be so.  What you

23            objected to, I ruled.  He just objected and I

24            ruled.

25     Q     You said on direct examination that they were

1                    Greene - People - Cross                780

2      monitoring incoming calls?

3          A      Yes.

4          Q      Where were those incoming calls being made

5      to?

6          A      The residence.

7          Q      And you knew that --

8                    THE COURT:  What residence are you

9                  talking about?

10                   THE WITNESS:  The victim's residence.

11         Q      What was that address?

12                   MR. KESSLER:  Objection to the address.

13                   THE COURT:  Sustained.

14         Q      Whose address was that?  Without giving the

15     exact address, whose residence was that?

16         A      Victim's address.

17         Q      What was the name of the victim?  Who we are

18     talking about?

19                   MR. KESSLER:  Again, Judge, I object

20                 to -- if this officer was present and knows

21                 the person, that is one thing, but again we

22                 are calling for testimony from other

23                 witnesses.  That's why I'm objecting.

24                   MR. SCHECTER:  Your Honor, this witness

25                 on direct examination said they're monitoring

```
 1                      Greene - People - Cross          781

 2              incoming calls.

 3                      THE COURT:  I'm going to overrule the

 4              objection.

 5                      MR. SCHECTER:  Thank you.

 6                      THE COURT:  You can answer that if you

 7              know.

 8                      Can you repeat the question, please.

 9                      MR. SCHECTER:  Can the court reporter

10              repeat the question.

11                      THE COURT:  Can the court reporter

12              repeat the question.

13                      (The court reporter read back the

14              requested question.)

15      A       I'd like to clarify.  The residence doesn't

16      necessarily refer to where the person lives.  The

17      residence means where the incoming calls are coming to.

18      Q       Whose telephone was being monitered?

19                      THE WITNESS:  Refer to my notes, is that

20              all right?

21                      THE COURT:  You can refresh your

22              recollection.

23                      MR. SCHECTER:  The only thing I would

24              ask, just tell me what you were using to

25              refer --
```

1                    Greene - People - Cross          782

2          A    The Liu family, L-I-U.

3          Q    And do you know if the calls that were being

4     monitered with the Liu family was at their residence?

5          A    Yes.

6          Q    And what time did the monitoring start?

7          A    I have no idea.

8          Q    What time did you tell someone to start

9     monitoring the phone calls?

10         A    I did not instruct anyone to monitor the

11    phone calls.  It was not my place.

12         Q    Who was the one whose place it is to start

13    telling someone to start monitoring phone calls?

14                   MR. KESSLER:  Objection.

15                   THE COURT:  Sustained.

16         Q    Detective, when you arrived at 1 Police Plaza

17    at approximately 2:00 p.m., had you been advised that

18    there were monitoring of phone calls prior to your

19    arrival at 1 Police Plaza?

20         A    I don't remember.  What I remember is being

21    told that certain procedures were already in effect.

22         Q    Was one of those procedures the monitoring of

23    phone calls?

24                   MR. KESSLER:  Objection.

25                   THE COURT:  Sustained.

2       Q.    You said that there was monitoring of

3   incoming calls; am I correct?

4       A     Correct.

5                  MR. KESSLER:  Objection.

6                  THE COURT:  It's been asked and

7             answered.

8                  MR. SCHECTER:  Well, I'm going to ask

9             him another way.

10      Q     Am I correct?

11      A     Yes.

12      Q     What time were you advised of that?

13      A     Counselor, the technical response -- our

14  technical response unit when I arrived at 1 Police Plaza

15  was already starting procedures to monitor phone calls

16  and get the surveillance.  For me to give you an exact

17  time, it's difficult.

18      Q     That's fine.

19                 THE COURT:  I don't need your comments,

20            Mr. Schecter, please.

21      Q     You also said that teams were assigned to

22  surveillance; am I correct?

23      A     That's correct.

24      Q     Are you the -- were you the one -- were you

25  the person who assigned the teams surveillance?

```
 1                    Greene - People - Cross              784

 2        A     Through me they were assigned.

 3        Q     And part of that was the tracking of

 4   telephone calls?

 5        A     Correct.

 6        Q     Would that be different telephones than the

 7   call -- than the telephone that the monitoring was done

 8   on?

 9        A     Yes.

10        Q     And what time did you set that up?

11        A     Again, the teams were sent out.  Those teams

12   were responsible for those things, so.

13        Q     And you said this was all done pursuant to

14   procedures and court orders?

15        A     Correct.

16        Q     And you mentioned that there was an

17   eavesdropping warrant?

18        A     Correct.

19        Q     Do you know what time the eavesdropping

20   warrant was obtained.

21        A     Still could not give you a specific time, no.

22              MR. SCHECTER:  Your Honor, I would ask

23              that these four pages be marked Defendant's A

24              for identification.

25              THE COURT:  How many pages are there?
```

Case 1:16-cv-01166-RJD Document 8-8 Filed 11/30/16 Page 96 of 156 PageID #: 1268

2             MR. SCHECTER:   Four.

3             THE COURT:   Four pages, Defendant's A

4        for identification.

5             (Defendant's Exhibit A marked for

6        identification.)

7        Q    Detective, will you look at that.  Have you

8    ever seen that document, those documents before?

9        A    Yes.

10       Q    Will you look on page four.  Is that the page

11   where a court signed the eavesdropping warrant?

12       A    Yes.

13       Q    And is there a time, a date, and time when

14   that eavesdropping warrant was obtained?

15       A    There is a time on this that says 8:53.

16       Q    And a date?

17       A    April 1, 1995.

18       Q    And to your knowledge would that be the date

19   and time that the eavesdropping warrant was signed and

20   obtained?

21       A    Yes.

22       Q    And am I correct in saying that would be

23   after the incoming calls were being monitered and the

24   tracking of the phone, phones was being done?  Simple

25   yes or no.

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 97 of 156 PageID #: 1269

2        A     I wouldn't know.  You're asking me questions.

3   I didn't -- I did not obtain the warrant.  It was

4   another investigator.  So you're asking me questions --

5        Q     As the coordinator were you given the

6   warrant?

7        A     Eventually, yes.

8        Q     Beside for that warrant that you have in your

9   hand, did you ever see any other eavesdropping warrants

10  signed by any court?

11                    MR. KESSLER:  Objection.

12                    THE COURT:  Sustained.

13       Q     Did you ever receive any other eavesdropping

14  warrants?

15                    MR. KESSLER:  Objection.

16                    THE COURT:  Sustained.

17       Q     Detective, do you have any knowledge of any

18  other eavesdropping warrant being obtained except for

19  the one you have in your hand?

20                    MR. KESSLER:  Objection.

21                    THE COURT:  Overruled.

22                    Do you have any knowledge of any

23                other --

24                    THE WITNESS:  No, I don't.

25       Q     Detective, if the eavesdropping warrant was

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 98 of 156 PageID #: 1270

2     signed at 8:53 in the evening, had the monitoring of

3     phone calls already commenced?

4                         MR. KESSLER:  Objection.

5                         THE COURT:  Sustained as to the form of

6                    the question.

7          Q     Detective, did there come a time -- am I

8     correct in saying, detective, you were not present when

9     Hai Zheng was arrested?

10         A     That's correct.

11         Q     Detective, were other -- withdrawn.

12         You said that there was another location where --

13    that you were aware that there was a drop made; am I

14    correct?

15         A     That's correct.

16         Q     And when you say, drop made, would that be

17    the money changing hands?

18         A     Where the ransom was supposed to be made,

19    yes.

20         Q     And were you present at that location where

21    the drop was made?

22         A     No.

23         Q     If you know, was anyone arrested at that

24    location?

25                        MR. KESSLER:  Objection.

1                    Greene - People - Cross                788

2                    THE COURT:  Overruled.

3                    Just yes or no.

4        A     Yes.  Well, yes.  Can I --

5                    THE COURT:  Go ahead.

6        A     I'm sorry.  There were -- I'm sorry.  Since I

7    was not there, what I was informed was that people were

8    being brought in.  Whether they were under arrest, I do

9    not know, at the time.

10       Q     Well, did you sign a Criminal Court complaint

11   accusing other individuals besides my client and Qin

12   Zheng of this kidnapping?

13                   MR. KESSLER:  I object.  First of all,

14              his client isn't Qin --

15                   THE COURT:  Sustained.

16                   MR. SCHECTER:  No, other people beside

17              my client and another person.

18                   MR. KESSLER:  Judge, I ask to approach.

19                   THE COURT:  Sure.

20                   (Sidebar discussion off the record.)

21                   MR. SCHECTER:  Withdrawn, your Honor.

22                   Your Honor, I would ask this document be

23              marked Defendant's 2.

24                   THE COURT:  B.

25                   MR. SCHECTER:  Defendant's B.

1                    Greene - People - Cross              789

2                    THE COURT:  Mark it Defendant's B for

3          identification.

4                    MR. KESSLER:  Judge, can I see that

5          before it's shown to the witness?

6                    MR. SCHECTER:  Well --

7                    (Shown to counsel.)

8                    (Defendant's Exhibit B marked for

9          identification.)

10        Q     Detective, will you look at -- are you

11   familiar with it?

12        A     Yes.

13        Q     Did you prepare it?

14        A     Did I prepare it, no.

15        Q     Well, did you read it and sign it?

16        A     Yes.

17        Q     And in that document --

18                   THE COURT:  Wait a minute.  Don't refer

19                   to anything that's not in evidence.

20        Q     Detective, did you state how much money was

21   recovered at the drop location in this document?

22                   THE COURT:  Wait a minute, counselor.

23                   Step up.

24                   (Sidebar discussion off the record.)

25                   MR. SCHECTER:  Can I see Defendant's

```
 1                    Greene - People - Cross            790

 2             A -- withdrawn.  Just show him Defendant's B.

 3                    (Defendant's Exhibit B shown to

 4             witness.)

 5        Q    Detective, did you read that prior to signing

 6   it?

 7        A    I'm sorry, which part did you want me to

 8   refer to?  I'm sorry.

 9                    THE COURT.  No.  Did you read that piece

10             of paper before you signed off on it?

11                    THE WITNESS:  Yes.

12        Q    Does that help?  According to your

13   information how much money was recovered at the drop

14   location?

15                    THE COURT:  Sustained.

16                    MR. KESSLER:  Objection.  Beyond the

17             scope of this witness.

18                    THE COURT:  He said he wasn't present

19             there.

20                    MR. SCHECTER:  Your Honor, I would offer

21             Defendant's B into evidence.

22                    MR. KESSLER:  I object.

23                    THE COURT:  Sustained.

24        Q    Detective, did you read Defendant's B prior

25   to signing it?
```

1

2          A    I'm sorry?

3          Q    Did you read it prior to signing it?

4          A    Yes.

5          Q    Did you make any changes on it prior to

6     signing it?

7          A    No.

8          Q    Is that a fair and accurate representation of

9     what you said on April 1st of 1995?

10                    MR. KESSLER:  Objection.

11                    THE COURT:  Sustained.

12         Q    Detective, on April 1st did you have any

13    conversation with an interpreter of any Jin Hao Liu?

14                    MR. KESSLER:  Objection, relevance.

15                    THE COURT:  Sustained.

16                    MR. SCHECTER:  Can I have a sidebar?

17                    THE COURT:  I think this is a good time

18                    for us to recess for lunch.

19                    Ladies and gentlemen, don't discuss the

20                    case amongst yourselves or with anyone else.

21                    Don't let anyone else discuss the case in

22                    your presence.  Report to where the court

23                    officer tells you to report at 2 o'clock.

24                    Have a nice lunch.

25                    (The jury left the courtroom.)

1          Proceedings                792

2          (A lunch recess was taken.)

3          THE CLERK:  This is the case on trial,

4      calendar number 4, indictment 3282 of '95,

5      People versus Hai Guang Zheng.  Let the

6      record reflect the presence of the official

7      Mandarin interpreter, Mr. Yi Wan, the

8      defendant, defense attorney and the Assistant

9      District Attorney, outside the presence of

10     any sworn jurors at this time.

11         Are there any applications before the

12     jurors are brought in?

13         MR. KESSLER:  Judge, my application is

14     my detective Kevin Streine is the man from

15     ballistics who fired the weapon.  He is on a

16     schedule.  I asked defense counsel if we can

17     take him out of order.  It shouldn't take him

18     more than a couple of minutes.

19         MR. SCHECTER:  No objection.

20         THE COURT:  Okay, we will interrupt the

21     cross examination of Detective Greene for the

22     second time to take Detective Streine.

23         (The jury entered the courtroom.)

24         THE CLERK:  Case on trial continued.

25     Let the record reflect the presence of

1                    Streine - People - Direct              793

2              defendant, defense attorney, Assistant

3              District Attorney, the official Mandarin

4              interpreter, 12 regular, 4 alternate jurors

5              all present and properly seated.

6                   Counsel waive the reading of the roll?

7                   MR. KESSLER:   Yes.

8                   MR. SCHECTER:   Yes.

9                   THE COURT:   Good morning.  We are going

10             to interrupt the cross examination of

11             Detective Greene to call another witness who

12             has a time schedule problem, with the consent

13             of both parties.

14                  You may call your witness.

15                  MR. KESSLER:   People call Detective

16             Kevin Streine.

17    K E V I N   S T R E I N E, Detective, a witness

18             called on behalf of the People, after

19             having been first duly sworn and having

20             stated his shield number as 3667 and his

21             command as The Ballistic Squad, New York

22             City Police Department, took the witness

23             stand and testified as follows:

24                  THE COURT:   You may inquire.

25    DIRECT EXAMINATION

```
 1
 2     BY MR. KESSLER:
 3          Q     Detective Streine, what division of the New
 4     York City Police Department are you assigned?
 5          A     The Ballistic Squad.
 6          Q     How long have you been assigned there?
 7          A     Since July of 1993.
 8          Q     What are your general duties and
 9     responsibilities in ballistics?
10          A     I'm a firearms examiner.  I'm responsible to
11     test firearms that come into the possession of the
12     police department through various circumstances, as well
13     as to identify ammunition and other ballistic evidence
14     that come along with firearm cases.
15                     MR. KESSLER:  Could I have the witness
16                be shown the gun and ammunition that's been
17                marked in evidence.  I don't know the --
18                     THE COURT:  People's 10.
19                     (People's 10 shown to witness.)
20          Q     Detective Streine, may I ask you to take a
21     look at what has been marked People's 10 in evidence.
22     Do you recognize what that is?
23          A     Yes, I do.
24          Q     And what is that?
25          A     It's a 380 caliber Lawson semi-automatic
```

1

2    piston I had tested once in April and once in July of

3    last year.

4         Q    July 21, 1995; did you test that weapon on

5    that date?

6         A    Yes, I did.

7         Q    When you say you tested that weapon, could

8    you describe for us what you did on that day?

9         A    After bringing the gun over to my work

10   station, I opened up the bag it was in.  I took the gun

11   and the one live round that I had tested into our test

12   range.  The test range contains a test tank, which is a

13   metal tank that holds about 800 gallons of water.  I

14   loaded the gun with the bullet, fired the gun into the

15   test tank, recovering the bullet and the shell that were

16   discharged.

17        Q    The bullet that you tested on July 21st,

18   where did you get the bullet from?

19        A    That was one of six bullets that were

20   vouchered on a voucher separate from the gun itself.

21        Q    Do you have that voucher number?

22        A    Yes, I do.

23        Q    Would you tell us what that number is?

24        A    That is F like Frank 881239.

25        Q    When you tested this particular gun with that

1

2   ammunition from that voucher number, did a bullet come

3   out of the gun?

4        A    Yes.

5        Q    Did you recover that bullet?

6        A    Yes, I did.

7        Q    If you can, tell us how you know that's the

8   gun that you tested?

9        A    In addition to my two signed reports being in

10  the sealed bag, the bag is sealed with my signature on

11  it.  Also there is a lead seal, a police department seal

12  on the gun, and that lead seal number matches the number

13  to my report.

14                  MR. KESSLER:  I have nothing further.

15                  MR. SCHECTER:  No questions.

16                  THE COURT:  You can step down.

17                  Recall Detective Greene, please.

18                  MR. SCHECTER:  Your Honor, could we

19             approach for just a moment?

20                  THE COURT:  Yes.

21                  (Sidebar discussion off the record.)

22                  (Detective Greene retook the witness

23             stand.)

24                  THE COURT:  You have been previously

25             sworn.  You're still under oath.

1              Greene - People - Cross                797

2                   THE WITNESS:   Yes.

3     CROSS EXAMINATION

4     BY MR. SCHECTER:

5         Q     Detective Greene, at any time from 2:00 p.m.

6     on April 1st until 2:00 a.m. on April 2nd did you ever

7     leave 1 Police Plaza?

8         A     No, I don't think so.   No.

9         Q     In other words, you were coordinating this

10    operation from your headquarters of Major Case?

11        A     Correct.

12        Q     At some time after you commenced working did

13    you come into information concerning an interview with

14    Guo Bang Liu, the male?

15        A     I had.   But I had knowledge of him prior to

16    it, when I got to 1 Police Plaza, because the

17    information that was given to me over the phone.

18        Q     But when you got -- am I correct in assuming

19    you received a phone call from someone while you were at

20    home; they gave you a very brief run down of what they

21    knew at that time?

22        A     Correct.

23        Q     And that, come in and you're going to either

24    coordinate or we need you?

25        A     Right.

```
 1                    Greene - People - Cross          798

 2        Q     When you got down to police headquarters

 3   prior to midnight on April 1st onto April 2nd, did you

 4   receive a 61 for Guo Bang Liu?

 5        A     I believe so, yes.

 6        Q     Do you have it with you?

 7        A     Yes, I believe I have a copy.

 8        Q     Okay.  Will you look at it.

 9        A     Okay.

10        Q     Do you have it in front of you?

11        And this 61, am I correct in saying this was

12   prepared prior to the two people being arrested?

13        A     Correct.

14        Q     Now, was Mr. Liu asked for a description of

15   the two individuals that did -- withdrawn.

16        Mr. Liu give a description of the two individuals?

17        A     Not to me.

18        Q     I'm not saying to you; on the 61.

19        A     Is this information on information on the 61,

20   yes.

21        Q     I'm not saying you took that information, but

22   he gave the information to someone?

23        A     Yes.

24        Q     And that person wrote down certain

25   characteristics about the two individuals?
```

1                    Greene - People - Cross                    799

2          A    Yes.

3          Q    Okay.  And as to the first individual, did he

4    give a sex?

5          A    Yes.

6          Q    What was that sex?

7          A    Male.

8          Q    Did he give a race?

9          A    Yes.

10         Q    What was that?

11         A    Asian.

12         Q    Did he give an age?

13         A    Yes.

14         Q    What was that?

15         A    Thirties.

16         Q    Did he give a height?

17         A    Yes.

18         Q    What was that?

19         A    Five six.

20         Q    A weight?

21         A    125.

22         Q    And a hair --

23         A    Short.

24         Q    As to the second individual, did he give a

25   height?

1

2      A      Yes.

3      Q      What was that?

4      A      Five six.

5      Q      Did he give an age?

6      A      Thirties.

7      Q      And he said also male Asian?

8      A      Yes.

9      Q      And did he give a hair length?

10     A      Yes.

11     Q      What was put down?

12     A      Short.

13     Q      Now, you were the arresting officer for Hai

14  Zheng; am I correct?

15     A      I don't understand your question.

16     Q      Were you the arresting officer?

17     A      At the location where he was arrested, no.

18     Q      No.  Were you the one who prepared the

19  paperwork concerning Hai Zheng?

20     A      Once he was in my custody --

21     Q      Once he was back in.

22     A      Yes.

23     Q      Did you prepare an on-line booking sheet?

24     A      Yes, one was prepared for me.

25     Q      Well, when I say -- you would ask questions,

1

2    but you don't speak Chinese, do you?

3         A    No.

4         Q    When I say "you," you were using an

5    interpreter?

6         A    Correct.  Or the detective who at the time

7    was put in charge of doing the arrest paperwork on him,

8    whoever that detective was.

9         Q    Who was that detective; do you know?

10        A    No, I'm not sure whether it was me -- I mean

11   I don't remember whether it was me.  It was someone was

12   assigned to do it, starting the paperwork, the arrest

13   paperwork.

14        Q    Do you have the on-line booking sheet for Hai

15   Zheng?

16        A    I have a photostat copy, yes.

17        Q    And that has you listed as the arresting

18   officer?

19        A    Yes.

20        Q    And I believe down the bottom that has your

21   signature on it?

22        A    Yes.

23        Q    Okay.  Now, did you ask Mr. Zheng or make a

24   determination of Mr. Zheng's height?

25        A    Yes, it was done.

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 113 of 156 PageID #: 1285

2         Q    And what was that you wrote down on the

3    on-line booking --

4         A    I'm sorry, it's blocked out on this

5    photostatic copy and I believe the District Attorney has

6    my original.

7         Q    Will you look at my copy --

8         A    Sure.

9         Q    -- which is not blocked out.

10                   (Shown to witness.)

11        Q    Okay.  Is that the same copy that you were

12   looking at?

13        A    Yes.

14        Q    That's a better copy that you're able to see?

15        A    Yes.

16        Q    What height did you put down, line 15?

17        A    Five ten.

18        Q    Now, at any time prior to Mr. Zheng getting

19   back to the precinct or getting back to 1 Police Plaza,

20   did you personally have any interview with Liu Guo Bang?

21        A    No, not prior to him being brought over to 1

22   Police Plaza.

23        Q    Do you know if he was ever at your --

24                   THE COURT:  Who are you talking about?

25                   MR. SCHECTER:  Liu Guo Bang.

1                    Greene - People - Cross          803

2          Q     Do you know if he was ever at 1 Police Plaza

3     while you were there?

4          A     Yes.

5          Q     But you didn't speak to him, he was being

6     questioned by other detectives?

7          A     He was introduced to me.  He was introduced

8     to me briefly and -- when brought in.  So I knew who he

9     was.  Whether he was being interviewed, or whatever they

10    were doing at the particular time, they were

11    interviewing him in reference to calls or what have you.

12         Q     Now, you stated that at approximately between

13    4:30 and 5 o'clock you conducted a lineup?

14         A     Correct.

15         Q     Now, prior to that lineup did you have any

16    conversation with Liu Guo Bang?

17         A     Short conversation in reference only to what

18    I was about to do, the lineup.

19         Q     Do you know if it -- well, withdrawn.

20         What time, if you know or if you have anything in

21    the record, did Hai Zheng get to 1 Police Plaza?

22         A     I don't recall.

23         Q     Would you have any -- would you have anything

24    in your notes that would help you refresh your

25    recollection or that would be able to tell you what time

1                    Greene - People - Cross          804

2    he was brought to 1 Police Plaza?

3         A     No, because he was being moved around to

4    wherever it was necessary he was needed.

5         Q     Do you remember when for the first time you

6    saw Hai Zheng at 1 Police Plaza?

7         A     Sometime in the afternoon.

8         Q     I'm talking about the defendant.

9         A     Oh.  We are now speaking about --

10        Q     Hai Zheng.

11        A     Bang --

12        Q     Not Guo Bang.  Do you know what time my

13   client got to 1 Police Plaza?

14        A     Sometime after the arrest was made in Queens.

15   I don't know the exact time.

16        Q     Do you know what time was the first time you

17   saw him at 1 Police Plaza, my client?

18        A     I didn't mark down the time, no.

19        Q     Do you know if he came to 1 Police Plaza at

20   the same time that the two females got to 1 Police

21   Plaza?

22        A     I don't remember, counselor.

23        Q     On the day before April 1st did you have any

24   conversation with Detective Banks.

25        A     On the 1st?

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 116 of 156 PageID #: 1288

2        Q    Yes.

3        A    Yes.

4        Q    Did you give him anything?

5        A    I don't recall.

6        Q    At any time did you see any photographs on

7   April 1st?

8        A    Yes.

9        Q    Did you ever on April the 2nd or any date

10   thereafter, were you ever given those photographs --

11   were you ever given those photographs of the -- of the

12   Jin -- Hao Liu and Liu Yan Wu?

13        A    I'm sorry.  I didn't -- would you repeat the

14   question.

15        Q    Were you given -- after the arrest of my

16   client, were you ever given the photographs?

17        A    The photographs of the victims were provided

18   from the family way before your client was arrested.

19        Q    No, I'm not saying that.  After the arrest

20   were you given those photographs back?

21        A    Given those back?

22        Q    Yes.

23        A    The victims' photos?

24             THE COURT:  Were you given them back?

25             Did anybody give them back to you?

```
 1                    Greene - People - Cross              806

 2        A     I don't recall.  I mean, the photographs of

 3   the victims were given to all detectives that were

 4   involved in the case if they went out for surveillance

 5   or monitoring of any location so they had them.

 6        Q     Did you ever get the photographs back?

 7        A     Whether they were returned -- I can't tell

 8   you all the photos were returned to me, no.

 9        Q     When you say, "the photos," were they the

10   actual photographs or were they photocopies of the

11   people --

12                    MR. KESSLER:  Objection as to relevance.

13                    THE COURT:  Overruled.

14        Q     -- that was given out to the people that went

15   out?

16        A     They were what you call one on one.  There is

17   a one-on-one camera we use to take photos of photos so

18   they come out like a Polaroid.  It's a Polaroid of a

19   photo.

20        Q     It's not a Xerox?

21        A     No.

22        Q     Would you have any of those with you today?

23        A     I don't have any here.  The District Attorney

24   may have.

25        Q     Now, on April 2nd -- withdrawn.
```

2           Was one of the people working under your direction

3     a Detective Keith Ng or Keith Ned?  How does he -- Keith

4     Ng?

5           A     Keith Ng was part of the investigation, yes.

6           Q     Do you know how he pronounces his last name?

7           A     Ng.

8           Q     When for the first time did you see him in

9     connection with this incident?

10                MR. KESSLER:  Objection again as --

11                objection as to relevance as to when the

12                first time he saw another detective.

13                THE COURT:  Is that relevant?

14                MR. SCHECTER:  Could be.

15                THE COURT:  Then answer if you know the

16                answer.

17          A     I believe in 1 Police Plaza.

18          Q     Do you know was that on the 1st or 2nd?

19          A     I don't remember.

20          Q     Now, did there come a time that you conducted

21    an interview with Liu Jin Hao?

22          A     Yes.

23          Q     Do you know what time that interview was?

24          A     I will have to refer to my -- 0150 hours.

25          Q     And once again I assume you had an

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/18   Page 119 of 156 PageID #: 1201

1

2     interpreter with you?

3         A    Yes.

4         Q    How long did you speak to her for?

5         A    To give you exact the amount of time,

6     counselor, I couldn't, but it was a substantial amount

7     of time to do an interview.

8         Q    Excuse me?

9         A    To give you an exact time, I couldn't do

10    that.  But it was --

11        Q    When you finished speaking to her, did you

12    immediately start interviewing Liu Yan Wu?

13        A    If I recall right the interviews were done

14    simultaneously.  I don't know if it was immediately

15    following.  I might have done something in between

16    but --

17        Q    Well, what time did you speak to Liu Yan Wu?

18        A    Says here 0300 hours.

19        Q    And am I correct in saying both those

20    interviews were done prior to the lineup?

21        A    Correct.

22        Q    Now, do you know if Liu Guo Bang spoke to

23    either of the two females prior to witnessing the

24    lineup?

25        A    It's my recollection he didn't.

Case 1:16-cv-01166-RJD   Document #:8   Filed 11/30/16   Page 120 of 156 PageID #: 1202

2          Q      Do you know if he knew that his wife and

3     sister were at 1 Police Plaza?

4                     MR. KESSLER:  Objection as to his state

5                of mind.  Objection as to whether or not if

6                the other witness --

7                     THE COURT:  Sustained as to the form of

8                the question.

9          Q      While you were interviewing either of the two

10    females did you see Liu Guo Bang?

11         A      No.

12         Q      Am I correct in saying you didn't interview

13    the two females together?

14         A      That's correct.

15         Q      They were in a different room?

16         A      That's correct.

17         Q      When you went in to get either of the two

18    females or bring them back to that room, do you know if

19    Liu Guo Bang was in that room?

20         A      No.

21         Q      You don't know?

22         A      No, he was not in the room.

23         Q      Now, after your interview with the two

24    females did you have any conversation with Detective Ng

25    about what either of the two females stated?

2          A     I don't recall.  If I remember right he was

3     busy doing something else.  No, I don't think so.

4          Q     Do you know if he was in the room while

5     either of the two females was being interviewed?

6          A     While I was conducting my interview?

7          Q     Yes.

8          A     No, the only ones in the room was myself and

9     Detective Christine Leung.

10         Q     And that would be the female who was doing

11    the translating?

12         A     That's correct.

13         Q     Do you know where my client Hai Zheng was

14    during the time that you were interviewing the two

15    females?

16                    MR. KESSLER:  Objection as to relevance.

17                    THE COURT:  Pardon me?

18                    MR. KESSLER:  As to relevance.

19                    THE COURT:  Overruled.  I will allow.

20                    Do you know?

21                    THE WITNESS:  No.  No, I don't.

22         Q     Did you direct Detective Ng to speak to Hai

23    Zheng, to my client?

24         A     I don't think I directed him, no.

25         Q     Now, detective, when you spoke to --

1                    Greene - People - Cross            811

2                    MR. SCHECTER:  Just one moment, Judge.

3          Q     When you spoke to Liu Jin Hao did you take

4     any notes concerning that interview?

5          A     I'm trying to remember, counselor.  Give me a

6     few minutes.  I don't recall whether, whether I was

7     taking the notes while Detective Leung was translating

8     or was she jotting -- I believe I was taking the notes

9     as she translated.

10         Q     Did you take handwritten notes?

11         A     I believe so.

12         Q     Do you know what happened to your handwritten

13    notes?  Do you have your handwritten notes with you

14    today?

15         A     They should have been attached to the

16    original files.  They may be in the file that the

17    District Attorney has.

18                    MR. KESSLER:  Judge, the handwritten

19                notes I have are from a different witness.

20                That would -- I believe if the detective sees

21                this, this will refresh his memory, but these

22                are the handwritten notes I have that are in

23                the file.

24                    THE WITNESS:  No, these are not them.

25                The file was done relatively -- I don't

```
1                   Greene - People - Cross           812

2                   remember, counselor, to be honest.  To be

3                   honest, I just don't remember.

4         Q         Am I correct in saying while the translation

5    was going on you did not have a typewriter typing out --

6         A         That's correct.

7         Q         So you took handwritten notes you took to

8    prepare the DD5?

9                   MR. KESSLER:  Objection, your Honor.  I

10                  think it's --

11                  THE COURT:  Sustained as to the form of

12                  the question.

13        Q         Did you take handwritten notes when Liu Jin

14   Hao was being interviewed?

15                  MR. KESSLER:  Again I object.  The

16                  witness indicated he doesn't recall if he did

17                  or he didn't.

18                  MR. SCHECTER:  He specifically said he

19                  did.

20                  THE COURT:  He did.  I will allow the

21                  counsel to probe.

22                  You may answer the question.  Overruled.

23                  MR. SCHECTER:  Can the court reporter

24                  read back the question?

25                  THE COURT:  Read back the question.
```

```
 1                      Greene - People - Cross          813
 2                      (The court reporter read back the
 3                 requested question.)
 4       A    I would have to say I probably jotted some
 5    things down.  Just I probably jotted some things down
 6    just to gear memory.  But I don't remember whether in
 7    fact I took a whole listing and history.  I don't
 8    remember, counselor, really.
 9       Q    Would you have taken notes putting down key
10    points that --
11       A    That's possible, yes.
12                 MR. SCHECTER:  Your Honor, can I have
13                 the court reporter on the side?
14                 THE COURT:  Yes.
15                 (The following proceeding took place at
16                 sidebar.)
17                 MR. SCHECTER:  This would be notes that
18                 he took of the complaining witness.  I have
19                 not been provided with any scratch notes of
20                 this witness --
21                 THE COURT:  I'm aware --
22                 MR. SCHECTER:  -- of the detective, your
23                 Honor.  I'm going to ask to have either his
24                 testimony be precluded, because it's the only
25                 report of anyone interviewing the complaining
```

```
 1                    Greene - People - Cross           814

 2        witness.  I did not have the scratch notes.

 3        That may or may not be the same.  There is a

 4        clear Rosario violation here and I'm asking

 5        for appropriate sanctions, including

 6        dismissal of the indictment.

 7             MR. KESSLER:  As discussed with the

 8        Court, there appears there is Rosario

 9        missing, his scratch notes and another page.

10        I'm allowing defense counsel to do it in

11        front of the jury, even though I don't think

12        it's proper in front of the jury to talk

13        about Rosario and violations of Rosario.

14             THE COURT:  He is not.  We are doing it

15        at sidebar.

16             MR. KESSLER:  He is now questioning --

17             THE COURT:  They're not here.  I will

18        listen to argument at the appropriate time

19        and I will impose appropriate sanctions for

20        any Rosario that's not available.

21             (The following occurred in open court.)

22        Q    Now, detective, you said you also interviewed

23   Liu Yan Wu.  Am I correct in saying also when you

24   interviewed her you didn't have the typewriter there to

25   prepare your DD5?
```

2        A    That's correct.

3        Q    Okay.  And once again you would have taken

4    some sort of notes by hand of what she said?

5        A    Possibly, yes.

6        Q    And you have those notes with you?

7        A    I don't have them here, no.

8        Q    Do you know where those notes are?

9        A    All of my paperwork should be in the case

10   folder.

11       Q    Well, if they are not in that file is there

12   anyplace else you know where they can be?

13       A    No.

14       Q    Could they be in your locker?

15       A    No.

16       Q    Could you have destroyed them?

17       A    No.

18                 MR. KESSLER:  Objection.

19                 THE COURT:  Overruled.

20       A    No.

21       Q    You have no idea where any of those notes

22   are?

23       A    Counselor, there is a lot of paperwork when

24   you coordinate these types of operations.  And I

25   would -- I mean, for me to tell you I know where every

1

2    inch of paper from all detectives who worked the case --

3        Q      I'm just talking about your work, not any of

4    the other detectives.

5        A      Again.  Again, I don't speak the language, so

6    I had another detective there interpreting.  So --

7        Q      Well, when the other detective was

8    interpreting were you asking the questions about what

9    happened and then she would interpret?

10       A      Yes.

11       Q      So it was still you were the one -- she

12   would -- then an answer would be given and the

13   interpreter would give you in English the response?

14       A      I'm sure that everyone knows when you have a

15   victim like that in a situation --

16               MR. SCHECTER:  I'm objecting to what

17               everyone knows.

18               THE COURT:  Sustained as to the term.

19       A      I'm handling an interview in a difficult

20   situation.  I have -- I have an upset --

21               MR. SCHECTER:  Your Honor --

22               THE COURT:  He is explaining his answer.

23               MR. SCHECTER:  Your Honor, there is no

24               question.

25               THE COURT:  You don't want to hear it?

```
 1                    Greene - People - Cross              817

 2                    MR. SCHECTER:  No.

 3                    THE COURT:  Sustained.

 4          Q     Now, detective, you prepared a DD5 for Liu

 5     Jin Hao; am I correct?

 6          A     Would you repeat the name again?  I'm sorry.

 7          Q     L-I-U, J-I-N, H-A-O.

 8          A     Yes.

 9          Q     And that DD5 was prepared sometime after she

10     was interviewed?

11          A     Correct.

12          Q     And you said you used an interpreter.  I

13     believe it was Detective Leung?

14          A     Right.

15          Q     Do you know if he ever prepared any

16     paperwork?

17          A     No, I don't think so.

18          Q     Well, the only interview paperwork that was

19     prepared for that interview was yours?

20          A     Should have been mine, yes.

21          Q     That was a typewritten DD5?

22          A     Yes.

23          Q     And how many pages was that DD5?

24          A     Which particular one are we talking about?

25          Q     Of your interview with Liu Jin Hao.
```

1                      Greene - People - Cross              818

2          A     It should have been three.   It's only two

3     here.

4          Q     Am I correct in saying your DD5 was three

5     pages?

6          A     Yes.

7          Q     How many pages do you have with you?

8          A     Two.

9          Q     How many pages did you give the District

10    Attorney?

11         A     That's a question --

12         Q     Well --

13         A     I'm assuming I gave him three.

14         Q     Did you look through his file?

15         A     Today, no.

16         Q     Did he ever ask you about page 3?

17         A     He actually got -- someone in the District

18    Attorney's office took the file and photostated the

19    file.   I'm pretty sure I gave three fives.

20         Q     Well, how many do you have with you today?

21         A     Two, two pages of three --

22         Q     Do you know when the District Attorney was

23    given that five to Xerox?

24         A     Months ago.

25         Q     When did you get the five back?

1                    Greene - People - Cross              819

2          A      Same particular day.  I don't remember if I

3    checked.  I don't think I checked that particular five,

4    no.  When the papers were returned to me I don't think I

5    checked that particular five.  I didn't count the pages.

6          Q      And am I correct in saying as you sit here

7    you don't remember the exact wording of what was on that

8    DD5?

9          A      No.

10         Q      And you don't remember -- well, approximately

11   how many pages of paperwork have you prepared since

12   April of 1995 in all your cases?

13         A      I couldn't give you a number.

14         Q      Hundreds, thousands?

15         A      Couldn't give you an estimate.

16         Q      Okay.  And you do not know whether that DD5

17   was completely filled or partially; am I correct?

18         A      I don't remember, no, counselor.

19         Q      But you don't have a copy of that DD5 with

20   you?

21         A      In front of me, no.

22         Q      And you don't have the notes that you used to

23   take that DD5 either?

24         A      In front of me, no.

25         Q      And you don't know where either the notes are

1                Greene - People - Redirect            820

2     or that DD5 is.

3                     MR. KESSLER:  Objection, asked and

4                answered.

5                     THE COURT:  Sustained.

6        Q     Did you personally voucher any evidence in

7     this case?

8        A     No.

9        Q     Did you personally have any conversation with

10    my client Hai Zheng through a translator in this matter?

11       A     No.

12                    MR. SCHECTER:  Can I see the two lineup

13                pictures?  Can I see --

14                    THE COURT:  5 and 6.

15                    MR. SCHECTER:  5 and 6.

16                    (Shown to counsel.)

17                    MR. SCHECTER:  I have nothing further.

18                    THE COURT:  Do you have any --

19                    MR. KESSLER:  Just a couple of

20                questions.

21    REDIRECT EXAMINATION

22    BY MR. KESSLER:

23       Q     Detective, the notes, if you did take any

24    that you took, would you have used them to type up the

25    fives you did type up in this case?

2      A      Yes.

3      Q      So whatever was in the notes would have been

4   in sum and substance what were --

5                 MR. SCHECTER:  Objection.

6                 THE COURT:  Sustained as to the form.

7      Q      Did you take -- type up fives in connection

8   with this case?

9      A      Yes.

10     Q      Was those based on the sum and substance of

11  the conversations with the individuals you had?

12                MR. SCHECTER:  Objection.

13                THE COURT:  Sustained as to form.

14     Q      And with regard to the page that's missing of

15  the DD5, you read the other two pages that you do have?

16     A      Yes.

17     Q      And during your interview with her would it

18  be fair to say the portion that's missing would be after

19  the portion where she told you about the abduction and

20  the rape?

21                MR. SCHECTER:  Objection.

22                THE COURT:  Sustained.  It's leading,

23                suggestive.

24     Q      Well, when you spoke to her -- without

25  obviously telling us what she said -- had she already

1

2    spoke about the initial abduction and did you type that

3    portion out?

4                    MR. SCHECTER:   Objection, your Honor.

5                    MR. KESSLER:   Then I ask to approach.

6                    THE COURT:   Yes.

7                    (Sidebar discussion off the record.)

8        Q    Detective, when you went and spoke to the

9    witness Mr. Schecter was talking about, did you, if you

10   recall, type your DD5 in chronological order the way she

11   was telling you?

12       A    Yes.

13       Q    After reading the fives that you have that

14   were typed, at what portion does your DD5s end?  Do you

15   understand my question?

16                   MR. SCHECTER:   Objection.

17       A    Yes.

18                   MR. SCHECTER:   Objection, your Honor,

19               to a -- it's a document that's not evidence.

20               It would be bolstering his testimony.

21                   THE COURT:   Sustained.

22       Q    Could you tell us, without telling us exactly

23   what she said, what portions of your interview with her

24   did you record in the DD5 that you have?

25                   MR. SCHECTER:   Objection.

1                    Greene - People - Redirect              823

2                    THE COURT:  Sustained as to the form.

3                    You mean percentage wise?

4          Q     Well, had you spoke to her how about this --

5     had you spoke to her about the events on March 31st that

6     day?

7          A     Yes.

8          Q     Did you have that portion typed up in your

9     DD5?

10         A     Yes.

11                   MR. SCHECTER:  Objection.

12                   THE COURT:  Sustained.

13         Q     April 1st, that day, did you speak to her

14    about the events that took place on April 1st?

15         A     Yes,

16         Q     Is that portion typed up in the DD5?

17         A     Yes.

18                   MR. SCHECTER:  Objection.

19                   THE COURT:  Overruled.

20         Q     Did you talk to her about the 12 o'clock --

21    going into the 2nd now -- that period of time, 12:00,

22    12:05, going now from the 1st into the 2nd officially --

23         A     Yes.

24         Q     Okay.  Is that initial portion in your DD5?

25         A     Yes.

```
 1                    Proceedings              824
 2              MR. SCHECTER:  Objection, your Honor.
 3              THE COURT:  Overruled.
 4              MR. KESSLER:  I have nothing further.
 5              THE COURT:  Do you have any anything
 6         else, Mr. Schecter?
 7              MR. SCHECTER:  No, but I would ask if I
 8         can go on the record outside the presence of
 9         the jury.
10              THE COURT:  Yes.  You want to do that
11         now?  All right.  You want to step outside.
12              Are you finished with this witness,
13         both?
14              MR. KESSLER:  Yes.
15              MR. SCHECTER:  Yes.
16              THE COURT:  You can step out.
17              (The witness left the courtroom.)
18              THE COURT:  You want to do it now,
19         Mr. Schecter?
20              MR. SCHECTER:  Yes, your Honor.
21              THE COURT:  Would the court reporter
22         please step over here.
23              (The following proceeding occurred at
24         sidebar.)
25              MR. SCHECTER:  I just want that marked
```

1               Ng - People - Direct            825

2               as Court Exhibit 1.  I will deal --

3                    THE COURT:  I intended to do that.

4                    MR. KESSLER:  That's no problem.  I

5               intended to do that.

6                    MR. SCHECTER:  Then I will deal with

7               sanctions at the appropriate time.

8                    THE COURT:  Yes.

9                    (The following occurred in open court.)

10                   THE COURT:  Call your next witness.

11                   MR. KESSLER:  People call Detective Ng.

12    K E I T H   N G, Detective, a witness called on

13              behalf of the People, after having been

14              first duly sworn and having stated his

15              shield number as 4280 and his command as

16              the Queens Robbery Squad New York City

17              Police Department, took the witness stand

18              and testified as follows:

19                   THE COURT:  You may inquire.

20    DIRECT EXAMINATION

21    BY MR. KESSLER:

22        Q     Detective Ng, how long have you worked for

23    the New York City Police Department?

24        A     This July 15 going to be ten years.

25        Q     And presently what is your assignment?

1

2       A    I'm assigned to Queens Robbery Squad, Asian

3  Crime Investigation Team.

4       Q    Beginning on -- actually, other than English,

5  do you speak any other language fluently?

6       A    Yes.  I'm Chinese.  I'm native Chinese.

7       Q    What is your native Chinese tongue?

8       A    I speak Cantonese, Mandarin, and Taison,

9  T-A-I-S-O-N.

10      Q    Can you speak all of those dialects fluently?

11      A    Yes.

12      Q    On April 1, 1995 were you assigned to an

13  investigation with the Major Case Division?

14      A    Yeah.  Yes, I assist in the Major Case Squad

15  for investigation.

16      Q    Did there come a time during your

17  investigation that you were in the home of a woman named

18  Emily Liu?

19      A    Yes.

20      Q    At the time that you were in Miss Liu's home,

21  could you tell us during that period of time did there

22  come a point in time that you were using her phone?

23      A    Yes, I -- yes, I did.

24      Q    Okay.  And what steps were taken with her

25  phone and what did you do exactly while you were there

1                    Ng - People - Direct                    827

2      with the phone?

3           A.    My duty on to Emily Liu's apartment was to

4      monitor the phone and make sure all the incoming calls

5      from the outside from the perpetrator or kidnapper --

6                      MR. SCHECTER:  Objection to the term

7                 "kidnapper."

8                      THE COURT:  Sustained.

9           A     From the outside every call come out monitor.

10     I monitor phone, make sure all the information that we

11     know.  And if there was new development we call outside

12     units, notify headquarters, notify outside units from

13     radio and from landlord to make sure everybody know what

14     is going on in the apartment.

15          Q     When you say monitoring the phone calls, did

16     you actually listen into the phone calls?

17          A     Yes.  Every phone call come in, Emily Liu

18     pick up the phone.  And at the same time I pick up the

19     phone.  There was two phones in the apartment with the

20     same number, same line.  I pick up the phone, monitor

21     all the phone conversation.

22          Q     During the time you were monitoring,

23     listening into the phone conversations, did there come a

24     period of time during the phone conversation you became

25     aware somebody was being held for ransom?

1

2        A    Yes.

3        Q    Could you tell the members of the jury about

4    how many phone conversations did you monitor, what

5    happened regarding that particular incident about money?

6        A    Well, there was about ten phone calls,

7    approximately ten, ten calls to the location.

8        Q    Were you listening on those ten phone calls?

9        A    Yes, I did.

10       Q    And could you tell us -- without exactly

11   telling us what was said, could you tell us in sum and

12   substance what the person on the other end said?

13       A    Yes.

14            MR. SCHECTER:  Objection to --

15            THE COURT:  I'm sorry?

16            MR. SCHECTER:  Objection to in sum and

17            substance, your Honor.  If he wants to say

18            exactly what was said, fine.

19            THE COURT:  To the best of his

20            recollection.

21       Q    I'm asking obviously -- do you remember word

22   for word what every person said verbatim?

23       A    Well, I recall about what the majority, what

24   happened with the phone calls.

25       Q    My question is simply in sum and substance

1

2       what was said over the line that you heard, and can you

3       tell us also in what language was spoken?

4            A       Well, the caller was speaking Mandarin

5       dialect.

6            Q       Was it male or female?

7            A       Male call.  Male Chinese.

8            Q       Could you tell us what this male

9       Mandarin-speaking person said in sum and substance?

10           A       Well, he called --

11                   MR. SCHECTER:  Objection, your Honor.

12                   THE COURT:  Overruled.

13           A       He call up the apartment, and Emily Liu was

14      picking up the phone.  They had a conversation with each

15      other.  And the male Chinese caller and the -- and Emily

16      Liu had a conversation over the phone.  I was monitoring

17      the phone on the end.  The conversation of the male

18      Chinese caller asked for originally was at $15,000 for

19      each person for release.  And --

20           Q       Then what happened?

21           A       Then what happened go negotiations.  The

22      price were dropped down to $7,500 for each person.  And

23      they asked the family, get the money ready.  Put in the

24      shopping bag.  Put all the money, cash in the Chinese

25      tea can.  Buy some -- buy some vegetable and/or mix, up

Case 1:16-cv-01166-RJD   Document 8-8   Filed 11/30/16   Page 141 of 156 PageID #: 1313

2     the grocery.  Deliver the shopping bag to 217 Henry

3     Street.

4          Q     Now, Detective Ng, did there come a time on

5     April 2, 1995 that you went to 1 Police Plaza?

6          A     Yes.

7          Q     And on April 2, 1995 I'm going to direct your

8     attention to about 6:15 in the morning.  Were you at 1

9     Police Plaza at approximately that time?

10         A     Yes, I did.  I was there.

11         Q     And at about 6:15 in the morning on April 2,

12    1995 did you speak to anyone in person?

13         A     Yes.

14         Q     Do you recall who you spoke to?

15         A     I speak to Hai Guang Zheng.

16         Q     Do you see him in the courtroom today?

17         A     Yes.  He is on the right-hand side with blue,

18    green, white, striped shirt.

19                    THE COURT:  Indicating the defendant.

20         Q     Now, prior to speaking to Mr. Hai Guang

21    Zheng, did you advise him of anything?

22         A     Yes.

23         Q     What did you advise him of?

24         A     I advise him of his rights in Chinese,

25    English -- Chinese and English.

2     Q    Would you say that again?  You advised him of

3    something in Chinese and English?

4     A    I advised him of rights, Miranda rights, in

5    English and Chinese.

6     Q    Did you use a particular form to do that?

7     A    Yes, I did.

8     Q    And did you sign that form?

9     A    Yes, I did.

10    Q    Did Mr. Hai Zheng sign that form?

11    A    Yes.  He got a chance to read it and sign it.

12    Q    And is the form written in the Chinese

13   language as well as the English?

14    A    Yes, in both.

15    Q    After you had advised him of his rights in

16   Mandarin and Chinese, what did you say to him and what

17   did he say to you, initially?

18    A    Initially I asked him, tell me what happened

19   in the verbally.  Then he told me what happened, the

20   whole incident.

21    Q    The first time he told you verbally what

22   happened, did you write any notes down?

23    A    No, I just listened.

24    Q    Did he then tell you again?

25    A    And then after I listened to the story, then

Case 3:16-cv-01166-BJD   Document 8-8   Filed 11/30/16   Page 143 of 156 PageID #: 1315

```
 1
 2    and D, and ask if you recognize what that is?

 3         A     Yes.

 4         Q     And what is that?

 5         A     Those original, the Miranda warning form I

 6    was to read to Mr. Hai Guang Zheng.  And there was a

 7    statement in my handwriting from Hai Guang Zheng on the

 8    April 2, 1995.

 9         Q     You said that was the original?

10         A     Yes, that's correct.

11         Q     And do you recognize your signature on there?

12         A     Yes.

13         Q     And were you present when Mr. Zheng signed it

14    as well?

15         A     Yes.

16         Q     And does his signature appear on there as

17    well?

18         A     Yes.

19         Q     Is that form, those forms, in the same or

20    substantially the same condition now as they were at the

21    time you interviewed Mr. Zheng on April 2, 1995?

22         A     Yes, I did.

23               MR. KESSLER:   I ask they be admitted

24               into evidence.

25               (Shown to defense counsel.)
```

```
 1          Ng - People - Voir Dire/Defendant        834
 2                    MR. SCHECTER:  Can I have just have a
 3          minute.
 4                    (Pause in the proceeding.)
 5                    MR. SCHECTER:  May I have a brief voir
 6          dire?
 7                    THE COURT:  Yes.
 8     VOIR DIRE BY
 9     MR. SCHECTER:
10          Q     Detective Ng, B, C, and D, are they in
11     English or Chinese?
12          A     English.  It's English.
13          Q     Did my client read the statements prior to
14     signing them?
15                    MR. KESSLER:  Objection.
16                    THE COURT:  Sustained.  That's not part
17          of the voir dire.
18          Q     Do you know if Mr. Hai Zheng spoke or was
19     able to read English?
20                    MR. KESSLER:  Objection to the form of
21          the question.  Beyond the scope of voir dire.
22                    THE COURT:  Sustained.  Since there is
23          no objection --
24                    MR. SCHECTER:  No, I'm objecting.
25                    THE COURT:  It's overruled.
```

```
1                      Ng - People - Direct              835
2                      (People's Exhibit 12-A, B, C, D marked
3               in evidence.)
4    DIRECT EXAMINATION
5    BY MR. KESSLER:
6                      MR. KESSLER:  You can show the witness
7               A, B, C, and D for one moment.  Thank you.
8                      (Shown to witness.)
9         Q     Detective, did you note the date and the time
10   you initially began speaking to Mr. Hai Zheng on the
11   document?
12        A     It's about quarter after 6:00 a.m. on April
13   2, 1995.
14        Q     Now, you indicated that he initially spoke to
15   you.  You didn't take any notes, but then started
16   writing as he told you.  How long did this take, that he
17   was telling you and you were writing down the statement,
18   approximately?
19        A     Approximately what, just initial one?
20        Q     The whole thing, the whole time you were
21   speaking to him about.
22        A     I would say about 35 minutes or 45 minutes,
23   about 30 minutes.
24        Q     Did he appear during that period of time to
25   be intoxicated?
```

| | | |
|---|---|---|
| 1 | | Ng - People - Direct                    836 |

2       A       No.

3       Q       Under the influence of any narcotics?

4       A       No.

5       Q       Did he appear scared or fearful of you in any
6   way?

7                       MR. SCHECTER:  Objection.

8                       THE COURT:  Sustained.

9       Q       Would you define him as being cooperative or
10  uncooperative?

11      A       Oh, he is cooperative.

12                      MR. SCHECTER:  Objection.

13                      THE COURT:  Overruled.

14                      MR. SCHECTER:  I didn't hear --

15                      THE COURT:  He was cooperative.

16      Q       During the portion as you were writing down
17  things, did you ever cross out anything and change
18  anything during the statement?

19      A       Yes, some kind mistake I -- some kind -- my
20  own writing I cross or something.  I wasn't sure what he
21  say, and then we ask him again.  Then I write down the
22  paper, transfer the paper.

23      Q       So if he said something and you wrote it down
24  wrong, what would you do?

25      A       What?  Excuse me?

1                          Ng - People - Direct              837

2          Q    He said something.  You wrote it down wrong.

3    What would you do, is my question?

4                    MR. SCHECTER:  Objection.

5          A    I change, correct it.  And he initial it.  I

6    initial it.  It's stapled.

7                    THE COURT:  Overruled.

8          Q    Each of the pages, did you sign each of the

9    pages?

10         A    Excuse me?

11         Q    Did you sign each of the pages of the

12   statement?

13         A    Yes.

14         Q    Did he sign each of the pages of the

15   statement?

16         A    Yes.

17         Q    Did you see him sign each of the pages of the

18   statement?

19         A    Yes.

20         Q    During the time that you were interviewing

21   him about the statement, did you ask him how old he was,

22   his date of birth?

23         A    Yes.

24         Q    Do you recall how old, what year or date he

25   told you he was born?

2      A     I can refresh my recollection.

3             MR. KESSLER:  Request permission --

4             MR. SCHECTER:  Your Honor, I would ask

5      him to say what he is using.

6             THE COURT:  What are you using?

7      A     I use statement.  I use 12-B, the statement.

8   He give me a date of birth 3/26/68.  At that time that

9   make him --

10            THE COURT:  We need a mathematician.

11     Q     Could you tell us -- just tell me what his

12  date of birth was.

13     A     March 26th.  That make him 27.

14     Q     Okay.

15     A     That's - excuse me.

16     Q     Now, I guess one last question.

17  Detective, when you were writing down the

18  statement, did you write down the statement when he was

19  completely finished from beginning to end, or did you

20  write down sentence by sentence as he was telling it to

21  you?

22            MR. SCHECTER:  Objection, your Honor.

23            Compound question.

24            THE COURT:  Overruled.

25     A     When I write the statement, as I said before,

1
2      I listen to what he told me happened first.  In the

3      statement when I start writing and I remember what he

4      say, then I start writing.  When halfway or any question

5      come up, I ask him again.  He told me then.  I keep

6      continue the statement.  So everything come up as

7      problem or question, then I ask him what happened.  Then

8      he told me what happened.  Then I keep going on and I

9      finish the statement.

10                      MR. KESSLER:  I think I'm done.  Just

11                      two questions.

12          Q     Did he admit to you in the statement anywhere

13     he had raped the women?

14          A     Excuse me?

15          Q     Did he admit to you in the statement that he

16     had raped the women?

17          A     Oh, I ask the question.  But he say, no, he

18     had no sexual intercourse with the victim.

19          Q     Did he admit to you in the statement he had

20     kidnapped the women?

21          A     Yes.

22                      MR. SCHECTER:  Objection, your Honor.

23                      THE COURT:  Sustained.  The statement

24                      speaks for itself.

25                      MR. KESSLER:  I have nothing further.

```
 1                    Ng - People - Cross              840

 2                THE COURT:   You can cross examine.

 3   CROSS EXAMINATION

 4   BY MR. SCHECTER:

 5       Q      Do you have your memo book with you?

 6       A      My memo book?

 7       Q      Yes.

 8       A      No, I thought I make copy of the memo book.

 9                MR. KESSLER:   Actually I have a copy.

10                MR. SCHECTER:   I have -- may I have a

11           moment.   I never seen this before.

12                THE COURT:   How much time do you need?

13           A few minutes?

14                MR. SCHECTER:   Two minutes.

15                THE COURT:   That's two.

16                MR. KESSLER:   If I can point to defense

17           counsel where it is (indicating).

18                (Pause in the proceedings.)

19                THE COURT:   Okay.

20       Q      Detective, let me ask you.   Beside for these

21   four pages that you introduced in evidence, did you take

22   any other notes, memorandum, or prepare any other

23   paperwork in connection with this case?

24       A      Excuse me?   Regarding your clients or --

25       Q      From the time you first came into this case
```

1                        Ng - People - Cross                    841

2       on April 2nd, and whenever you signed off that day, did

3       you take any other notes, memorandum, or prepare any DD5

4       or other police reports in connection with this matter?

5            A      Like I say, it's so wide question.  Are you

6       talking about your client, regarding your clients, or

7       defendant Qin or someone else?

8            Q      Concerning this case.

9            A      Concerning this case, DD5, is a combination

10      question.  I didn't do one DD5.

11           Q      You didn't prepare any DD5?

12           A      No.

13           Q      Okay.  Not that hard of a question.

14           A      You said lot of people --

15                  THE COURT:  Save your comments.

16           A      It's paperwork.

17                  THE COURT:  Please.

18           Q      Now, what time were you first -- were you

19      working on April 1st?

20           A      Excuse me?

21           Q      Were you working on April 1st?  Is that your

22      regular tour of duty?

23           A      It's my RDO, my regular day off, I'm sorry.

24           Q      You said you ended up being called in that

25      day?

1

2          A      Yes.

3          Q      Did you mark that in your memo book you were

4     called in that day?

5          A      I didn't, because I put down RDO.

6          Q      Now, do you remember what time you were

7     called to come into work that day?

8          A      If I remember correctly, approximately about

9     5:00 p.m. on April 1, 1995.

10         Q      All right.  And do you remember who called

11    you?

12         A      Yes.

13         Q      Who called you?

14         A      It's Sergeant Hines from Major Case Squad.

15         Q      And did he tell you at that time over the

16    phone what the case was about?

17         A      A little bit briefly.  We need you to come

18    in.

19         Q      And did he tell you where to go?

20         A      Yes.

21         Q      Did he tell you, go to 1 Police Plaza?

22         A      Yes, correct.

23         Q      Okay.  And do you remember what time you got

24    down to 1 Police Plaza?

25         A      Oh, exactly what time I cannot recall.  I

1

2   could say it's approximately about 5:30 or 5:45.

3       Q    How long were you at 1 Police Plaza?

4       A    I was -- well, it's very short.  I was there

5   only about twenty minute to half hour, so.

6       Q    And at that time were you then told what the

7   police knew about this incident at that time?

8       A    We had little debriefing, yes.  Just a little

9   bit, not much.

10      Q    And did you speak to any civilians at that

11   time who were involved in this matter?

12      A    Yes, I did.

13      Q    Who did you speak to?

14      A    I talked to the male.  It be exactly, I have

15   no recollection.  I know by face the victim.

16      Q    Would it be Liu Guo Bang you spoke to?

17      A    Could be him, Mr. Liu.

18      Q    And did you make any notations or notes about

19   what your conversation with him was?

20      A    No, not that I remember.

21      Q    Were you speaking to him and asking him

22   questions, or were you acting as an interpreter?

23      A    Well, I'm a detective.  I not just a

24   translator.  I too a detective too.

25      Q    Well, let me -- at times have you been used

1                    Ng - People - Cross                844

2    because of your Chinese background as an interpreter for

3    another detective to speak to a Chinese client?

4         A    No.  If I myself interesting see what

5    happens, I find out what is going on, on the native

6    language.  I spoke to Mr. Liu.

7         Q    In other words, when you spoke to Mr. Liu you

8    were not -- another detective was not speaking to him

9    asking him questions, and you were not translating?

10        A    Well, it's like on off.  Sometimes a new

11   question asked about, or some inquiry, I do translate

12   for him a little bit.

13        Q    I'm talking about this particular case.

14        A    Yes, I'm talking about this case.  When some

15   people come up with some question -- well, how about

16   some question -- and ask Mr. Liu, and I translate for

17   him on and off.

18        Q    Do you remember what police officers or

19   detectives asked you to translate?

20        A    Counsel, this was lot of people out there.  I

21   cannot remember exactly what is --

22        Q    Well, the last witness, Detective Michael

23   Greene, did he ever ask you to translate on April 1st?

24        A    Yes, I did.  He did.  Like he is a detective

25   assigned to the case.  Some question I ask, he is one of

1

2     the detectives who asked a question.

3          Q     So in other words, he was there interviewing

4     Mr. Liu and then he asked you at times to translate?

5          A     Yes.

6                MR. KESSLER:  Objection.

7                THE COURT:  What is the objection?

8                MR. KESSLER:  The witness has indicated

9                he said he may have.  I don't think it was a

10               specific fact.

11               MR. SCHECTER:  Well, I'm going into

12               that, your Honor.  I believe I'm entitled to.

13               THE COURT:  Overruled.  Go ahead.

14               MR. SCHECTER:  Okay.

15         Q     And so Detective Greene, you translated for

16    Detective Greene when -- a little bit when he was

17    talking to Mr. Liu?

18         A     Yes, on and off.  Like I said a few, few

19    questions, or one or two.  Like --

20         Q     Okay.

21         A     Like I say, a lot of people out there so.

22         Q     And other detectives may have, may have used

23    you as an interpreter for Mr. Liu?

24         A     Yes, as long as Chinese detective available.

25    But sometimes they use me; sometimes they use other

```
 1                       Ng - People - Cross              846

 2     detective.

 3          Q     Did you ever ask Mr. Liu for a description of

 4     the two individuals?

 5          A     Yeah.  He give me briefly, yes.

 6          Q     What description did he give to you?

 7                     MR. KESSLER:  Judge, I object.  I ask to

 8                approach.

 9                     (Sidebar discussion off the record.)

10                     THE COURT:  Objection is overruled.

11          Q     Now, what description did Mr. Liu give you of

12     the two individuals on April 1st?

13          A     If I remember correctly, he gave me like a

14     male Chinese, Fukinese, Foo Chow people.

15          Q     Did you ask him for a height and weight

16     description of the two individuals?

17          A     No, I cannot remember exactly correctly.

18          Q     You may have, but you never marked it down?

19          A     No, I don't mark.  No, I didn't.

20          Q     Do you know if anyone else was present

21     writing down when you were asked --

22                     MR. KESSLER:  Objection.

23                     THE COURT:  Sustained.

24          Q     Now, from there you said you went to a

25     different location?
```