UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
HAI GUANG ZHENG,

                    Petitioner,

          -against-

WARDEN, SING SING CORRECTIONAL
FACILITY

                    Respondent.
-------------------------------------------------------x
DEARIE, District Judge.

**MEMORANDUM & ORDER**

16 CV 1166 (RJD)

          Before the Court is Petitioner Hai Guang Zheng's ("Petitioner") application for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted in 1996, after a jury trial

in New York Supreme Court, Queens County, of four counts of kidnapping in the first degree,

two counts of rape in the first degree, one count of kidnapping in the second degree, two counts

of sexual abuse in the first degree and one count of criminal possession of a weapon in the

second degree.  He was sentenced to an aggregate term of eighty-four years to life.[1]

          Petitioner's conviction arises out of the abduction of one man and two women at JFK

Airport in 1995.  As a result of entering the United States from China illegally in 1992, Petitioner

---

[1] The court sentenced Petitioner to four indeterminate terms of 25 years to life for the kidnapping counts—two
concurrent terms of 25 years to life with respect to each victim that were to run consecutively to each other.  two to
run concurrently with respect to one victim, two to run concurrently with respect to the other victim, and each
couple to run consecutively.  The court also sentenced Petitioner to indeterminate terms of imprisonment from eight
and one-third to 25 years on each rape and second-degree kidnapping count.  Finally, the court sentenced Petitioner
to indeterminate terms of imprisonment from two and one-third to seven years for each sexual abuse count and from
five to 15 years for the weapon possession count.  These sentences were to run consecutively to each other and to
the first-degree kidnapping sentence.

incurred a significant financial debt to his smuggler, AK Guan ("Guan"). Three years later, and still indebted to Guan, Petitioner agreed to meet Guan at JFK Airport on March 31, 1995 to pick up some of Guan's friends. When Petitioner arrived at the airport, Guan joined Petitioner in his car. At the same time, Guo Bang Liu ("Guo") and his wife Liu Yan Wu ("Liu"), arrived at JFK Airport from Los Angeles, California, and were greeted by Guo's sister, Jin Hao Liu ("Jin"), who lived in Manhattan. As Guo, Liu and Jin left the airport via limousine service, Guan directed Petitioner to cut off the car, at which point, Petitioner testified, Guan approached the car carrying a pistol. Trial Tr. 901:2-902:16 (Hai Guang Zheng). At trial, the victims gave conflicting accounts regarding whether both Petitioner and Guan or just Guan approached the car and whether one or both men were carrying guns. Trial Tr. 349: 17-350:5 (Guo Bang Liu); 395:5-396:4 (Jin Hao Liu); 451:19-23 (Liu Yan Wu). Ultimately, Guo, Liu and Jin were ordered out of their car and into Petitioner's car. While Petitioner was driving, Guan demanded Guo and Liu hand over their passports; however, when Guan examined the passports, he apparently realized he and Petitioner had abducted the wrong people. Trial Tr. 351:5-11 (Guo Bang Liu); 428:13-22 (Jin Hao Liu). Nevertheless, Petitioner continued driving and eventually stopped the car at a location near the Brooklyn Bridge. Guo was released, made his way to his family's apartment in Manhattan and went to the local police precinct with a family member. From Brooklyn, Petitioner and Guan drove the women to a basement apartment in Flushing, Queens where they were joined by a third man, Petitioner's codefendant. The victims testified that the codefendant was quite a bit shorter and heavier than the "tall" man driving the car—later identified as Petitioner. Trial Tr. 400:7-13 (Jin Hao Liu); 455: 22-25 (Liu Yan Wu). Guan left Petitioner and his codefendant in the apartment and instructed Petitioner to call the women's family and demand ransom money. Petitioner claimed that he protested, but Guan responded

that if Petitioner asked any questions or failed to follow instructions, he would kill Petitioner's family in China and send Petitioner back to China. Trial Tr. 905:4-10 (Hai Guang Zheng). The women spent the night in the apartment, but did not sleep because, as they later testified, they observed a gun next to Petitioner's pillow and feared for their safety. Trial Tr. 404:8-18 (Jin Hao Liu); 457:15-19 (Liu Yan Wu). Petitioner testified that after Guan left the apartment, he telephoned a friend, who told Petitioner to call the police. Trial Tr. 932:7-15 (Hai Guang Zheng). Petitioner did not call the police, he claimed, because he feared retribution from Guan. Id.

The women testified they were raped the next morning, one after the other, by Petitioner and his codefendant. Trial Tr. 403:4-408:2 (Jin Hao Liu); 457:22-465:21 (Liu Yan Wu). Petitioner raped Liu while the codefendant raped Jin and then Petitioner raped Jin while the codefendant raped Liu. Id. Liu testified that she resisted the "taller man," later identified as Petitioner, and thus was not sure where he ultimately ejaculated. Trial Tr. 494:4-495:9 (Liu Yan Wu). Liu testified that she was not strong enough to resist Petitioner's codefendant and he ejaculated in her vagina. Trial Tr. 465:7-18 (Liu Yan Wu). There was no testimony at trial confirming whether Petitioner ejaculated while raping Jin, and if so, where he ejaculated. Petitioner denies raping the two women.

According to Petitioner, he spoke to Guan the morning after the kidnapping, who was angry he had not yet demanded ransom from the women's family. Trial Tr. 933:8-24 (Hai Guang Zheng). Petitioner finally called the family and around 10:00 PM, more than 24 hours after the abduction, a family member transported $15,000 in a bag of groceries to 217 Henry Street in Manhattan. Because the family had already gone to the police, the calls between the women's family and Petitioner were recorded and traced and police were dispatched to the area

where the two women were held. Shortly after midnight, a detective observed two men and two women walk out of a house and get into a car. Trial Tr. 727:5-729:22 (Det. Steven Banks). The detective and his partner followed the car for a few blocks and then pulled up alongside it where they were able to confirm that the women resembled those in photographs provided to the police. Id. The detective arrested Petitioner and his codefendant and the women were taken to Beekman Hospital in Manhattan. Neither of the women had any physical bruising or scratching. Tests showed semen in Liu's vagina and on her underwear. There was semen found only in Jin's underwear. At trial, Liu testified that prior to her rape she had sexual intercourse with her husband two days earlier. Trial Tr. 499:17-501:13 (Liu Yan Wu). Jin testified that prior to her rape she had sexual intercourse in January 1995—approximately three months earlier. Trial Tr. 444:19-445:6 (Jin Hao Liu). Additional testimony revealed that spermatozoa can remain on the skin for "up to 72 hours" and on clothing for "years" and still elicit a "positive" test result. Trial Tr. 563:4-15 (Thomas Hickey).

Petitioner testified at trial and asserted his innocence. He confessed to kidnapping but explained he was acting under duress and feared for his own life as well as the lives and safety of his family in China. Petitioner testified that he never raped the women. Trial Tr. 911:2-18 (Hai Guang Zheng). Petitioner asked the trial court to instruct the jury on the defense of duress, which the court declined to do, noting Petitioner (i) "was free to go any time he wanted to. He had a phone. He left the place many, many times. He could have called the police. He could have left completely," and (ii) that the exception to duress for those who "intentionally or recklessly" place themselves in a situation where they will be subject to duress applied. Trial Tr. 996:20-998:21. Petitioner was convicted on July 8, 1996 on ten of the twelve charges against him.

Since his conviction, Petitioner has continuously asserted his innocence. Petitioner filed a direct appeal to the Appellate Division, Second Department. The Appellate Division vacated Petitioner's conviction of Sexual Abuse in the First Degree and his corresponding sentence, because no evidence pertaining to that count had been presented at trial, and otherwise affirmed Petitioner's conviction with respect to the kidnapping, rape and weapons charges. The Appellate Division concluded the trial court appropriately declined to instruct the jury on the affirmative defense of duress because "[v]iewing the evidence adduced at trial in the light most favorable to the defendant, there is no reasonable view of the evidence to support the defendant's claim of duress. The defendant failed to establish that the force or threat of force was capable of immediate exercise o[r] realization." People v. Hai Guang Zheng, 268 A.D.2d 443, 444 (2d Dept. 2000). Petitioner's motion for leave to appeal to the Court of Appeals was denied on June 15, 2000.

Since then, Petitioner has filed two motions in the trial court pursuant to NY CPL §§ 440.10 and 440.30 to vacate his conviction: first, claiming ineffective assistance of counsel as a result of his attorney's failure to have DNA evidence available at the time of his trial, and second, seeking post-conviction DNA testing. In both motions, Petitioner claimed DNA testing would exonerate him. On June 18, 2001, the trial court denied Petitioner's ineffective assistance of counsel claim because it was a record-based claim that should have been raised in Petitioner's direct appeal. The Appellate Division denied Petitioner's application for leave to appeal.

Petitioner filed his second motion to vacate pursuant to NY CPL § 440.30 on April 24, 2007, requesting DNA testing. The trial court denied Petitioner's motion on September 21, 2007, because Petitioner failed to show that there was a reasonable probability that the verdict would have been more favorable had DNA tests been performed— in light of other evidence

against Petitioner, including the victims' testimony regarding the circumstances of the rapes, even a negative DNA test result would not exonerate him. People v. Hai Guang Zheng, 2007 WL 2825997 (N.Y. Sup. Ct. Sept. 21, 2007). The trial court also concluded that the District Attorney's office satisfied its burden of establishing that, after over ten years, the rape kits could not be located, and, declined to draw an adverse inference on that basis. People v. Flax, 162 A.D.3d 1667, 1668 (4th Dept. 2018) (citing NY CPL § 440.30) (precluding "the court from drawing an adverse inference based on a purported failure to preserve evidence where…the People established that, despite their efforts, the physical location of the specific evidence is unknown"). The Appellate Division affirmed on January 19, 2010. People v. Hai Guang Zheng, 69 A.D.3d 878 (2d Dept 2010). The Court of Appeals denied petitioner's leave to appeal.

In 2016, Petitioner filed the instant petition claiming ineffective assistance of counsel for failing to conduct DNA testing, which he claims would have established his actual innocence. Petitioner also claims he was denied his right to a fair trial because the trial court refused to charge the jury on the affirmative defense of duress. Respondent argues Petitioner's claims are time-barred and also that his ineffective assistance of counsel claim is barred by independent and adequate state grounds because he failed to raise an ineffective assistance claim in his direct appeal to the Appellate Division. In any event, Respondent argues Petitioner's procedural errors should not be excused because he cannot demonstrate cause for the late filing of his Petition or prejudice resulting from the supposed errors, and, mistakes aside, Petitioner has not demonstrated the state court unreasonably applied clearly established Supreme Court precedent in denying his habeas claims. In sum and substance, Respondent cites to a record of compelling trial evidence corroborating Petitioner's participation in the charged crimes, including the fact that Petitioner readily confessed to a number of those crimes. And, with respect to the crimes to

which Petitioner did not confess, Respondent argues the credible evidence presented at trial supports Petitioner's guilt beyond a reasonable doubt.

As discussed below, Petitioner has not overcome the formidable burden required for this Court to grant habeas relief, because, even setting aside the fact that these claims are procedurally barred, Petitioner does not proffer a sufficient factual or legal basis to disturb the state court rulings denying his requests for relief. First, even if DNA evidence were available and tested negative for Petitioner's DNA, such a result would not exonerate him: there was ample evidence in the trial record from which the jury could have found Petitioner guilty of the charged offenses, including the two rapes. To that end, counsel's decision not to independently test the DNA evidence was strategically motivated, and a prudent exercise of caution and professional judgment, designed to reinforce to the jury the People's burden of proof and highlight reasonable doubt, rather than risk the possibility of a positive DNA test affirmatively establishing his client's guilt. Second, the evidence adduced at trial was insufficient to warrant a jury instruction on the affirmative defense of duress because the record reveals (i) Petitioner had multiple opportunities to escape the illicit activity, (ii) Petitioner intentionally and recklessly put himself in a situation where he was likely to be subjected to duress and (iii) the proffered threats were not sufficiently imminent to constitute duress. Accordingly, Petitioner cannot demonstrate a fundamental miscarriage of justice if his claim is denied, nor has he shown that the state court unreasonably applied clearly established Supreme Court precedent.

## DISCUSSION

I.     General Habeas Standards

*A. Threshold Requirements for Habeas Relief*

As an initial matter, a petitioner seeking federal habeas corpus relief faces a remarkably high hurdle, in large part because such "relief does not lie for errors of state law." Lewis v.

Jeffers, 497 U.S. 764, 780 (1990). Rather, "28 U.S.C. §2254 allows a court to entertain a habeas petition 'only on the ground that [an individual] is in custody in violation of the *Constitution or laws or treaties of the United States.*'" Garner v. Lee, 908 F.3d 845, 860 (2d Cir. 2018) (emphasis added) (quoting 28 U.S.C. § 2254(a)).

Procedurally, before a petitioner convicted in state court can bring bona fide federal claims to the habeas court, (i) the petitioner must exhaust those claims at the state level by fully and fairly presenting the substance of each claim to the highest state court, see 28 U.S.C.§ 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275 (1971) ("a state prisoner seeking federal habeas review of his conviction ordinarily must first exhaust available state remedies"); Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) ("the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court"), and (ii) the petitioner's claim cannot be procedurally defaulted—that is, the reviewing federal court cannot review a habeas claim that the state court denied based on an adequate and independent state procedural rule," Davila v. Davis, 137 S. Ct. 2058, 2064 (2017); Coleman v. Thompson, 501 U.S. 722, 729 (1991) (habeas claim is procedurally barred if it was decided "on a state law ground that is independent of the federal question and adequate to support the judgment.").

The exhaustion requirement is waivable only to the extent "there is an absence of available State corrective process" or "circumstances that render such process ineffective to protect the [petitioner's] rights." 28 U.S.C. §2254(b)(1)(B). On the other hand, a petitioner who fails to exhaust available state court remedies may nevertheless see his habeas petition denied, on the merits, by the reviewing federal court. 28 U.S.C. § 2254(b)(2).

The bar against review of procedurally-defaulted claims "ensure[s] that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." Martinez v. Ryan, 566 U.S. 1, 9 (2012). This bar applies "even where the state court has also ruled in the alternative on the merits of the federal claim," Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); see also Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original), unless the state court fails to "clearly and expressly state[] that its judgment rested on a state procedural bar," and that its merits-based finding was only an *alternative* ruling. See Garner v. Lee, 908 F.3d 845, 859 (2d Cir. 2018) ("While a state court may rest its judgment on a state procedural bar if it rejects the merits of a federal claim *only in the alternative*, . . . the Supreme Court has admonished that, when in doubt, courts should presume that the state court adjudicated the claim on the merits") (emphasis in original), cert. denied, 139 S.Ct. 1608 (2019).

Moreover, the state court's decision "must rest not only on an independent procedural bar under state law, but also on one that is adequate to support the judgment." Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), cert. denied, 552 U.S. 1150 (2008). A state procedural bar "is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the specific circumstances presented," id. (quoting, Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)). For example, the rule that a claim based upon a matter of record at trial must be raised on direct appeal and cannot be pursued in a motion for collateral relief under NY CPL § 440.10 is an "adequate" state procedural bar. Dominique v. Artus, 25 F. Supp. 3d 321, 333 (E.D.N.Y. 2014) (finding the rule that record-based claims

"cannot serve as the basis for relief [in a post-conviction motion to vacate] is firmly established and regularly followed in New York" (collecting cases)).

Importantly, although "adequacy is itself a federal question," Lee v. Kemna, 534 U.S. 362, 375 (2002) (internal quotation and citation omitted), the "[habeas courts'] function ... is not to ... peer over the shoulder of the state court judge ruling on questions of state law, Downs v. Lape, 657 F.3d 97, 101 (2d Cir. 2011) (internal quotations and citations omitted), cert. denied, 566 U.S. 1014 (2012). The habeas court need only decide "whether the state ruling falls within the state's usual practice and is justified by legitimate state interests, not whether the state court ruling was correct." Id.; see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law.").

Finally, the "independent and adequate state ground" bar may be excused only if a petitioner demonstrates either "cause" for failing to comply with the state rule and "actual prejudice" if the claim is not reached, or that a lack of federal review will result in a fundamental miscarriage of justice because he is actually innocent. Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 87 (1977). Typically, petitioners attempt to show "cause" through a claim of ineffective assistance of counsel, but to qualify as "cause" for this purpose the ineffectiveness claim must be independently exhausted. Edwards v. Carpenter, 529 U.S. 446, 452 (2000). If a petitioner fails to show cause the Court need not consider whether he would be prejudiced by the failure to reach his claim. Murray v. Carrier, 477 U.S. 478, 498 (1986).

*B. Substantive Review Standards*

The current habeas statute provides in relevant part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(1), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA").

The Supreme Court has repeatedly explained that this statute "erects a formidable barrier to federal habeas relief," Burt v. Titlow, 571 U.S. 12, 19 (2013), because it embodies "a foundational principle of our federal system: state courts are adequate forums for the vindication of federal rights . . . and are thus presumptively competent [ ] to adjudicate claims arising under the laws of the United States," id. at 19. Indeed, federal habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Id. at 16 (internal quotations, citations and alterations omitted). See also Virginia v. Le Blanc, 137 S.Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted); Renico v. Lett, 559 U.S. 766, 773 (2010) ("AEDPA [ ] imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt") (internal quotations omitted). But see Brumfield v. Cain, 135 S.Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief.") (internal quotation marks, citation and alterations omitted). Rather, "a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Shoop v. Hill, 139 S.Ct. 504, 506–07 (2019) (internal quotations and citations omitted). Accord Orlando

v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation and citation omitted). In short, "[i]f this standard is difficult to meet—and it is—that is because it was meant to be." Burt, 571 U.S. at 20 (internal quotations, citations and alterations omitted).[2]

Alternatively, under the less frequently invoked second branch of § 2254(d), a petitioner may seek habeas relief by challenging the factual basis of the adverse state court ruling. See 28 U.S.C. §2254(d)(2) (habeas court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings." Id. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). Further, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[3]

Ultimately, "[d]eciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of the facts requires the federal habeas court to train its attention on the particular reasons—both legal and factual—

---

[2] Although most claims involve the "unreasonable application" clause of §2254(d)(1), a petitioner occasionally invokes the "contrary to" clause, which requires that he show that the state court, when rejecting his claim, "directly contradict[ed] a holding of the Supreme Court." Evans. v. Fischer, 712 F.3d 125, 132 (2d Cir. 2013) (internal quotation and citation omitted), cert. denied, 571 U.S. 899 (2013).

[3] The Supreme Court and the Second Circuit have declined to address the relationship between §2254(d)(2) and §2254 (e)(1). See Brumfield, 135 S.Ct. at 2282 ("We have not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)") (internal quotation and citation omitted); Garguilio v. Heath, 586 F. App'x 764, 766 n. 1 (2d Cir. 2014).

why [the] state courts rejected a state prisoner's federal claims...and to give appropriate deference to that decision." Wilson v. Sellers, 138 S.Ct. 1188, 1191-92 (2018) (internal quotations and citations omitted). When the last state court decision is a simple affirmance, denial of leave, or otherwise not accompanied with reasons, Wilson "hold[s] that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." Id. at 1192.

II.    Analysis of Petitioner's Claims

    *A. Procedural Default*

      i. Time Barred

Respondent argues that Petitioner's claim is time-barred because, notwithstanding the one-year statute of limitations for bringing AEDPA actions, this petition was filed 16 years after the date on which Petitioner's judgment of conviction became final, and, even though Petitioner's post-conviction motions tolled the statute of limitations, they did so only during the pendency of such motions, resulting in well over a year untolled time. Petitioner, on the other hand, claims his tardy filing should be excused in light of (i) "continuous efforts to secure post-conviction relief," (ii) language barriers preventing him from performing research and drafting his papers, and (iii) erroneous advice that all efforts to secure post-conviction relief would toll the AEDPA statute of limitations. Petition, ECF No. 1, at 16.

Petitioner's post-conviction motions do not toll the statute of limitations for the entire 16-year period between his final judgment of conviction and the instant petition and the explanations Petitioner proffers to excuse this belated filing are insufficient. Equitable tolling is only appropriate in the "rare and exceptional" case where the petitioner "demonstrate[s] that he acted with reasonable diligence during the period he wishes to have tolled, but that despite his

efforts, extraordinary circumstances beyond his control prevented successful filing during that time." Romero v. Ercole, 2009 WL 1181260, at *2 (E.D.N.Y. Apr. 30, 2009); see also Holland v. Florida, 560 U.S. 631, 649 (2010); Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2010).

First, though the one-year statute of limitations does not count "the time during which a properly filed application for State post-conviction or other collateral review...is pending," there is no tolling if the relevant post-conviction motions are submitted after the limitations period has already expired. Doe v. Menefee, 391 F.3d 147, 154 (2d Cir. 2003). Petitioner's judgment of conviction became final on September 13, 2000. Petitioner filed a motion to vacate his conviction alleging ineffective assistance of counsel shortly thereafter, and the denial of that motion became final on October 9, 2001. Petitioner did not file his second post-conviction motion until April 2007, almost six years later, even though the AEDPA statute of limitations had run by roughly 2002.

Second, with respect to language barriers, "the diligence requirement of equitable tolling imposes on the prisoner a substantial obligation to make all reasonable efforts to obtain assistance to mitigate his language deficiency." Diaz v. Kelly, 515 F.3d 149, 154 (2d Cir. 2008). Petitioner does not aver any specific facts suggesting he made efforts to obtain language assistance "throughout the period he seek[s] to toll," and, in any event, Petitioner clearly had access to translation services to pursue his post-conviction motions, and thus cannot rely on a language barrier argument solely with respect to this federal action. Then v. Griffin, 2018 WL 2390124, at *5 (E.D.N.Y. May 25, 2018); Quezada v. Capra, 2015 WL 2130217, at *9 (S.D.N.Y. May 6, 2015) (no equitable tolling where petitioner "allege[d] in vague terms that he was unable to find, locate a knowledgeable person to assist him with his legal problems"); see also Cobas v. Burgess, 306 F.3d 441 (6th Cir. 2002) (no equitable tolling due to language difficulties where

petitioner "was able to file two post-conviction motions in state courts, as well as the instant habeas petition"). Indeed, whatever translation services Petitioner used for his post-conviction motions, he could have sought out for this petition.

Finally, "mere ignorance of the law is insufficient to support equitable tolling," and thus Petitioner cannot rely on "erroneous advice" to extend the one-year statute of limitations. Walker v. Graham, 955 F. Supp. 2d 92, 103 (E.D.N.Y. 2013) ("Courts in New York consistently have held that reliance on a jailhouse lawyer, or even on erroneous advice of a licensed attorney, does not qualify as an extraordinary circumstance warranting equitable tolling" (citing Baldayaque v. United States, 338 F.3d 145, 150-53 (2d Cir. 2003)); Then, 2018 WL 2390124, at *4; Worsham v. West, 2006 WL 2462626, at *2 (S.D.N.Y. Aug. 23, 2006) ("Mere ignorance of the law does not qualify as an extraordinary circumstance warranting equitable tolling in habeas cases"). Because this is not the "rare and exceptional" case where equitable tolling is appropriate, Petitioner's claims are time-barred.

ii. Independent and Adequate State Law Grounds

Even if Petitioner's claims were not time-barred, Respondent argues Petitioner's ineffective assistance of counsel claim is procedurally defaulted because it was rejected by the state court on independent and adequate state law grounds: in denying Petitioner's post-conviction ineffective assistance of counsel motion, the trial court held that Petitioner's claim was barred by section 440.10(2)(c) of the NY CPL because the claim could have been raised on Petitioner's direct appeal.

"Under New York law, if a criminal defendant fails to raise a record-based claim on direct appeal, before both the Appellate Division and the Court of Appeals, he is not permitted to otherwise collaterally attack his conviction with that claim." Boyd v. Saunders, 2018 WL

5313763, at *8 (E.D.N.Y. Oct. 26, 2018) (citing Aparicio v. Artuz, 269 F.3d 78, 91 (2d Cir.

2011)). An ineffective assistance of counsel claim is "record-based" where "a reviewing court

could conclude that defendant's counsel was ineffective simply by reviewing the trial court

record." Id. Petitioner's ineffective assistance of counsel claim is record-based because a

reviewing court could conclude by consulting only the trial record whether "there was a

reasonable possibility" that counsel's alleged error "might have contributed to the conviction"

United States v. Brutus, 505 F.3d 80, 88 (2d Cir. 2007). Accordingly, Petitioner's ineffective

assistance claim should have been raised on direct appeal and the trial court properly barred his

claim from review on procedural grounds, independent of any federal law. Notwithstanding, the

Court considers the merits of Petitioner's claims below.

### B. Actual Innocence and Ineffective Assistance of Counsel

Petitioner's assertion of actual innocence is packaged within an ineffective assistance of

counsel claim which relates to his trial attorney's decision not to conduct DNA testing of the

spermatozoa recovered from the victims' rape kits. Petitioner claims trial counsel should have

conducted DNA testing, and, relatedly, that the state court should have granted his post-

conviction motion for DNA testing, because such testing would establish his actual innocence.

Petitioner's ineffective assistance of counsel claim must be denied on its merits.

First, considering and then assuming Petitioner's claims are time-barred or that he has

procedurally defaulted on his ineffective assistance claim, Petitioner has not made the requisite

showing to excuse his default because no fundamental miscarriage of justice will occur if the

Court does not review his ineffective assistance of counsel claim. Even if DNA testing returned

a "negative" result, it is not "more likely than not" that no reasonable juror would have convicted

Petitioner. Second, issues of procedural default aside, Petitioner has not established that the trial

court decision denying his ineffective assistance of counsel claim and request to test DNA was contrary to clearly established Supreme Court precedent. Relatedly, Petitioner has not demonstrated the state court erred in denying his post-conviction motion for DNA testing. Not only were the rape kits missing by the time Petitioner made his 2007 motion for post-conviction DNA testing, but even if DNA tests were performed on the rape kits prior to trial, a negative result would not necessarily result in Petitioner's acquittal of the rape charges against him.[4] As discussed below, the evidence and testimony at trial revealed that Petitioner's spermatozoa would not necessarily appear in the victims' rape kits, even if he, in fact, raped the two women. Confronting this dilemma—where a negative DNA test result would not foreclose a rape conviction, but the possibility of a positive result would leave Petitioner defenseless—counsel made the strategic, prudent decision not to conduct DNA testing.

> i. Petitioner Has Not Demonstrated That Failure to Review His Claim Would Result in a Fundamental Miscarriage of Justice.

"Federal courts may address the merits of a claim that was procedurally defaulted in state court only upon a showing of cause for the default and prejudice to the petitioner." Bossett v. Walker, 41 F.3d 825, 828-29 (2d Cir. 1994). Absent cause and prejudice, "[a] federal court may review a procedurally defaulted claim...only if the petitioner demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). In the context of an ineffective assistance of counsel claim, this

---

[4] With respect to the missing rape kits containing DNA evidence, the District Attorney's office provided the state court with as much information as possible regarding the location of the rape kits, including affidavits from individuals who, at some time or another, had custody of the rape kits. The state court concluded the District Attorney's office satisfied its burden of establishing that the rape kits could not be located, and, indeed, NY CPL § 440.30(1-a)(b) "expressly precludes the court from drawing an adverse inference based on a purported failure to preserve evidence where...the People established that, despite their efforts, the physical location of the specific evidence is unknown." People v. Flax, 162 A.D.3d 1667, 1668 (4th Dept. 2018) (citing NY CPL § 440.30)).

means that the petitioner must show that his counsel's deficiencies were of constitutional proportions, likely resulting in or contributing to the conviction of an innocent person. See United States v. Spencer, 267 F. App'x 35, 37 (2d Cir. 2008) (where possible error "was of constitutional magnitude," court must inquire "whether there is a reasonable possibility that the error complained of might have contributed to the conviction" (quoting Brutus, 505 F.3d at 88)); see also Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002). To do so, the petitioner must establish "actual innocence"—that it is "more likely than not that no reasonable juror would have convicted him if the constitutional error had not occurred." Hernandez v. Goord, 2003 WL 23199521, at *14 (E.D.N.Y. Nov. 12, 2003) (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)). "Actual innocence means factual innocence, not mere legal insufficiency." Larcco v. Senkowski, 65 F. App'x 740, 742 (2d Cir. 2003) (quoting Dixon, 293 F.3d at 81).

To the extent Petitioner's ineffective assistance of counsel claim is time-barred or otherwise procedurally defaulted, he is unable to revive his claim in this Court. Petitioner contends that independent DNA testing would exonerate him; however, regardless of what such DNA testing may or may not have revealed, there was ample evidence of Petitioner's guilt presented at trial and that evidence was sufficient for a reasonable juror to readily conclude Petitioner was guilty beyond a reasonable doubt *even if* the DNA evidence tested negative for Petitioner's DNA. Indeed, (i) Petitioner confessed to all crimes except rape, and (ii) the evidence presented at trial indicated that a negative DNA test result would not foreclose Petitioner's guilt because Petitioner may not have ejaculated at all, or may have ejaculated on a surface that was not part of the victims' rape kits. Specifically, the trial record revealed the following:

- Eyewitness identification of the Petitioner by two of the victims. Trial Tr. 355:12-356:22; 391:23-25 (saw the defendant "immediately" during the lineup

identification and pointed him out in courtroom) (Guo Bang Liu); 400:7-401:23 (describing the defendant's physical appearance and pointing him out in the courtroom) (Jin Hao Liu).

- A physical description by the other female victim that matched Petitioner's physical appearance. 455:22-25 (Liu Yan Wu).

- Positive testing for spermatozoa on Liu's panties and vaginal swabs, Liu's testimony that her rapist gave her a cloth to "wipe" herself, Liu's testimony that she had sexual intercourse with her husband two days before the rape and testimony from an NYPD chemist that spermatozoa can stay in a female for up to 72 hours and spermatozoa on panties would "get a positive reaction" for "years". Trial Tr. 463:6-8 (Liu Yan Wu); 499:17-501:13 (Liu Yan Wu); 563:4-15 (Thomas Hickey).

- Liu's testimony that Petitioner did not ejaculate inside her vagina when he raped her, but somewhere "near her vagina," but that his codefendant ejaculated inside her vagina. Trial Tr. 463:12-17; 465:14-21; 495:7-496:11 (Liu Yan Wu).

- Jin's testimony that Petitioner raped her, positive testing for spermatozoa on her panties, and lack of any testimony regarding where Petitioner ejaculated while raping her.

- Highly credible testimony from the victims corroborated by the testimony from investigating and arresting police officers regarding the circumstances and details of the kidnappings.

- Petitioner's confession to all of the charged crimes, except for rape and sexual assault.

In defense, Petitioner's attorney highlighted (i) the absence of DNA testing linking the victims' rape kits to Petitioner, and (ii) that one victim provided only a physical description of her rapist without making an in-court identification. However, in light of the compelling evidence against him, even replacing Petitioner's first defense with an affirmatively "negative" DNA test result it is not more likely than not that no reasonable juror would have convicted him. Williams v. Bradt, 2016 WL 1273228, at *10 (E.D.N.Y. Mar. 30, 2016); see also Rivas v. Fischer, 687 F.2d 514, 541 (2d Cir. 2012) (reviewing courts must "consider all the evidence, old and new, incriminating and exculpatory, and, viewing the record as a whole, to make a probabilistic determination about what reasonable, properly instructed jurors would do"). A rational juror could conclude that, notwithstanding a "negative" DNA test result, Petitioner raped the victims but either (i) ejaculated on a surface that was not subject to rape kit testing, or (ii) did not ejaculate at all. This conclusion would be buttressed by Liu's testimony that, because she was pushing the "taller" rapist, he ejaculated outside her vagina, but because she was not strong enough to push her "shorter" rapist, the shorter rapist ultimately ejaculated inside her vagina. Petitioner's conviction was amply supported by the evidence and testimony at trial and declining to entertain Petitioner's procedurally defaulted claims would not result in a fundamental miscarriage of justice. Though a "positive" DNA test result would have unequivocally resulted in Petitioner's conviction, a "negative" result would clearly not have exonerated him.

ii. Petitioner Has Not Demonstrated the State Court's Decision Contravened Clearly Established Supreme Court Precedent.

Even setting aside Petitioner's belated filing and procedural default, Petitioner has not established that the state court decision denying his ineffective assistance of counsel claim contravened clearly established Supreme Court precedent. The Sixth Amendment guarantees a criminal defendant "the right...to have the Assistance of Counsel for his defense." U.S. Const.

amend. VI. This right guarantees the "*effective* assistance of counsel," McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added), meaning assistance that will ensure the defendant receives a fair trial, Strickland v. Washington, 466 U.S. 668, 686 (1984). To that end, the appropriate "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. To satisfy this benchmark inquiry, the petitioner must prove that counsel's representation "fell below an objective standard of reasonableness" with respect to "prevailing professional norms," or that because of deficiencies in counsel's representation, "there is a reasonable probability that...the result of the proceeding would have been different." Id. at 688, 690, 694 ("the court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and "must [ ] determine whether the [challenged actions or decisions] were outside the wide range of professionally competent assistance"). In other words, the petitioner must demonstrate counsel's ineffective representation resulted in prejudice. Id. at 692 ("[C]onstructive denial of the assistance of counsel altogether is legally presumed to result in prejudice").

To prevail on an ineffective assistance of counsel claim, "reasonable probability" of a different result means a "probability sufficient to undermine confidence in the outcome." Id. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," id. at 693, or that "counsel's deficient conduct more likely than not altered the outcome in the case," id. Instead, "a reasonable probability...sufficient to undermine confidence in the outcome" must focus on the reliability of the proceedings and whether, "consider[ing] the totality of the evidence," "the defendant has met the burden of

showing that the decision reached would reasonably likely have been different absent [counsel's] errors" while "exclud[ing] the possibility of arbitrariness, whimsy, caprice, nullification." Id. at 696.

With respect to whether counsel's representation "fell below an objective standard of reasonableness," there is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Pierotti v. Harris, 350 F. Supp. 3d 187, 195 (E.D.N.Y. 2018) (quoting Strickland, 466 U.S. at 689); see also Parisi v. United States, 529 F.3d 134, 141 (2d Cir. 2008); Green v. Lee, 964 F. Supp. 2d 237, 252 (E.D.N.Y. 2013) ("[A] reviewing court must avoid confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis"). For example, "strategic choices made by counsel after a thorough investigation…are virtually unchallengeable," and, even a less than complete investigation will generally warrant deference, at least "to the extent that reasonable professional judgment supports the limitations on investigation." Hernandez, 2003 WL 23199521, at *11 (citing Strickland, 466 U.S. at 690-91). This means that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id.

To prevail on an ineffectiveness claim already rejected by the state habeas court on the merits, a petitioner must show that "the state court applied Strickland to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002). The lens through which the reviewing court must analyze such a claim is doubly, and undeniably, deferential—the reviewing court must defer both to trial counsel's strategy, arguments and tactics, as well as the state court's judgment regarding the petitioner's ineffective assistance of counsel habeas claim. Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review of [state court]'s

decision is ... *doubly deferential* [because] [w]e take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of §2254(d)") (internal quotations and citations omitted) (emphasis added).

Here, as in Hernandez, counsel's alleged less-than-complete investigation and decision not to independently conduct DNA testing is entitled to deference because it was supported by "reasonable professional judgment." Hernandez, 2003 WL 23199521, at *11. What Petitioner viewed as his key to exoneration, counsel viewed as a strategic decision clearly executed to expose sources of reasonable doubt and highlight the People's failure to meet their burden of proof. See Trial Tr. 1025:13-22 (Defense Summation) ("Test the underwear. Test the spermatozoa. Send it for DNA testing...But the People did not do that. They had the burden of proving him guilty beyond a reasonable doubt. They have failed to do that as to these charges"); see also Greiner v. Wells, 417 F.3d 305, 320 (2d Cir. 2005) (court must "look for legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel"). The absence of a definitive DNA test result—positive *or* negative—allowed counsel to avoid the obvious perils associated with a positive test result and instead provided an opportunity to press the argument that the People's decision not to test the DNA demonstrated reasonable doubt, indicative of the weaknesses plaguing the prosecution's case. Trial Tr. 562:17-563:16 (Thomas Hickey); 1025:6-1027:11 (Defense Summation). Indeed, foreshadowing the prosecution's likely rebuttal—that Petitioner ejaculated on a surface not included in the rape kit, or did not ejaculate at all—counsel concluded that even a "negative" result would not foreclose a guilty verdict and chose instead to emphasize the People's substantial burden of proof and the reasonable doubt apparent from the untested DNA. Compare with Pavel v. Hollins, 261 F.3d 210, 223 (2d Cir. 2001) (citing Hart v. Gomez, 174 F.3d 1067,

1071 (9th Cir. 1999) (counsel's assistance was constitutionally ineffective where "having chosen to pursue a particular line of defense, counsel did not introduce readily-available evidence that would have corroborated that line of defense, and there was no plausible strategic reason for not introducing the evidence")).

In Pavel and Hart, counsel declined to, *inter alia*, call expert witnesses who were (i) "readily available" and (ii) could enhance a defense strategy with virtually no downside. Here, on the other hand, there was a very real possibility that the DNA test results would unravel the entire defense strategy and leave Petitioner defenseless. And, because the testimony (i) suggested Petitioner did not ejaculate on a surface that was ultimately part of the rape kit with respect to Liu's rape and (ii) did not indicate where and whether Petitioner ejaculated with respect to Jin's rape, a negative test result would not, by itself, exonerate him.

Even in cases of rape or sexual abuse, where physical evidence is preferred to avoid a "credibility contest," in this particular case, because the trial record contained persuasive proof of Petitioner's guilt, counsel made a reasoned and tactical choice to avoid the possibility of a positive DNA test that would affirmatively establish Petitioner's guilt. See Trial Tr. 1025:13-22 (Defense Summation). Compare with Pavel, 261 F.3d at 224 (failure to call medical expert to provide testimony regarding physical evidence in a sex abuse case constituted ineffective assistance because physical evidence should have been "a focal point of defense counsel's pre-trial investigation and analysis of the matter" but counsel instead "sat on his hands, confident that his client would be acquitted"). Petitioner's counsel did not "sit on his hands." Instead, counsel, cognizant of the weaknesses in his client's case, emphasized the *People's* burden of proving Petitioner guilty beyond a reasonable doubt and pointed to the *People's* failure to conduct DNA testing as an indication that they failed to meet their burden. Trial Tr. 1025:13-22 (Defense

Summation). The state court's alternative merits-based decision denying Petitioner's ineffective assistance of counsel claim was thus consistent with prevailing Supreme Court precedent and will not be disturbed.

### C. Denial of Fair Trial as a Result of Absence of Duress Charge

As a general matter, "due process does not require the giving of a jury instruction when such charge is not supported by the evidence." Blazic v. Henderson, 900 F.2d 534, 541 (2d Cir. 1990). "To overturn a state conviction on the basis of an erroneous jury charge, it must be established not merely that the instruction is undesirable, erroneous or even universally condemned, but it violated some right which was guaranteed to the defendant by the constitution." McColly v. Brunelle, 980 F. Supp. 691, 695 (W.D.N.Y. 1997) (citing Cupp v. Naughten, 414 U.S. 141, 146 (1973)); see also Davis v. Strack, 270 F.3d 111 (2d Cir. 2001). Indeed, "the jury instruction must by itself so infect the entire trial as to result in a conviction that violates [the defendant's] rights guaranteed by the Due Process Clause." Bass v. Scully, 1995 WL 347040, at *4 (E.D.N.Y. May 25, 1995) (citing Henderson v. Kibbe, 431 U.S. 145, 154-55 (1977)). This formidable burden "is especially great when [the petitioner's] claim is based on an omitted charge, rather than an erroneous one" because "the unlikely assumption that the jury *might* have reached a different verdict pursuant to additional instruction…is too speculative to justify the conclusion that constitutional error was committed." Id.

Under New York law, a duress instruction is appropriate "provided that any reasonable view of the evidence could support a finding of duress." Farrel v. Ercole, 2011 WL 8198114, at *22 (S.D.N.Y. Dec. 8, 2011) (citing New York v. Farnsworth, 65 N.Y.2d 734, 735 (1985)). NY Penal Law § 40.00 provides:

> In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was coerced to do so by the use or threatened use of

unlawful physical force upon him or a third person, which force or threatened force a reasonable firmness in his situation would have been unable to resist.

The coercion to commit an offense must stem from an *imminent* threat of physical force capable of "immediate exercise or realization," that does not merely indicate "danger of future harm." People v. Thompson, 825 N.Y.S. 2d 26 (1st Dept., 2006); People v. Staggieri, 251 A.D.2d 998, 998-999 (4th Dept. 1998). "[T]here must be no opportunity to escape, or abandon the commission of the crime, without suffering the use or threatened imminent use of physical force." Thompson, 825 N.Y.S. 2d at 26. The defendant bears the burden of establishing the defense of duress by a preponderance of the evidence. NY Penal Law § 25.00(2).

After a review of the trial record in this case, a duress instruction was not supported by the evidence and thus Petitioner has not been deprived of any right guaranteed by the Constitution. Any threats were not "capable of immediate realization," People v. Morrison, 133 A.D.3d 892 (2d Dept. 2015), and with respect to the rape charges specifically, there was no evidence that anyone directed Petitioner to rape the women or threatened any sort of physical force if Petitioner did not rape the women. Compare with Trial Tr. 969:12-17 (Q: [the codefendant] never held a gun on you or showed you any gun, did he?...A: Yes. Q: AK Guan never held a gun to you personally at any time, did he? A: No."). Moreover, if the defendant "ha[s] the opportunity to abandon the criminal activity and escape the alleged acts of duress" or where the defense "relie[s] on unspecific threats of violence at a future time," then a duress jury instruction is not appropriate. Id.; see also People v. Lane, 112 A.D.2d 247, 248 (2d Dept. 1985) (defense of duress not applicable where, "by his own testimony," defendant exited the apartment his coercer was robbing but "chose to wait outside for his coercer" rather than "abandon his criminal activity and escape his [coercer's] alleged acts of duress"); People v. Amato, 99 A.D.2d 495 (2d Dept. 1984) (defendant was left alone by his coercer for "five minutes" but "voluntarily

put himself back in a position where he could be subjected to duress"). Here too, (i) the alleged acts of duress were not capable of immediate realization—Petitioner testified he believed Guan's threats would be executed at a later time, and, as a matter of practical reality, Guan himself was in the United States when he made the alleged threats, and thus could not imminently harm Petitioner's family *in China*,[5] Trial Tr. 925:2-926:3; 969:12-17, and (ii) Petitioner had an "opportunity to abandon the criminal activity and escape the alleged acts of duress"—Guan left Petitioner within a few hours of the kidnapping and Petitioner could come and go from the house as he pleased, Trial Tr. 966:9-967:24 ("At first I was making phone calls inside...[l]ater on...I just left and made phone calls outside").

Furthermore, the defense of duress is not available where the defendant "intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress." Blount v. Napoli, 2012 WL 4755364, at *9 (E.D.N.Y. Oct. 5, 2012) (citing NY CPL § 40.00(2)). Petitioner's only contacts with Guan were in furtherance of illegal activity. Petitioner hired Guan to smuggle him into the United States illegally, agreed to pay Guan many thousands of dollars to do so, even though he could not afford it, and thus knew that by paying Guan to help him break the law, he would remain indebted to his lawless smuggler. Compare with People v. Campos, 108 A.D.2d 751 (2d Dept. 1985) (no duress defense where defendant went back to crime scene after already being threatened by cohort and thus intentionally and recklessly put himself in a position to be subjected, again, to duress).

Petitioner was not deprived of his right to fair trial because the state court did not instruct the jury on the defense of duress. The alleged threats were not sufficiently imminent, Petitioner

---

[5] Moreover, there was no evidence that Guan had the ability to immediately harm Petitioner's family in China through his association with someone physically closer to them.

had multiple opportunities to abandon or escape the criminal activity, *and* Petitioner intentionally placed himself into a situation where he could be subjected to duress.

## CONCLUSION

For the reasons discussed, Petitioner's application for relief pursuant to 28 U.S.C. § 2254 is denied in its entirety, and, because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
September 17, 2019

s/ Raymond J. Dearie
RAYMOND J. DEARIE
United States District Judge